UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,      :     CRIMINAL ACTION
                                     No. 15-10150-GAO
     Plaintiff,               :

          v.                   :

MITCHELL DANIELLS,             :

     Defendant.                :

: : : : : : : : : : : : : : : : : : : : : : : : : : : ::
```

BEFORE THE HONORABLE M. PAGE KELLEY,
UNITED STATES MAGISTRATE JUDGE
**DETENTION HEARING**

APPEARANCES:

```
For the United States         United States Attorney's Office
of America:                   BY:  GLENN A. MACKINLAY, AUSA
                              1 Courthouse Way, Suite 9200
                              Boston, MA  02210

For the Defendant:            Good Schneider Cormier
                              BY:  MICHAEL R. SCHNEIDER, ESQ.
                                   PHILIP G. CORMIER, ESQ.
                              83 Atlantic Avenue, 3rd Floor
                              Boston, MA  02110


                              U. S. District Court
                              1 Courthouse Way
                              Boston, Massachusetts  02210
                              Friday, June 17, 2016
                              12:19 p.m.
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**JANICE RUSSELL TRANSCRIPTS**
1418 Red Fox Circle
Severance, CO  80550
(757) 422-9089
trussell31@tdsmail.com

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  -- 17, 2016, and we're on the

3    record in Criminal Case No. 15-10150, the United States of

4    America versus Mitchell Daniells, the Honorable M. Page Kelley

5    presiding.

6              Would counsel please identify yourself for the record?

7              MR. MACKINLAY:  Good afternoon, your Honor.  Glenn

8    MacKinlay for the Government.

9              THE COURT:  Good afternoon, Mr. MacKinlay.

10             MR. SCHNEIDER:  Good afternoon, your Honor.  Michael

11   Schneider for Mitch Daniells, and along with me is Attorney

12   Phil Cormier.

13             MR. CORMIER:  Good afternoon, your Honor.

14             THE COURT:  How do you do.

15             Good afternoon, Mr. Daniells.

16             THE DEFENDANT:  Good afternoon.

17             THE COURT:  So we're here because Mr. Daniells had

18   previously consented to voluntary detention and now he's asked

19   for his hearing.  We did have a hearing previously.  I've

20   reviewed the transcript of that hearing and there was a witness

21   who testified and counsel for Mr. Daniells cross-examined him.

22             So I'm assuming that today we'll just hear argument.

23             I also have the filings of both the defendant with

24   several exhibits and the Government in opposition and I've

25   reviewed those.

1          MR. SCHNEIDER:  Thank you very much, Your Honor.

2          Yes, we are here today to ask that Mr., that your

3   Honor release Mr. Daniells on whatever conditions your Honor

4   deem appropriate, appropriate conditions, and we suggest that

5   there are, that, that there could certainly be appropriate

6   conditions that would make release totally the appropriate

7   thing to do today.

8          At the time that we originally assented to voluntary

9   detention the Government had filed an indictment charging

10  Mr. Daniells with, with one charge under 18 U.S.C. § 922(n).

11  Fairly recently, the Government has indicated that it now

12  intends to charge Mr. Daniells with one additional charge under

13  Section 922(a)(1)(A), which charges dealing in firearms.  I

14  would suggest that, you know, given that, given the fact that

15  the, the fact of this, of this new charge may require some

16  additional focus for our investigation, I would suggest under

17  Section 3142(e)(1) that there, that it really cannot be said

18  that there are no conditions or combination of conditions that

19  would reasonably assure Mr. Daniells' appearance in court to

20  respond to the charges or to reasonably assure the safety of

21  the community.

22          In addition, we've tried to indicate in our filings

23  that we have, you know, kind of the rudiments of an intelligent

24  release plan.  As we've indicated, Mr. Daniells is a 30-year-

25  old man.  I've spoken with a number of, of, of friends of

1  Mr. Daniells and family members and everyone suggests that,

2  says that Mr. Daniells is clearly someone who's extremely

3  intelligent, thoughtful, friendly, hard working, and I think

4  that's something that has been completely consistent with my

5  own experience of him.

6          Mr. Daniells grew up in Framingham, originally born in

7  Chicago, but grew up in Framingham.  He graduated.  He was

8  raised in Framingham.  His mother lives in Framingham.  He

9  graduated Framingham High School in 2004.  He worked in

10  Framingham for a period of time after graduating, working as a

11  pharmacy tech and working in detail in a variety of other jobs.

12  He's been working since pretty early on in his life and has

13  been working, and has been kind of hard at it for a long time.

14          He also attended, while living in Framingham, college

15  classes at Northeastern University and Mass. Bay Community

16  College, but for lack of funds was forced to stop going there.

17  Mr. Daniells is someone who I, who has informed me that he

18  wants to go back to college and, and get a degree.  He has an

19  interest in business management and he certainly has the

20  intelligence and education to be able to do that.  I don't

21  think there's any question about that.

22          As I indicated, he's been working all his life.  In

23  addition to the work that he did in Framingham, he also moved

24  out to be with his sister for a few years in Fort Collins,

25  Colorado and there, he worked, again, as a pharmacy tech at a,

1   at a pharmacy there.  He also got his commercial driver's

2   license and began working in the fracking industry and has

3   worked in fracking in Colorado, North Dakota, Texas, and

4   finally, Pennsylvania.  He's a very, been a very responsible

5   long-haul truck driver for a period of time after leaving the

6   fracking industry, which is extremely dangerous, demanding,

7   and, and hazardous work.  Mr. Daniells used his CDL, his

8   commercial driver's license, to work in the moving and storage

9   industry in Alexandria, Virginia, Gentle Giant, and also in

10  the, also out of Boston.

11       More recently, before he was picked up on the instant

12  charges, Mr. Daniells worked at Allied Builders Supply, which

13  is, I believe, a subsidiary of United Building Products, worked

14  out of their Framingham, their Framingham lot, their Framingham

15  office.  I've had an opportunity to speak to two of, to a

16  couple of Mr. Daniells' supervisors, someone named Mark -- I

17  forgot his last name -- but also, Alan Wallace I've indicated

18  in the papers that we filed and I would have to say that they

19  used nothing but superlatives to describe Mr. Daniells and the

20  fact that he was for them someone who is hard working, got

21  along well with others, extremely respectful of his supervisors

22  there, and someone that they really thought would be fit to

23  come back.  And I'll get into that a little further.

24       I mean, specifically, I, as I indicated, we have an

25  affidavit, my affidavit, that indicates my conversations with

1  Alan Wallace and a Mr. Hinckley.  There are jobs available.

2  They're actively hiring right now and all Mr. Daniells would

3  need to do would be to pass the same background check that he's

4  previously passed and I don't anticipate that that would be an

5  issue.  But it sounds like there are job openings readily

6  available and Mr. Daniells clearly would fit the bill.

7       One thing that's certainly striking when you look at

8  Mr. Daniells' background he has absolutely no record of

9  criminal convictions.  All I've seen on the record is simply

10 two 12-year-old or older continuances without a finding for

11 disorderly conduct and a simple assault and battery.  When you

12 look at his record, while there were a few assorted defaults,

13 it appears that they were all cleared up fairly, for the most

14 part, fair, fairly quickly.

15      There was an issue during the end of the detention

16 hearing, there was a notation on a pending case in Waltham

17 District Court that said, where the term "zero warrant" or "O"

18 and then the word "war" was repeatedly indicated on the docket

19 sheet and I think there was some suggestion that that might

20 have indicated that there were outstanding default warrants.

21 In fact, when I, when I made some phone calls I believe that I

22 clarified the fact that that really meant that there were zero

23 warrants outstanding.  It was simply Probation in Waltham doing

24 its job and making sure that there were no outstanding default

25 warrants.

1                There was -- there is one pending firearm possession

2      case and another charge out of Waltham District Court from an

3      incident in Weston.  At the time Mr. Daniells, according to the

4      police reports or the application for complaint, was sitting in

5      the backseat of a car when the driver had been pulled over.

6      When the officers, according to the police report, asked

7      whether anyone had any kind of weapons on them Mr. Daniells,

8      according to the report, volunteered the fact that he had a gun

9      and turned it over very respectfully and cooperatively to the

10     police.  He was nonetheless charged.  I would point out that at

11     the time -- and it's now become clear as a result of our

12     investigation and the discovery produced -- Mr. Daniells had a

13     valid license to carry out of the State of, or the Commonwealth

14     of Pennsylvania and I think it, he certainly would have had

15     reason to believe that he was not doing anything that would

16     have been unlawful.

17                Without getting into any of the details of the

18     Government's case against him, I do want to say I, I think

19     there's reason to believe that, that, you know, the, any

20     characterization of Mr. Daniells as an inveterate gun dealer is

21     simply something that the, I believe, the record simply will

22     show is simply not so.  The Government points to various

23     sociological data about kind of guns in, guns in cities and

24     guns in, in inner cities, in particular, and the fact this

25     generally poses a danger to the community.  As I pointed out

1  during the original detention hearing -- and I think the ATF

2  officer himself recognized it -- we have and we've seen it all

3  in the news recently a very complicated attitude in this

4  country and in Congress toward guns and gun possession.  It's

5  clearly both -- it's a Second Amendment right.  There are a lot

6  of states where the gun cultures are really considerably

7  different from the gun culture we have here in Massachusetts,

8  which has some of the harshest laws in the country.

9          From the information that I've developed through

10  speaking to a number of witnesses who knew Mr. Daniells well, I

11  think there is reason to believe that he had a very strong

12  interest in guns for sporting purposes, that he did use, that

13  he did go out with friends -- and I've spoken with at least two

14  witnesses who've confirmed this -- into the backwoods in

15  Pennsylvania and places where it was appropriate to shoot at

16  cans and other kinds of sort of improvised targets and that

17  that was something that he'd done.  There are a lot of people

18  in this Commonwealth who go to shooting ranges, of course, all

19  the time and that's considered legitimate.  And again, I

20  believe that Mr. Daniells' license to carry is still

21  technically, more than technically, it's still, in fact,

22  unexpired and he still has a license to carry in Pennsylvania.

23          So the other thing I would want to point out is that

24  while at the Wyatt Detention Center for the past year

25  Mr. Daniells has been extremely productive.  He's taken

1   advantage -- I think this is something that he's done for most

2   of his life and I think it's very consistent with his character

3   of someone constantly trying to better himself -- but he's

4   taken a number of programs there.  I've given you the

5   certificates.  Most recently -- and I could go through them,

6   but you have it in our filings -- he took a class in, in

7   kitchen work, living with others, anger, anger issues,

8   continuing sobriety, math classes, typing classes, parenting,

9   and most recently, he has a new certificate of rational

10  thinking, just how to think kind of critically and very, kind

11  of carefully and deliberately about the kinds of choices that

12  we all make in our lives.  And he's also been attending

13  religious services.  So I think he's used this time

14  productively.

15         The other thing that I will say is that he's -- well,

16  he's currently also taking, doing training in a barbering

17  program down at Wyatt.  And I know that almost every time that

18  I've tried to reach him on many afternoons or he's tried to

19  reach me and I've asked him to call me he's been involved doing

20  work in the kitchen there.

21         So I think he's been incredibly productive not just

22  taking classes, but actually doing work there and that's

23  consistent with someone who's really spent all of their adult

24  lives working hard.

25         Now Mr. Daniells has very strong support from his

1   family.  I've been in touch with his mom, Esther Daniells, and

2   his sister also named Esther Daniells.  They're both extremely

3   reputable people.  The mom works as an, as a data analyst and

4   management specialist for the Commonwealth of Massachusetts.

5   His sister, Esther, works in Cambridge, I believe it's at

6   Biogen -- it used to be at Genzyme -- and she has a biology

7   degree from Colorado State University.  They both indicated

8   that Mr. Daniells is completely welcome to go back and stay

9   with, stay at his mom's house in Framingham where he has deep

10  roots, contrary to, I would submit, to what the Government

11  suggests, and, you know, I think that that would be a very

12  appropriate residential placement.  In addition, based on the

13  information that we've provided, there's a job opening and I

14  think this would be an opportunity for him both to kind of get

15  out.  I mean, being down locked up in the kind of box that

16  Wyatt Detention Center is, albeit with their programs, is not

17  the same as being out and making an effort to get his life back

18  on track and I think that's really one of the strongest

19  arguments for his release.  I think we have an intelligent

20  release program, living with his mom, sister available, both of

21  them available to provide financial and emotional support.  He

22  has a job waiting at Allied Building Products, most likely,

23  and, you know, I would suggest that, you know, this is

24  something that should give your Honor some assurance that he

25  will appear in court as, as expected and that he really poses

1    no safety.

2         He does have, as I say, dreams of going back to

3    college and getting a degree.  That may have to be put on hold

4    for a little bit, but that's something, I think, he's thinking

5    about learning more about and trying to figure out how to

6    pursue that.  In addition, he's done volunteer work in the past

7    at the Boys & Girls Club.  I've been able to confirm that

8    through one independent source.  And I think he has an interest

9    in resuming some volunteer work either there or at a Salvation

10   Army in Framingham.  In addition, I think he wants to get kind

11   of reacquainted with his church and I think that would be a

12   part of what he would do in terms of release.

13        As far as the conditions of release, we haven't

14   proposed anything specific.  We're certainly open to anything

15   that would give your Honor an assurance that Mr. Daniells would

16   show up and wouldn't pose any kind of a danger and certainly

17   here and prepared to talk with you and Probation and, and the

18   prosecutor's office about conditions that might allow that to

19   occur.

20        But I would suggest that under 18 U.S.C. § 3142(e)(1)

21   it simply cannot be said that there aren't any appropriate

22   release conditions that could assure, that, that wouldn't

23   assure the, his appearance and the safety of the community and

24   I would ask that you release him.

25        THE COURT:  Thank you.

1          Yes.

2          MR. MACKINLAY:  We would, we would be in agreement

3   with the Pretrial Services that there are no conditions of

4   release based upon his danger and based upon his risk of

5   flight, both grounds, your Honor.

6          As I submitted in the filing to the Court, I'm going

7   to, I'll summarize briefly the issues relative to Mr. Daniells

8   being a danger and certainly the firearm trafficking that I've

9   harped upon.  I'm not going to harp on it again here, but

10  certainly, there are a number of guns involved, allegedly, as

11  many as 22 guns between what he purchased and, and some of

12  which have, have been recovered here in Massachusetts as well

13  as firearms that he had another person, straw purchaser,

14  purchase, who is cooperating with the Government and that he,

15  in fact, did sell one of those firearms within, just several

16  days later to an individual who is also cooperating here in

17  Massachusetts back against Mr. Daniells.  That weapon was also

18  recovered subsequently just a few days later as well from its

19  transportation from Pennsylvania at -- at the --

20          THE COURT:  I'm sorry.  As well as?

21          MR. MACKINLAY:  It -- it was --

22          THE COURT:  I just lost the last part of that.

23          MR. MACKINLAY:  Certainly.  It was trans, transported

24  a few days prior from Pennsylvania to Massachusetts by

25  Mr. Daniells where it was sold by him to Mr., to an individual,

1   Mr. Bailey, and then purchased by the ATF, which we have

2   recovered as well.

3          So there are multiple guns that have been recovered as

4   a result of either the purchase by Mr. Daniells in Pennsylvania

5   over the counter in his own name or by causing a straw

6   purchaser to also do the same.  And those weapons were

7   transported here and at least of the 22 guns, I believe I had

8   mentioned, 4 turned up in Massachusetts to date, 1 in New York

9   so far, and there may be 1 other weapon that may be -- that --

10  maybe 1 additional weapon in Massachusetts since the time, but

11  you get the idea.  There's a number of guns unaccounted for,

12  your Honor, and those cause potential danger as well.

13         With respect to the, the conduct, in addition to the

14  whole scheme of purchasing or causing others to purchase and

15  transport firearms that eventually sold in Massachusetts,

16  Mr. Daniells took another step that's a factor, I would

17  suggest, in the dangerousness as well and that is he removed

18  the serial numbers, which there's no good reason to do that but

19  to, obviously, cut, cut down on the accountability to be able,

20  of the police being able to go back and find out who it is that

21  was the original purchaser 'cause there's no serial number on

22  the gun.

23         Not only did he do that, but during the investigation,

24  following his arrest and the complaint, the ATF sought and

25  received from, from your Honor a search warrant for

1   Mr. Daniells' mother's place, which is the address of 28-C

2   Interfaith at Terrace, Terrace in Framingham, Massachusetts,

3   which is, I believe, the address that he's seeking now to be

4   released to.

5          So the ATF did a search warrant based upon their

6   entire investigation that turned up another witness and that

7   witness indicated that Mr. Daniells kept items at that address,

8   including, potentially, firearms, but also tools used to remove

9   the serial number, including a Dremel tool.  So when the ATF

10  did this search warrant with this new information from the new

11  witness who was identified after the arrest of Mr. Daniells

12  they found just that.  They found a Dremel tool, which was used

13  to remove the serial numbers like the cooperating witness had

14  indicated.  They found three sets of keys to a Taurus pistol,

15  security keys.  So they're firearms keys.  They found an ammo

16  box and they found certain attachments for this Dremel tool

17  that allowed the removal of the serial numbers, corroborating

18  the CW's information that that was done at that apartment, your

19  Honor.

20          More, more specifically, the CW indicated that not

21  only were the guns taken and transported from Pennsylvania to

22  that apartment, they, this individual left with Mr. Daniells

23  and went to another location in Framingham where he witnessed

24  the sale of one of those guns as well.

25          So I think what we have here is conduct that's very

1    serious in nature enlarging in scope and, obviously, dangerous

2    to the point of the firearms and the, and the conduct that was

3    conducted by Mr. Daniells.

4          Two of the firearms, again, I mentioned that were

5    recovered in the hands of persons identified by the Boston

6    Police Department as being gang members, including one that was

7    arrested during the course of the Columbia Point Sweep, which

8    was a significant gang investigation, wiretap investigation,

9    between the FBI and the Boston Police Department and other

10   various police departments and in which case one of the

11   firearms that I just mentioned that was purchased and

12   transported was recovered.

13         So we have several of the firearms recovered tied

14   directly to Mr. Daniells showing the breadth of his scheme and

15   the, and the ties to local criminals who may be using those

16   weapons to commit violent acts.

17         With respect to the risk of flight, your Honor, I

18   don't see that he has ties to this area.  I think he has more

19   ties to Pennsylvania and to other places, you know.  During the

20   course of the investigation it showed that he had multiple

21   driver's licenses in multiple locations that he had been

22   working and traveling.  I don't see the connection to this

23   particular area and the only connection would be the address

24   that we just discussed that the police determined he was

25   conducting his gun trafficking activities.

1          THE COURT:  Can I just ask you one question on that?

2          MR. MACKINLAY:  Uh-huh.  (Indicating an affirmative

3   response)

4          THE COURT:  I know he has lived in a lot of places and

5   has, I'll take your word that he has different driver's

6   license, etc., but I don't see any aliases used.

7          MR. MACKINLAY:  I don't, I don't have any and even in

8   his record I don't see any aliases --

9          THE COURT:  Okay.

10          MR. MACKINLAY:  -- your Honor.

11          THE COURT:  That's just -- I just wanted to verify

12   that.

13          MR. MACKINLAY:  I don't.  I --

14          THE COURT:  Okay.

15          MR. MACKINLAY:  I do see on his record where counsel

16   makes reference to a certain number of defaults, some that

17   appear to be technical defaults while on probation and some,

18   including the firearm case, I believe that default that exists

19   in the firearm case may be as a result of this case when he

20   came into our custody.

21          But more specifically with respect to the risk of

22   flight would be the following two factors:  No. 1, he was out

23   on bail on a firearm charge at the time that he committed these

24   offenses.  So he violated, certainly, the most important rule

25   and that is he ensured a state court judge on a possession-of-

1   a-firearm case that he would not commit a new crime.  He did

2   commit a new crime, according to the Grand Jury, anyway, at

3   least at this juncture, the possession of a different firearm

4   while under indictment, and also what I'm submitting we will be

5   charging him with gun dealing.

6          THE COURT:  So he was released in Waltham.  He was

7   released in about March of 2014?

8          MR. MACKINLAY:  He was.  He was released on bail in

9   that case and he was out on bail at the time that he committed

10  the sale on March 30, 2015 to Timothy Bailey and the other acts

11  that we discussed briefly were in the time leading up to that

12  as well.

13         So lastly, your Honor, he faces a guideline sentencing

14  range of approximately 70 to 87 months.  Now that's if a number

15  of enhancements, some of which may apply, some of which

16  Probation and the Court may not agree, but it's somewhere

17  between 70 and 87, is what the Government's calculation would

18  be if all of the enhancements were applied.  There's -- there's

19  -- there is some discussion that one or two of them may not

20  apply, which would reduce that somewhat to the area of 57 to

21  71, if, if at least one of them are not applicable.

22         THE COURT:  Is that with acceptance or --

23         MR. MACKINLAY:  It is.

24         One, one final point before I comment on a couple of

25  things counsel raised, your Honor, and that is, you know, there

1    is an element of sort of attempted witness tampering here and I

2    think that's an important factor for the Court to consider,

3    too, in terms of the defendant's conduct.  He -- you know, the

4    Government has recorded phone calls, two in particular, with

5    the straw purchaser which, you know, just characterizes,

6    essentially, Mr. Daniells asked the straw purchaser to lie to

7    the, to the ATF and, and not implicate Mr. Daniells in any of

8    the conduct and I think that speaks volumes to the type of

9    person that he is in terms of his accountability, your Honor.

10              With respect to the license to carry in Pennsylvania,

11   your Honor, that counsel references, I mean, we did produce

12   that evidence.  We, we believe that is accurate.  He did have a

13   license to carry.  Of course, it's irrelevant to the charges

14   here.  I don't take any position relative to the state charge

15   in Massachusetts firearm arrest that we just discussed out of

16   Waltham as to whether that's a factor there or not.  The bottom

17   line is it's not a factor here at all with the federal charges.

18              With respect to Mr. Daniells' comprehensive efforts at

19   the Wyatt Detention Center, I think that is certainly

20   noteworthy.  I, I read pretty detailed all of his efforts.  I

21   think those are steps in the right direction, but I don't think

22   they bear on release, your Honor.  I think they bear on

23   sentencing and mitigating factors at that point in the

24   proceeding and certainly not as a reason for him to be

25   released, given his track record and given the fact that he's

1  got conduct that's significant here.

2          And finally, your Honor, the case status.  I would

3  point out we have completed discovery relative to the new,

4  potential new charges or charging charges.  We have been before

5  the, the District Court when counsel and the defendant filed

6  this particular motion and he remanded the matter back to you

7  to address this particular issue, but we're going back before

8  the Court on, I think it's Monday, for a status conference,

9  which, essentially, will be pick a trial date or pick a plea

10  date and in either, either event will be adding additional

11  charge or charges prior to either a trial date or, you know,

12  during the course of any plea.

13          So I think there's no meaningful benefit to

14  Mr. Daniells at this juncture, given the track record that he

15  has and given the short time he has till the resolution of the

16  case.  I'd ask you to detain him on both grounds.

17          THE COURT:  Thank you.  Thank you.

18          Yes, Mr. Schneider.

19          MR. SCHNEIDER:  If I could just make a couple of

20  points.  And one thing I would ask to be able to do is also do,

21  bring up to your Honor -- and I'll show it to the prosecutor

22  first, to Mr. MacKinlay -- just a, a letter from Mr. Daniells

23  that he's handed me, along with a copy of that certificate of

24  completion of another program at, recently at, at Wyatt.  And I

25  just thought -- I know he would appreciate your Honor reading

1    it before you make any decision.

2           With respect to the facts alluded to by Mr.,

3    Mr. MacKinlay, I think substantively those are primarily

4    matters for another day and we'll address those.  We've

5    conducted our own investigation.  We think quite a number of

6    the facts may come out having a very different look based on

7    the information we have.

8           I certainly really question some of the guideline

9    calculation issues, even if the Government's evidence were, you

10   know, were clearly found to be credible either by a jury at a

11   trial or a Judge at sentencing, and that's something we

12   certainly will address at -- either -- either at trial or at

13   sentencing.

14          Again, you know, in terms of the sheer number of

15   firearms, I would just point out that there's no dispute that

16   14 of the firearms were legally purchased pursuant to

17   Mr. Daniells' license in Pennsylvania.

18          With respect to the issue of flight, again, I would

19   point out that Mr. Daniells has extensive ties.  He grew up in

20   Framingham.  His mom still lives there.  He's lived there off

21   and on for most of his adult life, even -- even when -- even

22   though he spent some time sort of searching for very honest and

23   highly remunerated work.  I mean, sometimes these jobs as a

24   long-distance truck driver for these fracking companies, you

25   know, they make anywhere in the vicinity of 60 to 120,000 a

1  year.  I mean, these are good, solid jobs, a lot of work

2  involved, but he's had an extensive history and there's

3  extensive work history in Framingham as well.  I think we have

4  some of the added assurances.  If there's any issue from

5  Pretrial Services, they can certainly check it out by speaking

6  with Ms., Mr. Daniells' mother, Esther Daniells, and, and, and

7  do whatever home visits.

8          And again, in terms of any conditions that are, that

9  your Honor would deem appropriate, we're certainly open to

10  discussing anything that would give your Honor an additional

11  assurance.

12          Oh.  But one thing I did want to do, your Honor is --

13  is, if I could --

14          THE COURT:  Yes, absolutely.

15          MR. SCHNEIDER:  -- hand this up to your Honor.

16          THE COURT:  Okay.  So I'm going to take this under

17  advisement 'cause I do want to study this.  And so that's what

18  I'm going to do and I hope to make a decision by the end of the

19  day today and issue -- I'll try to issue an order today, okay?

20          So I'm just taking this under advisement at this time.

21          Thank you.

22          MR. CORMIER:  Thank you.

23          MR. SCHNEIDER:  Thank you.

24          THE COURTROOM DEPUTY:  Court is in recess.

25      (Proceedings concluded at 12:49 p.m.)

1                          <u>CERTIFICATE</u>

2            I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    /s/ *Janice Russell*                    June 27, 2016

7    Janice Russell, Transcriber                  Date