```
            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )   Criminal Action
v.                                  )   No. 15-10150-GAO
                                    )
MITCHELL DANIELS,                   )
                                    )
        Defendant.                  )
                                    )


       BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
             UNITED STATES DISTRICT JUDGE
```

**HEARING**

```
    John J. Moakley United States Courthouse
              Courtroom No. 22
              One Courthouse Way
         Boston, Massachusetts  02210
            Thursday, June 30, 2016
                  10:02 a.m.


       Marcia G. Patrisso, RMR, CRR
           Official Court Reporter
       John J. Moakley U.S. Courthouse
       One Courthouse Way, Room 7209
         Boston, Massachusetts  02210
                (617) 737-8728

   Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: Glenn A. MacKinlay, Assistant U.S. Attorney
 3       John Joseph Moakley Federal Courthouse
         Suite 9200
 4       Boston, Massachusetts  02210
         On Behalf of the Government
 5
         GOOD SCHNEIDER CORMIER
 6       By: Michael R. Schneider, Esq.
             Philip G. Cormier, Esq.
 7       83 Atlantic Avenue
         Third Floor
 8       Boston, Massachusetts  02110
         On Behalf of the Defendant
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

|   |   |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  All rise. |
| 3 | (The Court enters the courtroom at 10:02 a.m.) |
| 4 | THE CLERK:  This is criminal matter 15-10150, *United States versus Mitchell Daniels*.  Court is in session.  Will the parties please identify themselves for the Court and for the record. |
| 8 | MR. MacKINLAY:  Good morning, your Honor.  Glenn MacKinlay for the government. |
| 00:09 10 | MR. SCHNEIDER:  Good morning, your Honor.  Michael Snyder for Mr. Daniels, and with me is Philip Cormier. |
| 12 | MR. CORMIER:  Good morning, your Honor. |
| 13 | THE COURT:  Good morning.  Mr. Schneider? |
| 14 | MR. SCHNEIDER:  Your Honor, without going over everything that's in all the materials, there are a number of points that I do want to just go back over and emphasize. Obviously we're here on an appeal of Magistrate Judge Kelley's detention order.  Originally we assented to voluntary detention after a detention hearing after Mr. Daniels's arrest.  At that |
| 00:10 20 | time there was only one charge pending against Mr. Daniels, which was under 18 U.S.C. Section 922(n).  The government has indicated that it is now planning on superseding with an additional charge. |
| 24 | The one thing I do want to point out is that the pretrial services report seems to indicate that there is a |


         1                    P R O C E E D I N G S
         2              THE CLERK:  All rise.
         3              (The Court enters the courtroom at 10:02 a.m.)
         4              THE CLERK:  This is criminal matter 15-10150, *United*
         5   *States versus Mitchell Daniels*.  Court is in session.  Will the
         6   parties please identify themselves for the Court and for the
         7   record.
         8              MR. MacKINLAY:  Good morning, your Honor.  Glenn
         9   MacKinlay for the government.
00:09   10              MR. SCHNEIDER:  Good morning, your Honor.  Michael
        11   Snyder for Mr. Daniels, and with me is Philip Cormier.
        12              MR. CORMIER:  Good morning, your Honor.
        13              THE COURT:  Good morning.  Mr. Schneider?
        14              MR. SCHNEIDER:  Your Honor, without going over
        15   everything that's in all the materials, there are a number of
        16   points that I do want to just go back over and emphasize.
        17   Obviously we're here on an appeal of Magistrate Judge Kelley's
        18   detention order.  Originally we assented to voluntary detention
        19   after a detention hearing after Mr. Daniels's arrest.  At that
00:10   20   time there was only one charge pending against Mr. Daniels,
        21   which was under 18 U.S.C. Section 922(n).  The government has
        22   indicated that it is now planning on superseding with an
        23   additional charge.
        24              The one thing I do want to point out is that the
        25   pretrial services report seems to indicate that there is a

1    second charge under 922(g), Count 2.  I believe that was
2    applicable to the codefendant and not to Mr. Daniels, if I'm
3    correct.
4         MR. MacKINLAY:  That's correct.
5         MR. SCHNEIDER:  In any event, obviously Magistrate
6    Judge Kelley denied on June 20th Mr. Daniels' request for
7    release on condition.  I would strongly ask your Honor to find
8    that there are indeed conditions of release that would ensure
9    both Mr. Daniels' continued appearance in court coupled with
10   the fact that there are conditions that would ensure that
11   there's no danger of -- any risk of safety to the community.
12        Magistrate Kelley, with respect to the issue of risk
13   of flight, comes out pretty strongly in her opinion to indicate
14   that she believed that Mr. Daniels has a strong family
15   presence, she says:  His mother lives in Framingham; his sister
16   and father who's here today, Irving Daniels who's in the back
17   of the courtroom, and his mother -- his sister, excuse me --
18   and his sister, Esther Daniels, are here today.  Both of them
19   live in Boston.
20        Mr. Daniels, as the magistrate indicated, has a long
21   personal history in Massachusetts in general, Framingham in
22   particular.  He grew up in Framingham, he graduated from
23   Framingham High School.  He worked, after graduating, in retail
24   as a pharmacy tech and in retail at a local pharmacy.  He
25   attended college classes at Mass. Bay Community College and

1  Northeastern University.  Actually, completed classes there.
2  And potentially has an interest in going on if he can put the
3  funds together to go eventually -- go back to college and get a
4  degree in business management or possibly the pharmacy area.
5       Mr. Daniels is a 30-year-old man.  He's extremely
6  intelligent.  He's very ambitious in his work life.  He's been
7  working hard all his life, something that we don't always see
8  that often in this court.  In addition to his work in pharmacy
9  and in retail in both Framingham and Fort Collins, Colorado, he
10 also worked in the fracking industry -- oil and gas fracking in
11 a number of states:  Colorado, North Dakota, Texas,
12 Pennsylvania.  He managed to get himself a commercial driver's
13 license which allowed him access to very well-paying jobs in
14 the fracking industry.  It also allowed him to get jobs in
15 moving and storage.
16      His most recent job has been at Allied Building
17 Products which is a subsidiary of United Builders Supply in
18 Framingham, Massachusetts.  I've had the opportunity to speak
19 with two of his former supervisors, most recently Alan Wallace,
20 who had nothing but really great things to say about
21 Mr. Daniels, the quality of his work, his willingness to work
22 with others, and his respect for both his supervisors and other
23 members of the company.
24      Mr. Daniels, as the magistrate pointed out, has a
25 very, very minimal criminal history.  It essentially involves

1      no criminal convictions.  There are two continues without a
2      finding of over 12 years old on his record.  He had a few
3      defaults.  They were subsequently removed.  There was
4      originally an issue about what the term "O" -- "OWARR" meant on
5      his record.  We subsequently clarified that and it's now become
6      clear that that meant that there was zero outstanding warrants.
7              He does have and did have at the time of his arrest
8      one pending charge in Waltham for possession of a loaded gun,
9      but it should be understood at the time he was seated in the
00:14 10   backseat of a car, the police officer asked whether anyone had
11     a weapon.  According to the police report, Mr. Daniels
12     volunteered that he had the gun.  There was no issue about that
13     in that case.
14              At the time Mr. Daniels had a license to carry that
15     was valid -- I think it's undisputed -- in Pennsylvania, and I
16     think he -- it could be understood that someone with a valid
17     license to carry in another state, especially one that has
18     reciprocity of numerous other jurisdictions, might have felt he
19     was simply doing nothing wrong.
00:15 20           With respect to his time at Wyatt, and I won't go into
21     the details because you have the certificates, but Mr. Daniels
22     has completed a number -- quite a number of programs, and I
23     think he shows a very healthy record of productivity down at
24     Wyatt.  Recently he's been taking math and typing classes, he
25     attends religious services, he does kitchen work, and he also

1   is learning to be a barber -- is taking the barbering program.
2              The magistrate indicated that because Mr. Daniels,
3   however, even though there was no flight risk was a danger to
4   the community based on the nature of the government's
5   allegations thus far.  Obviously, she relied on the
6   government -- the evidence that the government put forward in
7   its memorandum.
8              I would point out a couple of things:  First of all,
9   again, Mr. Daniels had a license to carry in Pennsylvania at
10  the time.  He was -- I think became sort of imbued with the
11  culture of guns in Pennsylvania.  This is a country that
12  obviously is very confused and very witted -- even our Congress
13  is -- about the meaning of guns in our society.  And I have
14  confirmed through speaking with other witnesses that
15  Mr. Daniels did, in fact, have a long history of going out in
16  the woods areas that were set aside for safe gun use and did
17  some target shooting and the like, and his friends went with
18  him for those sorts of things.  So I would ask that your Honor
19  put whatever evidence the government presents in that kind of
20  context.
21             In addition, I would suggest that the magistrate
22  overlooked possible conditions of release that would not only
23  ensure his appearance but would ensure the community's safety.
24  I think we can put together the basis -- the basics for a
25  release plan.  Mr. Daniels has been invited by his mother to

1  live with him in her Framingham apartment.  His sister, Esther
2  Daniels, has indicated in her affidavit that she would go out
3  to visit him frequently.  I think they both would provide, as
4  would Mr. Daniels, strong family and emotional support.  If in
5  the early stages he needed, you know, some assistance, they
6  would be there for him.
7       Again, I spoke specifically with the managers at
8  Allied Building Products and they indicated that there is a
9  job -- there are jobs there.  Drivers are badly needed.  And
10 Mr. Daniels was well liked.  And as long as he again passed the
11 background checks, in almost all likelihood there would be a
12 job waiting for him.
13      In addition, I know Mr. Daniels has done volunteering
14 in the past at the Boys and Girls Club and has indicated
15 interest to go back into the community in either some religious
16 venue or through the Salvation Army and do some volunteering.
17      I've also explored other conditions of possible
18 release including, you know, obviously the possibility of
19 either electronic monitoring, if that's something your Honor
20 was inclined to do or, alternatively, I did speak to Matthew
21 LeFrancois who is the executive director at Coolidge House, and
22 he indicated that while Coolidge House is primarily a
23 postconviction alternative, they have, in fact, accepted people
24 in Mr. Daniels's posture in the past, and that that's something
25 that could be worked out through the probation office if your

1  Honor had an inclination to do that.

2  So I would suggest in applying a de novo review of the
3  magistrate's decision, that your Honor could certainly find
4  that there are indeed conditions or a combination of conditions
5  of release that would ensure both that there's no risk of
6  flight and no danger to the community.

7  THE COURT: Okay. Before we hear from the government,
8  I think it would be useful for me to put on the record what
9  materials I have before me. I have reviewed the transcript of
10 both the evidentiary hearing held a year ago and the recent
11 oral argument; I have the respective submissions that are on
12 the docket from both the government and the defense including
13 the various affidavits supplied by the defendant.

14 I also have what appear to be two exhibits marked in
15 the evidentiary hearing, those are the two copies of the
16 complaints in the state actions, and I have a letter that
17 was -- a handwritten letter that was submitted by Mr. Daniels
18 dated 6/16 of this year. I think it was submitted at the last
19 argument.

20 And finally, I have a pretrial services report from
21 last year, it's dated 6/25/15, and a copy of a court of
22 probation inquiry to the state board done by, I believe, our
23 probation office which bears the date of 6/17 of this year. I
24 think that includes the universe.

25 Is there anything that I haven't mentioned that I

1  should have or anything that I've mentioned that I shouldn't
2  have?
3          MR. MacKINLAY:  No, your Honor.  I believe that's it.
4          MR. SCHNEIDER:  I believe that's it, thanks.
5          THE COURT:  So let me -- I guess my one question is to
6  the probation officer.  There's been no update of the formal
7  pretrial services --
8          MS. WALLS:  No, your Honor.  He's been in custody the
9  entire time and we've had no contact with him.
10         THE COURT:  So there's been no investigation of
11 residential possibilities?
12         MS. WALLS:  No, your Honor.
13         THE COURT:  The two state Waltham District Court
14 proceedings are, as I understand it, related to the same
15 incident?
16         MR. MacKINLAY:  They're not charged, your Honor.
17 They're related to the whole overarching case in the sense that
18 that firearm traced back to being purchased originally by
19 Mr. Daniels in Pennsylvania.
20         THE COURT:  No, but I'm just asking about the
21 relationship of the two district court proceedings to each
22 other.
23         MR. MacKINLAY:  Oh, I see.  Yes, they are.  I'm sorry.
24 Yes, we determined they were.  One charge was for possession of
25 a firearm, and then they went back and realized they could

```
 1   charge that it was loaded, and they went back and charged a
 2   second charge for the ammunition.
 3           THE COURT:  But it's for the same underlying episode?
 4           MR. MacKINLAY:  Yes, the same case.
 5           THE COURT:  Okay.  And those remain unadjudicated?
 6           MR. MacKINLAY:  Correct.  I think they're in default
 7   at this point.
 8           MS. WALLS:  Your Honor, they're in default due to his
 9   being in custody in this case.  He had a scheduled court
10   hearing and he missed it because he had been arrested in this
11   case.  So it's still open.
12           THE COURT:  Right.  And that's true of both of them.
13           I'm generally familiar with the state court forms and
14   abbreviations but I don't understand a couple of things here.
15   It may be that you can clarify.  The abbreviation -- there's a
16   list at the bottom of what are called "approved abbreviations,"
17   and then I see some that are not in that section.  C&E:  Does
18   anybody know what "C&E" means?
19           MR. SCHNEIDER:  Your Honor, can I ask -- is there
20   another copy?
21           THE COURT:  You want to look at it.
22           MR. SCHNEIDER:  That would be helpful.
23           THE COURT:  I'll just let you have these.  I think
24   that's the one I can't decipher, and it's the most common one.
25           (Pause.)
```

```
 1                THE COURT:  Do you have an idea?
 2                MS. WALLS:  Your Honor, Susanne Walls from probation.
 3    It's also one I've not seen, but the C&E on the second page --
 4    or on the third page, it looks like in the code there is a
 5    "DCE" which is discovery compliance --
 6                THE COURT:  Yeah.
 7                MS. WALLS:  -- and jury selection.  So "C&E" could be
 8    a modification of that.
 9                MR. MacKINLAY:  I believe I know what it is.  It's
10    "compliance and election," I think, with respect to election of
11    a jury trial and disposition.
12                THE COURT:  All right.  So it's equivalent, I guess,
13    to a status conference in our terminology.  Okay.
14                MR. MacKINLAY:  I won't belabor the point of going
15    through all of the information that I filed in the brief or
16    that the Court -- Magistrate Court wrote in her seven-page
17    decision except to say that none of the material provided by
18    counsel here today in the course of his argument is new.  These
19    are the same arguments that were presented at the earlier
20    proceeding before the magistrate court.
21                There are three points that I want to make relative to
22    that:  The case against the defendant is strong on the present
23    charge; it's strong on a future charge, whatever that might be,
24    whether that's a supplemental charge or whether it's a charge
25    that replaces the present charge but --
```

```
 1              THE COURT:  Do you think it's appropriate for me to
 2   consider possible future charges?
 3              MR. MacKINLAY:  I don't, your Honor.  The whole
 4   investigation is put to the Court because I think what's
 5   happening here is it gives the full extent of the conduct which
 6   goes to the criminal -- excuse me -- the dangerous nature of
 7   his actions which goes to the basis of the detention, your
 8   Honor.  So I'm not -- I'm describing it for that purpose and
 9   not for the purpose of saying we're going to charge something
10   else.  Counsel is well aware that we've discussed that.
11              THE COURT:  The current charge is 922(n).
12              MR. MacKINLAY:  Right.
13              THE COURT:  What's the range of punishment for that?
14              MR. MacKINLAY:  The maximum penalty under the statute
15   is five years, your Honor.
16              THE COURT:  And what would it be if you --
17              MR. MacKINLAY:  We've --
18              THE COURT:  (A)(1)(A).
19              MR. MacKINLAY:  Five years, your Honor.
20              THE COURT:  Same thing?
21              MR. MacKINLAY:  Dealing in firearms without a license
22   or conspiring to do the same would be a five-year maximum as
23   well.
24              So the three points, your Honor, that I would like to
25   make is the case against the defendant is strong but the
```

1  efforts that he made upon being confronted with the evidence;
2  in other words, he took steps to cover his tracks both in the
3  underlying offense by resorting to obliterating the serial
4  numbers from the weapons that he was illegally selling in an
5  effort to stop the trail or the tracing back to the purchaser,
6  which in the case of 14 guns, was himself.  In the case of the
7  straw purchaser, it was someone he had put up to purchasing
8  guns on his behalf.
9       So not only did he remove the serial number, again,
10 escalating the dangerous conduct, efforts to cover his tracks,
11 when the government did a search warrant after he was placed
12 under arrest, based upon more information that we received from
13 additional witnesses, a search of none other than his mother's
14 house, the house that he's now suggesting that he go be
15 released under conditions of supervision, we found tools used
16 to remove the serial number and other firearm-related materials
17 there, gun box, gun keys and the like, corroborating the
18 information from the cooperating witness that that was the
19 location that Mr. Daniels was using in his gun trafficking
20 activities.
21      Secondly, your Honor, in terms of the straw purchaser,
22 upon the investigation conducted by the ATF, Mr. Daniels on two
23 separate recorded calls spoke to the straw purchaser who was in
24 the presence of the ATF at the time and in essence told the
25 straw purchaser to lie to the ATF and minimize Daniels' role in

1  all of that.

2  The final point that I'd make, and I think it's the
3  strongest point, at least it was for the magistrate judge, as
4  we've been discussing, Mr. Daniels was out on bail on a firearm
5  case, on a firearm that traced back to him from Pennsylvania
6  from March 17, 2014, at the time of his commission of the
7  conduct here in 2015, the presently charged offense, March 30,
8  2015.  So he's out on bail on a related firearm-type case where
9  he promised the Court that he would not commit any new crimes,
10 committed new crimes including the crime charged in the
11 indictment.

12 I think that's the strongest point to show that he's
13 certainly not going to be a good candidate for release.  The
14 underlying conduct is troubling, it's extensive, and I would
15 suggest that he's a danger to the community and no conditions
16 of release are appropriate in this case.

17 THE COURT:  Okay.  Anything else?

18 MR. SCHNEIDER:  No, your Honor, just that there
19 were -- there were issues about the alleged straw purchaser and
20 his credibility.  I think there is evidence to suggest from the
21 discovery that he had some credibility problems in his initial
22 discussions himself with ATF.

23 THE COURT:  Just on the subject of the straw
24 purchaser, my clerk has noticed that his Pennsylvania address
25 appears in the transcript of the evidentiary hearing.  I don't

1    know whether his identity is still confidential or not public,
2    but the government may want to review what's in the public
3    record.
4             MR. MacKINLAY:  Thank you.
5             THE COURT:  Okay.  I'll take the matter under
6    advisement.
7             MR. SCHNEIDER:  Thank you, your Honor.
8             THE CLERK:  All rise.
9             (The Court exits the courtroom and the proceedings
10   adjourned at 10:28 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    C E R T I F I C A T E
 2
 3         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of
 4   the United States District Court, do hereby certify that the
 5   foregoing transcript constitutes, to the best of my skill and
 6   ability, a true and accurate transcription of my stenotype
 7   notes taken in the matter of Criminal Action No. 15-10150-GAO,
 8   United States of America v. Mitchell Daniels.
 9
10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter
12
     Date:  9/14/16
13
14
15
...
25
```

C E R T I F I C A T E

I, Marcia G. Patrisso, RMR, CRR, Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of Criminal Action No. 15-10150-GAO, *United States of America v. Mitchell Daniels*.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

Date:  9/14/16