UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                          )
UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )    Criminal Action
v.                        )    No. 15-10150-GAO
                          )
MITCHELL DANIELLS,        )
                          )
        Defendant.        )
                          )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY ONE
EVIDENTIARY HEARING

John J. Moakley United States Courthouse
Courtroom No. 22
One Courthouse Way
Boston, Massachusetts  02210
Thursday, June 22, 2017
11:19 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 7209
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Glenn A. MacKinlay and Timothy E. Moran,
3              Assistant U.S. Attorneys
               Timothy
4         John Joseph Moakley Federal Courthouse
          Suite 9200
5         Boston, Massachusetts  02210
          On Behalf of the Government
6
          LAW OFFICE OF GORDON W. SPENCER
7         By: Gordon W. Spencer, Esq.
          945 Concord Street
8         Framingham, Massachusetts  01701
          On Behalf of the Defendant
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2                 Direct  Cross  Redirect  Recross

3   WITNESSES FOR THE
      DEFENSE:

4
    MICHAEL SCHNEIDER
5
      By Mr. Spencer        7              141
6     By Mr. MacKinlay              108

7                   E X H I B I T S

8
    GOVERNMENT'S
9    EXHIBIT     DESCRIPTION                 FOR ID   RECEIVED

10  20   Transcript of detention hearing              118

11  21   Discovery letter with photograph             120

12  22   Email to Mr. Schneider from Mr. MacKinlay
           dated 6/18/15                              122
13
    23   Proffer agreement dated 7/6/15               124
14
    24   Certified records from Central Falls pertaining
15         to the defendant                           131

16  25   Email to Mr. MacKinlay from Mr. Schneider dated
           8/7/15                                     138
17
    DEFENDANT'S
18   EXHIBIT

19  1    Attorney notes                               10

20  2    Memorandum dated 5/15/16                     16

21  3    Memorandum dated 8/5/16 marked privileged and
           confidential                              23
22
    4    8/4/15 email thread between Attorney Schneider
23         and AUSA MacKinlay                         30

24  5    "Apple versus the FBI:  Understanding iPhone
           Encryption.  The Risks for Apple and Encryption."  35
25
```

| | DEFENDANT'S | | | |
|---|---|---|---|---|
| | EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
| 6 | | 8/7/15 attorney notes from Wyatt visit | | 46 |
| 7 | | Letter to Mr. Daniells from Mr. Schneider dated 4/18/16 | | 46 |
| 8 | | Notes of telephone conference dated 4/2/16 | | 49 |
| 9 | | Letter to Mr. Daniells from Mr. Schneider dated 5/3/16 | | 53 |
| 10 | | 3/9/16 note sent to file detailing 3/8/16 meeting | | 58 |
| 11 | | Letter to Mr. Daniells from Mr. Schneider dated 3/10/16 | | 59 |
| 12 | | Letter to Mr. Daniells from Mr. Schneider dated 3/15/16 | | 62 |
| 13 | | Letter to Mr. Schneider from Mr. Daniells | | 63 |
| 14 | | Letter to Mr. Schneider from Mr. Daniells dated 5/4/16 | | 65 |
| 15 | | Schneider memo to file dated 8/9/16 re meeting with Mr. Daniells | | 78 |
| 16 | | Cover letter for discovery package | | 82 |
| 17 | | ATF incident report dated 5/20/15 | | 87 |
| 18 | | Attorney notes on discovery issues | | 101 |
| 19 | | Attorney notes dated 8/9/16 | | 103 |
| 20 | | Transcript of detention hearing | | 117 |

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  All rise.
 3          (The Court enters the courtroom at 11:19 a.m.)
 4          THE CLERK:  The United States District Court for the
 5  District of Massachusetts.  Court is in session.  Be seated.
 6          For an evidentiary hearing in the case of United
 7  States v. Mitchell Daniells, 15-10150.  Would counsel identify
 8  yourselves for the record.
 9          MR. MacKINLAY:  Good morning, your Honor.  Glenn
10  MacKinlay on behalf of the government.
11          MR. MORAN:  And Timothy Moran for the government, your
12  Honor.  Good morning.
13          MR. SPENCER:  And Gordon Spencer on behalf of the
14  defendant, Mr. Mitchell Daniells.
15          THE COURT:  All right.  Who is present.
16          MR. SPENCER:  I'm sorry?
17          THE COURT:  Who is present.
18          MR. SPENCER:  Who is present.  I'll remember that next
19  time.
20          THE COURT:  I was just looking for the -- this is an
21  evidentiary hearing on two motions by the defendant to exclude
22  certain evidence on the claim of -- that the evidence was
23  improperly disclosed by prior counsel to the government.  So
24  they're the defendant's motions.  Mr. Spencer, I think you have
25  the laboring oar, at least at the beginning.
```

00:04 (line 10)
00:05 (line 20)

1          MR. SPENCER:  I agree.

2          THE COURT:  Go ahead.

3          MR. MacKINLAY:  Your Honor, I just have one

4   preliminary matter.  I know the Court's well aware of it but I

5   just want to make sure we're all on the same page, that the

6   affidavit submitted in the evidence in support of the motions

7   are not evidence before the Court absent of someone testifying

8   and being subject to cross-examination.

9          The First Circuit's recently decided that case and

00:06 10   confirmed that position in the *Phillipos* case, 849 F.3d 464 in

11   2017, essentially holding that if a person submits an

12   affidavit, they have to testify in order for that affidavit to

13   be admissible and be subject to cross-examination accordingly.

14          THE COURT:  Well, okay.  I'll take note of the case to

15   the extent it applies.  I'll take your word for it that it

16   applies to some degree.  My hesitation is it may depend on the

17   context of what issue is being resolved.

18          MR. MacKINLAY:  I understand.

19          THE COURT:  So go ahead, Mr. Spencer.

00:06 20          So Mr. Daniells calls Attorney Michael Schneider.

21              MICHAEL SCHNEIDER, duly sworn

22          THE CLERK:  Have a seat.  State your name and spell

23   your last name for the record.

24          THE WITNESS:  My name is Michael Schneider,

25   S-C-H-N-E-I-D-E-R.

```
 1              MR. SPENCER:  May I inquire?

 2              THE COURT:  Please.

 3                        DIRECT EXAMINATION

 4   BY MR. SPENCER:

 5   Q.   Good morning, sir.

 6   A.   Good morning.

 7   Q.   And are you employed?

 8   A.   Yes, I am.

 9   Q.   What is your occupation?

10   A.   I'm a lawyer.

11   Q.   How long have you been practicing law?

12   A.   Since 1983.

13   Q.   And what law school did you go to and when did you -- or

14   you actually said when you graduated.  What law school did you

15   go to?

16   A.   Columbia Law School.

17   Q.   And the jurisdiction, federal and state, where you're

18   licensed to practice law?

19   A.   I'm licensed to practice law in Massachusetts, New York,

20   the District of Massachusetts, the First Circuit, the D.C.

21   Circuit, and the Supreme Court.

22   Q.   Do you take federal appointments to represent indigent

23   defendants under the Criminal Justice Act?

24   A.   Yes, I do.

25   Q.   How long have you been accepting appointments in that
```

1    capacity?

2    A.   I'm not quite sure, but probably about six, eight years,

3    maybe a little more.

4    Q.   Now, have we met before today?

5    A.   No.

6    Q.   Have we spoken over the phone?

7    A.   Yes.

8    Q.   Over the last month or so?

9    A.   I remember maybe one or two phone calls.

00:08 10   Q.   Okay.  Drawing your attention to June 18th of 2015, did

11   you have an occasion to receive an appointment to represent a

12   Mr. Mitchell Daniells?

13   A.   Yes.

14   Q.   And would that be on Criminal Action 15-10150-GAO?

15   A.   I assume that number is correct.

16   Q.   Okay.  And do you see Mr. Daniells in the courtroom?

17   A.   Yes, I do.

18   Q.   And could you please indicate your former client?

19   A.   He's the gentleman at the defense table.

00:08 20         MR. SPENCER:  And may the record reflect he's

21   identified Mr. Daniells.

22         THE COURT:  All right.

23   BY MR. SPENCER:

24   Q.   Do you recall being in court on June 18, 2015, for his

25   initial appearance?

1    A.    Yes, I do.

2    Q.    Do you have any recollection on that day receiving any

3    property on his behalf?

4    A.    I don't have a specific recollection.

5    Q.    At some point after June 18, 2015, were you made aware

6    that Mr. Daniells had a cell phone in his possession at the

7    time of his arrest?

8    A.    Yes.

9    Q.    Who made you aware of that?

00:09 10   A.    Either the paperwork or Mr. Daniells or the government.  I

11   don't remember.

12   Q.    Were you aware as of the date of the initial appearance

13   that Mr. Daniells had an IPhone 5s?

14   A.    I later learned that it was an IPhone 5s, but I knew that

15   there was a cell phone.

16   Q.    Okay.  And you took notes regarding your initial

17   appearance that day, right?

18   A.    I did.

19            MR. SPENCER:  Okay.  May I approach, your Honor?

00:09 20            THE COURT:  You may.

21            MR. SPENCER:  Page 1 of the disclosure.

22   BY MR. SPENCER:

23   Q.    I'm showing you a document.  Take a look at it.  Can you

24   tell me if you recognize what that document is?

25   A.    This looks like my rough notes of either speaking with

 1   Mr. Daniells in the lockup probably prior to or after the first

 2   appearance in court.

 3   Q.   And how do you know that to be the case?

 4   A.   I see a date that says "6/18/15" on the left-hand side.

 5   Q.   Is that your handwriting?

 6   A.   This looks like my handwriting, yes.

 7   Q.   Okay.

 8        MR. SPENCER:  I would like to introduce this document.

 9        MR. MacKINLAY:  No objection.

00:10 10        THE COURT:  All right.  Exhibit 1.

11        MR. SPENCER:  Exhibit 1.

12        THE CLERK:  We'll mark this as Defendant's Exhibit 1

13   as received.

14        (Defendant's Exhibit No. 1 received into evidence.)

15        THE COURT:  Are you going to use it?

16        MR. SPENCER:  I'm going to use it for a brief second.

17   I have another copy.

18        THE COURT:  No, that's all right.  I just wanted to

19   get a sense of it.  That's all.

00:11 20        Paul.

21        (Discussion off the record.)

22   BY MR. SPENCER:

23   Q.   So we've just shown -- you've Identified what has been

24   admitted into evidence as Exhibit 1 as your notes.  Do you see

25   that on the screen?

1   A.   I see my notes, yes.

2   Q.   Okay.  And I just want to direct your attention just real

3   briefly to the left-hand corner.  Do you see where you wrote

4   the letters "iPhone 5"?

5   A.   Yes.

6   Q.   All right.  And would that refresh your recollection as to

7   whether or not you were made aware on the date of his initial

8   appearance that Mr. Daniells had an iPhone 5 in his possession?

9   A.   I think this probably means that Mr. Daniells had had an

00:11 10   iPhone 5 in his possession.

11   Q.   Okay.  Fair enough.  Thank you.

12        MR. SPENCER:  I'll hand this back to you.

13   Q.   Were you also made aware at some point after you learned

14   that Mr. Daniells had an iPhone 5 in his possession that the

15   phone was passcode-protected?

16   A.   I remember that coming out at some point later on.

17   Q.   Right.  I'm not trying to find out when, just some point

18   during the representation --

19   A.   At some point I learned that, yes.

00:12 20   Q.   And would that have been told to you by Mr. Daniells, that

21   there was a passcode on the phone?

22   A.   Probably.  And I probably learned it from the government

23   as well.

24   Q.   Now, do you deny on August 7, 2015, you provided the

25   United States Attorney's Office with the passcode of Mitchell

1  Daniells' iPhone 5?

2  A.   I don't deny that.

3  Q.   And do you admit that you would have only gotten that

4  passcode from Mr. Daniells?

5  A.   Yes; that's true.

6          THE COURT:  Excuse me just a minute.  My screen is

7  frozen here.

8          (Pause.)

9          THE COURT:  Sorry about the technical difficulties but

00:16  10  I think we may need an IT person.  We'll take a short break.

11          THE CLERK:  All rise for the Court.  The Court will

12  take a short recess.

13          (The Court exits the courtroom and there is a recess

14  in the proceedings at 11:31 a.m.)

15          (The Court enters the courtroom at 11:35 a.m.)

16          THE CLERK:  For a continuation of the Daniells

17  evidentiary hearing.  Be seated.

18          MR. SPENCER:  All set?

19          THE COURT:  Okay.  Yes, I think we are.

00:20  20  BY MR. SPENCER:

21  Q.   Good morning again.

22  A.   Good morning.

23  Q.   So I think where I left off, I asked you if the only

24  person you could have gotten the passcode was -- would be from

25  Mr. Daniells?

1    A.    Yes.

2    Q.    And at the time that you received this passcode somewhere

3    between June 18th and August 7th of 2015, did you believe you

4    had an attorney-client relationship with Mr. Daniells?

5    A.    Of course I did.

6    Q.    Okay.  And based upon your 30-some-odd years of training

7    and experience, did you have an understanding at the time that

8    all client communications are considered to be confidential

9    with the exception of the commission of future crimes?

00:20 10   A.    Yes.

11   Q.    And that means that these communications are privileged,

12   right, to your understanding?

13   A.    Yes.

14   Q.    Okay.  And did you realize at the time that you disclosed

15   the passcode on August 7, 2015, that you were under an ethical

16   obligation not to disclose that unless you first had your

17   client's consent?

18   A.    Yes.

19   Q.    Okay.  Did you believe as of August 7, 2015, that you were

00:21 20   also under a constitutional duty not to disclose that passcode

21   without Mr. Daniells' consent?

22   A.    Yes.

23   Q.    Meaning based upon your experience and training, you were

24   aware of the Sixth Amendment at the time, right?

25   A.    Yes.

 1    Q.   And also based upon your training and experience, do you

 2    agree that if you gave the passcode to the government without

 3    Mr. Daniells' consent and that evidence was used against him at

 4    a trial, you would therefore be ineffective?

 5    A.   That could very well be.

 6    Q.   Now, as you sit here today, sir, do you have any

 7    recollection on August 7, 2015, giving Mr. Daniells' passcode

 8    to his IPhone 5s to the government?

 9    A.   I do just based on refreshing my recollection from

00:21 10    reviewing some of the documents.

11    Q.   As you sit here today, refreshing your recollection and

12    reviewing all the documents that you reviewed, do you have a

13    memory of Mr. Daniells first giving you consent to do that?

14    A.   I don't have an independent recollection without reviewing

15    any documents.

16    Q.   Could you say that --

17    A.   I don't have an independent recollection.

18    Q.   But you said something after that, about documents?

19    A.   Without reviewing the documents.

00:22 20    Q.   Upon reviewing the documents, do you have an independent

21    recollection of getting consent from Mr. Daniells first?

22    A.   I don't have an independent recollection.

23    Q.   Now, these documents that you reviewed, was a copy of your

24    entire file forwarded over to Mr. Daniells via my office?

25    A.   Yes.

1    Q.   And does that file memorialize the conversations that you

2    and Mr. Daniells had over the course of your relationship?

3    A.   Some of the conversations are memorialized much better

4    than others.

5    Q.   And have you reviewed that file in preparation for your

6    testimony today?

7    A.   I did over the course of the past month.  Bits and pieces

8    of it, at least.

9    Q.   After your review of the file, did you review any

00:23 10   information that gave you any reason to believe that you may

11   have possibly given over the passcode to the government without

12   Mr. Daniells' consent?

13   A.   No.

14        MR. SPENCER:  May I approach?

15        THE COURT:  You may.

16   BY MR. SPENCER:

17   Q.   I'm handing you a document.  Please take a look at that

18   document and tell me if you recognize what that document is.

19   A.   It's a document to the file in this case dated May 15,

00:24 20   2016.

21   Q.   And was this document generated by yourself?

22   A.   It looks like it was, yes.

23   Q.   Okay.  And did you give the date of the document?

24   A.   The date of the document is May 15, 2016.

25   Q.   But doesn't it appear to chronicle various discussions

1    with Mr. Daniells and Mr. Glenn MacKinlay starting from May 5,

2    2016, up to May 12, 2016?

3    A.   That's what it looks like, yes.

4         MR. SPENCER:  I'd like to introduce this as the next

5    exhibit.

6         MR. MacKINLAY:  No objection.

7         THE CLERK:  This will be Defendant's Exhibit 2

8    received.

9         (Defendant's Exhibit No. 2 received into evidence.)

00:25 10         MR. SPENCER:  And I'd like to publish this.

11         THE COURT:  Go ahead.

12         MR. SPENCER:  Thank you.

13    BY MR. SPENCER:

14    Q.   Okay.  So we're on page 2 of Exhibit 2, and there's a

15    paragraph in the middle that speaks of an issue of a search

16    warrant for a cell phone.  Do you see that paragraph?

17    A.   Yes.

18    Q.   Can you start and just read into the record starting from

19    "I told M.D."?

00:25 20    A.   "I told M.D. that I thought it was possible I had provided

21    the passcode but only after G.M. had threatened to get Apple to

22    open the iPhone and provide the contents to them pursuant to

23    the court order."

24    Q.   Okay.  Thank you.  What does "M.D." stand for?

25    A.   Mitchell Daniells.

1    Q.    And what does "G.M." stand for?

2    A.    Glenn MacKinlay.

3    Q.    All right.  And do you affirm that you specifically stated

4    in this memo -- just so we have some context -- on the first

5    page of the document you see that there is a caption that

6    indicates "5/12/2016 Wyatt visit to interview M.D.," or Mr.

7    Daniells?

8    A.    That's correct.

9    Q.    And would the second page be pursuant to that Wyatt

00:26 10   interview that you had with Mr. Daniells?

11   A.    Could you show me the second page again?

12   Q.    Sure.

13   A.    Yes, it does look like it's part of the same conversation.

14   Q.    Okay.  And now, just a few moments ago you indicated that

15   after review of the file, it did not assist you in refreshing

16   your recollection as to whether or not you possibly gave over

17   the passcode to the government without Mr. Daniells' consent?

18   A.    Could you repeat that question?

19   Q.    Sure.  I asked you a few moments ago if your review of

00:26 20   your file refreshed your recollection as to whether or not you

21   possibly gave over the passcode to the government without Mr.

22   Daniells' consent, and you said there wasn't anything in the

23   file that would refresh your recollection.

24   A.    If I said that, that's what I said.

25   Q.    Okay.  And so reviewing that last entry that you read into

1   the record that you told Mr. Daniells that you thought it was

2   possible that you had provided the passcode but only after

3   Glenn MacKinlay threatened to get Apple to open up the phone,

4   does that refresh your recollection as to whether or not you

5   provided that passcode without Mr. Daniells' consent?

6   A.   That probably reflects something that I said during my

7   discussions with Mr. Daniells at that time.

8   Q.   Now, did you also draft an affidavit in support -- well,

9   let me rephrase it.

00:27 10       Did you draft an affidavit in connection with the facts of

11   this case?

12   A.   Yes.

13   Q.   And do you have a recollection of stating in Paragraph 31

14   in that affidavit, "Although I think it's unlikely I would have

15   turned over the passcode without Mr. Daniells' permission, at

16   this point almost two years later I have no independent

17   recollection of that conversation"?

18   A.   I wrote that.

19   Q.   You wrote that?  And you affirm that statement today?

00:28 20   A.   I have no independent and specific recollection of

21   any -- of my conversation with Mr. Daniells about that issue,

22   yes.

23   Q.   Right.  But I also want to focus on the first sentence

24   when you say "It's unlikely that I would have turned over the

25   passcode without Mr. Daniells' consent."

1    A.    That's true.

2    Q.    Okay.  Now, why do you say it's unlikely?

3    A.

4          Because I've since had now an opportunity to review my

5    handwritten notes from the date that I apparently had a

6    conversation with Mr. Daniells on the morning of August 7th.

7    Q.    And so it's just based exclusively on the notes that you

8    took at your meeting with Mr. Daniells on August 7th that gives

9    you a basis to say that it's unlikely?

00:29 10    A.    Yes.

11   Q.    Okay.  And I just want to be clear.  When you provided the

12   passcode to the government, do you deny or do you admit that

13   that disclosure was not inadvertent or by accident?

14   A.    That's right.

15   Q.    Okay.  It was deliberate on your part?

16   A.    Yes, it was.

17   Q.    Okay.  I want to go over a little bit of your experience,

18   if I could, that you've had with criminal defense work

19   involving cell phones and passcodes, if I can.

00:29 20   A.    Okay.

21   Q.    Prior to August 7, 2015, has a federal or state prosecutor

22   ever asked you to provide a client's passcode to a smartphone?

23   A.    I don't believe so.

24   Q.    Prior to August 7, 2015, had you ever provided a client's

25   passcode other than Mr. Mitchell Daniells'?

A.    No.

Q.    So this is pretty much a new experience for you?

A.    Yes.

Q.    So considering that your experience was limited on this issue, before you provided the passcode, did you consider the implications of providing a clients's cell phone passcode to a federal prosecutor who requested it?

A.    Yes.

Q.    What would be those implications that you considered?

A.    I considered the fact that this was a substantial intrusion of Mr. Daniells' privacy rights.  Cell phones, as the Supreme Court has held in a number of cases, contain extremely private matters.  I had reservations about whether the government, in fact, had probable cause to search the entire cell phone, notwithstanding the warrant that was obtained. And, yeah, I had concerns about that.

Q.    Okay.  Did you also consider the implication that providing the passcode to the government pursuant to some belief of consent would then negate your ability to file a motion to suppress the contents of that passcode -- of that cell phone?

A.    I probably thought about it but I didn't believe that it would have had an effect because the government had obtained a search warrant and an order from -- to Apple to unlock the cell phone.

1    Q.    Right.  But my question is:  If you allowed the government

2    to execute the warrant, you still would have preserved Mr.

3    Daniells' right to challenge that warrant, correct?

4    A.    It probably would have been preserved either way, in my

5    opinion.

6    Q.    So you believed that if you gave -- if Mr. Daniells gives

7    consent to search the cell phone, you still can challenge --

8    A.    Mr. Daniells, in my view, was not given consent to search

9    the cell phone and I was not transmitting Mr. Daniells' consent

00:31 10   to the government to search the cell phone; I simply provided

11   the passcode.

12   Q.    And you just don't remember if you got his consent or not

13   first?

14   A.    I don't have an independent recollection of the

15   conversation that morning when I spoke to Mr. Daniells about

16   the issue about what was discussed.

17   Q.    Right.  Meaning that -- you stated you went to Wyatt to

18   speak to Mr. Daniells before you provided the passcode,

19   correct?

00:32 20   A.    That's correct.

21   Q.    All right.  And then at that point in time would you have

22   had any communications with Mr. Daniells about the implications

23   that Mr. Daniells could incur as a result of giving consent to

24   provide the passcode?

25   A.    I don't specifically recall the contents of that

1   conversation that morning but I can't imagine that I didn't

2   have some conversation about that.

3   Q.   And as you sit here, do you have any independent

4   recollection of telling him that, "Hey, if you provide the

5   passcode, you lose your rights to file a motion to suppress

6   based upon an invalid warrant"?

7   A.   I don't believe that I had that conversation.

8   Q.   Okay.  Now, the date that you signed the affidavit -- if I

9   told you it was May 11th of 2017, would that sound about right?

00:32 10   A.   Yes.

11   Q.   Now, prior to you drafting this affidavit, do you recall

12   drafting a memorandum that is contained within your file dated

13   August 9th -- I'm sorry -- August 5th, 2016, and updated as of

14   August 9th, 2015 [*sic*]?

15   A.   That sounds about right.

16        MR. SPENCER:  May I approach?

17        THE COURT:  Yes.

18   BY MR. SPENCER:

19   Q.   I'm handing you another document, Attorney Schneider.

00:33 20   Take a look at it and tell me if you recognize what this is.

21   A.   This looks like a document dated August 5th, updated as of

22   August 9th, presumably 2016.

23   Q.   And is that -- is it a memorandum?

24   A.   It's a memorandum to the file.

25   Q.   And it's privileged and confidential?  At least --

A.   It's marked as "privileged and confidential."  To the

extent that it contained conversations with Mr. Daniells, it

would have been privileged and confidential.

     MR. SPENCER:  I would like to admit this as the next

exhibit.

     MR. MacKINLAY:  No objection.

     THE CLERK:  Defendant's Exhibit 3 is received.

     (Defendant's Exhibit No. 3 received into evidence.)

BY MR. SPENCER:

Q.   So I'm just going to put Exhibit 3 on the screen.  And

again, this -- as you testified, this is a memorandum that you

submitted to the file that was privileged and confidential as

it pertained to communications with Mr. Daniells, correct?

A.   Correct.

Q.   Okay.  And just for the record, I'm going to go to page 4

of this exhibit.  And do you see the sentence starting with

"Schneider" that I've just pointed to?  "Schneider met with

Daniells"?

A.   Yes.

Q.   So could you just read that one statement into the record?

A.   "Schneider met with Daniells but does not have a specific

recollection of his conversation."

Q.   And is that in reference to the August 7th Wyatt visit?

A.   Yes.

Q.   All right.  And so I just mentioned that just to establish

1    as of August 9, 2016, you still did not have an independent

2    recollection of your conversation with Mr. Daniells as it

3    pertained to his consent on the issue of the passcode?

4    A.   That's correct.

5    Q.   Prior to August 7, 2015, were you made aware that Mr.

6    Daniells himself refused a specific request by the government

7    for his passcode to his IPhone 5s?

8    A.   Yes.

9    Q.   Do you know exactly when that request was made upon Mr.

00:36 10   Daniells?

11   A.   After reviewing some of the documents in the file, my

12   recollection was refreshed that there was some discussion of

13   the issue at the end of the proffer session on July 15th.

14   Q.   Okay.  Also, in your affidavit did you not attest at

15   Paragraph 10, "I believe that Mr. Daniells did inform me that

16   on at least one occasion prior to the proffer on the day of his

17   arrest he was asked by the agents to cooperate with them by

18   providing them with consent to search his cell phone"?

19   A.   That's correct.

00:37 20   Q.   So now you've testified to two -- and you've affirmed that

21   statement I just read under oath, right?

22   A.   Yes.

23   Q.   So now you've testified to two previous occasions prior to

24   August 7, 2015, where Mr. Daniells was asked by the government

25   for the passcode and there was a refusal?

1    A.    Yes.

2    Q.    And you mentioned that one was -- meaning a request -- was

3    made during the proffer.  What was the date of that proffer?

4    A.    July 15, 2015.

5          MR. SPENCER:  Just one moment, your Honor.

6          (Pause.)

7    Q.    And then after the proffer on July 15, 2015, do you have a

8    recollection of a third conversation that you had with

9    Mr. Glenn MacKinlay on or about the status conference of July

00:38 10    21, 2015, where the cell phone was discussed?

11    A.    I don't remember whether it was actually at the status

12    conference but it was around that period that Mr. MacKinlay

13    began asking me whether the client would provide -- would

14    consent to the search of the cell phone.

15    Q.    And would that have been a 1'01 communication between you

16    and Mr. MacKinlay?

17    A.    I know that there were a couple of communications in the

18    hallway of this building where we had some discussions

19    about -- there was at least one or two where we had discussions

00:38 20    about whether my client would consent to the search of his cell

21    phone.

22    Q.    And again, would that be a 1'01 communication, meaning

23    there were no other persons present?

24    A.    Probably so.

25    Q.    And do you have a recollection upon -- and this was after

1    the proffer?

2    A.    That was after the proffer.

3    Q.    And do you have a recollection of telling Mr. MacKinlay

4    that in response to his request for the passcode, cell phone

5    searches are extremely intrusive?

6    A.    I did say that.

7    Q.    And that they raise significant privacy issues?

8    A.    I did say that.

9    Q.    And did you also tell Mr. MacKinlay that "I did not

00:39 10    believe that Mr. Daniells would or should consent to a search

11    of his cell phone"?

12    A.    I did say that at that time.

13    Q.    And then you highlighted it especially because of the fact

14    that it obtained irrelevant information?

15    A.    Irrelevant and private information, yes.

16    Q.    Private information.

17          But you did tell him that you would get back to him on his

18    request?

19    A.    I did.

00:39 20    Q.    Did you make any -- before you gave that passcode over to

21    the government, did you make any independent investigation to

22    ascertain what, if any, incriminating information would have

23    been on that cell phone?

24    A.    I have a dim recollection of asking Mr. Daniells whether

25    there were -- whether it be text messages or anything

1    specifically problematic, but I don't have a specific

2    recollection of exactly what was said.

3    Q.   And you don't have any notes that reflect that

4    communication, right?

5    A.   Not to my knowledge.

6    Q.   Do you recall what AUSA MacKinlay stated to you, if

7    anything, after you explained to him your concerns about

8    providing the passcode over to him?

9    A.   I don't other than there was a repeated message from

00:40 10   Mr. MacKinlay and from the agents in the case that they had a

11   lot of evidence against Mr. Daniells; that there was a

12   possibility that a superseding indictment would be filed.  A

13   number of different statutory alternatives were mentioned as

14   superseding indictments; and that Mr. Daniells needed to

15   continue to help himself, were the words that I recall them

16   using.

17   Q.   And that would be in response to your indicating that

18   Mr. Daniells would or should not provide the passcode over to

19   him?

00:41 20   A.   Yes.

21   Q.   How did you interpret those responses, meaning did you

22   understand them to be some type of warning or threat?

23   A.   I certainly felt that that was pressure by the government,

24   yes.

25   Q.   Were you left with any impressions at that point in time

1    that if you provided the passcode, that Mr. Daniells would not

2    have been superseded?

3    A.   It was my impression that if we remained in a helpful

4    stance toward the government, both with respect to the proffer

5    and perhaps especially now that the government had gotten a

6    search warrant and the order to Apple, that providing this bit

7    of information that I thought the government would inevitably

8    be able to get anyway, that it would serve Mr. Daniells'

9    interest by providing the information and that it might avoid a

00:42 10    superseding indictment.

11    Q.   Okay.  But you received no promise as to that before you

12    provided --

13    A.   There was no explicit promise.

14    Q.   And so between the time that you made this statement to

15    Mr. MacKinlay regarding that it was your belief that Mr.

16    Daniells would and should not consent to a search of his cell

17    phone, the only thing that changed between that statement and

18    you giving up the passcode was that Mr. MacKinlay got a

19    warrant?

00:42 20    A.   Got a warrant and the order, yes.

21    Q.   And the order?

22    A.   Yes.

23    Q.   Meaning you didn't hear any change at all as far as

24    Mr. Daniells' sentiments regarding his opinion about whether or

25    not to disclose the passcode?

1  A.    If there had been any change in views, it would have come

2  during that conversation on the morning of August 7th.  But as

3  I say, I don't have a specific recollection of that.

4  Q.    Right.  I guess my question is:  Between the date that you

5  gave that statement to Mr. MacKinlay --

6  A.    Yes.

7  Q.    -- that he would or should not on August 7th prior to your

8  arrival, had Mr. Daniells ever expressed that you were aware of

9  any change in his mind?

00:43 10  A.    No.

11  Q.    I would like to go over the emails that you began to

12  receive from Mr. MacKinlay after your discussion with him.

13         MR. SPENCER:  May I have a moment?  I need to find the

14  email.

15         (Pause.)

16         MR. SPENCER:  May I approach?

17         THE COURT:  Yes.

18  BY MR. SPENCER:

19  Q.    I'm handing you a document.  I think it's already been

00:44 20  filed on ECF.  Take a look at it and tell me if you recognize

21  what that document is.

22  A.    This is a document dated August 4th, and it has an email

23  thread between myself and Mr. MacKinlay.

24  Q.    All right.  And do you affirm that you were participating

25  in that email thread along with AUSA Glenn MacKinlay?

1    A.    Yes.

2    Q.    Okay.

3          MR. SPENCER:  I'd like to introduce this as the next

4    exhibit.

5          MR. MacKINLAY:  No objection.

6          THE CLERK:  This will be Exhibit 4.

7          (Defendant's Exhibit No. 4 received into evidence.)

8    BY MR. SPENCER:

9    Q.    So would it be fair to say that the email thread began on

00:45 10   July 31st?

11   A.    Yes.

12   Q.    And it was an email from AUSA MacKinlay stating, "Michael,

13   is your client going to the provide us with the password to his

14   iPhone?"

15   A.    That sounds right.

16   Q.    And over a period of time between July 31st and August

17   4th, there were numerous emails where Mr. MacKinlay was asking

18   for this passcode, correct?

19   A.    I don't know that there were numerous emails.

00:45 20   Q.    Okay.  You responded back on July 31st saying that you

21   hadn't had a chance to go down to Wyatt yet, right?

22   A.    Yes.

23   Q.    And then on August 4th, Mr. MacKinlay stated that, "We

24   have obtained a search warrant for his cell phone.  This is his

25   last chance to provide the password or we'll go forward with

1  providing a court order to Apple"?

2  A.   I received that email.

3  Q.   All right.  And in your affidavit did you describe

4  Mr. MacKinlay's demeanor as being insistent or insisting?

5  A.   I felt certainly that there was pressure from the

6  government to provide the passcode.  And I think the email

7  speaks for itself.  This was his last chance to provide it.

8  Q.   As of the date of these emails, what did you know -- when

9  you heard the statement from Mr. MacKinlay, "We will go forward

00:47 10  with providing the court order to Apple next week," what did

11  you know about Apple's ability as of August 4th, 2015, to be

12  able to actually assist the government in getting into the

13  phone?

14  A.   I assumed they had the capacity to do it.

15  Q.   Why did you make that assumption?

16  A.   I believe that I had -- I believe that I had read stuff in

17  the papers and that it was in the air that Apple had the

18  capacity to do it.

19  Q.   There's nothing in the file that reflects what you knew as

00:47 20  of August 4, 2015, about Apple's ability?

21  A.   Not that I'm aware of.

22  Q.   And you indicated that you assumed that AUSA MacKinlay was

23  being forthright with you when he told you that Apple -- "We

24  will go forward with providing the court order to Apple next

25  week"?

1    A.    I assumed that he would do what he said he was going to

2    do.

3    Q.    Now, you indicated that this was your first case that you

4    had dealing with actual -- well, passcodes, you said.  But did

5    you have previous experience about search warrants that

6    directed and ordered -- that directed Apple to assist the

7    government in getting into a smartphone?

8    A.    No, I had not.

9    Q.    Okay.  So this was your first case?

10   A.    Yes.

11   Q.    And you made no attempt prior to providing that passcode

12   to research the issue as to whether or not the government's

13   comments to you were accurate?

14   A.    No.

15   Q.    As of August 7, 200 -- or -- yeah, August 7, 2015, were

16   you aware of any security features on the phone which would

17   have prevented Apple from complying with the warrant?

18   A.    I was not aware of that.

19   Q.    And did you attempt to research that issue before you

20   provided the passcode?

21   A.    No.

22   Q.    At the time you received these emails and you felt

23   pressure, did you go over in your mind, sir, why the prosecutor

24   kept asking you for the passcode as opposed to just allowing

25   Apple to help him?

A.    I probably spent some time thinking about it but I don't
have a specific recollection.

Q.    As you sit here today, do you have an impression that it
was odd for the government to keep insisting that your client
provide the passcode?

A.    My impression is that they were going to do it either the
easy way or the hard way.

Q.    And why would going -- doing it through Apple be the hard
way, to your understanding?

A.    I don't know.

Q.    I mean, over the course of your career you said you had no
experience in dealing with orders to Apple to get into cell
phones, but you did have experience with search warrants and
residences, right?

A.    Yes.

Q.    And you've had experience with government agents obtaining
a search warrant to enter the premises of a previous or former
client?

A.    Yes.

Q.    And had you ever over the course of your career accepting
federal appointments -- had any of the agents contacted you
first and asked for the consent of Mr. Daniells before -- I'm
sorry -- of your client before that warrant was executed?

          MR. MacKINLAY:  Objection.

          THE COURT:  Overruled.  You may answer it.

1          THE WITNESS:  No.

2    BY MR. SPENCER:

3    Q.   And would you have found that to be odd that if agents had

4    actually gotten a warrant to search a client's residence, that

5    they called you up first to ask for your client's permission

6    before they executed the warrant?

7    A.   Yes.

8    Q.   But you didn't draw that same parallel here?

9    A.   I felt that this was simply a way to make it a little bit

00:50 10   easier and that it would save them maybe a week.

11   Q.   Did it ever occur to you at the time that Mr. MacKinlay

12   was sending you emails that he actually needed the passcode to

13   get into the phone?

14   A.   No.

15   Q.   Have you done any research into this issue since August 7,

16   2015?

17   A.   I became aware that later models of the Apple iPhone had

18   some sort of a feature that made it very difficult for the

19   government to break into those phones without Apple rewriting

00:51 20   some new codes.

21   Q.   And that feature was called the "security enclave," right?

22   A.   I don't remember.  I do remember that the issue came up

23   around the time of the San Bernardino killings.

24          MR. SPENCER:  May I approach?

25          THE COURT:  All right.

BY MR. SPENCER:

Q.   I'm handing you another document.  Take a look at that document and tell me if you recognize what that document is.

A.   "Apple versus the FBI:  Understanding iPhone Encryption. The Risks for Apple and Encryption."  This looks like a document off the Internet.

Q.   And do you have any specific recollection of that document being contained within your file?

A.   I have a vague recollection that probably at some point I started looking at -- I pulled this down.

Q.   Right.  And if you look, there's a -- there's a date at the top of that document.  And could you just indicate that date into the record?

A.   February 17, 2016.

Q.   Okay.  And you don't -- you don't dispute that this document was a document you pulled off the Internet and was contained within your file?

A.   That would be consistent with what this document looks like, yes.

        MR. SPENCER:  I would like to introduce this as the next exhibit.

        MR. MacKINLAY:  No objection.

        THE CLERK:  This is going to be Defendant's Exhibit 5.

        (Defendant's Exhibit No. 5 received into evidence.)

        MR. SPENCER:  I'd like to publish this, your Honor.

BY MR. SPENCER:

Q.   Okay.  So we're looking at Exhibit 5.  Again, you've

identified this document as a document that was consistent with

a -- your research taken off the Internet regarding security of

iPhones?

A.   Yes.

Q.   And you see that there's a date at the top of that

document?  And it's not clear, but it looks to be May 2, 2016?

A.   I don't recognize that handwriting in the upper right-hand

corner.

Q.   No.  No.  No, I mean in the left-hand corner there's a

date that I want you to just take note of.

A.   Yes, 5/2/2016.

Q.   Okay.  And as of 5/2/2016, you were still representing the

defendant, Mr. Mitchell Daniells?

A.   That's correct.

Q.   I just want to draw your attention to page 3 of the

document.  And you see language there that states that the 5s

featured -- the 5s featured the A7 chip which included a secure

enclave?

A.   I see that.

Q.   And how this is basically a completely independent

computer with its own operating system that offers two

important security upgrades over the 5c?

A.   I see that.

1    Q.   And you see in the next bullet point they talk about it

2    contains a unique key generated by the secure enclave that's

3    completely random and unknown to Apple?

4    A.   I see that.

5    Q.   Do you see the second-to-the-last paragraph it states, "In

6    other words, had the terrorists had an IPhone 5s or later, the

7    judge's order would have been moot"?

8    A.   I see that.

9    Q.   Okay.  Now, did you have any understanding once you read

00:55 10  that article what significance that might have had as far as

11   Mr. Daniells' plight?

12   A.   I don't remember reading the article and I don't remember

13   if I was the one who pulled it down or whether I asked my

14   paralegal to dig up some information on this.

15   Q.   But you don't dispute that article was in your file?

16   A.   It was in my file.

17   Q.   And are you aware -- have you done any research and heard

18   the term called "brute force entry"?

19   A.   No, but I can imagine what it means.

00:55 20  Q.   And if I told you that it's where the government can try

21   tens of hundreds of thousands of attempts to try and breach the

22   actual phone, would that sound right?

23            MR. MacKINLAY:  Judge.

24            THE COURT:  Well --

25            MR. SPENCER:  I'll rephrase it.

1          THE COURT:  Go ahead.

2     BY MR. SPENCER:

3     Q.   What's your understanding of what brute force into a phone

4     is?

5     A.   That the government can try to make many different

6     attempts using thousands -- tens of thousands of different

7     passwords in order to gain entry.

8     Q.   And are you aware that the secure enclave feature prevents

9     an actual brute-force entry into the phone based upon your

00:56 10    reading of the article?

11    A.   At some point I learned probably through newspaper

12    articles that that's the case.

13    Q.   Now, when Mr. MacKinlay indicated that "this is his last

14    chance or we're going to submit the search warrant to Apple,"

15    what was your understanding of what Mr. MacKinlay meant by

16    "last chance"?

17    A.   That this is -- would be his last opportunity to help

18    himself by voluntarily providing the passcode.  And that, in my

19    view, sort of implicitly -- the government -- because

00:57 20    Mr. MacKinlay had mentioned the fact that the government had

21    not indicted Mr. Daniells on other charges, that they

22    were -- that it was possible with his continued assistance to

23    the government, that they might decide either not to supersede

24    or that -- and there was some -- I had had some discussions in

25    addition with Mr. MacKinlay about the various 2K2.1 sentencing

1   guidelines and the various upward adjustments, and that there

2   might be a way that -- if Mr. Daniells continued to be somewhat

3   helpful to the government, that they might take a more

4   favorable view of not urging -- recommending certain guideline

5   upward adjustments.

6   Q.   Now, after you provided that passcode over to the

7   government, did they end up superseding Mr. Mitchell Daniells?

8   A.   Not until fairly recently but, yes, they did.

9   Q.   Over the course of your relationship with Mr. Daniells

00:58 10   while you were working with the prosecutor after you provided

11   the passcode, did he continue to threaten to supersede

12   Mr. Daniells?

13   A.   At some point there was discussion that the prosecutor was

14   planning or considering on superseding.

15   Q.   And that would have been after you provided the passcode?

16   A.   I believe that that began either in November or in -- at a

17   status conference in January of 2016.

18   Q.   Okay.  So again, it would have been after you provided the

19   passcode?

00:58 20   A.   Yes.

21   Q.   And did you ask Mr. MacKinlay why that would be when he,

22   Mr. Daniells, provided the passcode pursuant to this

23   last-chance communication that he gave over to you?

24   A.   I'd have to say I was disappointed that Mr. MacKinlay

25   informed me that his supervisor felt that -- that he and his

1   supervisor felt that an upward -- that a superseding indictment

2   was necessary.

3   Q.   Notwithstanding the fact that he provided the passcode?

4   A.   That's true.

5   Q.   Did you challenge that decision based upon your knowledge

6   of the case leading up to that point?

7   A.   I believe that I expressed my dissatisfaction and

8   continued to make efforts to persuade Mr. MacKinlay not to

9   supersede.

00:59 10   Q.   Would you have filed a motion to dismiss the superseding

11   indictment based upon your communications with Mr. MacKinlay

12   about this last chance to cooperate or else?

13   A.   At some point I had a number of lawyers in my office

14   generate memoranda with respect to search-and-seizure issues in

15   the case, and this was one of them.

16   Q.   Now, this email thread that we just went over, you did

17   indicate that you'd been --

18           MR. SPENCER:   Your Honor, I believe it's Exhibit 4.

19   Q.   You indicated to Mr. MacKinlay that as of August 4th,

01:00 20   "I've been on vacation since Friday but will try to see him,"

21   meaning Mr. Daniells, "on Thursday or Friday of this week"?

22   A.   Yes.

23   Q.   And did you also indicate, "I anticipate that he will

24   provide what you're looking for"?

25   A.   Yes.

1    Q.    Now, you hadn't had any communications with Mr. Daniells

2    from the proffer up until August 7th, correct?

3    A.    Not that I recall.

4    Q.    So then why did you tell Mr. MacKinlay, "I anticipate that

5    Mr. Daniells will provide what you're looking for"?

6    A.    Because I felt that the government, with the search

7    warrant and the Apple order, would inevitably be able to get

8    the information on the cell phone, and that if there were any

9    suppression issues, it would focus on whether or not the

01:01 10   government had probable cause to obtain the search warrant in

11   the first place and whether the scope of the search warrant was

12   appropriate.

13   Q.    And you don't believe by providing consent you waived

14   those arguments?

15   A.    I don't believe that I did.

16   Q.    And you anticipated that Mr. Daniells would change his

17   mind even though on two separate occasions he said no?

18   A.    Apparently I must have, yes.

19   Q.    Now, you indicated that you actually created a document as

01:02 20   a result of the communications that you had with Mr. Daniells

21   down at Wyatt.  Is that fair to say?

22   A.    Yes.

23   Q.    Okay.

24         MR. SPENCER:  One moment, your Honor.

25         (Pause.)

1          MR. SPENCER:  May I approach?

2          THE COURT:  Yes.

3   BY MR. SPENCER:

4   Q.   I'm handing you a document.  Take a look at that document

5   and tell me if you recognize what that document is.

6   A.   It looks like a copy of my handwritten notes.

7   Q.   And would that be of the Wyatt visit that you had with Mr.

8   Daniells?

9   A.   Yes.

01:03 10  Q.   Of August 7, 2015?

11  A.   Yes.

12  Q.   Is that your handwriting?

13  A.   Yes.

14         MR. SPENCER:  I'd like to introduce this as the next

15  exhibit.

16         MR. MacKINLAY:  No objection.

17         THE CLERK:  Defendant's Exhibit 6 is received.

18         (Defendant's Exhibit No. 6 received into evidence.)

19         MR. SPENCER:  And I would also like to publish this

01:03 20  one.

21  BY MR. SPENCER:

22  Q.   Okay.  So we've just admitted into evidence Exhibit 6.

23  You -- could you just indicate again what this document is?

24  A.   These are my handwritten notes of the August 7, 2015,

25  meeting with Mr. Daniells down at Wyatt.

1    Q.   And did you provide this note to Mr. Daniells once he

2    began to complain -- strike that.  I'll lay some foundation.

3         At any point in time after the Wyatt meeting did Mr.

4    Daniells complain about a passcode being provided without his

5    permission to you?

6    A.   My recollection is at some time in March of 2016, Mr.

7    Daniells did express vehement concerns about passing on the

8    passcode.

9    Q.   And pursuant to your request did -- to his complaints, did

01:04 10   you provide this document over to Mr. Daniells?

11   A.   I didn't locate this document in my file but at some point

12   I did.  When I located it, I believe I passed it on.

13   Q.   Okay.  And that was to confirm that there was some

14   conversation at Wyatt about a passcode?

15   A.   Yes.

16   Q.   Okay.

17        MR. SPENCER:  May I see Exhibit 3 -- or 2?

18        THE CLERK:  I don't have 2.  I have 3.  You have the

19   other ones.

01:05 20        MR. SPENCER:  Okay.  Your Honor, thank you.

21   BY MR. SPENCER:

22   Q.   Showing you Exhibit 3 again.  This is your August

23   5th/updated August 9th memorandum.  And I want to direct your

24   attention to page 4 of this document.  And can you start and

25   read into the record starting with "Schneider"?

         1    A.    "Schneider's single page of handwritten notes of the

         2    meeting indicate that he and Daniells discussed three items:

         3    New discovery (the Sportsman's video) and the record of

         4    Daniells' prior criminal history, the fact that the prosecutor

         5    had," quote/unquote, "obtained the search warrant to search

         6    Daniells' cell phone, and the issue of Daniells' consent to

         7    password.  While the" --

         8          Do you want me to continue?

         9    Q.    Please.

01:06   10    A.    "While the notes do not explicitly say that Daniells

        11    consented to turning over the passcode, the notes do list three

        12    passcodes.

        13    Q.    Thank you.  So now I'm going to direct your attention back

        14    to Exhibit 6.  And you do see, as you indicate in the memo, as

        15    of August 9th that there were three areas of discussion on the

        16    Wyatt meeting, right?

        17    A.    Yes, I do.

        18    Q.    And the first was what you coined as new discovery, the

        19    3/27 Sportsman video?

01:07   20    A.    Yes.

        21    Q.    Okay.  And just by way of background, there was a video

        22    that was provided to you by the government that related to

        23    alleged gun purchases in Pennsylvania that was connected to the

        24    alleged indictment?

        25    A.    Yes.

 1   Q.   Okay.  And then you talk about priors and CWOF's, criminal

 2   history, right?

 3   A.   Yes.

 4   Q.   And then a second area of discussion was search warrant

 5   obtained, and then you have, it looks to be circled, "consent

 6   password," right?

 7   A.   Yes.

 8   Q.   And then you see three different numbers, right?

 9   A.   Yes.

01:07 10   Q.   And one of those numbers was the passcode?

11   A.   Presumably.

12   Q.   Presumably.  And then you see some sentencing guidelines

13   calculations, right?

14   A.   Yes.

15   Q.   Okay.  And you're certain that Exhibit 6 was

16   contemporaneously made on August 7, 2015?

17   A.   Yes.

18   Q.   All right.

19        (Pause.)

01:09 20        MR. SPENCER:  May I approach?

21        THE COURT:  You may.

22   BY MR. SPENCER:

23   Q.   I'm handing you another document.  Take a look at that

24   document and tell me if you recognize what that document is.

25   A.   This looks like a letter to Mr. Daniells dated April 18,

1    2016, from me.

2    Q.   And do you affirm that that document was in your file?

3    A.   I'm sure it was.

4    Q.   And that you sent it to Mr. Daniells on or about that

5    time?

6    A.   Most likely I would have.  I do notice that it's unsigned,

7    but yes.

8              MR. MacKINLAY:  What number is that?

9              MR. SPENCER:  15 and 16.  I'm sorry.

01:09 10           Next exhibit.

11             MR. MacKINLAY:  No objection.

12             THE COURT:  It's going to be 7.

13             THE CLERK:  Defendant's Exhibit 7 is received.

14             (Defendant's Exhibit No. 7 received into evidence.)

15   BY MR. SPENCER:

16   Q.   Just by way of background, Exhibit 2 that the -- I'm

17   sorry.  Exhibit 6, the actual contemporaneous notes that you

18   took, mention of a new Sportsman video, right?

19   A.   Yes.

01:10 20   Q.   I'm going to show you Exhibit 7.  And this is a letter

21   that's dated April 18, 2016, right?

22   A.   Yes.

23   Q.   Over to Mr. Daniells?

24   A.   Yes.

25   Q.   Can you read into the record your comments starting with

1    "last week"?

2    A.    "Last week I wrote the prosecutor a second discovery

3    letter, a copy of which is attached hereto, requesting store

4    videos of the January, February and March 2015 firearms

5    purchases by W.R., copies and/or photographs of items seized

6    from your backpack at the time of arrest, materials relating to

7    the search of all cellular phones including yours, videos" --

8    Q.    Stop right there.  All right.  So this appears to be some

9    type of update that you provided to Mr. Daniells as the status

01:11 10    of discovery?

11    A.    Yes.

12    Q.    And as of April 18, 2016, did you tell Mr. Daniells that

13    you wrote the prosecutor a discovery letter asking for store

14    videos for the purchases of March 2015 firearms?

15    A.    For that entire period, yes.

16    Q.    For that entire period.

17         Now, this is well past this Sportsman video that you

18    mentioned back on August 7th of 2015, right?

19    A.    I believe the discovery of the Sportsman's video was

01:11 20    sometime over the summer of 2015.

21    Q.    When you received it, the Sportsman video?

22    A.    That would be my best guess, yes.

23    Q.    And did you also see how you told Mr. Daniells on April

24    18, 2016, that you sent the prosecutor a second discovery

25    letter on "materials related to search of all cellular phones,

1    including yours"?

2    A.    Yes.

3    Q.    So it would be fair to say as of August of 2015 and April

4    of 2016, you received no materials as far as cell phone

5    extraction off that IPhone 5s?

6    A.    At some point we received the Cellebrite extraction

7    report.

8    Q.    But it hadn't been after April 18, 2016?

9    A.    Not necessarily.

01:12 10   Q.    Well, you indicated that you sent the prosecutor a

11   discovery letter "requesting materials related to the search of

12   all cellular phones, including yours"?

13   A.    I wanted to make sure that I had made a comprehensive

14   request for all cell phone materials.

15             MR. SPENCER:  And may I approach?

16   Q.    Handing you another document, sir.  Take a look at that

17   and tell me if you recognize what that document is.

18   A.    I don't recognize it.

19   Q.    Is that your handwriting?

01:13 20   A.    No.

21   Q.    Okay.  Do you know whose handwriting it is?

22   A.    Could I see it again?

23   Q.    Yes.

24   A.    This may be my partner, Phil Cormier's.

25   Q.    And do you dispute that this document was contained within

1    your file?

2    A.    If you have it, it probably was.

3    Q.    Okay.  And do you see any reference that is made to

4    Mr. Daniells?

5    A.    It says, "Telephone conference with Mitch Daniells."

6    Q.    Right.  As of what date?

7    A.    4/20/16.

8    Q.    And it says, "Discussed 4/18 letter that Michael Schneider

9    sent to Mitch"?

01:14  10    A.    Correct.

11    Q.    All right.

12          MR. SPENCER:  Can I introduce this next document, for

13    what it's worth?

14          MR. MacKINLAY:  I think he's probably authenticated

15    it.  I have no objection at this point.

16          THE COURT:  All right.

17          THE CLERK:  Defendant's 8 is received.

18          (Defendant's Exhibit No. 8 received into evidence.)

19    BY MR. SPENCER:

01:15  20    Q.    Showing you Exhibit 8, as you indicated, this references a

21    telephone conference with Mitch Daniells dated April 20, 2016,

22    right?

23    A.    Correct.

24    Q.    And you see the initials "M.S." -- and is that "P.C."?

25    A.    "P.G.C."

1    Q.    Would that be your partner?

2    A.    Yes.

3    Q.    And does that look like your partner's handwriting?

4    A.    You know, I'm really not super familiar with it but it

5    must be.

6    Q.    Okay.  Based upon the fact that it's not yours?

7    A.    Correct.

8    Q.    Okay.  And you see that there was discussions that you and

9    Mr. Daniells had regarding the last exhibit, Exhibit 7, which

01:15 10    is the April 18, 2016, correspondence, correct?

11    A.    That's what it says.

12    Q.    And it was during that correspondence where you're letting

13    Mr. Daniells know that you're trying to get discovery regarding

14    materials related to the search of the cellular phones,

15    including yours, right?

16    A.    Correct.

17    Q.    And then on this telephone conference, Mr. Daniells begins

18    to ask some questions, right?

19    A.    He probably did.

01:16 20    Q.    Well, you do see three comments, one saying, "Cell phone,"

21    question mark?

22    A.    I see what it says here, yes.

23    Q.    And you see another comment, "Did they get info from?"

24    A.    Yes.

25    Q.    And "GPS," two question marks?

```
 1    A.    I see that, yes.

 2    Q.    All right.  And so reviewing this document, does this

 3    refresh your recollection as to what, if any, communications

 4    Mr. Daniells had on April 20th after he received that April

 5    18th correspondence?

 6    A.    Other than that he had some concern -- he had expressed

 7    very substantial concerns about my having turned over the

 8    passcode and that he wanted to know the details about what the

 9    government had gotten off of it.

10    Q.    And nowhere in these notes is there any indication that

11    the passcode was given because you consented to Mr. Daniells?

12    A.    Those notes, no.

13    Q.    And would it be fair to say that it was only after he

14    received the letter on April 18th did he ever know that his

15    cell phone was ever actually breached?

16    A.    I don't know that.

17    Q.    Do you have any evidence in your file that would indicate

18    that you communicated to Mr. Daniells prior to April 18th that

19    his cell phone had been breached by the government?

20    A.    I don't.  I know that the government was sending to the

21    Wyatt info- -- IT people the -- some of the discovery or all of

22    the discovery packets that I received.  At least that was my

23    assumption.

24    Q.    Well, I'm talking about did he ever receive any word from

25    you.
```

```
 1   A.   I don't remember.  Just to be clear, I do recall at some
 2   point that I sent a flash drive -- a copy of a flash drive with
 3   most of the materials that were obtained off of a Cellebrite
 4   extraction report, but I can't tell you when that was.  And I
 5   think that that has to be done through the Wyatt
 6   administration.
 7   Q.   And so we're clear, that telephone conversation was April
 8   20th, 2016?
 9   A.   That's what it says.
10   Q.   Right.
11   A.   Yes.
12           MR. SPENCER:  May I approach again?
13           THE COURT:  All right.
14   BY MR. SPENCER:
15   Q.   Handing you another document.  Take a look at that
16   document and tell me if you recognize what that document is.
17   A.   It looks like a letter from me to Mr. Daniells dated May
18   3, 2016.
19   Q.   And can you confirm that this was in your file?
20   A.   I'm sure it was.
21   Q.   And that you sent it to Mr. Daniells on or about that
22   date?
23           MR. MORAN:  What's the Bates number?
24           MR. SPENCER:  20.
25           THE WITNESS:  I'm sure -- I suspect I did.
```

```
 1              MR. SPENCER:  Next exhibit.

 2              MR. MacKINLAY:  No objection.

 3              THE WITNESS:  My only caution there is that it is

 4      unsigned --

 5              THE CLERK:  Hold on.  Let me get this marked.

 6              This will be Defendant's 9, is received.

 7              (Defendant's Exhibit No. 9 received into evidence.)

 8      BY MR. SPENCER:

 9      Q.   Okay.  You were saying?

01:19 10      A.   I was saying it's unsigned.  Sometimes my office

11      administrator scans the documents in and PDFs them.  After I

12      send the -- when I send the letter out, sometimes I just have

13      the original Microsoft version without a signature.

14      Q.   All right.  So showing you again Exhibit 7, that is the

15      April 18th correspondence, right?

16      A.   That's correct.

17      Q.   And on page 2, you see it's not signed, right?

18      A.   That's correct.

19      Q.   But you know on April 20th you got a phone call about the

01:20 20      fact that he received it?

21      A.   That's correct.

22      Q.   So just because you didn't sign it doesn't mean you didn't

23      send it out?

24      A.   Absolutely.

25      Q.   Showing you Exhibit 9.
```

1    A.    Yes.

2          MR. SPENCER:  May I just look at it one moment,

3    please, your Honor?

4          (Pause.)

5    Q.    Can you start with the letter "I am" and read?

6    A.    "I am enclosing a copy of this latest discovery package

7    which is Bates-stamped pages 834 to 877.  As part of the

8    discovery, he also sent me a DVD containing the video of the

9    Sportsman's Outlet on March 27, 2015, that shows you and W.R.

01:20 10   in the store before he purportedly purchased the SCCY."

11   Q.    Okay.  Let's stop there.  So just to make sure we have the

12   acronyms, "W.R." is the name of the cooperating witness?

13   A.    Yes.

14   Q.    All right.  And you see how it's only on May 3, 2016,

15   where you actually received a DVD containing the video of the

16   Sportsman Outlet dealing with an alleged firearms purchase back

17   on March 27th of 2015?

18   A.    That's what it says.

19   Q.    That's what it says.

01:21 20        So if August -- you're talking about at least eight or

21   nine months -- you're mentioning on Exhibit 6 the notes that

22   you took at the Wyatt meeting of the Sportsman video, but it's

23   only on May of 2016 that you actually confirmed that you

24   received it?

25   A.    That's what it says.

1   Q.   As a matter of fact, if you had just received it as of May

2   3, 2016, you would consider that to be new discovery, right?

3   A.   If I had just received it then, yes.

4   Q.   Right.  And you do acknowledge that on Exhibit 6 you

5   actually indicate to Mr. Daniells where you claim it was August

6   7, 2015, that you received new discovery, March 27 Sportsman's

7   video?

8   A.   Sportsman's interview, video and photos, yes.

9   Q.   And going back to Exhibit 9 --

01:22 10   A.   If I may just --

11   Q.   Please.  No.

12   A.   3/27 was the date of the --

13   Q.   -- alleged firearm's purchase?

14   A.   The date of the alleged firearm's purchase, yes.

15   Q.   Yes.  That's all you wanted to --

16   A.   That's all I wanted.

17   Q.   All right.  So Paragraph 2, you indicate as part of

18   discovery, the prosecutor also produced a flash drive.  Do you

19   see that?

01:23 20   A.   Yes.

21   Q.   Second paragraph.

22   A.   Yes.

23   Q.   Was that the flash drive that you were making reference

24   to?

25   A.   It could be, yes.

1  Q.   And it talks about the information extracted from the cell

2  phone and decrypted by Cellebrite?

3  A.   Correct.

4  Q.   So it would be fair to say only as of May 3, 2016, did you

5  ever receive materials regarding the extraction of the cell

6  phone?

7  A.   That may be.  I don't remember.

8  Q.   All right.  But you have no reason to dispute this

9  information that's contained in this --

01:23 10  A.   That's what I wrote.

11  Q.   Okay.  And could you read into the record starting with

12  the letters -- or with the word "while"?

13  A.   "While I had specifically requested a copy of the search

14  warrant that purportedly authorized the government to obtain

15  the information off your phone, the prosecutor has not yet

16  produced either the warrant or any search materials used by the

17  prosecutor in support of its application for the warrant."

18  Q.   Okay.  Going back to Exhibit 9 on page 2, do you see the

19  third bullet point?

01:24 20  A.   That "your CORI and BOP" --

21  Q.   Yeah.

22  A.   -- "seem to confirm that you should be Criminal History

23  Category" --

24  Q.   It's cut off but keep going.

25  A.   "That your Pennsylvania license to carry --

1    Q.   No.  "Since the Massachusetts" --

2    A.   "Since the Massachusetts disorderly CWOF and Fort Collins

3    arrest will not count."

4    Q.   And again, you sent this to Mr. Daniells as of May 3,

5    2016, correct?

6    A.   I believe so.

7    Q.   And right after the Sportsman video that's indicated on

8    Exhibit 6, what information are you specifically talking about

9    with Mr. Daniells?

01:25  10   A.   I'm talking about his -- starting to talk about his

11   criminal history and any CWOF'S and priors.

12            (Pause.)

13            MR. SPENCER:  May I approach?

14            THE COURT:  Yes.

15   BY MR. SPENCER:

16   Q.   Showing you another document.  Could you just take a look

17   at it and tell me if you recognize what it is?

18   A.   I do.

19   Q.   What is it?

01:27  20   A.   It's a document to the Daniells file dated 3/9/2016, and

21   it's about a client interview with Mr. Daniells on March 8,

22   2016.

23            MR. SPENCER:  Next exhibit.

24            MR. MacKINLAY:  No objection.

25            THE CLERK:  It's going to be Defendant's Exhibit 10

1     received.

2              (Defendant's Exhibit No. 10 received into evidence.)

3     BY MR. SPENCER:

4     Q.    Showing you Exhibit 10, again, you confirm this is a note

5     you made to the file regarding a client interview at Wyatt

6     March 8, 2016, right?

7     A.    Correct.

8     Q.    And this -- just so we're clear, the first statement

9     indicates that you met with client at Wyatt Detention for three

01:28 10    hours on March 8th, correct?

11    A.    That's correct.

12    Q.    All right.  And then on the second page it says, "M.D. had

13    questions about."  Could you read what his questions were?

14    A.    "Whether we had a motion to suppress and how the

15    government obtained the cell phone records and GPS data.  I

16    told him I thought there had been a 2703 application."

17    Q.    Okay.  And the next statement?

18    A.    "The case law surrounding 922(a)."

19    Q.    Okay.  Now, you have a to-do list at the bottom.  And can

01:28 20    you indicate to the Court what your to-do list was?

21    A.    "Send M.D. the 2703(d) applications and warrants that

22    produced the cell data and GPS.  How did they get the GPS data.

23    Any discovery he does not have.  M.G.L. Chapter 269, Section

24    10A and N."

25    Q.    Okay.  Would it be fair to say that as of the March 8,

1    2015, interview with Mr. Daniells, there was no discussion

2    about the fact that Mr. Daniells -- in response to his question

3    how the government obtained his GPS data, about he consented to

4    the passcode?

5    A.   I don't recall the specifics of the conversation.

6    Q.   Okay.  But there's no mention in your notes about any

7    consent and passcode?

8    A.   I didn't see any mention, no.

9    Q.   And you're seeing how Mr. Daniells, months later, is

01:29 10   inquiring as to how they're getting this information?

11   A.   That's correct.

12        MR. SPENCER:  May I approach?

13        THE COURT:  Yes.

14        MR. SPENCER:  Disclosure No. 10.

15   BY MR. SPENCER:

16   Q.   I'm showing you another document.  Take a look at that

17   document and tell me if you recognize what that document is.

18   A.   This looks like a letter to Mr. Daniells from me dated

19   March 10th, 2016.

01:30 20        MR. SPENCER:  Next exhibit.

21        MR. MacKINLAY:  No objection.

22        THE CLERK:  This will be Defendant's Exhibit 11, which

23   is received.

24        (Defendant's Exhibit No. 11 received into evidence.)

25   BY MR. SPENCER:

1    Q.    Showing you a copy of Exhibit 11 -- and this was sent

2    March 10th?

3    A.    Correct.

4    Q.    And that meant two days after you visited with Mr.

5    Daniells?

6    A.    Correct.

7    Q.    And had your to-do list, correct?

8    A.    Yes.  Yes.

9    Q.    You wrote down a --

01:31 10   A.    Yes.

11   Q.    Can you start with the word "it" and read into the

12   record --

13   A.    "It also appears from the recent discovery that some of

14   these witnesses, including Sean, and some of the girls had

15   provided information about other people you know.  As you know,

16   the government also obtained a search warrant without your

17   consent to get phone information off your cell phone that they

18   seized when they arrested you."

19   Q.    All right.  Can you explain what you were trying to tell

01:32 20   Mr. Daniells by that statement?

21   A.    I was trying to say that the search warrant -- that a

22   search warrant was obtained on the cell phone and that we never

23   consented to the obtaining of the search warrant.

24   Q.    You didn't consent to the obtaining of the search warrant?

25   A.    Correct.

Q.   But you knew at that point in time there was consent to

actually search the phone.

A.   Oh, and it says, "consent to get phone information off

your cell phone that they seized when they arrested you."

Q.   Right.  You indicate, "As you know, the government also

obtained a search warrant without our consent to get phone

information off your cell phone."

A.   I think at that point that I did not -- I was -- I was

not -- I remember -- Mr. Daniells, during the March 8th

01:32  interview, was angry that they had obtained information as a

result of the search warrant and the giving up of the passcode.

I think at that point when he asked me, I was not -- I did not

recall whether or not that I had actually turned over the

passcode or how it was obtained.  I didn't remember it at that

point.

Q.   So you said he was angry because his passcode had been

turned over, but you don't recall how it got turned over to the

government?

A.   At that point I did not recall.

01:33  Q.   What would have been the only way that the government

could have gotten his passcode?

A.   I was focused on how the government got the information

and I just didn't remember.

Q.   But you do see how on March 10th you're telling Mr.

Daniells in a letter that "they got the information off your

1    phone without our consent"?

2    A.    That's what it says.

3    Q.    Okay.  There's another letter that you sent to

4    Mr. Daniells I'm trying to locate.

5             MR. SPENCER:  May I approach?

6             THE COURT:  Yes.

7    BY MR. SPENCER:

8    Q.    Showing you another letter.  Take a look at it and tell me

9    if you recognize what it is.

01:34 10   A.    This is a letter dated March 15, 2016, from me to Mr.

11   Daniells, excerpted.

12            MR. SPENCER:  Next exhibit.

13            MR. MacKINLAY:  No objection.

14            THE CLERK:  This will be Defendant's Exhibit 12

15   received.

16            (Defendant's Exhibit No. 12 received into evidence.)

17            THE COURT:  What's the date of the letter?  What's the

18   date of the letter?

19            THE CLERK:  I'm sorry.  It's March 15, 2016.

01:35 20   BY MR. SPENCER:

21   Q.    Okay.  This one will be brief.  Exhibit 12, you see how

22   you sent Mr. Daniells an update regarding his case, correct?

23   A.    Yes.

24   Q.    And do you acknowledge that as of this date you sent him

25   several cases addressing the question whether the government

 1    can charge you under 922(n)?

 2    A.    Yes.

 3    Q.    Okay.

 4          MR. SPENCER:  May I approach?

 5          THE COURT:  All right.

 6    BY MR. SPENCER:

 7    Q.    Showing you a document, take a look at the handwriting and

 8    tell me if you recognize the person's handwriting.

 9    A.    That looks like Mr. Daniells'.

01:36 10    Q.    Okay.  Would you concede that was contained within your

11    file?

12    A.    No, that looks like it is.

13          MR. SPENCER:  Next exhibit.

14          MR. MacKINLAY:  May I have one moment, please.

15          (Pause.)

16          MR. MacKINLAY:  No objection.

17          THE CLERK:  This is going to be Defendant's Exhibit

18    13.

19          (Defendant's Exhibit No. 13 received into evidence.)

01:37 20    BY MR. SPENCER:

21    Q.    All right.  So this is Defendant's Exhibit 13.  Do you see

22    a statement from Mr. Daniells, whose handwriting you identify,

23    saying, "Thank you for the time to send forth the 922(n)

24    cases."  Can you read that or do you want me to make it bigger?

25    A.    If you can make it a bigger, that would be great.

1    Q.   Do you see how he's thanking you for sending him the

2    922(n) cases?

3    A.   Yes.

4    Q.   All right.  And the only reason why I bring this up is to

5    give the letter some context.  You do acknowledge that on

6    Exhibit 12 you sent him 922(n) cases?

7    A.   Correct.

8    Q.   All right.  And so this document is acknowledging receipt

9    and that you sent them -- or that he received -- strike it.

01:38 10        That he drafted this document sometime after March 15,

11   2016?

12   A.   Probably so, yes.

13   Q.   Okay.  But there's one comment I'd like you to read into

14   the record starting with, "I'm also curious."

15   A.   "I'm also curious as to how my iPhone was accessed.  Even

16   with a warrant, it appears phone service providers are refusing

17   to physically unlock cell phones, iPhones in particular.

18   San Bernardino, CA, the attack case, a singular" --

19   Q.   "A similar situation"?

01:39 20   A.   "A similar situation."

21   Q.   And so again, you're seeing questions coming from your

22   former client as to how -- and it appears to be after March of

23   2016 -- how the government got into his phone?

24   A.   Yes.

25   Q.   Did you provide an answer to that question to him at any

1    point in time?

2    A.   I began to.  I think it took me a little time to figure

3    out, by looking at my file, what the sequence of events was.

4    Q.   So you were unable to tell him at that point in time,

5    "Well, you gave me the passcode back in Wyatt in August"?

6    A.   I believe -- I didn't remember at the time he first asked

7    me about it.

8            MR. SPENCER:  May I approach?

9            THE COURT:  Yes.

01:40  10    BY MR. SPENCER:

11    Q.   Showing you another document.  Take a look at that

12    document and tell me if you recognize what that document is.

13    A.   This is a document dated May 4, 2016.  It's a letter from

14    me to Mr. Daniells and my partner Phil Cormier.

15    Q.   Okay.

16            MR. SPENCER:  Next exhibit.

17            MR. MacKINLAY:  No objection.

18            THE CLERK:  This is going to be Defendant's Exhibit 14

19    received.

01:41  20            (Defendant's Exhibit No. 14 received into evidence.)

21    BY MR. SPENCER:

22    Q.   Okay.  Exhibit 14 is a May 4, 2016, letter that you just

23    acknowledged was in your file?

24    A.   Correct.

25    Q.   Can you start reading from "AUSA MacKinlay"?

A.   "AUSA MacKinlay just sent me the search warrant he

obtained from the magistrate.  Last summer, the prosecutor had

asked for that consent to the search of your phone.  When we

did not do so, he informed me that that he had gotten a warrant

and that he did not need our consent.  Attached is the

warrant."

Q.   Okay.  Thank you.  So you said at some point after you

received the letter from Mr. Daniells, you had to start trying

to piece things together?

A.   I had started to try and piece things together.

Q.   And is this May 4, 2016, correspondence the efforts of

what you managed to gather at this point in time?

A.   I was starting to piece things together.

Q.   All right.  And at no point in time as of May 4, 2016, did

you ever tell Mr. Daniells that you had agreed to provide his

passcode with his consent after the warrant by AUSA MacKinlay

was obtained?

A.   At that time -- I don't know.  I don't have any specific

recollection of a conversation after August 7th --

Q.   Okay.

A.   -- to that effect.

Q.   Meaning that this document doesn't reflect what you say in

your contemporaneous notes of August 7th do?

A.   This document reflects my recollection as of May 4, 2016.

          THE COURT:  Mr. Spencer, we're almost at one o'clock.

 1    How much more do you have?

 2         MR. SPENCER:  Well, as far as documents are concerned,

 3    the cell phone, maybe four or five, but then there's the

 4    proffer issue.

 5         THE COURT:  Right.

 6         MR. SPENCER:  So I have a fair amount of information

 7    to go over.

 8         THE COURT:  How much is that?

 9         MR. SPENCER:  Well, clearly another hour, I would say.

01:43 10        THE COURT:  Okay.  Well, I think we'll take a lunch

11    recess and resume at two, if everybody is available.

12         MR. SPENCER:  I do have --

13         THE COURT:  I don't want to have to have Mr. Schneider

14    come back another day.

15         MR. SPENCER:  Sure.  I agree.  Three o'clock -- I

16    mean, I have to be somewhere by three.  In Woburn, actually.

17    But I'll see what I can do to fix that.

18         THE COURT:  Well, or -- I think we have to at least --

19         MR. SPENCER:  Get through him.

01:44 20        THE COURT:  There may be other witnesses, but at least

21    I want to finish with Mr. Schneider.

22         MR. MacKINLAY:  That said, should I keep the witnesses

23    here?

24         THE COURT:  Yes.

25         MR. MacKINLAY:  Thank you.

1          THE COURT:  I'll tell you what.  We could come back at

2     quarter to two rather than take a full hour.  Why don't we at

3     least cheat a little in that direction.

4          Okay.  Let's take a recess.

5          THE CLERK:  All rise for the Court.  Court is going to

6     take a recess.

7          (The Court exits the courtroom and there is a recess

8     in the proceedings at 1:00 p.m.).

9          THE CLERK:  All rise.

02:35 10          (The Court enters the courtroom at 1:50 p.m.)

11          THE CLERK:  For a continuation of the evidentiary

12     hearing.  Be seated.

13          THE COURT:  Continue.

14          MR. SPENCER:  Thank you.

15                    MICHAEL SCHNEIDER, resumed

16     BY MR. SPENCER:

17     Q.   Good afternoon, Attorney Schneider.

18     A.   Good afternoon.

19     Q.   I think we left off, I was going over an exhibit, Exhibit

02:35 20     14, which is the May 4, 2016, letter that -- Exhibit 14, May 4,

21     2016, letter that you sent to Mr. Daniells.  Do you recall

22     that?

23     A.   Yes.

24     Q.   And it's -- this is the first correspondence that you've

25     been shown today that demonstrates that there was some

1  communication by you to Mr. Daniells about the government

2  asking for his consent to the passcode?

3  A.   I don't remember it if that's true, but it may be.

4  Q.   Right.  Meaning that you haven't seen any other

5  correspondence today other than this correspondence?

6  A.   I have not.

7  Q.   Okay.  And this correspondence dated May 4, 2016, comes

8  approximately two months after Exhibit 10, which is dated March

9  9, 2016, where Mr. Daniells is asking you questions about how

02:36 10  the government obtained the cell phone records and GPS data?

11  A.   Yes.

12  Q.   Okay.  And at no point in time up to this period, meaning

13  May 4, 2016, had you told him that -- you spoke about the Wyatt

14  visit from August 7th?

15  A.   Could you repeat the question?

16  Q.   Yeah.  At no point in time between March 8th of 2016 and

17  May 4th of 2016 did you ever mention, to your recollection, the

18  Wyatt visit that --

19  A.   I don't have any recollection.

02:37 20  Q.   Okay.  Now, I want to refer your attention back to

21  Exhibit 2.  Now, just for the record, the last exhibit that I

22  showed you, Exhibit 14, dealt with the May 4th communication,

23  correct?

24  A.   Yes.

25  Q.   Okay.  So then we're moving in chronological order.  You

1    see on Exhibit 2 there's a May 5th entry, right?

2    A.    Yes.

3    Q.    And it talks about receiving further discovery from Glenn

4    MacKinlay, including the 2703 order?

5    A.    Yes.

6    Q.    What is a 2703 order?

7    A.    It is an order that permits the government to obtain

8    historical cell site location information.

9    Q.    Okay.  Then you see that there's a visit with Mr. Daniells

02:38 10   on May 12th, right?

11   A.    Correct.

12   Q.    All right.  And just so we're clear, on May 4th you send a

13   letter to Mr. Daniells talking about the government asking for

14   his consent, correct?

15   A.    Apparently, yes.

16   Q.    Can you read that paragraph, slowly for the court

17   reporter, into the record?

18   A.    Which paragraph?

19   Q.    The paragraph after "May 12, 2016."

02:38 20   A.    "On 5/12/16, Phil Cormier and I went down to Wyatt to

21   speak with client for two-and-a-half-hour-plus conversation

22   with client.  We were kept waiting for 45 minutes to an hour.

23   During the conversation with Mitch, we went over the new

24   discovery we received, including the video of the 3/27/15

25   purchase in Sportsman's Outlet, the Triple I record check which

1    seemed to show only a CWOF for an A&B, a CWOF for a disorderly

2    and the open Waltham/Weston charges, aside from dismissed and

3    nolle prossed charges.

4        "We also discussed the government's 2703(d) order and

5    materials for the HCSLI and call detail records on the cell

6    phone, the search warrant and order to Apple for his phone

7    (which were obtained by the government on their own without our

8    consent) the Cellebrite report and imaging and/or decryption of

9    the cell phone contents, the flash drive containing cell phone

02:39 10   contents.

11       "M.D. said he did want me to send him copy (via Jean

12   Singleton) of the flash drive for him to review, and I told him

13   our paralegal would figure out how to do it."

14   Q.   Okay.  And you noticed on that visit, the first thing you

15   went over with Mr. Daniells was the new discovery you received,

16   including the video of the March 27, 2015, purchase at

17   Sportsman's Outlet, right?

18   A.   That's what it says.

19   Q.   All right.  Going back to Exhibit 6, which you have dated

02:40 20   August 7, 2015, does it not indicate that at that point in time

21   you go over the new discovery of the March 27 Sportsman's

22   interview video?

23   A.   It says "Sportsman interview video/photos."

24   Q.   And you call it "new discovery," right?

25   A.   Yes.

1    Q.   And then you call it also "new discovery" again about nine

2    months later, on May 12, 2016?

3    A.   That's what this says, yes.

4    Q.   As a matter of fact, we've already established that you

5    just received that discovery not too long ago?

6    A.   I don't know when I received the discovery, but if this

7    memo is correct, it would have been sometime just before this

8    meeting.

9    Q.   And then you see on this Exhibit 2, the next thing that

02:40 10   you discuss with Mr. Daniells after the video -- the purchase

11   at Sportsman Outlet is the Triple I record check which seems to

12   show only a CWOF for an A&B, a CWOF for disorderly, and the

13   open Waltham/Weston charges, right?

14   A.   Yes, that's correct.

15   Q.   And then going back to this document that you claim is

16   dated August 7, 2015, right after Sportsman's videos, you see a

17   notation that back at Wyatt you also bring up his record,

18   including priors and CWOF'S, right?

19   A.   That's correct.

02:41 20   Q.   Oh, I'm sorry.  Just one more point.  You also discussed

21   on May 12th after you sent the May 4, 2016, correspondence

22   where you tell Mr. Daniells again "the search warrant and order

23   to Apple for his phone which were obtained by the government on

24   their own without our consent," right?

25   A.   That's what it says.

1    Q.   And again, there was no mention at that time of the Wyatt

2    interview, right?

3    A.   That's what it says.

4    Q.   And then going to page 2, it appears that you discussed

5    the issue with the cell phone in more detail, right?

6    A.   Yup.

7    Q.   And then you specifically begin to explain that Glenn --

8    or "Glenn MacKinlay sent me an email telling me that they would

9    get a search warrant without our consent if we do not give them

02:42 10    the password."  And then you go on to say, "I reminded Mitchell

11    Daniells that he had given me several possible passcodes for

12    the phone after we had discussions about it, and that I was

13    uncertain whether I provided them or whether Apple/ Cellebrite

14    decrypted the phone"?

15    A.   That's correct.  That's what it says.

16    Q.   So would it be fair to say that after nine months or so

17    was the first time that you had this discussion about whether

18    or not you provided the passcode to the government?

19    A.   Other than any conversations that would have occurred on

02:42 20    May 7th, that's what this seems to indicate.

21    Q.   And then is it fair to say that "I told Mr. Daniells it

22    was possible I had provided the passcodes"?

23    A.   Yes.

24    Q.   Did you do any preparation, meaning looking through your

25    files, to see if it was not a possibility but a certainty that

1   you provided the passcode before you met with him?

2   A.   I don't recall if I did.

3   Q.   Is it fair to say that you would have had an email in your

4   file that would have demonstrated that on August 7, 2015, you

5   did provide a passcode?

6   A.   That I would have had an email in my file?

7   Q.   If you researched your files --

8   A.   Oh, yes, I had an email, yes.

9   Q.   -- you would have uncovered --

02:43 10        But that email -- you didn't talk to Mr. Daniells about

11   that email, did you?

12   A.   At that time, no.

13   Q.   Did you talk to Mr. Daniells about the email that Glenn

14   MacKinlay sent you telling you that he had gotten a search

15   warrant without our consent if we do not give him the passcode?

16   A.   I don't remember.

17   Q.   Well, if you go to this document on page 2 you see

18   specifically where you state, "I told Mr. Daniells" --

19   "Mitchell Daniells that when Glenn MacKinlay had not heard back

02:43 20   from us" -- go on, go on -- and then "Glenn MacKinlay sent me

21   an email telling me that he had gotten a search warrant"?

22   A.   Yes.

23   Q.   So you mention an email that Glenn MacKinlay sent to you

24   back in July and August of 2015 to Mr. Daniells?

25   A.   Yes.

1    Q.   But you didn't mention the email that you sent to Glenn

2    MacKinlay saying that you actually provided the passcode?

3    A.   I think I was still piecing together what had occurred.

4    Q.   It was on the same email thread, was it not?

5    A.   It was a separate email.

6    Q.   So you hadn't uncovered that email as of May 12, 2016?

7    A.   I don't remember.

8    Q.   I'm sorry.  Lastly, on Exhibit 2, you see how on page 3 of

9    that exhibit -- at the bottom you see, "We again went over the

02:45 10   sentencing guidelines calculation"?

11   A.   Yes, I see that.

12   Q.   Okay.  And you also noted on this document that you claim

13   was generated on August 7, 2015 -- you also see on that

14   document "sentence calculations gone over"?

15   A.   I went over the guideline calculations numerous times both

16   with Mr. MacKinlay and Mr. Daniells.

17   Q.   I understand.  All I'm saying is the information in

18   Exhibit 6 seems to mirror the information that's listed in

19   Exhibit 2.  Would you tend to agree with that?

02:45 20   A.   That's your characterization, but it's not incorrect.

21   Q.   Okay.  Is it possible that Exhibit 6 is actually

22   contemporaneous notes with respect to the May 12, 2016,

23   interview that you had with Mr. Daniells?

24   A.   I think it is virtually impossible.

25   Q.   At some point in time, particularly during this May 12,

1  2016, interview, did Mr. Daniells start to blame you for

2  messing his case up?

3  A.   Yes.

4  Q.   What specifically do you recall him telling you?

5  A.   I recall him specifically focusing on turning over the

6  passcode and letting him give up the name of Kenny Brobby

7  during the proffer session.

8  Q.   And what did you say in response to the passcode issue

9  when he started to blame you?

02:46 10  A.   At which particular point in time?

11  Q.   The May 12, 2016, visit.

12  A.   I think I would have said what's reflected in that memo.

13  Q.   Okay.  On page 2 of Exhibit 2, you see where "Mr. Daniells

14  continued to seem to focus on this and to blame me for the

15  evidence against him provided by William Roberts, P.J.,

16  Copithorne and Kenny Brobby"?

17  A.   Yes.

18  Q.   And is there, to your memory, any response that you gave

19  to that blame?

02:47 20  A.   I don't remember.

21  Q.   And would it be fair to say that if you had reviewed

22  Exhibit 5, that would have been prior to your meeting with

23  Mr. Daniells on May 12th, correct, meaning that if this

24  document is accurate, and it's dated May 2nd, and it was in

25  your file as of that date, you would have had an opportunity to

1   review that document before your meeting with Mr. Daniells?

2   A.   I don't remember to what extent I read it and reviewed it.

3   Q.   At some point did Mr. Daniells tell you that the reason

4   why the prosecution kept asking for the passcode was because

5   they couldn't get into the phone without it?

6   A.   He may have said that.

7   Q.   But you didn't realize that at the time you provided the

8   passcode?

9   A.   No.

02:48 10   Q.   At some point would it be fair to say that the

11   relationship between you and Mr. Daniells broke down?

12   A.   Yes.

13   Q.   And so you had to move to withdraw?

14   A.   Yes.

15   Q.   And did you review any rules of professional

16   responsibility prior to you moving for withdrawal?

17   A.   Yes.

18   Q.   Did you review Rule 1.116?

19   A.   Sounds familiar but you'd have to refresh me.

02:49 20   Q.   Okay.

21         MR. SPENCER:  May I approach, your Honor?

22         THE COURT:  Yes.

23   BY MR. SPENCER:

24   Q.   Before I show you any rules, I'd like to just show you

25   this document.  Take a look at it and tell me if you recognize

1    what it is.

2    A.    This is excerpts of the -- it's excerpts of a memo to the

3    file in Mr. Daniells' case dated August 9, 2016, and it

4    concerns an August 8th meeting with Mr. Daniells at Wyatt and a

5    telephone follow-up conference.

6    Q.    Can you just briefly review it just to make sure that it

7    contains the body -- I understand certain portions are

8    redacted.

9    A.    It looks like a memo I would have prepared.

02:50 10              MR. SPENCER:  Next exhibit, please.

11              MR. MacKINLAY:  No objection.

12              THE CLERK:  That is going to be 15.  Defendant's 15 is

13    received.

14              (Defendant's Exhibit No. 15 received into evidence.)

15    BY MR. SPENCER:

16    Q.    Showing you page -- well, just so the record reflects it,

17    Exhibit 15 would be a memo that's -- you put in your file

18    regarding a meeting with Mr. Daniells on August 8th?

19    A.    That's correct.

02:51 20    Q.    All right.  I'm going to page 5 on that exhibit.  First,

21    can you indicate, starting with "Daniells," and read the first

22    sentence.

23    A.    "Daniells called back," that sentence?

24    Q.    Well, actually, the first -- read the whole paragraph but,

25    yes, "Daniells called back."

1    A.    "Daniells called back 10 minutes later and continued

2    making accusations.  Cormier was again present for the call.

3    Schneider told Daniells in his continued accusations that

4    Schneider had misled, coerced and lied to him.  Created a

5    conflict of interest and that a line had been crossed and now

6    he had to withdraw.  Schneider specifically mentioned certain

7    things" --

8    Q.    Okay.  And one of the mentions in the bullet point is

9    "Schneider gave up the passcode to his iPhone without Daniells'

02:51 10   consent"?

11   A.    That's correct.

12   Q.    And do you see the paragraph previous up there says Rule

13   of Professional Responsibility that you reviewed?

14   A.    That's correct.

15   Q.    And it was that Rule 1.116?

16   A.    Yes.

17   Q.    Are you aware of another Rule of Professional Conduct

18   called Rule 1.6, confidentiality of information?

19   A.    Yes.

02:52 20   Q.    And have you read that rule prior to today?

21   A.    I'm sure I have but not recently.

22   Q.    I'm showing you a copy of that rule.  Take a look at it

23   and tell me if you recognize what that rule is.

24   A.    This is the Massachusetts Rule of Professional Conduct,

25   Rule 1.6, that deals with the confidentiality of information.

1    Q.    And showing you another rule, take a look at that rule and

2    tell me if you recognize what that rule is.

3    A.    This is Massachusetts Rule of Professional Conduct, Rule

4    1.0, Terminology.

5    Q.    And would you have reason to review both of these rules

6    over the course of your representation or be familiar with them

7    over the course of your representation with Mr. Daniells?

8    A.    At some point I know I would have reviewed 1.16.  Whether

9    or not I reviewed 1.0, I don't remember.

02:53 10   Q.    Are you aware that this rule specifically requires that

11   you not reveal confidential information relating to the

12   representation of a client unless that client gives informed

13   consent?

14   A.    Yes.

15   Q.    And are you aware that the terminology of informed consent

16   denotes the agreement by a person or proposed conduct after the

17   lawyer has communicated adequate information and explained

18   about the material risks and reasonable available alternatives

19   to the proposed course of conduct?

02:53 20   A.    It's been a long time since I'd read that section but at

21   some point I'd read it.

22   Q.    And are you aware that in reference to informed consent,

23   that it must be given in writing by the person, or a writing

24   that the lawyer promptly transmits to the person confirming an

25   oral informed consent?

A.   To be honest, I had forgotten that provision.

Q.   Okay.  So it would be fair to say that as it pertains to

getting informed consent from Mr. Daniells before you actually

provided that passcode over to the prosecutor, you never

actually had him sign anything giving that consent?

A.   It is correct that I never obtained any written consent to

turn that information over.

        MR. SPENCER:  Judge, I just ask the Court, I'm going

to just submit these just for judicial notice purposes.

        THE COURT:  All right.

        MR. SPENCER:  Judge, with that, I'll start on the

proffer.  I think I'm concluded with the passcode.

        THE COURT:  Okay.  Go ahead.

BY MR. SPENCER:

Q.   Now, we talked about the proffer.  You said it was July

15th?

A.   That's correct.

Q.   And what information were you aware of regarding the file

or the information provided by the government to you between

the date of his initial appearance on June 18th to the actual

proffer on July 15th?

A.   So at that point I would have received -- I would have

received the detention packet of discovery.  There may have

been an additional packet of discovery.  I don't recall.  I

would have received information from Mr. MacKinlay and the

1    agents either in the courtroom or in the hallway, and I also

2    would have attended and conducted cross-examination of Agent

3    Oppedisano with respect to the case.

4    Q.   Would it be fair to say that the litigation was in its

5    early stages at the time that you had Mr. Daniells submit to

6    this proffer?

7    A.   It certainly was.

8    Q.   And you stated that you received a discovery detention

9    packet?

02:56 10   A.   Yes.

11   Q.   And would you recognize a copy of the cover letter if I

12   were to show it to you?

13   A.   Yes.

14   Q.   I'm showing you a document.  Tell me if you recognize what

15   that document is.

16   A.   This looks like a discovery packet -- the cover letter to

17   a discovery packet from AUSA MacKinlay dated June 23, 2015.  It

18   includes copies of the *Jencks* material of the government's

19   witness, Brian Oppedisano, and other exhibits that he intended

02:56 20   to use at the hearing.

21            MR. SPENCER:  The next exhibit.

22            MR. MacKINLAY:  No objection.

23            THE CLERK:  This is going to be Defendant's Exhibit

24   16.

25            (Defendant's Exhibit No. 16 received into evidence.)

BY MR. SPENCER:

Q.   And after you received that on June 23, 2015, the proffer
was shortly thereafter?

A.   The proffer was on July 15th.

Q.   So just a few weeks thereafter?

A.   A few weeks thereafter.

Q.   And you're not aware of any additional -- and so the
record's clear, it was about 110 pages of Bates-stamped
material, 1 to 110?

A.   If that's what that says, yes.

Q.   All right.  So were you aware at the time that you
participated in the proffer with Mr. Daniells that there was a
March 30th transaction where Timothy Bailey purchased a gun?

A.   Yes, I was aware of that.

Q.   And that the federal agents were able to trace that gun
back over to a Mr. Will Roberts?

A.   That's correct.

Q.   And then the agents went to speak to Mr. Will Roberts
about that?

A.   That's correct.

Q.   And from review of the reports generated by the agents,
had you known by the time of the proffer that Mr. Will Roberts
first began to lie to the agents?

A.   I remember that there was some lies contained in his
proffer.

1           MR. MacKINLAY:  Your Honor, I object to this.  I don't

2    know the relevance of this to the proffer.

3           MR. SPENCER:  It's relevant because it deals with the

4    information that Mr. Schneider knew at the time he's giving

5    counsel over to Mr. Daniells, and the information that he knows

6    about his own file is relevant to the issue of the advice that

7    he gives.

8           THE COURT:  All right.  Well, go ahead.

9           MR. SPENCER:  All right.

02:58 10   BY MR. SPENCER:

11   Q.   Now, I'll try to actually just get to the point.  Would it

12   be fair to say based upon the discovery information you

13   received, you had learned information that Will Roberts had

14   committed a crime?

15   A.   Yes.

16   Q.   And that he was lying to federal agents about it?

17   A.   Yes.

18   Q.   Which is another crime?

19   A.   Yes.

02:58 20   Q.   Okay.  And so were you also aware when you participated in

21   the proffer that obviously Mr. Roberts had some type of bias to

22   curry favor from the government, right?

23   A.   Sure.

24   Q.   And were you aware -- and just to kind of streamline this,

25   were you aware there was an allegation that Mr. Will Roberts

1  was present at a March 27 alleged gun transaction with

2  Mr. Daniells?

3  A.   Yes.

4  Q.   And was there any -- to your knowledge, was there any

5  other witnesses that was present in addition to Mr. Daniells to

6  these alleged transactions?

7  A.   There was a Joshua Kahle whose name came up at some point

8  who was a clerk at one of the stores.

9  Q.   And are you aware if any of the clerks at any of the

02:59 10  stores interviewed by the agents were able to confirm that

11  Mr. Daniells was actually present with Mr. Roberts during the

12  time of the March 27th transaction?

13  A.   I don't think I had any reason to believe that.

14  Q.   And so in essence, as of the time of the proffer the only

15  information that you really had as far as that March 27th

16  transaction was that Mr. Will Roberts said that it happened and

17  you had no additional live witness to actually corroborate

18  that?

19  A.   I had other information that made me concerned about the

03:00 20  strength of the government's case.

21  Q.   I understand that.  I'm just talking about live witness

22  testimony that corroborated Mr. Will Roberts'.  You weren't

23  aware of anybody else that was --

24  A.   I was not aware of any other live testimony; that's

25  correct.

1    Q.    Now, before the proffer, were you made aware that the

2    government agents were interested in determining the identity

3    of an unidentified person that was with Mr. Daniells at the

4    time of the March 27th transaction?

5    A.    I'm not sure I understand the question.

6    Q.    Okay.  Do you know the name "Jermaine Gardner"?

7    A.    I recently have seen that in the file.

8          MR. SPENCER:  May I approach?

9          THE COURT:  Yes.

03:01 10   BY MR. SPENCER:

11   Q.    Showing you a two-page document.  Take a look at it and

12   tell me if you recognize what it is.

13   A.    Yes.  I recognize this to be an ATF instant report or

14   form.  It looks like it was prepared on May 20th, 2015.

15   Q.    And does it reference a gentleman named Jermaine Gardner

16   that was identified as being with Mr. Daniells at the time of

17   the March 27th alleged purchase?

18   A.    I see there's a paragraph that says that McPartlin had

19   previously identified the picture as Gardner, and that someone

03:02 20   who's redacted out of here, presumably it's the --

21   Q.    Cooperating witness?

22   A.    -- cooperating witness made an identification of the

23   photograph.

24   Q.    All right.  Is there a Bates-stamp number on this

25   document?

1    A.    004.

2    Q.    And the next one?

3    A.    The next one?  005.

4    Q.    And so this -- if this was included in the detention

5    packet, Bates stamped Number 1 to 110, there's no reason you

6    wouldn't have seen this proffer?

7    A.    That's correct.

8              MR. SPENCER:  Next exhibit.

9              MR. MacKINLAY:  No objection.

03:03 10           THE CLERK:  This is going to be Defendant's Exhibit 17

11   received.

12             (Defendant's Exhibit No. 17 received into evidence.)

13   BY MR. SPENCER:

14   Q.    Now, after you received this detention packet, did you

15   give Mr. Daniells advice on participating in a proffer with the

16   government?

17   A.    Yes.

18   Q.    What was that advice?

19   A.    I believe I met with Mr. Daniells before and after the

03:03 20   second piece of the detention hearing on July 1st in which we

21   discussed sort of various options.  By that point I had already

22   discussed with Mr. Daniells the fact that he had -- that there

23   were several ways to go in the case, that he had a right to a

24   jury trial.  I would have explained what all of the rights that

25   are concomitant with a jury trial involved and what preparation

1    for trial would look like.  I also explained that in many

2    federal cases, defendants end up going a different route, end

3    of pleading guilty and try to minimize any damage at sentencing

4    by fighting various upward adjustments, pushing for downward

5    adjustments at sentencing, and pushing for variances as low as

6    possible.

7        So with respect to the proffer itself, I would have told

8    him what a proffer is and I would have described it.

9    Q.   Did you give any encouragement to Mr. Daniells to

03:04 10   participate?

11   A.   I would say that at some point before the proffer, we had

12   had discussions about the strength of the -- what I perceived

13   to be the strength of the government's case, especially with

14   respect to the straw purchase information.

15   Q.   Okay.  Let's stop there.

16   A.   Okay.

17   Q.   So at this point there's only one charge that Mr. Daniells

18   has been charged with.

19   A.   That's correct.

03:05 20   Q.   And that would be 18 United States Code 922(n)?

21   A.   That's correct.

22   Q.   Possession of a firearm while being a prohibited person?

23   A.   That's correct.

24   Q.   Had you looked into, at that point in time, whether or not

25   Mr. Daniells was ever told that he could not possess a firearm?

1    A.    I had looked -- I had had a law student in my office, and

2    I'd done a little bit of research myself, reviewed the *Quinones*

3    case and reviewed some of the legal bases for 922(n).

4    Q.    Prior to the proffer?

5    A.    Yes.

6    Q.    And would it be fair to say that the only evidence that

7    you knew of that the government was relying upon before you

8    went into the proffer to support the 922(n) charge was the

9    statements of Will Roberts and the historical cell site

03:06 10   location which corroborated what he had to say?

11    A.    I think there was something in the discovery materials

12    about the fact that there had been a court date on the other

13    pending charge on June 6th.

14    Q.    And how did that factor into the calculus of the strength

15    of the government's case?

16    A.    Well, that had to do with the 922(n) charge.

17    Q.    Now, did you also learn prior to the proffer that there

18    was an independent witness that was with Mr. Daniells that if

19    the government found out who it was, would have, in fact,

03:06 20   corroborated Mr. Roberts?

21    A.    I was aware that there was someone who had driven down

22    Mr. Daniells from Massachusetts to Pennsylvania, and it was my

23    impression that that person was along for the ride.

24    Q.    Along for the ride?  Okay.  But based upon your 30 years

25    of experience practicing law, you know that being present along

1    for the ride could still provide incriminating information as

2    pertained to Mr. Daniells?

3    A.   To my best recollection, the information that I had

4    received from Mr. Daniells about this other person was that he

5    was an idiot, that he didn't know anything about anything, and

6    that he was along for the ride.

7    Q.   Right.  But you know that there was an allegation that

8    this person was along for the ride while Mr. Daniells allegedly

9    received weapons from another person?

03:07 10   A.   It was not my understanding that he was present at the

11   scene when there was any receipt of weapons.

12   Q.   Did you ask?

13   A.   I don't recall.

14   Q.   Because --

15   A.   I would assume I did but I don't recall.

16   Q.   Because that would be important for you to know, right?

17   A.   Yes, it would.

18   Q.   Because that would tell you whether or not this person,

19   although perhaps innocent of his own right, would have

03:07 20   witnessed an actual crime committed by somebody else?

21   A.   Yes; that's correct.

22   Q.   And now this Will Roberts person, the person who has all

23   this bias, could not be corroborated by an actual live person?

24   A.   That's true.

25   Q.   And you would have had reason to know that if you asked

1   Mr. Daniells the question, "Well, what did Kenny Roberts see

2   that day"?

3   A.    Kenny Brobby -- presumably, yes.

4   Q.    Right?  But you don't know whether you asked him that

5   question or not?

6   A.    I don't remember.

7   Q.    Did you do any preparation with Mr. Daniells prior to

8   going into the proffer?

9   A.    We had had a number of meetings both on -- on June 18th,

03:08 10   before and after the first appearance but didn't get into a lot

11   of detail.  Primarily, I learned from Mr. Daniells what he

12   understood the government's case to be against him; a meeting

13   on June 22nd where I got more information that was down at

14   Wyatt; and then I had meetings before and after -- at least

15   before the detention hearing and maybe after the detention

16   hearing; and then another meeting on July 1st.

17   Q.    During all these meetings, did you ever ask Mr. Daniells

18   about the identity of the person who was with him down in

19   Pennsylvania?

03:09 20   A.    I believe -- I didn't know the person's name but I think I

21   had information that there was a person who was simply a

22   pothead, who was an old friend who had nothing to do with

23   anything, and he was just along for the ride.

24   Q.    And did you attempt to find out any more information as to

25   where he was located at the time of any alleged straw

1   purchases?

2   A.   I didn't make any effort to interview him or locate him.

3   Q.   Now, during the proffer session itself, did you recall

4   hearing any type of questioning from the government via its

5   agents about the identity of this unknown person at the time?

6   A.   Yes.

7   Q.   What did you -- who asked the question and what did you

8   hear them say?

9   A.   I don't remember.  To the best of my recollection one or

03:09 10   more of the agents was asking a number of questions at the

11   proffer session.  I believe Mr. MacKinlay was as well.  I don't

12   remember who asked.

13   Q.   And once this person's identity was sought, what did

14   Mr. Daniells do?

15   A.   I think Mr. Daniells looked at me, and I think I said to

16   him, "I think we need to take a break."

17   Q.   And do you have an understanding, even though the

18   relationship between you two was short, why he would be looking

19   at you at that particular moment?

03:10 20   A.   I think he was uncertain whether there would be any value

21   in giving it up or whether it would be a risky thing to do.

22   Q.   And so he was looking for advice from you in that regard?

23   A.   That's correct.

24   Q.   I mean, at the time that the passcode -- and there was a

25   passcode request made during the proffer as well?

A.    At the end of the proffer session, yes.

Q.    Mr. Daniells didn't look to you for advice on whether or

not to refuse, right?

A.    I don't remember.

Q.    You don't have any notes that reflect that?

A.    I don't.

Q.    But after they asked the specific question, he looked to

you for help?

A.    I believe that's right.

03:10 Q.    And then you took a break?

A.    Yes.

Q.    So that means at this point in time you have to put the

lawyer hat on, right?

A.    For sure.

Q.    And so you need to think about any and all implications

that this information could cause as it pertains to the rights

of Mr. Daniells?

A.    That's right.

Q.    What type of implications or complications did you think

03:11 about when you sat down with Mr. Daniells for this brief talk

during the middle of the proffer session?

A.    I think I was focusing on the fact that the more

Mr. Daniells could be, and appear to be, helpful to the

government without worsening his situation, the better result

that I might be able to achieve in seeing if we could prevent a

1   superseding indictment in the case, and to see also if we could

2   get the government to sort of treat some of the 2K2

3   enhancements in a different light -- in a more favorable light.

4   Q.   So was there any focus at all on making sure that his

5   rights were protected concerning providing the government

6   information that could potentially incriminate him?

7   A.   I think other than my asking Mr. Daniells, "Was this guy

8   just along for the ride?  Does he know anything about

9   anything?" and hearing that he didn't, I didn't do any further

03:12 10   due diligence beyond that.

11   Q.   Well, is it fair to say that during the conversation he

12   asked for your advice on what to do, right?

13   A.   Yes.

14   Q.   And you told him that if Kenny was just along for the ride

15   and didn't know anything, then maybe you could give him the

16   name?

17   A.   I said it may be okay.

18   Q.   It may be okay?

19   A.   I think I said something along those lines.

03:12 20   Q.   Or maybe not, meaning you weren't sure?

21   A.   That's what I said.

22   Q.   I mean, you had a chance to get to know Mr. Daniells over

23   the course of perhaps -- over a year, correct?

24   A.   Yes.

25   Q.   Intelligent individual?

1    A.    Very much so.

2    Q.    He likes to ask questions?

3    A.    Yes, he does.

4    Q.    He likes to have things explained to him?

5    A.    Yes, he does.

6    Q.    And you're saying that you said to him "maybe it's okay"

7    and he didn't ask any follow-up or responsive questions?

8    A.    I don't recall any follow-up to that.

9    Q.    Did he tell you that he thought Kenny was an idiot?

03:13 10   A.    Yes.

11   Q.    What did that statement state to you about what he was

12   thinking?

13   A.    What I remember is being told that Kenny is an idiot, he

14   was a pothead, and he was just along for the ride.

15   Q.    And didn't he also tell you that he didn't want the agents

16   approaching him?

17   A.    I don't specifically remember that.

18   Q.    Paragraph 20 of your affidavit, did you not swear,

19   "Mr. Daniells mentioned, as he always had before, about his

03:14 20   reservations about mentioning other people's names.  He also

21   told me he was concerned about the government approaching this

22   person because he believed Kenny was an idiot."

23         Isn't that what you said?

24   A.    I guess I did say it.  If it's in the affidavit, I said

25   that.

1  Q.   Okay.  Are you disputing what you signed your affidavit

2  to -- the information that you signed the affidavit to?  I

3  mean, are you disputing what I just stated?

4  A.   No; I don't have a specific recollection at this time that

5  he said specifically said anything about approaching -- not

6  approaching the witness.  What I do remember is that

7  Mr. Daniells was extremely clear that he didn't want to rat on

8  anyone, he did not want to snitch on anyone, that he did not

9  want to get anyone in trouble.

03:14 10  Q.   All right.  And so Mr. Daniells told you that he did not

11  want this person approached.  Have you done proffers before

12  this day?

13  A.   Yes.

14  Q.   And have you had the experience of seeing government

15  agents approach witnesses that are provided during a proffer

16  session?

17  A.   That sometimes happens, yes.

18  Q.   So you had specific experience with that?

19  A.   Yes.

03:15 20  Q.   And when Mr. Daniells told you that he did not want the

21  government approaching this person, you said, "Well, maybe you

22  should give him the name"?

23  A.   I told him that maybe he should give him the name.

24  Q.   At any point in time did you relay to him the benefit of

25  your experience with proffer agreements saying that, "Well,

1    there's nothing to stop the agents from approaching Kenny if we

2    give up the name"?

3    A.    I don't recall having said that.

4    Q.    Do you believe that fact to be true, that there's nothing

5    to stop the agents from approaching Kenny if you give them the

6    name?

7    A.    That's true.

8    Q.    Did you let Mr. Daniells know about this?

9    A.    I don't believe I did.

03:15 10    Q.    Is it fair to say that Mr. Daniells has never been

11    convicted of a felony?

12    A.    That was certainly my understanding.

13    Q.    So it wasn't your understanding he was a very

14    sophisticated person as it pertained to dealing with criminal

15    procedure, particularly a federal criminal procedure?

16    A.    From my recollection, he had virtually no record.

17    Q.    So he looked to you for advice on this issue?

18    A.    That's correct.

19    Q.    And what Mr. Daniells did was give the name of a witness

03:16 20    that the government didn't know about that was able to

21    corroborate a live witness that had credibility issues,

22    correct?

23    A.    I certainly didn't anticipate that that was going to

24    happen.

25    Q.    But that's what happened?

```
 1  A.   But that's what happened.

 2       MR. SPENCER:  I'm probably about five, ten minutes.

 3  Q.   Did you speak with Mr. MacKinlay first about what to

 4  expect in the proffer session?

 5  A.   I told Mr. MacKinlay in advance of the proffer session

 6  that my client was not going to be giving up the names of

 7  anyone that he was not -- he was not going to be cooperating,

 8  he was not going to be ratting on anyone, he was not going to

 9  be snitching on anyone.

03:17 10 Q.   Well, isn't that the whole point of a proffer, for a

11  witness -- or, rather, the defendant to provide cooperation?

12  A.   The government -- the agents and Mr. MacKinlay were

13  repeatedly focused in their comments to me that if -- that

14  Mr. Daniells needed to come in and help himself and other sorts

15  of law enforcement language that I've heard certainly a lot of

16  over the course of my career, and that if he did this, there

17  was at least a possibility that we may be able to avoid a

18  superseding indictment, and that there would be other issues

19  that might be dealt with far more leniently on the sentencing

03:17 20 side.

21  Q.   Well, what kind of cooperation -- if you told

22  Mr. MacKinlay that there's no way that he's going to provide

23  any names, give anybody up, what cooperation were you

24  believing, along with Mr. MacKinlay, as to what information he

25  was going to give?
```

1    A.    I conceptualized this more along the lines of a

2    safety-valve proffer.

3    Q.    What do you mean by that?

4    A.    It's an opportunity where a defendant presents information

5    about the things that they did -- part of it was I was trying

6    to convince Mr. MacKinlay and the agents that Mr. Daniells, you

7    know, had this -- may have had this relationship with Will

8    Roberts but that he was not a gun dealer; Mr. Daniells had a

9    concealed -- to my recollection a concealed license to carry --

03:18 10   a license to conceal and carry in Pennsylvania; and that he was

11   a sportsman and that he had gone out into the woods frequently

12   and would shoot, you know, guns at cans and stuff like that.

13   Q.    When you told Mr. MacKinlay that he wasn't going to

14   provide any names, what did Mr. MacKinlay say in response to

15   that?

16   A.    That he was still interested in having him come in.

17   Q.    And when you got to the proffer, did you see -- who did

18   you see present inside the proffer?

19   A.    There were two ATF agents, Mr. MacKinlay, there may have

03:19 20   been another AUSA, and there was a police officer.

21   Q.    An African-American gentleman?

22   A.    I don't remember.

23   Q.    Do you know an Officer Greg Brown?

24   A.    That name sounds familiar.

25   Q.    And why was this Boston police officer there?

```
 1    A.    I don't recall.

 2    Q.    Do you recall him asking Mr. Daniells any questions about

 3    people that he knew involved with the Point investigation?

 4    A.    I'm sure that there were questions asked.  I don't

 5    remember whether it was Detective Brown -- or Sergeant Brown.

 6    Q.    At any point in time while you were sitting during the

 7    proffer, did you hear the agents trying to get Mr. Daniells to

 8    provide information about other people?

 9    A.    Yes.

10    Q.    And if that wasn't your expectation, did you speak up

11    about it?

12    A.    I think that -- yes, I believe that I actually said -- I

13    believe I actually said, "Mr. Daniells is not here to do that."

14    Q.    Would it be fair to say that in light of the fact that

15    there were agents there asking questions about having

16    Mr. Daniells give up the names of other people, that you and

17    Mr. MacKinlay weren't on the same page about expectations of

18    the proffer?

19    A.    I understood at the meeting that Mr. MacKinlay was letting

20    his people ask these questions but there was no information

21    given about other people.

22    Q.    At any point in time did Mr. Daniells tell you that he

23    believed that you pressured him to do the proffer?

24    A.    I believe that came after the point that he was starting

25    to blame me.
```

1    Q.   What specifically did he tell you?

2    A.   I don't recall.  Certainly I remember him saying that it

3    was a mistake on my part to let him give up the name Kenny

4    Brobby.

5         MR. SPENCER:  May I approach?

6    Q.   Showing you two pages.  Take a look at them.  I know

7    they're not dated but just tell me if you recognize what they

8    are.

9    A.   It's a document from my file entitled "Further Notes on

03:21 10   Discovery Issues."

11   Q.   Okay.

12        MR. SPENCER:  Next exhibit.

13        MR. MacKINLAY:  No objection, your Honor.

14        THE CLERK:  This is going to be Defendant's Exhibit

15   18, which will be received.

16        (Defendant's Exhibit No. 18 received into evidence.)

17   BY MR. SPENCER:

18   Q.   So for the record, I'm putting on the screen Exhibit 18.

19   Again, this is a note that you indicated that was in your file,

03:22 20   but it's not dated, correct?

21   A.   Yup.

22   Q.   Go to page 2.  I'm sorry.  All right.  Well, in your notes

23   it does state that -- it says, "Prosecution pressured both

24   Mitch and Bailey to cooperate"?

25   A.   Correct.

1    Q.   And it says, "Mitch refused," right?

2    A.   Correct.

3    Q.   What information were you relying upon, if you could

4    recall, to make that comment to your file?  What pressure were

5    you thinking about?

6    A.   Well, I think starting on the day of Mr. Daniells' first

7    appearance, either the agents or Mr. MacKinlay would come to me

8    and they presented me with what they felt was sort of a list of

9    their evidence against Mr. Daniells, that they felt that they

03:23 10   had a very strong case and that he needed to come in and help

11   himself.  And specifically, that they were very interested in

12   getting the guns off the streets.

13        MR. SPENCER:  And I think this is my last document.

14   Q.   Showing you a five-page document.  Take a look at it and

15   let me know if you recognize it.

16   A.   This, again, looks like it's a document in my partner Phil

17   Cormier's handwriting.

18   Q.   Okay.  Would it be fair to say that you and Mr. Cormier

19   began to start to sit in on the discussions with

03:24 20   Mr. Daniells --

21   A.   That's correct.

22   Q.   What was the reason for that?

23   A.   I felt like I needed some additional assistance in

24   making -- in doing the best I could for Mr. Daniells.

25   Q.   Based upon the problems that you were experiencing leading

1    up to the point where you felt that you needed more help?

2    A.    I felt like I needed more -- when Mr. Daniells started

3    blaming me for what he perceived to be some of the mistakes

4    earlier on, I brought in my partner who is a very smart lawyer.

5            MR. SPENCER:  Next exhibit.

6            MR. MacKINLAY:  No objection, your Honor.

7            THE CLERK:  Defendant's Exhibit 19 will be received.

8            (Defendant's Exhibit No. 19 received into evidence.)

9    BY MR. SPENCER:

03:25 10   Q.    Okay.  Showing you Exhibit 19, and you -- again, that is

11   not your handwriting, correct?

12   A.    That's correct.

13   Q.    And you do see notes, at least towards the bottom, that

14   gives a date of August 9, 2016?  Towards the bottom.

15   A.    That's correct.

16   Q.    Did you withdraw from this case?  Do you recall the

17   approximate month that you withdrew?

18   A.    August of 2016.

19   Q.    So this is around the time that you withdrew?

03:25 20   A.    Correct.

21   Q.    All right.  And do you see comments from Mr. Daniells

22   saying, "You told me that the prosecution was going to charge

23   me with trafficking.  I feel that you coerced me"?

24   A.    I see that.

25   Q.    And then you deny that on the next entry, correct?

1    A.   I did, in fact, deny it.  The prosecutor kept saying that

2    if things don't go right, we may charge -- we may file a

3    superseding indictment.

4    Q.   Okay.  And so what you disagreed with was the certainty of

5    the claim, meaning Mr. Daniells claiming that the prosecution

6    was going to charge, and you indicated what in response?

7    A.   I'm not sure what Mr. Cormier was exactly reporting here.

8    Q.   Okay.  So what's your recollection of what Mr. Daniells

9    accused you with as it pertains to coercion to go in to the

03:26 10   proffer?

11   A.   That I -- one of the things he said to me was that it was

12   a mistake for me to tell him that Tim Bailey -- the

13   codefendant's lawyer had told me that Tim Bailey was not going

14   to appear at the detention hearing and that he was coming in

15   for a proffer and he was going to be cooperating.  That was one

16   of the things.

17   Q.   But do you ever recall Mr. Daniells telling you that he

18   felt coerced by you to do the proffer?

19   A.   Yes.

03:27 20   Q.   And what information did he give in support of that claim?

21   Why did he believe that?

22   A.   I don't remember.

23   Q.   Okay.  And this comment here on Exhibit 19 that "it was

24   because the prosecution was going to charge me with

25   trafficking," you don't recall making that statement to him?

A.    I know that the -- at various points I had concerns that
the prosecution was going to be superseding with an additional
charge of either 922(a)(1)(A), which is essentially being a
dealer in guns, or with Section -- Title 18, Section 922(a)(6),
which is what the DOJ manual lays out as being kind of the
standard charge for straw purchasing.

Q.    Let me ask you:  At the time of the proffer had you known
of any specific evidence that was provided to you by the
government which supported that Mr. Mitchell Daniells was
selling firearms?

A.    At that time other than the one gun to Tim Bailey.

Q.    Yeah, but you didn't have any evidence at that point in
time that Mr. Daniells actually sold that gun to Mr. Bailey, at
the time of the proffer?

A.    At the time of the proffer there was a 4473, there was a
signed bill of sale with the cooperating witness's name, there
was a proffer from the cooperating witness, there was --

Q.    But my question --

A.    -- GPS and cell phone tracking.

Q.    Yeah, I understand all of that.  But my question is did
you have any specific evidence -- I hear the evidence that
Mr. Daniells may have been in possession of a weapon as of
March 27, but what evidence did you have that Mr. Daniells had
sold that gun or any other gun, for that matter, as of the date
of the proffer?

A.    My understanding is that there was evidence at that time

that had already been developed that when Mr. Bailey was

arrested on June 17th, the day before Mr. Daniells was

arrested, and the police went through his cell phone, he

identified the person with an 8917 or 8197 cell phone as being

the person from whom he had purchased the gun.  That was my

recollection.

Q.    That's your recollection?

A.    I may be wrong.

Q.    Meaning there was evidence that Mr. Daniells and

Mr. Bailey were in contact with one another prior to Mr. Bailey

coming into contact with that gun?

A.    Yes.  And the detention records also included -- the

detention hearing also included, as I recall, some kind of call

detail records showing some connection between what I

understood to be Mr. Daniells' cell phone and Mr. Bailey's cell

phone.

Q.    Other than that, did you have any other information that

Mr. Daniells had been selling multiple guns?

A.    No.

Q.    Okay.  So that the charge of 922(a)(1)(A) has to deal with

more than one gun?

A.    That's correct.

Q.    And so as of the time that you did this proffer, were you

really aware of any evidence that supported the government's

1    threat they were going to supersede him under 922(a)(1)(A)?

2    A.    And based on the information that I had from my own

3    communications with my client, I didn't understand that

4    Mr. Daniells -- and I didn't believe that Mr. Daniells was

5    selling guns.

6    Q.    So then if the only threat that would have caused

7    Mr. Daniells to go into the proffer in the first place, which

8    was a superseding indictment for 922(a)(1)(A), and you didn't

9    have any evidence at that point in time of him selling guns,

03:30 10   why did you counsel him to do the proffer at that point in

11   time?

12   A.    I was also concerned about an (a)(6) indictment as well.

13   Q.    All right.  Has an (a)(6) indictment ever come down?

14   A.    No.

15   Q.    Had Mr. MacKinlay ever threatened to charge Mr. Daniells

16   with a violation of 922(a)(1)(A)?

17          MR. MacKINLAY:  Your Honor, I'm going to object to the

18   word "threatened" at this point.

19          MR. SPENCER:  I'll rephrase, your Honor.  Sorry.

03:31 20   BY MR. SPENCER:

21   Q.    Had Mr. MacKinlay ever intimated that he would be charging

22   Mr. Daniells with a violation of 922(a)(6) if he did not submit

23   to a proffer?

24   A.    My best recollection is that at some point early on he had

25   mentioned 922(a)(6), but at some point after that initial

```
 1   mention he never repeated that.
 2          MR. SPENCER:  I just want to confer with Mr. Daniells,
 3   your Honor.
 4          (Counsel confers with the defendant off the record.)
 5   BY MR. SPENCER:
 6   Q.   Mr. Schneider, do you recall during the proffer --
 7          MR. GORDON:  One moment.
 8          (Counsel confers with the defendant off the record.)
 9   Q.   During the proffer session -- and just by way of
10   background, you know that there was more than one alleged
11   purchase between Mr. Daniells and Mr. Roberts, right?
12   A.   I did learn that.
13   Q.   All right.  And so at the proffer when the agent was
14   asking who the identity was of the person of the March alleged
15   transaction, did they also ask Mr. Daniells who was with him
16   for the previous purchases, meaning January and February?
17   A.   I don't recall.
18   Q.   Okay.
19          MR. SPENCER:  Anything?
20          Thank you.  Nothing further.
21          THE COURT:  Mr. MacKinlay?
22                           CROSS-EXAMINATION
23   BY MR. MacKINLAY:
24   Q.   Good afternoon, Attorney Schneider.
25   A.   Good afternoon.
```

1    Q.   I want to set the stage for the time around June of 2015

2    into July of 2015 with respect to the government and the

3    defendant.  We could start at that point, okay?

4    A.   Okay.

5    Q.   Would it be fair to characterize the situation as this:

6    You were looking to cap the recommendation -- or cap the

7    exposure of your client, Mr. Daniells?

8    A.   That's fair to say.

9    Q.   In other words, you were trying to get possibly the best

03:34 10   deal or recommendation by the government as you could to

11   adequately and appropriately represent him?

12   A.   I guess that's fair.

13   Q.   And in so doing, at that time it involved negotiating with

14   the government such that there would not be a superseding

15   indictment adding another charge?

16   A.   I was concerned about a superseding indictment.

17   Q.   Okay.  And to be clear, the first charge was 922(n), which

18   carried a five-year maximum sentence.  Is that right?

19   A.   That's correct.

03:35 20   Q.   And when you were notified at the initial appearance, you

21   were provided a copy of the indictment?

22   A.   Yes.

23   Q.   And you knew it was a 922(n) charge at that time?

24   A.   Yes.

25   Q.   Now, the government's interest, would it be fair to say,

1    at the early part of this case was the recovery of firearms?

2    That seems to have been raised numerous times during the direct

3    examination, correct?

4    A.   I know that was stated by you and/or one of the agents.

5    Q.   But that was clear, that that was the focus of what the

6    government was trying to do at that time?

7    A.   I'm sorry.  Can you just repeat that, though?

8    Q.   Sure.  It was clear through the discussions leading up to

9    the proffer that that was the focus of the government at that

03:35 10   time?

11   A.   Getting the guns off the street?

12   Q.   Correct.

13   A.   Yes.

14   Q.   At no point -- at the time that you met with Mr. Daniells

15   initially or at any point subsequent did you develop or does

16   your file indicate any evidence that he said not to provide the

17   passcode?

18   A.   I don't recall.

19   Q.   Well, there's no express note in your file not to do that,

03:36 20   correct?

21   A.   I believe there was some indication in one of the

22   write-ups of the proffer that he had refused his consent to the

23   search of his iPhone, and I believe there may have been some

24   reference in one of the -- it may have been the arrest report

25   that he had declined to provide his consent to the search of

1   his iPhone.

2   Q.   But there's no express -- you have no memory, independent

3   memory, that he expressly said, "Do not produce the passcode"?

4   A.   I don't have an independent recollection.

5   Q.   And there's no independent documentation in your file

6   where you noted or one of your other associates or partners

7   noted, "Daniells told me," or someone else, "do not provide the

8   government with the passcode"?

9   A.   As I sit here today, I can't say that there is.

03:37 10   Q.   The issue of consent is a little bit of a red herring.

11   We're talking about there was a search warrant received and

12   there was a court order.  We're clearly talking about the

13   production of the passcode, just to be clear, correct?

14   A.   You are now, yes.

15   Q.   I want to talk about your intake notes.  I think we have

16   them as Exhibit 1.

17        MR. SPENCER:  That's 6; that's 1.

18        MR. MacKINLAY:  Thank you.

19   BY MR. MacKINLAY:

03:38 20   Q.   When did you take these notes?

21   A.   Presumably on June 18th, 2015.

22   Q.   Well, did you take them contemporaneous with the time that

23   you were getting the information?

24   A.   Presumably, yes.

25   Q.   What do you mean "presumably"?

| | |
|---|---|
| 1 | A.   That's my -- I would assume -- in most cases when I have |
| 2 | handwritten notes like this, it's almost always |
| 3 | contemporaneous. |
| 4 | Q.   I mean, it does reflect at least the date in the corner? |
| 5 | A.   That's right. |
| 6 | Q.   Is that date consistent with the date of the initial |
| 7 | appearance? |
| 8 | A.   I would say that that coupled with the fact that we were |
| 9 | probably given an 11 a.m. 6/25 detention hearing date to appear |
| 03:39 10 | in court, that that suggests that that did occur on 6/18 -- |
| 11 | that these were notes from 6/18. |
| 12 | Q.   And what does this reference here, this note here say? |
| 13 | A.   It says "attorney-client." |
| 14 | Q.   And would that be reflective of your recording |
| 15 | conversations with your client? |
| 16 | A.   It's either reflective of that or -- and perhaps |
| 17 | reflective of attorney-client privilege. |
| 18 | Q.   Now, during the course of this, what you described it as, |
| 19 | an intake document, I believe on direct examination -- |
| 03:39 20 | A.   I may have described it as that.  That's essentially what |
| 21 | it is.  It's a lot of background information about my client in |
| 22 | preparation for the detention hearing. |
| 23 | Q.   -- there was reference made to, for example, some |
| 24 | background information, education background? |
| 25 | A.   Correct. |

1    Q.    Employment, right, military and so forth.  Is that

2    correct?

3    A.    Correct.

4    Q.    Over on this side there was reference made earlier to the

5    iPhone 5?

6    A.    I see that reference, yes.

7    Q.    Okay.  Is there any reference next to that or anywhere on

8    this document of a code -- a passcode?

9    A.    No.

03:39 10   Q.    There's a reference to a sister in this location.  Did he

11   provide you with a name -- Mr. Daniells provide you with the

12   name of his sister?

13   A.    Yes, he did.

14   Q.    Is that Esther Daniells?

15   A.    Yes.

16   Q.    Is there any suggestion or indication in your memory,

17   first, that Mr. Daniells provided you with the passcode at this

18   interview?

19   A.    I don't recall that having been the case.

03:40 20   Q.    Looking at the document, do your records indicate that

21   there's any notation that he provided you the passcode at this

22   particular interview?

23   A.    This document does not.

24   Q.    In fact, wouldn't you have recorded it at the time that

25   you had recorded the iPhone 5 reference right here?  Would that

1    normally be something you would record at that time?

2    A.   Normally I would have.

3    Q.   You had described at great length how you had advised --

4    prior to the proffer now -- Mr. Daniells of the consequences of

5    what a proffer was going to be like and the consequences of it.

6    Is that correct?

7    A.   I had some discussion of that, yes.

8    Q.   Well, I think you mentioned before and after the detention

9    hearing words to that effect.  Do you recall that?

03:41 10   A.   Yes.

11   Q.   So did you have an opportunity -- a full and fair

12   opportunity to discuss what a proffer was?

13   A.   Yes.

14   Q.   And did he express back and forth to you questions?

15   A.   He's a very intelligent man.  I would assume he did.

16   Q.   We've heard he has lots of questions.  Do you recall

17   questions about the proffer during the meetings -- when you met

18   with him before the proffer?

19   A.   I don't have a specific recollection.

03:42 20   Q.   But you do recall speaking to him about the topic?

21   A.   Yes.

22   Q.   And based upon your discussions with him, do you feel that

23   you fully advised him of the nature of a proffer and the

24   consequences of it?

25   A.   I'm sure at the time I felt that I had adequately advised

 1    him.

 2    Q.   In fact, in your notes didn't you reflect it's a difficult

 3    road, or words to that effect?  Does that sound --

 4    A.   I don't see them but I would imagine that I may have

 5    written that.

 6    Q.   And you're referring to the cooperation in an effort to

 7    assist the government to get additional guns off the street.

 8    That was a difficult road?

 9    A.   Well, that I don't recall.

03:42 10  Q.   In any event, following your providing advice to him, it's

11    fair to say he agreed to conduct the proffer?

12    A.   Yes.

13    Q.   And the proffer was set up.  Is that correct?

14    A.   Yes.

15    Q.   Now, we heard about what you did not know through

16    counsel's questioning about the state of the evidence before

17    the proffer.  Do you remember that a moment ago?

18    A.   Yes.

19    Q.   In fact, there was a detention hearing.  Is that right?

03:43 20  A.   That's correct.

21    Q.   And during the course of the detention hearing, there was

22    a witness for the government who testified over the course of

23    two days?

24    A.   Yes.  I believe it was one day.

25    Q.   Well, the hearing lasted over the course of two separate

1    days.  Is that right?

2    A.   There was a very brief hearing on July 1st.

3    Q.   The second day would just be an argument and decision by

4    the court.  Would that be fair to say?

5    A.   That's correct.

6    Q.   You were present?

7    A.   Yes.

8    Q.   Mr. Daniells was obviously present?

9    A.   Yes.

03:43 10    Q.   And there was the cross-examination conducted of the

11    government's witness, Brian Oppedisano, by yourself?

12    A.   Yes.

13    Q.   And so at that time there was a more full record developed

14    relative to the case that the government had at that time and

15    was in the process of developing against Mr. Daniells?

16    A.   There was evidence that was developed at the detention

17    hearing.

18    Q.   And would it be fair to characterize the evidence

19    developed at the detention hearing as being more substantial

03:44 20    than what was just characterized by counsel?

21    A.   I would hate to have to make that judgment.

22         MR. MacKINLAY:  May I approach the witness, your

23    Honor?

24    Q.   Turning to the second page of the document, it's

25    reflected -- the marked page in particular but also the top

1    cover sheet and the second day sheet.

2    A.    Toward the end?  Yes.

3    Q.    Would you take a moment and read that to yourself.

4    A.    First I need to understand who's -- yes.

5          (Pause.)

6    Q.    Is what I refer to there a summary that was provided to

7    the Court on the breadth of the investigation and the nature of

8    it in more broad terms than a simple possession of a gun,

9    922(n)?

03:45 10   A.    This is your summary to the Court.

11   Q.    Okay.  And so that summary was the evidence that was

12   provided?

13   A.    It's the government -- it's your perspective on the

14   evidence that was provided, yes.

15         MR. MacKINLAY:  Your Honor, I'm going to offer the

16   transcript into evidence.

17         MR. SPENCER:  No objection.

18         THE COURT:  Okay.

19         THE CLERK:  This is going to be Government Exhibit 20,

03:46 20   received.

21         (Government Exhibit No. 20 received into evidence.)

22   BY MR. MacKINLAY:

23   Q.    In addition to the evidence that -- as a part of the

24   evidence that was summarized, which I don't believe was

25   discussed, there was also consensually recorded telephone calls

1    that you learned about during the course of the detention

2    discovery as well as the detention hearing?

3    A.    Yes.

4    Q.    Okay.  And that was not discussed earlier on direct

5    examination, correct?

6    A.    I don't recall it being discussed, no.

7    Q.    And those calls, you had an opportunity to listen to them?

8    A.    I did.  It would have been quite a while ago but I did.

9    Q.    And were there subsequent transcripts that you received or

03:46 10   did you develop any yourself?

11   A.    Actually, I don't recall the transcripts.  I recall

12   the -- one of the agent's affidavits that contained a

13   description of what occurred during one of those calls.

14   Q.    Would it be fair to say a summary of what occurred during

15   the calls?

16   A.    Yes.

17   Q.    You knew of that information before the proffer?

18   A.    Yes.

19   Q.    Because the detention hearing -- obviously that

03:47 20   information was provided to you?

21   A.    Yes.

22   Q.    Would you consider that evidence also strong evidence

23   against Mr. Daniells that you took into account in advising him

24   of the proffer?

25   A.    It was additional evidence.

```
     1   Q.   It was testified on direct examination about Sportsman's

     2   video and some suggestion that the Sportsman video information

     3   came out after the fact -- was provided to you after the fact.

     4   Do you remember that line of questioning?

     5   A.   I remember there was some questioning about the video.

     6   Q.   Did you receive an automatic discovery letter and

     7   associated attachments along with it during the course of your

     8   representation?

     9   A.   Yes.

03:48 10   Q.   Now, the automatic discovery letter that was provided in

    11   the case was provided on or about July 21st, 2015?

    12   A.   That sounds right.

    13   Q.   So it would have been after the date of the proffer on

    14   July 15th, correct?

    15   A.   Correct.

    16   Q.   But it would have been before the whole trip down to

    17   Wyatt, which we're going to talk about in a moment.

    18   A.   If you're talking about the 8/7 trip, that would have been

    19   correct.

03:49 20        MR. MacKINLAY:  May I approach again, your Honor?

    21   Q.   I'm showing you a document.  See if you recognize it and

    22   also check the attachments and who attended.  Do you recognize

    23   that?

    24   A.   I do.

    25   Q.   Is that the discovery letter you provided -- you were
```

1    provided?

2    A.    It looks like the discovery letter I was provided.

3    Q.    And are there attachments there also referenced with Bates

4    numbers as well?

5    A.    There is an attachment.

6    Q.    And what is the attachment?

7    A.    The attachment looks like it contains photographs.  Very

8    poorly presented photographs.  Very difficult to see anything,

9    but that contains photographs.

03:49 10   Q.    And is it represented that those photographs were still

11   photographs taken of the Sportsman's club video that reflected

12   the defendant inside the store that was discussed earlier?

13   A.    That was my understanding, that that's what the government

14   was purporting those photographs to be, yes.

15   Q.    So just to be clear, you had this information prior to

16   August 7th?

17   A.    It is my understanding that I was aware both that there

18   were photos and videos from the Sportsman's store.

19          MR. MacKINLAY:  I'd ask this be marked as the next

03:50 20   exhibit, please, your Honor.

21          MR. SPENCER:  No objection.

22          THE CLERK:  This is going to be Government's Exhibit

23   21.  It's going to be received.

24          (Government Exhibit No. 21 received into evidence.)

25   BY MR. MacKINLAY:

1   Q.   There was also further discussion prior to the August 7th

2   visit that there was -- or the notes that you had -- we're

3   going to talk about -- in a moment, about the August 7th

4   visit -- that the 922(n) was an issue that was recorded in your

5   notes.  Do you recall that?

6   A.   I remember looking at the 922(n) issue.

7   Q.   And that information also was known to you through the

8   indictment at the initial appearance back on June --

9   A.   That he was being charged with 922(n)?

03:51 10   Q.   Right.

11   A.   Yes.

12   Q.   And the *Quinones* case was also known to you as well

13   through the course of information provided by the government to

14   you as well as your own research.  Isn't that right?

15   A.   That's correct.

16        MR. MacKINLAY:  If I may approach, your Honor.

17   Q.   I'm showing you a document and ask if you recognize that

18   as well.

19   A.   I recognize that this is an email from you to me dated

03:51 20   June 18th, 2015.

21   Q.   Is the topic of the --

22   A.   The topic is listed as 922(n).

23   Q.   And is there -- within the body of the email is there some

24   law in reference to the law supporting the existing charge?

25   A.   It looks like this is essentially a memo from you as to

1    why you believed that 922(n) clearly covered complaints and not

2    just indictments.

3    Q.    Had you seen this prior to the time of August 7th when you

4    went down to Wyatt?

5    A.    Yes.

6          MR. MacKINLAY:  I'd offer this as the next exhibit,

7    please, your Honor.

8          MR. SPENCER:  No objection.

9          THE CLERK:  This is going to be Government's Exhibit

03:52 10   22, is received.

11         (Government Exhibit No. 22 received into evidence.)

12   BY MR. MacKINLAY:

13   Q.    You discussed at length the proffer that occurred on July

14   15th of 2015.  Isn't that correct?

15   A.    Yes.

16   Q.    Was a proffer letter provided to you in advance of that?

17   A.    Yes.

18   Q.    And a standard proffer agreement?

19   A.    Yes.

03:53 20        MR. MacKINLAY:  May I approach the witness, please.

21   Q.    I'm showing you a document and ask if you recognize that

22   as well.

23   A.    It's a document dated July 6, 2015.

24   Q.    Does the second page indicate that it's been executed?

25   A.    Yes.

```
 1   Q.   Who executed the document according to the signatures that

 2   appear?

 3   A.   Glenn A. MacKinlay, Mitchell Daniells, Michael R.

 4   Schneider.

 5   Q.   And it's dated July 15th of 2015?

 6   A.   The document is dated July 6th but the signatures are

 7   dated July 15th.

 8   Q.   It's your signature and the signature of the defendant as

 9   well?

10   A.   Yes.

11   Q.   Did you have an opportunity to explain this to him?

12   A.   Yes.

13   Q.   By "this" I mean this proffer letter.

14   A.   Yes.

15   Q.   When did you do that?

16   A.   I believe -- so I believe that you sent me a proffer

17   letter on June 25th with some typos in it, including putting my

18   name in the place of the defendant's name, and I -- to the best

19   of my recollection, that would have been the subject of

20   discussion on July 1st.

21   Q.   That was quite a slipup, wasn't it?

22   A.   Yes.

23   Q.   All right.  It was corrected and sent back to you?

24   A.   Yes.

25   Q.   And then you used the corrected version to speak to
```

1    Mr. Daniells?

2    A.    Yes.

3    Q.    And that's this one?

4    A.    Yes.

5         MR. MacKINLAY:  I offer this as the next exhibit,

6    please.

7         MR. SPENCER:  No objection.

8         MR. MacKINLAY:  I'd ask for it back.

9         THE CLERK:  This is going to be Government's Exhibit

03:55 10   23, which is received.

11        (Government Exhibit No. 23 received into evidence.)

12   BY MR. MacKINLAY:

13   Q.    This proffer agreement contains some express language

14   relative to derivative use.  Is that correct?

15   A.    Yes.

16   Q.    Did you explain "derivative use" to Mr. Daniells?

17   A.    I would have gone over the contents of that letter and I

18   would have definitely explained that paragraph.

19   Q.    Referring to what we just marked as Exhibit 23, Paragraph

03:55 20   2?

21   A.    Yes.  I can't guarantee that he would have understood it

22   but I definitely would have explained it.

23   Q.    I'm sorry.  I can't hear you, sir.

24   A.    I can't guarantee he would have understood it but I

25   definitely explained it to him.

1    Q.   Well, I mean, you were just telling the Court that he's a

2    smart guy and he questions a lot and he has a lot of interest

3    and involvement in this case.  What do you mean by that?

4    A.   First of all, I think the concept of derivative use to

5    someone who's not a lawyer can be complicated.

6    Q.   Well, let me continue on to the second sentence, actually,

7    Paragraph 2.  "The government may make derivative use or may

8    pursue any investigative leads suggested by any statements made

9    or other information provided by Mitchell Daniells during the

03:56 10   course of the proffer."

11        What's confusing about that?

12   A.   It says what it says, yeah.

13   Q.   But you're not confused about that.

14   A.   I'm not confused about that.

15   Q.   Did he express to you any confusion about this in the

16   times that you met with him, those two times?

17   A.   I don't recall, but I will say that he certainly was very

18   distressed in the early part of the case.

19   Q.   Okay.  When you got to the proffer, you had another

03:56 20   opportunity -- a full opportunity to go through this with him

21   in the absence of anybody else from the government, true?

22   A.   Are you talking about the day of the proffer?

23   Q.   The day of the proffer.

24   A.   Yes.

25   Q.   And then during the course of the preparation -- or the

1    preliminaries, I should say, of the proffer, there was some

2    discussion with Mr. Daniells about the proffer letter in the

3    presence of all the government witnesses.  Would that be fair

4    to say?

5    A.    Yes.

6    Q.    In other words, the letter was explained to him again by

7    someone other than you; more specifically, me?

8    A.    Yes.

9    Q.    And he was also asked if he understood those questions

03:57 10   during the course of that conversation?

11   A.    I don't recall but that sounds reasonable.

12   Q.    Was there also discussion about the importance of telling

13   the truth?

14   A.    Yes.

15   Q.    The proffer itself did not last long.  Would that be fair

16   to say?

17   A.    I don't have a specific recollection but I would imagine

18   45 minutes to an hour.

19   Q.    During the course of that proffer, did you take any notes?

03:58 20   A.    No.

21   Q.    Did you see anybody else taking notes?

22   A.    Yes.

23   Q.    Who did you see taking notes?

24   A.    At least one of the agents was taking notes.

25   Q.    Did you see anybody else other than that one agent?

1    A.    I don't remember if you were taking notes or anyone else

2    was taking notes.  I don't remember.

3    Q.    So during the course of the proffer itself, would you

4    agree with me there was a break?

5    A.    Yes.

6    Q.    One break?

7    A.    I remember one break.

8    Q.    Okay.  And the one break -- your memory is, you testified

9    I believe on direct examination, that you think it was during

03:59 10    the break that Mr. Brobby talked to you about -- excuse

11    me -- Mr. Daniells talked to you about Mr. Brobby, correct?

12    A.    I believe prior to the break a question was asked about

13    who drove down to Pennsylvania with Mr. Daniells.

14    Q.    Okay.  And it was your memory without the benefit of any

15    notes that Mr. Daniells looked at you and gave you a signal

16    that he wanted to talk to you.  Would that be accurate?

17    A.    I believe that that's the case, yes.

18    Q.    Is it possible that there was a break later in the

19    proffer?

03:59 20    A.    There may have been another break.  I don't remember.

21    Q.    Let me ask you this:  Do you recall during the proffer the

22    agents becoming frustrated because in their view Mr. Daniells

23    was not telling the truth?

24    A.    I -- I don't know if they were frustrated.  I do remember

25    a number of questions being asked by the agents.

1    Q.   Do you recall that that occurred after Mr. Daniells had

2    provided his account of the firearms that were brought up to

3    Massachusetts from Pennsylvania?

4    A.   I do remember that there were some sort of concerns

5    expressed by the ATF agents in the room on the topic.

6    Q.   Relative to his account that he had a backpack from which

7    he was selling the guns and then the backpack was taken, he

8    never received any money back.  Do you recall that?

9    A.   That sounds like what occurred.

04:00 10   Q.   And then the second part of the story, to acclimate you,

11   would be Mr. Daniells reported to the agents that he had a car

12   with additional guns in it that was stolen, he reported the car

13   stolen but he didn't report the guns stolen.  Does that refresh

14   your recollection?

15   A.   Yes, there was definitely questioning about that.

16   Q.   So that said, do you recall the break being after that?

17   A.   To be honest, I don't recall.

18   Q.   But you do recall Mr. Daniells not being concerned about

19   Kenneth Brobby because he was stupid and he didn't have any

04:01 20   information that would be helpful anyway?

21          MR. SPENCER:  Objection to the form of that question.

22          THE COURT:  Sustained.  Rephrase it.

23   BY MR. MacKINLAY:

24   Q.   Do you recall Mr. Daniells not being concerned about

25   Kenneth Brobby because, according to you, Daniells said he was

 1   stupid?

 2   A.   I recall Mr. Daniells saying that he was stupid and a

 3   pothead.

 4   Q.   I want to go through the sequence of events now.   The

 5   proffer occurred on July 15th, correct?

 6   A.   Correct.

 7   Q.   There was discussions about the passcode being provided at

 8   that time, correct?

 9   A.   At some point during the proffer, yes.

04:02 10   Q.   Do you recall that occurring -- do you recall indicating

11   to get a search warrant?

12   A.   I think I expressed my belief that this was a serious

13   privacy intrusion and I had questions as to whether or not

14   there really was probable cause to obtain a search warrant.

15   Q.   So in other words, there was no acquiescence at that time

16   relative to either consent to get a search warrant for the

17   phone or the production of a passcode by Mr. Daniells to you,

18   correct?

19   A.   That's correct.

04:03 20   Q.   Following the proffer, there was a series of emails that

21   have been marked as exhibits that reflect conversations between

22   us relative to the passcode.   Is it fair to say?

23   A.   Yes.

24   Q.   Defendant's Exhibit 4 is one of those strings, I think as

25   was referenced.   It references an email string on August 4th

1  which would have been -- well, I should say on July 31st to

2  August 4th, correct?  You have that before you?

3  A.   Yes.

4  Q.   Just to be clear, on the most recent email would be you

5  indicating that you're going to go down later in the week and

6  speak to Mr. Daniells relative to a number of issues, but

7  certainly the passcode is one of them, correct?  And you

8  anticipated that he would provide it at that time?

9  A.   Yes.

04:04 10  Q.   The next communication -- aspect of this would have been

11  on the 7th.  Would that be fair to say?  August 7th, 2015?

12  A.   Yes.  Yes.

13  Q.   And what occurred on August 7th relative to the passcode

14  issue that was inquired of?

15  A.   Well, I believe I went down and spoke to Mr. Daniells

16  about the passcode, but as I explained during my direct

17  testimony, I don't have a specific recollection of the

18  conversation.

19  Q.   I understand that.  But that was one of three topics you

04:04 20  were going to go talk to him about, right?

21  A.   From my notes that appears to be the case, yes.

22  Q.   We'll get to your notes in a moment.  You went to the

23  Wyatt Detention Center that day?

24  A.   Yes.

25  Q.   As you promised?

1  A.   Yes.

2  Q.   Tell us, is there a procedure you have to log in or sign

3  in and also sign out when you leave the facility?

4  A.   You certainly have to sign in.  I think they sign you out.

5  Q.   In any event, there's a record of when you go there and

6  when you leave?

7  A.   Yes.  Yes.

8         MR. MacKINLAY:  Your Honor, I'd offer into evidence a

9  group of certified records from the Central Falls Detention

04:05 10  facility relative to the visits of Mr. Schneider to the

11  defendant.

12         MR. SPENCER:  No objection.

13         THE CLERK:  This is going to be Government's Exhibit

14  24, which is received.

15         (Government Exhibit No. 24 received into evidence.)

16  BY MR. MacKINLAY:

17  Q.   I'm going to show you what we just marked as Exhibit 24

18  and ask you a few questions.  These purport to be records

19  relative to Mitchell Daniells?

04:06 20  A.   I see his name is on the record.

21  Q.   Well, let's start with the front page.  Does that appear

22  to be a certificate of authenticity from the Wyatt Detention

23  Facility of, among other things, the visits that you had?

24  A.   That's what it says, yes.

25  Q.   There's a picture of Mr. Daniells in the corner of the

1    record and it also references his name here.  Is that correct?

2    A.    Yes.

3    Q.    In this particular spot right here, does it show last date

4    visit -- last visit date?  Excuse me.

5    A.    Yes.

6    Q.    Does it say 8/7/15, 11:22?

7    A.    Yes.

8    Q.    Referring to the second of the same series of records,

9    what purports to be a bad copy of records, does it also reflect

04:07 10    the same Mitchell Daniells?  There's a blacked-out photograph

11    here in the corner.  It also references visits including this

12    visit right here I'm referring to?

13    A.    Yes.  Yes.

14    Q.    Does that say 8/7/2015, 10:38, and then 8/7/2015, 11:22,

15    contact visit?

16    A.    Yes.

17    Q.    Is that the time that you went down there to speak to

18    Mr. Daniells regarding those three topics you described and

19    documented in your notes?

04:07 20    A.    I believe it must have been.

21    Q.    I'm sorry.  I didn't hear you.

22    A.    I believe it must have been.

23    Q.    While you're there, did anybody go with you to speak to

24    him?

25    A.    On that visit, I don't believe so.

1    Q.    You met with him in an attorney room with Mr. Daniells and

2    yourself alone?

3    A.    Correct.

4    Q.    Did you take contemporaneous notes?

5    A.    Apparently I did, yes.

6    Q.    What do you mean, "apparently"?  I mean --

7    A.    Well, there are notes in my file.  There are handwritten

8    notes from that date that have to have been contemporaneous.

9    Q.    So I'm showing you what was previously marked as

04:08 10    Exhibit 6.  Do these appear to be your notes?  Defendant's

11    Exhibit 6, I believe.

12    A.    Yes.

13    Q.    So this is the notes referencing Mitchell Daniells at

14    Wyatt.  Is that your note?  Is that your indication?  Is that

15    what you mean by that note?

16    A.    Yes.

17    Q.    And this is the date?  Does that say 8/7/15?

18    A.    Yes.

19    Q.    And you say -- you have physically noted here, "Update"

04:08 20    and then three separate topics.

21    A.    Yes.

22    Q.    Is that correct?

23    A.    Yes.

24    Q.    When did you put down the topics?

25    A.    I put down -- typically what I do when I go in for client

interviews is I have an agenda of topics that I want to cover,

and then either in the margins on the left or the right or on

separate pages I start marking it up.  Often -- sometimes it's

in different colors, sometimes it's in the same color as the

original agenda items that I write down.

Q.    When do you fill out the topics?

A.    The topics are typically notes that I take in with me

about things that I want to cover.

Q.    In other words, you do it before you go to Wyatt?

A.    Or while I'm sitting and waiting in the room.

Q.    Before you meet with him?

A.    Before I meet with the client.

Q.    Did you do that with these notes?

A.    That's what it looks like.

Q.    Okay.  And first is "New Discovery."  Would you have

listed the new discovery and would you have listed all of these

notes?  In your pre-note --

A.    Yes.

Q.    I'm sorry.

A.    Apparently that's what I did, yes.

Q.    Well, do you have any memory of whether you did this

beforehand or whether you did this after or contemporaneous

with the conversation with him?

A.    My guess is that -- no, that would have been done before,

like when it --

1    Q.    And when you talk about two, your note says "S.W."?

2    A.    Yes.

3    Q.    What does that stand for?

4    A.    "Search warrant."

5    Q.    And then what's the next notation right here?

6    A.    It says "obtained."

7    Q.    "Obtained"?

8    A.    Yes.

9    Q.    What is that referring to?

04:10 10    A.    Well, apparently it's that I obtained consent to, I

11   believe, give up the password.

12   Q.    And you know that because the next word says "consent"?

13   A.    It says, "Consent re password."

14   Q.    And you somehow marked -- or somehow circled it?  When was

15   it circled?

16   A.    I don't recall.  That may have been after -- I don't

17   recall.

18   Q.    Well, let's put it this way --

19   A.    Yeah.

04:10 20    Q.    -- you didn't have that information before you went down

21   there?

22   A.    That's correct.

23   Q.    You have that information when you came back?

24   A.    That's correct.

25   Q.    And while you're there, you made these notations or you

1    circled them to confirm that you had the consent to provide the

2    passcode, right?

3    A.   I think that's quite possible.

4    Q.   On the right here, there's a group of numbers.  What are

5    they?

6    A.   I assume they're passcodes.

7    Q.   Were these numbers provided to you at this time by

8    Daniells?

9    A.   I assume from this that that's what happened.

04:11 10   Q.   The rest of the information appears to deal with guideline

11   calculations.  Would that be fair to say?

12   A.   Yes.

13   Q.   Was that the third topic?

14   A.   Yes.

15   Q.   Are we still in the situation on July -- excuse me -- on

16   August 7th where Mr. Daniells had only been facing the one

17   922(n) charge?

18   A.   Yes.

19   Q.   Was it still your goal in keeping the government from

04:11 20   bringing additional charges and exposing the defendant to a

21   higher sentence?

22   A.   Yes.

23   Q.   Once you recorded this, according to the records you

24   departed the facility around 11:22 in the morning.  Is that

25   consistent with your memory?

1   A.   You know, to be honest, I make enough of those visits that

2   I just don't recall, but that's not inconsistent with my

3   memory.

4   Q.   It's not inconsistent with the time that you left?

5   A.   That's right.

6   Q.   And where did you go once you left the Wyatt Detention

7   Facility following this meeting with Mr. Daniells?

8   A.   I may have stopped for lunch at a diner or something along

9   the way and then I probably headed back to my office.

04:12 10   Q.   And how long would you estimate it took you to get from

11   Wyatt with lunch back to your office?

12   A.   Several hours.

13   Q.   And then at some point that afternoon did you have further

14   communication regarding the passcode?

15   A.   Yes.

16   Q.   How did you do that?

17   A.   By email.

18   Q.   Okay.  And what did you say in the email?

19   A.   That was the email that was introduced earlier saying

04:12 20   that -- "Give me a call.  Here's the passcode."

21   Q.   You didn't put the passcodes in the email, did you?

22   A.   I did not.

23   Q.   Why not?

24   A.   I think it's a mistake to put anything like Social

25   Security numbers or passcodes or anything like that in emails.

1    Q.   You thought it was important to protect it so you wanted

2    to do it by phone.  Would that be fair to say?

3    A.   Yes.

4         MR. MacKINLAY:  May I approach the witness?

5    Q.   I'm showing you an email and ask you if you recognize

6    that.

7    A.   Yes.

8    Q.   What do you recognize that to be?

9    A.   This is an email that I sent you on August 7th at 4:09

04:13 10   p.m.

11   Q.   Regarding the passcodes in the manner you just described?

12   A.   Yes.

13        MR. MacKINLAY:  I'd ask it be marked as the next

14   exhibit, please, your Honor.

15        MR. SPENCER:  No objection.

16        THE CLERK:  Government Exhibit No. 25 received.

17        (Government Exhibit No. 25 received into evidence.)

18   BY MR. MacKINLAY:

19   Q.   Showing you what we just marked as Exhibit 25, the time of

04:14 20   the email is 4:09 p.m. on the 7th of August?

21   A.   Yes.

22   Q.   Or approximately four and a half hours after you left

23   Mr. Daniells?

24   A.   Yes.

25   Q.   You have indicated that you have no independent memory

1    relative to Mr. Daniells in that meeting providing you the

2    authority to give the passcodes to the government?

3    A.    That's correct.  I don't have an independent recollection.

4    Q.    After looking at the sequence of emails, after looking at

5    the notes, after looking at the jail visit records, is your

6    memory refreshed relative to how the passcodes were obtained

7    that day?

8    A.    I think that these documents probably indicate that

9    Mr. Daniells gave me the passcodes.

04:15 10   Q.    Now, Attorney Schneider, you have indicated, I believe on

11   direct examination and also in an affidavit filed with the

12   Court, that you think it would be unlikely that you would have

13   turned over the passcode without his permission?

14   A.    That's correct.

15   Q.    And would that be because in your practice and in your

16   experience that type of authority/request would be something

17   that would come directly from him?

18   A.    I guess so, yes.

19   Q.    In other words, you're not going to make a significant

04:16 20   decision on your own, correct?

21   A.    I would never do that.

22        THE COURT:  Mr. MacKinlay, we've been going for almost

23   two hours.  Why don't we just take a ten-minute break.

24        THE CLERK:  All rise for the Court.  The Court will

25   take a 10-minute break.

1          (The Court exits the courtroom and there is a recess

2     in the proceedings at 3:32 p.m.)

3               THE CLERK:  All rise.

4               (The Court enters the courtroom at 3:47 p.m.)

5               THE CLERK:  For a continuation of the evidentiary

6     hearing in Daniells.  Be seated.

7               THE COURT:  Go ahead.

8     BY MR. MacKINLAY:

9     Q.   Very briefly, Attorney Schneider, there was discussion on

04:32 10     direct examination about this download of an article from the

11    Internet concerning the Apple iPhone.  Do you recall that?

12    A.   Yes.

13    Q.   Do you know if that particular article dealt with the

14    phone at issue and seized from Mr. Daniells?

15    A.   I don't for a fact know.

16    Q.   And by the way, the superseding indictment in this case,

17    do you know when it was handed down?

18    A.   No.

19    Q.   If I suggested to you March 22, 2017, approximately how

04:33 20    long after you were off the case was the superseding indictment

21    brought?

22    A.   I guess that's like nine months.

23               MR. MacKINLAY:  No further questions.

24               MR. SPENCER:  Just a couple.

25                         REDIRECT EXAMINATION

BY MR. SPENCER

Q.    You indicated when Mr. MacKinlay was asking you questions

that the note from the Wyatt meeting reflected the passcodes

and there wasn't any other notes in the file that reflected

that this passcode was given prior to that day, right?

A.    I believe that's correct.

Q.    Do you recall ever having any discussions with Ms. Esther

Daniells prior to August 7, 2015?

A.    Yes.

Q.    And who is Esther Daniells?

A.    There's an Esther Daniells who is Mr. Daniells' mother and

there is an Esther Daniells who is Mr. Daniells' sister.

Q.    Did you have more communications with one Esther Daniells

over the other?

A.    Yes.

Q.    Which one?

A.    The sister.

Q.    The sister.

      Do you have any recollection of specifically speaking with

the sister about Mr. Daniells' Facebook passcodes during that

summer?

A.    Facebook passcodes, yes.

Q.    All right.  And are there any notes in your file -- were

those passcodes actually given to Esther Daniells by you?

A.    I believe so.

1    Q.   All right.  And who gave you those Facebook passcodes?

2    A.   Mr. Daniells.

3    Q.   All right.  And he provided those Facebook passcodes to

4    you before the August 7, 2015, meeting?

5    A.   I believe those were provided pretty soon after the first

6    appearance but I don't remember when.

7    Q.   All right.  And is there any -- as far as -- you reviewed

8    your file, right?  Yes?

9    A.   Yes.

04:34 10   Q.   Do you have any indication in the file that Mr. Daniells

11   gave you these Facebook passcodes prior to August 7th and then

12   you then forwarded those passcodes at his request over to

13   Esther Daniells?

14   A.   I don't have any recollection if I do or don't, but I

15   don't think so.

16   Q.   Okay.  But, again, you don't deny that there were specific

17   passcodes that Mr. Daniells gave to you over the summer that's

18   not specifically reflected in your file?

19   A.   I think that I saw a document in Mr. Daniells' handwriting

04:35 20   that contains the Facebook passcodes.

21   Q.   Okay.  Thank you.  Nothing further.

22        MR. MacKINLAY:  No questions.

23        THE COURT:  All right, Mr. Schneider.  Thank you.  You

24   may step down.

25        THE WITNESS:  Thank you.

1            (The witness is excused.)

2            MR. SPENCER:  Are we going to call more witnesses?

3            THE COURT:  What do you have?

4            MR. SPENCER:  Well, the agent that's outside that --

5            THE COURT:  How long will he be?

6            MR. SPENCER:  He's not going to be longer than 10

7   minutes.

8            THE COURT:  40 minutes?

9            MR. SPENCER:  I moved my appointment to a little bit

04:35 10  later and I'm kind of working against that now.

11            THE COURT:  All right.  You'll have evidence as well

12  or it depends?

13            MR. MacKINLAY:  It depends on if he calls the same

14  witnesses, your Honor.  They're brief.  In the government's

15  eyes, they're brief.

16            THE COURT:  Can we resume on Monday morning?

17            MR. MacKINLAY:  I can but I would like a moment just

18  to check in the hallway with the witnesses to make sure there's

19  no vacations.

04:36 20            THE COURT:  As far as we're concerned we're pretty

21  open, so Monday or Tuesday.

22            MR. SPENCER:  Tuesday would be better for me.

23            THE COURT:  Check on Tuesday.

24            (Pause.)

25            THE COURT:  Wednesday would be better for us, I'm

```
 1    reminded.  See if Wednesday works.

 2              (Pause.)

 3              THE COURT:  Wednesday?

 4              MR. SPENCER:  Wednesday at nine I can do.

 5              THE COURT:  I'm not sure it will be nine.

 6    Nine-thirty, probably.

 7              MR. MacKINLAY:  We believe so.  We have at least two

 8    of the witnesses that we expect to be available.  Most likely

 9    that would be fine, your Honor.

10              MR. SPENCER:  May I ask which two because I may not

11    need the third.

12              MR. MacKINLAY:  Oppediasano and Kelsch the government

13    will be calling.  Relative to McPartlin, he's upstairs at the

14    moment.

15              MR. SPENCER:  I need McPartlin.

16              THE COURT:  Why don't we say 9:30 on Wednesday we'll

17    resume the hearing.  Okay?  With that, we will recess for the

18    day.

19              THE CLERK:  All rise for the Court.  Court will be in

20    recess.

21              (The Court exits the courtroom and the proceedings

22    adjourned at 3:55 p.m.)

23

24

25
```

1                       C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Criminal Action No. 15-10150-GAO,

8     *United States v. Mitchell Daniells*.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12
      Date:  7/11/17
13

14

15

16

17

18

19

20

21

22

23

24

25