UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                              )
UNITED STATES OF AMERICA, )
                              )
        Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 15-10150-GAO
                              )
MITCHELL DANIELLS,            )
                              )
        Defendant.            )
                              )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE



DAY TWO
EVIDENTIARY HEARING



John J. Moakley United States Courthouse
Courtroom No. 22
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 28, 2017
9:49 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 7209
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Glenn A. MacKinlay and Timothy E. Moran,
 3            Assistant U.S. Attorneys
              Timothy
 4        John Joseph Moakley Federal Courthouse
          Suite 9200
 5        Boston, Massachusetts  02210
          On Behalf of the Government
 6
          LAW OFFICE OF GORDON W. SPENCER
 7        By: Gordon W. Spencer, Esq.
          945 Concord Street
 8        Framingham, Massachusetts  01701
          On Behalf of the Defendant
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2                    Direct  Cross  Redirect  Recross

 3   WITNESSES FOR THE
        GOVERNMENT:
 4
     MATTHEW KELSCH
 5
         By Mr. MacKinlay      95
 6       By Mr. Spencer             114, 124

 7   WITNESSES FOR THE
        DEFENSE:
 8
     DANIEL McPARTLIN
 9
         By Mr. Spencer        5                51
10       By Mr. MacKinlay           43

11   BRIAN OPPEDISANO

12       By Mr. Spencer        54
         By Mr. MacKinlay           81
13
     MITCHELL DANIELLS
14
         By Mr. Spencer        130
15       BY Mr. MacKinlay           172

16                     E X H I B I T S

17

     GOVERNMENT'S
18    EXHIBIT     DESCRIPTION              FOR ID   RECEIVED

19   29   Email chain between Agent McPartlin and AUSA
          MacKinlay                                   50
20
     33   Certificates and training and background of Agent
21        Kelsch                                      98

22   34   Cellebrite cell phone report of Daniells phone    103

23   35   Apple policy on iPhone searches             107

24

25
     DEFENDANT'S
```

| | EXHIBIT | DESCRIPTION | FOR ID | RECEIVED |
|---|---|---|---|---|
| 26 | | Flash drive - audio interview of Mr. Daniells | | 10 |
| 27 | | ATF report of investigation dated 11/14/14 | | 15 |
| 28 | | ATF report of investigation dated 4/23/15 | | 29 |
| 30 | | Page 18 of transcript of detention hearing | | 66 |
| 31 | | Agent Oppediasano proffer notes dated 7/15/15 | | 70 |
| 32 | | ATF report of investigation dated 4/11/17 | | 71 |
| 36 | | Mr. Daniells' note to Attorney Schneider with iPhone passcodes | | 141 |

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          (The Court enters the courtroom at 9:49 a.m.)

4          THE CLERK:  Court is now in session.  The matter of

5  *United States of America v. Mitchell Daniells*, Criminal No.

6  15-CR-10150.

7          Would counsel please identify themselves for the

8  record.

9          MR. MacKINLAY:  Good morning, your Honor.  Glenn

10  MacKinlay on behalf of the United States.

11          MR. SPENCER:  Good morning, Judge.  Gordon Spencer on

12  behalf of the defendant, Mr. Mitchell Daniells, who is present.

13          THE COURT:  Good morning.  You may be seated.  Thank

14  you.

15          MR. SPENCER:  Mr. Daniells calls Special Agent

16  McPartlin.

17                    DANIEL McPARTLIN, duly sworn

18          THE CLERK:  Please state your name and spell your last

19  name for the record.

20          THE WITNESS:  Daniel McPartlin, M-C-P-A-R-T-L-I-N.

21          MR. SPENCER:  May I inquire?

22          THE COURT:  Please.

23                       DIRECT EXAMINATION

24  BY MR. SPENCER:

25  Q.   Are you employed, sir?

```
 1    A.   Yes.

 2    Q.   What is your occupation?

 3    A.   Special agent for ATF.

 4    Q.   How long have you been so employed?

 5    A.   15 years.

 6    Q.   Are you aware of a gentleman named Mr. Mitchell Daniells?

 7    A.   Yes.

 8    Q.   Are you aware that he's filed a motion to exclude evidence

 9    from an iPhone that a former lawyer provided a passcode to the

10    government?

11    A.   Yes.

12    Q.   As well as a motion to exclude evidence derived from a

13    proffer where his lawyer gave him information?

14    A.   Yes.

15    Q.   Have you read both those motions?

16    A.   Yes.

17    Q.   And just for the record, were you present during any

18    attorney-client communications between Mr. Daniells and

19    Mr. Schneider?

20    A.   No.

21    Q.   And so you know, one of the issues with respect to the

22    passcode is whether or not Mr. Daniells gave consent?

23    A.   Yes.

24    Q.   And are you aware whether or not Mr. Daniells gave

25    consent?
```

1    A.    Yes.

2    Q.    Did he?

3    A.    Well, according to his attorney.

4    Q.    His attorney specifically told you that?

5    A.    No.

6    Q.    Okay.  Were you aware the outline of the investigation

7    leading up to the actual proffer session -- and just for the

8    record, was there a proffer session that took place between

9    yourself and Mr. Daniells?

10   A.    Yes.

11   Q.    And what was the date of that?

12   A.    I think it was in July of 2015.

13   Q.    If I said July 15, 2015, would that refresh your

14   recollection?

15   A.    Yes.

16   Q.    And do you recall arresting Mr. Daniells on or about June

17   18th of 2015?

18   A.    Yes.

19   Q.    And did you have an open investigation against

20   Mr. Daniells at that time?

21   A.    Yes.

22   Q.    Now, during the actual arrest, was there a post-arrest

23   interview?

24   A.    Yes.

25   Q.    And did you tell him on that day that additional charges

1    would be coming?

2    A.    I don't recall.

3    Q.    You don't recall.

4          As of June 18, 2015, the only charge that you knew that

5    was filed or he was indicted for was a violation of United

6    States Code Section 922(n), 18 U.S.C. 922(n)?

7    A.    Yes.

8    Q.    And during the post-arrest interview, was there any

9    information that you wanted to obtain from him at that time?

10   A.    Yes.

11   Q.    What information did you want to obtain?

12   A.    Where the guns went to, who they went to.

13   Q.    What guns?

14   A.    The guns that were purchased by himself and by William

15   Roberts.

16   Q.    Was there anything else that you wanted to obtain during

17   that post-arrest interview?

18   A.    No.

19   Q.    Okay.  And was your primary purpose just to get these guns

20   off the street?

21   A.    Yes.

22   Q.    Did you have any intention of further investigating

23   Mr. Mitchell Daniells as it pertained to the prosecution of him

24   of a violation of 922(n) at that point in time?

25   A.    Yes.

1    Q.    Did you believe by the time of his arrest this proffer

2    that you, as an investigative agent, had garnered enough

3    information at that point in time to prosecute him?

4    A.    Yes.

5    Q.    But did you want more?

6    A.    Yes.

7    Q.    What did you want?

8    A.    To know where the guns went and where the guns were; who

9    bought them.

-01:-21 10    Q.    And you were planning on using that information in order

11    to further prosecute Mr. Mitchell Daniells?

12    A.    Yeah, we use all investigative means we could to find out

13    what happened.

14    Q.    Now, that post-arrest interview, was that recorded?

15    A.    Yes.

16            MR. SPENCER:  Judge, just for the record, I have a zip

17    drive.  It's about 15 minutes.  I would just like to introduce

18    this as the next exhibit.  It's the actual post-arrest

19    interview between Agent McPartlin and the defendant.

-01:-22 20            THE COURT:  It's an audio recording?

21            MR. SPENCER:  It's an audio recording.

22            MR. MacKINLAY:  No objection.

23            THE COURT:  Okay.  I don't know what the next number

24    is.  I think it's 26?

25            MR. SPENCER:  Judge, do you have all the exhibits?

```
 1              THE COURT:  I believe they're in the custody of the
 2   clerk.
 3              THE CLERK:  Defendant's Exhibit 26 is accepted.
 4              (Defendant's Exhibit No. 26 received into evidence.)
 5   BY MR. SPENCER:
 6   Q.   Would it be fair to say during that interview you asked
 7   Mr. Daniells to help himself?
 8   A.   Yes.
 9   Q.   After that post-arrest interview, did you take him down to
10   the federal courthouse?
11   A.   Yes.
12   Q.   At any point in time during that day do you recall asking
13   Mr. Daniells for the passcode to his cell phone?
14   A.   I don't recall specifically but I know most of the time
15   when we commute -- this drive took 45 minutes -- we always talk
16   about cooperation and, you know, what would count as
17   cooperation.  We probably said, "Hey, if you can tell us where
18   the guns went, you might give us your password to your phone."
19   Q.   Meaning as an investigative agent, it wouldn't surprise
20   you if you were to ask Mr. Daniells for the passcode on the way
21   down to the federal courthouse?
22   A.   I probably would have gave it as an example of
23   cooperation.
24   Q.   And why would you want his passcode at that point in time?
25   A.   Because it would speed the investigation up.
```

Q.   In what way?

A.   Because there might be the information on the phone that could be critical to our investigation.  If we didn't get it, we would use our investigative means to move forward.

Q.   Okay.  Do you recall during the post-arrest interview that you told Mr. Daniells that "We don't need your help to help us prove the case; we already have the case proved"?

A.   That sounds right.

Q.   Did you also tell Mr. Daniells during that post-arrest interview that "We can't lie to you as federal agents"?

A.   I don't recall that.

Q.   Okay.  Well, is that true or is that not true?

A.   No, we can lie.

Q.   And as of the date of his arrest, you stated that the only charge you had against him was a violation of 922(n).  What, if any, other charges were you considering against Mr. Daniells at that time?

A.   Dealing guns without a license.

Q.   Would that be a violation of federal law?

A.   Yes.

Q.   18 United States Code 922(a)(1)(A)?

A.   Yes.

Q.   Now, just a few weeks thereafter there was a proffer?

A.   Yes.

Q.   Whose idea was it to have Mr. Daniells engage in a

1    proffer?

2    A.    It was Attorney MacKinlay's.

3    Q.    Did you provide any advice or information to Mr. MacKinlay

4    before that decision was made?

5    A.    I don't think so.

6    Q.    Did you sit down with Mr. MacKinlay prior to the proffer

7    in order to have any expectations as to what information you

8    were trying to obtain?

9    A.    We usually do that, yes.

10   Q.    And so what information or what expectation were you of

11   just prior to the proffer?

12   A.    In a gun-trafficking case, our only expectation is to get

13   guns off the street, and that's what we were hoping to do.

14   Q.    Do you know if AUSA Glenn MacKinlay had any conversations

15   with Mr. Daniells' previous lawyer about the expectations of a

16   proffer?

17   A.    I do not.

18   Q.    Was it also your intention at that point in time, meaning

19   prior to the proffer, to obtain any information you could as to

20   the identity of the person that allegedly went with

21   Mr. Daniells on a March 27th purchase down in Pennsylvania?

22   A.    Yes, in addition to other people that went on the other

23   trips.

24   Q.    And did you sit down with AUSA Glenn MacKinlay prior to

25   the proffer to make sure that expectation was verbalized?

1    A.    I don't think we specifically talked about that, no.

2    Q.    Do you recall who specifically asked Mr. Daniells the

3    question in the proffer about who he went down to Pennsylvania

4    with?

5    A.    Yeah; I believe it was me.

6    Q.    Okay.  So I would just like to go over briefly what you

7    knew about the investigation including the identity of this

8    person prior to the proffer.  Would it be fair to say about

9    eight months prior, if I told you around November of 2014,

-01:-1810  there was an investigation that was opened up against

11   Mr. Mitchell Daniells?

12   A.    Yes.

13   Q.    And was there a report drafted by an ATF agent by the name

14   of Brian Oppedisano?

15   A.    Oppedisano?  Yes.

16   Q.    Oppedisano?

17         And would it be fair to say what you knew was back on

18   August 2nd, 2013, Mr. Jeremy Perez, a third party, was arrested

19   by the New York City police?

-01:-1820  A.    Yes.

21   Q.    And they recovered a firearm with an obliterated serial

22   number off that person?

23   A.    Yes.

24   Q.    And then that obliterated serial number was restored?

25   A.    Yes.

1    Q.    And then a trace was conducted of the firearm?

2    A.    Yes.

3    Q.    And it was determined that that firearm was purchased by

4    Mr. Mitchell Daniells?

5    A.    Yes.

6    Q.    And were you also aware that there was another firearm

7    purchased by Mr. Daniells that was recovered off of another

8    third party?

9    A.    Yes.

-01:-11 10   Q.    And what was his name?

11   A.    Emmanuel Osamwonyi.

12   Q.    Now, to your understanding was this your investigation?

13   A.    We were co-case agents, me and Brian Oppedisano.

14   Q.    Meaning it was ATF New York that recovered -- that

15   investigated the New York recovery of the firearm, right?

16   A.    I'm not sure how we got it, actually.  We got a trace from

17   New York and we put it together and opened a case here.

18   Q.    Okay.  Were you aware agents from the ATF Pittsburgh

19   office went to try to speak to Mr. Daniells after recovery of

-01:-12 20   these two firearms?

21   A.    I believe they may have talked, yes.

22   Q.    And were they successful?

23   A.    No.

24   Q.    And then after recovery of those two firearms, did you

25   further learn information about Mr. Daniells being arrested in

1    Massachusetts?

2    A.   Yes.

3    Q.   And that was for possession of a firearm in violation of

4    Mass. General Laws 269 Section 10A?

5    A.   Yes.

6    Q.   And at the time that you opened up this investigation in

7    November of 2014, were you aware that he had a court date in

8    Massachusetts on or about November 24, 2014?

9    A.   I can't say when we learned about his court date but we

-01:-11 10  eventually did, yes.

11        MR. SPENCER:  May I approach?

12   Q.   Showing you a copy of an ATF report.  Would you take a

13   look at it and let me know if you know what it is?

14   A.   Yes; it's the opening report in the case.

15   Q.   And it's signed by your partner, Brian Oppedisano?

16   A.   Yes.

17        MR. SPENCER:  Next exhibit, please, Judge.

18        MR. MacKINLAY:  No objection.

19        THE COURT:  Okay.  27.

-01:-12 20  THE CLERK:  Defendant's Exhibit 27 is received.

21        (Defendant's Exhibit No. 27 received into evidence.)

22   BY MR. SPENCER:

23   Q.   Would it be fair to say that between the date of your

24   opening of this investigation and the date of Mr. Daniells'

25   arrest, you were aware that Mr. Daniells was going back and

1  forth to court in Massachusetts?

2  A.   I can only assume.  We didn't know where he was exactly.

3  Q.   Right.  But did you have any information that he wasn't

4  reporting to his court dates?

5  A.   No.

6  Q.   Did you make any attempt to try to go to talk to

7  Mr. Daniells while he would be at the courthouse for his

8  particular court date?

9  A.   No.

10  Q.   Why is that?

11  A.   Because we were just getting surveillance at that time.

12  Q.   And during the course of your investigation, did you ever

13  attempt to interview Mr. Perez or Mr. Osamwonyi?

14  A.   We did not.

15  Q.   Why not?

16  A.   We didn't feel the need.

17  Q.   Okay.  Now, is it fair to say that that last exhibit that

18  you took a look at, it outlines all the weapons that had been

19  purchased by Mr. Daniells over the course of two years, between

20  2011 and 2013?

21  A.   I'd have to look at it again and see the attachments.

22  Q.   Okay.  You're not aware of a list of weapons that you

23  attached to a report that Mr. Daniells purchased?

24  A.   At some point.  If I could look at the report, I can tell

25  you.

1    Q.    Sure.  I'm handing you Exhibit 27.

2    A.    Yeah, that's the list.

3    Q.    And between the years of 2011 and 2013?

4    A.    Yes.

5    Q.    Was it approximately 14 guns?

6    A.    Yes.

7    Q.    And so as of the date that you opened up your

8    investigation, there were approximately, about, 11 guns off

9    that list that were unaccounted for?

-01:-10   10    A.    Yes.

11    Q.    Leading up to the proffer, did you have any specific

12    information that any of those 11 guns had been illegally sold

13    by Mr. Daniells?

14    A.    Well, we knew that they were purchased in Pennsylvania and

15    they were recovered in Massachusetts, so I had reason to

16    believe they were, yes.

17    Q.    I'm sorry.  Can you repeat that?

18    A.    They were purchased in Pennsylvania and they were

19    recovered in Massachusetts.

-01:-12   20    Q.    Sir, I'm talking about --

21    A.    Just by that fact, I know there's something there.

22    Q.    Well, I'm talking about the 11 unaccounted-for weapons.

23    A.    That's what I'm talking about.

24    Q.    Do you have any specific information that any of those 11

25    guns have been sold on the street?

1    A.    When they were recovered, yes, so they got there somehow.

2    Q.    All 11 guns were recovered?

3    A.    No, three.

4    Q.    I'm talking about the 11 guns that were unaccounted for.

5    Did you have any information that any of those 11 guns were

6    sold on the street?

7    A.    At that time, no.

8    Q.    Okay.  Now, additionally what you found out was that there

9    were a series of drug transactions involving Mr. Timothy

-01:-010   Bailey?

11   A.    Yes.

12   Q.    And during those drug transactions, did Mr. Bailey

13   indicate that he could get access to firearms?

14   A.    Yes.

15   Q.    Did he ever mention before the proffer -- did he ever

16   mention Mr. Mitchell Daniells as being the source of this gun

17   supply?

18   A.    Everything I learned about that investigation was from

19   reports and interaction with other agents.  I was a part of a

-01:-020   different group than that group.

21   Q.    Sir, as of the date of the proffer were you in possession

22   of any information, reports or otherwise, that Mr. Bailey had

23   identified Mr. Daniells as the source of this gun supply?

24   A.    Yes.

25   Q.    Where did you learn that information from?

1    A.    From the reports from the other agents.

2    Q.    So prior to the proffer, there were reports that were in

3    existence which specifically identified Mr. Daniells as the

4    source of this gun supply?

5    A.    Yeah, Chi-Town, and that he could get guns.

6    Q.    Yeah, but was Mr. Daniells' name specifically identified

7    as the source of this gun supply?

8    A.    No.

9    Q.    Then on March 30th there was a gun that actually became

-01:-01 10    the subject of the charge of the 922(n) count against

11    Mr. Daniells, correct?

12    A.    Yes.

13    Q.    That gun ended up in the hands of Mr. Timothy Bailey?

14    A.    Yes.

15    Q.    And you were able to trace it back to Mr. William Roberts?

16    A.    Yes.

17    Q.    Did you ever speak to Mr. Will Roberts as a result of

18    furthering the investigation once you traced it back to him?

19    A.    Yes.

-01:-02 20    Q.    And was that in the months of April and May of 2016?

21    A.    Yes.

22    Q.    And it was after speaking with Mr. Will Roberts, did you

23    then determine you had the probable cause to -- for an arrest

24    warrant against Mr. Daniells?

25    A.    Yes.

1    Q.    Not before?

2    A.    No.

3    Q.    And as of the date that you spoke to Will Roberts leading

4    up to the day of the proffer, was Mr. Will Roberts the only

5    live witness that provided any testimony against Mr. Daniells?

6    A.    And Timothy Bailey.

7    Q.    From --

8    A.    From reports.

9    Q.    From reports?

-01:-01 10    A.    Yes.

11    Q.    What reports from Timothy Bailey identified Mr. Mitchell

12    Daniells in any way?

13    A.    Not in name, but by his nickname, "Chi-Town."

14    Q.    So would it be fair to say that Will Roberts was the only

15    live witness to identify Mr. Mitchell Daniells by name as being

16    involved?

17    A.    Yes.

18    Q.    During the course of your conversations with Mr. Roberts,

19    had he lied to you over the course of those interviews?

-01:-02 20    A.    Not me personally.

21    Q.    To other agents?

22    A.    Yes.

23    Q.    Which is a crime, right?

24    A.    (No verbal response.)

25    Q.    It's not a crime?

```
 1    A.    It's a crime, yes.

 2    Q.    Okay.  And obviously at the time of the proffer you had a

 3    desire to get any other corroborating witnesses, including live

 4    witnesses, to corroborate Will Roberts' story, correct?

 5    A.    Yes.

 6    Q.    And did you tell Mr. Mitchell Daniells of that desire

 7    prior to him going to the proffer?

 8    A.    I couldn't speak with Mr. Daniells.  No.

 9    Q.    So you didn't?

10    A.    No.

11    Q.    Did you tell AUSA MacKinlay that you had the desire to

12    obtain witnesses to corroborate the testimony of Mr. Will

13    Roberts?

14    A.    We didn't have conversations like that.  You're just

15    trying to further the case.  So you go to the proffer to get

16    whatever information you can.

17    Q.    Now, what other crimes was Mr. Will Roberts guilty of at

18    the time that -- at least that you were aware at the time that

19    you participated in the proffer?

20    A.    Straw purchasing.

21    Q.    And that's a violation of 922(a)(6)?

22    A.    Yes.

23    Q.    How about lying to federal agents?

24    A.    Yes.

25    Q.    Obstruction of justice?
```

1    A.    No.

2    Q.    He never told any of the agents that he didn't know where

3    his guns were -- or first, that he told them that he knew where

4    his guns were, where he was actually lying to the agents?

5    A.    He provided a story initially that the guns were stolen

6    because he was instructed by Mitchell Daniells to do so.

7    Q.    And that wouldn't be obstruction of justice?

8    A.    Yes.

9    Q.    Do you believe that Mr. Will Roberts was treated any

-01:-0510    differently than Mr. Mitchell Daniells as it pertained to the

11    investigation?

12              MR. MacKINLAY:   Objection.

13              THE COURT:   Sustained.

14    BY MR. SPENCER:

15    Q.    What was Mr. Will Roberts' ethnic background?

16    A.    White.

17    Q.    And Mr. Daniells is black?

18    A.    Yes.

19    Q.    Was Mr. Roberts told that he could be expected to be

-01:-0220    charged with a crime as a result of his participation in this

21    incident?

22    A.    Yes.

23    Q.    Was he charged?

24    A.    No, not at this time.

25    Q.    Was the conduct of Mr. Will Roberts any different the way

1   that you saw it than the conduct of Mr. Daniells?

2   A.    Yes.

3   Q.    How so?

4   A.    Very different.

5   Q.    How so?

6   A.    Will Roberts is a friend of Mitchell Daniells who was, in

7   my mind, coerced into buying these guns.

8   Q.    He was what?

9   A.    Coerced.

-01:-01  10   Q.    What information do you have that he was coerced?

11   A.    Because I think he took advantage of him.

12   Q.    What information did you have that he took advantage of

13   him?

14   A.    Well, he showed up the first time and he didn't know why

15   he was going, and he was a friend.  And he laid it on, "Hey, I

16   want you to buy these guns."  The second time he didn't even

17   get paid.  So it didn't make a lot of sense why he was doing

18   it.

19   Q.    Did he ever tell you that he was coerced?

-01:-02  20   A.    Not in those specific words, no.

21   Q.    Did he tell you in any general way that he was being

22   coerced?

23   A.    Yeah, he felt that he was being taken advantage of.  Yes.

24   Q.    So you do know that buying -- is it your claim that

25   Mr. Will Roberts told you that he bought eight guns as a straw

1   purchaser on behalf of Mr. Daniells?

2   A.   Yes.

3   Q.   Would that also be trafficking in guns?

4   A.   No; he's the straw purchaser.  The person who takes them

5   from one state to another is the trafficker.

6   Q.   During the course of your interviews with Mr. Roberts, did

7   he mention an individual named "Sean"?

8   A.   Yes.

9   Q.   What specifically did he tell you about Sean?

-01:-01 10   A.   Sean was a black male who arrived with Mitchell Daniells

11   on March 27th when Roberts bought two guns from Mitchell

12   Daniells.

13   Q.   And did he give you a description of this person Sean?

14   A.   Yes.

15   Q.   Was it black male, six feet in height, 30 years of age,

16   skinny with hair in short twisted braids?

17   A.   Yes.

18   Q.   And what, if any, efforts did you make to try to find out

19   the identity of this person?

-01:-02 20   A.   I tried to show him a photo lineup and then a single

21   picture.

22   Q.   And was he able to identify anybody?

23   A.   He was confident that he identified a person in the

24   picture who he identified as Jimmy Gardner.

25   Q.   And there was a report that was generated as a result of

1    that?

2    A.    Yes.

3          MR. SPENCER:   Judge, I think that report's one of the

4    exhibits.   Do you mind if I just take a look?

5          (Pause.)

6    Q.    Approaching and showing you Exhibit 17, is that your

7    report?

8    A.    Yes.

9    Q.    And does it deal with the photo array that you showed

-01:-01 10    Mr. Will Roberts?

11    A.    Yes, it does.

12    Q.    And where he testified that one single photo that you

13    showed him, identified as Jermaine Gardner, he said he was

14    confident that was the person that went with him to

15    Pennsylvania?

16    A.    Yes.

17    Q.    And the date of this report, or at least the date of the

18    actual photo array, is May 13, 2015?

19    A.    Yes.

-01:-02 20    Q.    What else did he tell you about this person named "Sean"?

21    A.    That he came, like, to the house for a little bit, he

22    accompanied them when they went to the guns stores, and I think

23    when they were getting ready to leave he said, "Hey, the guy's

24    really going to like these," or something to that effect.

25    Q.    "Like these" referencing what, weapons?

 1    A.    Yes.

 2    Q.    And would that have been Sean who made that statement?

 3    A.    Who Roberts identified as Sean, yes.

 4    Q.    As of May 13, 2015, when this specific person was

 5    identified, what investigation did you undertake to try to

 6    verify that?

 7    A.    No other additional investigation.

 8    Q.    Do you recall testifying in front of a federal grand jury?

 9    A.    Yes.

00:-59 10   Q.    And would that date of your testimony be June 16, 2015?

11    A.    I can't be sure of the date.

12    Q.    Does that sound about right?

13    A.    Say the date again?

14    Q.    June 16, 2015, just a couple of days before the arrest?

15    A.    Yes.

16    Q.    And were you specifically asked by Mr. MacKinlay, "Did you

17    take any steps to identify this person named Sean"?

18    A.    Yes.

19    Q.    And did you ever tell those federal grand jurors about

00:-59 20   Mr. Will Roberts' identification of this individual as Jermaine

21    Gardner?

22    A.    It's in his report, yes?

23    Q.    You told the grand jurors that?

24    A.    Rephrase the -- can you ask the question again?

25    Q.    Yeah.  Did Mr. MacKinlay ask you if you'd taken some

1   steps in an effort to identify that individual named Sean?

2   A.   Yes.

3   Q.   And did you ever tell those federal grand jurors about

4   what Will Roberts told you regarding him identifying him as

5   Jermaine Gardner?

6   A.   He said he was confident and that was the picture.

7   Q.   Now, as of the day of the proffer, the information that

8   you had, according to your investigation, that Mr. Daniells had

9   actually sold any weapons was limited, correct?

00:-58 10   A.   Yes.

11   Q.   And after the proffer were you able to obtain information

12   based upon the information that he gave you in order to support

13   a theory that Mr. Daniells had been selling weapons?

14   A.   We learned information as a result of the investigation,

15   yes.

16   Q.   As a result of the information that he gave you?

17   A.   Yes.

18   Q.   Now, did that come from the identity of the person that

19   accompanied him down to Pennsylvania on March 27, 2015?

00:-57 20   A.   Yes, it did.

21   Q.   Additionally, after Jermaine Gardner was identified, did

22   you subsequently learn in your investigation that Jermaine

23   Gardner was stopped while in the presence of Mr. Daniells by

24   law enforcement in Pennsylvania?

25   A.   I learned that.  I don't know if it was before or after I

 1    showed the lineup.

 2    Q.    But it was before the proffer?

 3    A.    Yes.

 4    Q.    And what specifically did you learn?

 5    A.    I think it was -- they were just driving in the car.  I

 6    don't know the reason why they were stopped.  And he just had

 7    Jermaine Gardner's name, his identifiers.  And we knew from

 8    phone records that he called Jermaine a lot, so that was the

 9    information we had at the time.

00:-56 10   Q.    If I showed you a copy of your report, would you recognize

 11   it?

 12   A.    Yes.

 13   Q.    Take a look at that document.  Is that your report?

 14   A.    Yes, it is.

 15   Q.    What's the date of the actual information that you're

 16   reporting?

 17   A.    4/3/2015.

 18   Q.    Is the report signed?

 19   A.    Yes.

00:-56 20   Q.    What's the date of the signature?

 21   A.    4/23/15.

 22   Q.    And does it reference a particular day?

 23   A.    4/3/15.

 24   Q.    4 --

 25   A.    -- 3/2015.

1    Q.    Okay.  What happened on that day?

2    A.    The Decatur Township Police Department stopped a vehicle

3    registered to and operated by Mitchell Daniells.

4    Q.    And who was in the car with him?

5    A.    Gardner.

6    Q.    And you had that information prior to the proffer?

7    A.    Yes.

8              MR. SPENCER:  Next exhibit.

9              MR. MacKINLAY:  No objection.

00:-55 10              THE CLERK:  Defendant's Exhibit 28 received by the

11    Court.

12              (Defendant's Exhibit No. 28 received into evidence.)

13    BY MR. SPENCER:

14    Q.    So did that report that you generated corroborate any of

15    the information that Mr. Will Roberts gave you as to the

16    identity of the person that was with Mr. Daniells on or about

17    March 27, 2015?

18    A.    It didn't corroborate it but it made it possible that that

19    could be the person.

00:-55 20    Q.    Well, did you ask Mr. Roberts if he knew Mr. Jermaine

21    Gardner?

22    A.    Yeah, I probably -- I'm sure I did.

23    Q.    Did he say he knew him?

24    A.    No.

25    Q.    So he happened to just take a look at a photograph and

1   actually said that this was the person that was with

2   Mr. Daniells on the date of the incident, right?

3   A.   He had confidence that may be the person.

4   Q.   Right.  And then shortly thereafter, unbeknownst to you

5   and Mr. Will Roberts, Mr. Jermaine Gardner is seen in a car

6   with Mr. Daniells on or about April 3, 2015?

7   A.   Yes.

8   Q.   And that's just a week after March 27th, correct?

9   A.   Yes.

00:-54   10   Q.   So it would, in fact, corroborate at least some

11   information regarding the fact that Will Roberts knew this

12   person -- or actually identified this person with Mr. Mitchell

13   Daniells?

14   A.   Well, I wouldn't use "corroborate," but it made sense.

15   Q.   All right.  You did no further investigation of Jermaine

16   Gardner?

17   A.   No.

18   Q.   During that post-arrest meeting of June 18th, did

19   Mr. Daniells ever indicate that he wanted to cooperate?

00:-53   20   A.   Yes.

21   Q.   He did?

22   A.   Yes.

23   Q.   What did he say specifically?

24   A.   Well, there came a point in the interview where he wanted

25   to shut the recorder off.  I thought that's when he was going

1  to make some kind of statement, but nothing really happened

2  after that.

3  Q.   All right.  So he didn't cooperate once you turned the

4  recorder off?

5  A.   No.

6  Q.   So were you left with the impression at any point in time

7  pre-recording or post-recording that Mr. Daniells wanted to

8  cooperate with you?

9  A.   I was unsure.

00:-53 10  Q.   Did he ever specifically say it?

11  A.   No.

12  Q.   And do you know what caused him to sit down with you on

13  July 15th in order to do a proffer?

14  A.   I don't.

15  Q.   Were you told prior to the proffer that Mr. Daniells

16  refused to provide you with any names?

17  A.   No.

18  Q.   Was there an Officer Greg Brown there?

19  A.   Yes.

00:-52 20  Q.   Why was he there?

21  A.   Because of the investigation that wound up in Boston, and

22  he was hoping to get more information regarding that to help

23  get the guns back.

24  Q.   Okay.  So was Officer Greg Brown a Boston police officer?

25  A.   Yes.

1    Q.   Was he involved in any way, shape or form in your 922(n)

2    investigation of Mr. Mitchell Daniells?

3    A.   No.

4    Q.   So he was brought in the room just to get additional

5    intel, if possible?

6    A.   Yes.

7    Q.   And whose idea was that?

8    A.   I believe it was AUSA MacKinlay.

9    Q.   And did AUSA MacKinlay tell you why he wanted Officer Greg

00:-51 10   Brown in the room where he was not involved in the

11   investigation of Mr. Mitchell Daniells?

12   A.   I don't think we had a conversation about it.

13   Q.   Did you have any information at the time of the proffer

14   that Mr. Daniells knew about the Columbia Point sweep

15   investigation?

16   A.   Yeah, we told him on the way back from -- when we were

17   driving up from the Framingham Police Department to federal

18   court that there was a big arrest and there was going to be a

19   lot of people at the lockup.

00:-51 20   Q.   I understand what you told him, but did you have any

21   information that he had any knowledge about that investigation?

22   A.   Well, I did tell him so he did have knowledge about it.

23   Q.   Other than what you told him.

24   A.   No.

25   Q.   Okay.  Do you recall during the proffer any questions

1    asked of Mr. Daniells about the passcode to his cell phone?

2    A.    At the end of the proffer AUSA MacKinlay asked him if he

3    would be willing to give the password, and Attorney Schneider

4    said -- he said, "If you get a search warrant, then we'll

5    probably give it to you."

6    Q.    That's what he said?  Was there a report generated as a

7    result of the proffer?

8    A.    Yes.

9    Q.    Who generated that report?

00:-50 10    A.    Brian Oppedisano.

11    Q.    Were there notes taken as a result of the proffer?

12    A.    Yes.

13    Q.    Who took those notes?

14    A.    Brian Oppedisano.

15    Q.    And do you recall in that proffer report, is there any

16    statement that indicates that Attorney Schneider said that "If

17    you get a warrant, we'll provide you with the passcode"?

18    A.    I don't believe that was in the notes because it was at

19    the end of the meeting.  There had already been a break and we

00:-49 20    were about ready to leave.

21    Q.    All right.  So there's no mention -- and this proffer took

22    place almost two years ago, right?

23    A.    Yes.

24    Q.    No mention in the contemporaneous notes about Attorney

25    Schneider saying, "We'll give it to you if you get a search

1  warrant"?

2  A.   I don't recall seeing that in the notes.

3  Q.   And in the proffer report that was generated -- and would

4  it be fair to say that it was generated by Agent Oppedisano on

5  April 11, 2017?

6  A.   Yes.

7  Q.   So again, almost two years after the proffer?

8  A.   Yes.

9  Q.   And nowhere in that report that's generated almost two

00:-49 10  years later is there any mention of Attorney Schneider saying

11  "We'll provide this passcode to you upon production of a search

12  warrant"?

13  A.   No.

14  Q.   Do you know why it was asked for, the passcode, in lieu of

15  just getting a search warrant?

16  A.   Speed the investigation.

17  Q.   How long does it take to actually execute a warrant once

18  it's obtained?

19  A.   It depends on the carrier and what the backlog is.

00:-48 20  Q.   Based upon your training and experience?

21  A.   It varies.  I can't give you an answer on that.

22  Q.   Okay.  And was it during the proffer session where

23  specifically Mr. Daniells was asked about the identity of the

24  person who went with him to Pennsylvania?

25  A.   Yes.

1    Q.   With respect to the previous alleged gun purchases, was

2    the identity of the people that were supposedly with

3    Mr. Daniells asked as well?  I can rephrase that.  Meaning

4    prior to March 27, 2015, there were other alleged instances of

5    gun purchases between Will Roberts and Mr. Daniells, correct?

6    A.   Yes.

7    Q.   And was Mr. Daniells specifically asked of the identity of

8    any persons that was with him during those previous visits to

9    Pennsylvania?

00:-47 10   A.   I don't believe so.

11   Q.   You weren't interested in knowing that information?

12   A.   Yeah, we wanted to know it.  Yes.

13   Q.   So why didn't you ask it?

14   A.   I don't know.

15   Q.   And then the question was asked about the March 27th

16   purchase.  Had you already known at that point in time there

17   was a person identified as Jermaine Gardner that was

18   Mr. Daniells?

19   A.   Yes.

00:-47 20   Q.   And did you tell Mr. Daniells that?

21   A.   No.

22   Q.   Did you tell his lawyer that?

23   A.   No.

24   Q.   And did Mr. -- what did Mr. Daniells say in response to

25   the question?

1    A.    Kenny Brobby was with him.

2    Q.    And he never asked to speak to his lawyer?

3    A.    No.

4    Q.    And did you say anything in your notes, anything in any

5    report that specifically states one way or the other if a break

6    was obtained during the course of the proffer?

7    A.    When you look at the notes, it just goes to a certain

8    point and ends.  There was only one break, and the break

9    happened at the end of the notes.

00:-46 10   Q.    So is there any mention of a break inside the notes?

11   A.    No.

12   Q.    Is there you any mention of a break inside the proffer

13   report generated by your partner?

14   A.    No.

15   Q.    But you're saying there was, in fact, a break that took

16   place?

17   A.    Yes.

18   Q.    And previous to this incident, had there been other cases

19   that you've worked on where you've asked defendants to provide

00:-46 20   their passcodes to their cell phone?

21   A.    I'd say yes, but it's been a long time.

22   Q.    So as you sit here today, you have no independent memory

23   of any particular suspect that you had indicted or was under

24   investigation where they actually provided you with the

25   passcode to their cell phone?

1    A.    Not in the recent past, no.

2    Q.    And do you have any recollection of getting a search

3    warrant for a cell phone over the course of your career as an

4    ATF agent?

5    A.    Yes.

6    Q.    And is it your common practice to help speed things along

7    to ask the defendant to provide you with the passcode first?

8    A.    Every case is different.  I --

9    Q.    That's not my question.

00:-45 10    A.    If it makes it go faster, yes, I would ask for consent for

11    the password.

12    Q.    So you do have a specific recollection of asking previous

13    suspects for consent for a passcode once you get the search

14    warrant in order to speed things along?

15    A.    Not in the recent past.

16    Q.    Do you have any recollection of seizing any cell phones

17    from suspects over the last two years?

18    A.    Yes.

19    Q.    Do you have any recollection of getting search warrants to

00:-44 20    seize those cell phones -- I mean, to search those cell phones?

21    A.    Yes.

22    Q.    And on no other occasion do you have any recollection of

23    asking the suspects to provide you with a passcode first to

24    speed things along?

25    A.    In the other case, no.  The password issue never came up.

1    Q.   You just execute the warrant, right?

2    A.   Sometimes you don't need a passcode.  Sometimes you can

3    just get into the phone.  I've worked on two cases in the

4    last -- two long-term cases in the last three years, so the

5    other case I never needed a passcode from anyone.

6    Q.   All right.  So you never actually had to ask Apple or

7    Samsung or some other company to assist in extracting data from

8    the phone?

9    A.   No.

00:-44 10   Q.   And once you obtained that name of Kenny Brobby, did you

11   have an interview with Kenny Brobby?

12   A.   Yes, we did.

13   Q.   And what, if any, incriminating information can you recall

14   he provided against Mr. Daniells?

15   A.   He said he went to Pennsylvania with him.  He was there

16   when he met his friend.  They went to Weston, Pennsylvania.

17   They went to two gun stores.  The friend in Weston,

18   Pennsylvania, bought him two guns, they drove back to

19   Massachusetts with the guns.  And he also provided some other

00:-43 20   names that we followed up on in the case.

21   Q.   All right.  And as a result of following up on those

22   names, did you obtain more incriminating information against

23   Mr. Daniells?

24   A.   Yes, we did.

25   Q.   And how did you get the contact information for Kenny

1    Brobby?

2    A.   During the proffer Mitchell Daniells provided the name

3    Kenny Brobby, said he was from Worcester.  So we went through

4    the Massachusetts Criminal Intelligence System and we found

5    that a person named "Kenny Brobby" had a driver's license in

6    Worcester.  We drove to that address, we came in contact with

7    his mother.  He wasn't there.  She gave us the cell phone.  I

8    called the cell phone and we set up an interview.

9    Q.   Was the name "Kenny Brobby" -- did you find that in

00:-42 10   Mr. Daniells' cell phone?

11   A.   I don't think the full name "Kenny Brobby" was in the cell

12   phone.

13   Q.   Did you find the cell phone information that you got from

14   his mother also inside of his cell phone?

15   A.   You know, I never corroborated the number to see if it was

16   the same number.

17   Q.   And the names that Mr. Daniells provided to you, can you

18   state to the Court what those names were, meaning the other

19   witnesses?

00:-42 20   A.   From Kenny Brobby?

21   Q.   Yes.

22   A.   I believe he gave us the name "Jess."  I don't think he --

23   he didn't know any other information, but we later identified

24   her as Jessica Bagby.

25   Q.   And then after speaking -- did you speak with Jessica

1    Bagby?

2    A.   Yes, we did.

3    Q.   And did she provide incriminating information against

4    Mr. Daniells?

5    A.   Yes, she did.

6    Q.   As a result, did you learn about another individual named

7    "P.J."?

8    A.   Yes, we did.

9    Q.   How did you learn about the name "P.J."?

00:-41 10    A.   From Jessica Bagby.

11    Q.   And did you interview P.J.?

12    A.   Yes, we did.

13    Q.   And did he provide incriminating information against

14    Mr. Mitchell Daniells?

15    A.   Yes, he did.

16    Q.   Did you also learn of a witness named "Ashley Faucher"?

17    A.   Yes.

18    Q.   And how did you learn of her information?

19    A.   Well, before all this happened, we had phone information

00:-41 20    and we put it into a system that had frequency of calls, and

21    she was number 2 on the list for the last year, so that's how

22    we got her name.

23    Q.   And when did you call her?

24    A.   I don't believe we called her.  We just drove to

25    Worcester, we found her and then we interviewed her.

1   Q.   And did she provide incriminating information against

2   Mr. Mitchell Daniells?

3   A.   Yes, she did.

4   Q.   And would it be fair to say that you spoke to Ashley

5   Faucher after the proffer?

6   A.   Yes.

7   Q.   And would it be fair to say that you spoke to Ms. Ashley

8   Faucher after you extracted the information -- or, rather,

9   extracted data from Mr. Daniells' cell phone?

00:-40 10   A.   I can't say.  I don't know when the timeline on that was.

11   Q.   And on September 28, 2015, did you execute a search

12   warrant of Mr. Daniells' residence?

13   A.   Yes.

14   Q.   28C Interfaith Terrace?

15   A.   Yes.

16   Q.   In Framingham?

17   A.   Yes.

18   Q.   And did you -- who submitted the affidavit in support of

19   that search?

00:-40 20   A.   I did.

21   Q.   And would it be fair to say that much of the information

22   that you relied upon in order to search that residence came

23   from the witnesses that you spoke to after the proffer?

24   A.   Yes.

25   Q.   Is it fair to say that without the defendant's cell phone

1   and without the statement given about the identity of the

2   person that went with Mr. Daniells, you would have been unable

3   to get that search warrant?

4   A.   I can't say that.

5   Q.   Is it fair to say that before the proffer and before the

6   extraction of the cell phone, the evidence that you had about

7   Mr. Mitchell Daniells allegedly selling guns was limited but

8   then became supplemented upon speaking with all of these

9   witnesses?

00:-39 10   A.   The proffer helped, yes.

11   Q.   And the cell phone?

12   A.   That helped too, yes.

13          MR. SPENCER:  May I have a moment?

14          (Counsel confers with the defendant off the record.)

15   BY MR. SPENCER:

16   Q.   Did you also show pictures of Jessica Bagby to Mr. Kenny

17   Brobby?

18   A.   I'd have to look at my report.

19   Q.   As you sit here today, you have no independent memory of

00:-38 20   that?

21   A.   I can't remember.

22          MR. SPENCER:  Anything else?

23          Nothing further.

24          THE COURT:  Mr. MacKinlay?

25                    CROSS-EXAMINATION

1    BY MR. MacKINLAY:

2    Q.   Special Agent McPartlin, at this proffer on July 15, 2015,

3    you recall persons were present, correct?

4    A.   Yes.

5    Q.   Do you recall that Special Agent Oppedisano was assigned

6    to keeping notes and writing a report?

7    A.   Yes.

8    Q.   Nobody else, to your memory, was writing notes or keeping

9    a report during the course of that proffer?

00:-38 10   A.   Correct.

11   Q.   And that was at my instruction?

12   A.   Yes.

13   Q.   At the beginning of the proffer, would it be fair to say

14   that the proffer letter was provided, and in addition to

15   counsel having an opportunity to look at it and go over it with

16   Mr. Daniells, I also went through it with Mr. Daniells?

17   A.   That's correct.

18   Q.   Do you recall about the sequence, I should say, the

19   topical sequence of the proffer after going over the proffer

00:-37 20   letter through the conclusion of the proffer session?

21   A.   Yes, I do.

22   Q.   Was there a break in the proffer?

23   A.   Yes.

24   Q.   When was the break in the proffer?

25   A.   The break occurred when we had talked about the William

1    Roberts' guns, and now we moved on to the guns that Mitchell

2    Daniells purchased himself.

3    Q.   Okay.  Now, the name "Kenneth Brobby" came up, correct?

4    A.   Yes.

5    Q.   Who provided it?

6    A.   Mitchell Daniells.

7    Q.   Not his lawyer, Mr. Schneider?

8    A.   No.

9    Q.   When in the course of the proffer did the name "Kenneth

00:-36 10   Brobby" come out of the mouth of Mitchell Daniells?

11   A.   When we talked about the William Roberts' guns, we

12   concluded with that, and then we went on to talk about the guns

13   he purchased himself.

14   Q.   Okay.  And then at some point wasn't there a discussion or

15   an explanation by Mr. Daniells of what happened to the guns?

16   A.   Yes.

17   Q.   When did that occur in relation to the name "Kenneth

18   Brobby" being provided by him?

19   A.   After.

00:-36 20   Q.   How long after?

21   A.   Five minutes.

22   Q.   What did he say as an explanation about the

23   firearms -- the Roberts' guns as well as the guns that he

24   bought himself during the course of the proffer?

25   A.   Mitchell Daniells said that the Roberts' guns -- he had

1    all the guns in a black duffel bag, he drove to a part of

2    Boston, he went into a building, he went into the hallway, he

3    handed a male the bag of guns but he never got paid for them.

4    Q.   Did he also talk about a second group of guns?

5    A.   Yes.  He said that the guns that he purchased in his name

6    in Pennsylvania, he had them all in the car.  He drove to

7    Academy Homes in Boston.  He went in someone's house, and at

8    some point he came out and the car and the guns were stolen.

9    Q.   And this story that he gave, did that fit with your

00:-35 10   investigation, you and Special Agent Oppedisano's

11   investigation?

12   A.   No, it did not.

13   Q.   What was your reaction upon hearing that story?

14   A.   I looked at his attorney and I said, "I think we should

15   take a break.  I think you need to talk to your attorney.

16   We're going to step outside and you let us know.  We'll come

17   back in and we'll try to get back on track."

18   Q.   And was there a break at that point?

19   A.   Yes, there was.

00:-35 20   Q.   And what happened?

21   A.   We all got up and left.

22   Q.   Who was left in the room?

23   A.   Attorney Schneider and Mitchell Daniells.

24   Q.   And that was the only break?

25   A.   Yes.

1   Q.   And that was after the name "Kenneth Brobby" was provided

2   by the defendant?

3   A.   Correct.

4   Q.   The story that he provided, was there a conversation

5   before the break about your -- you and Agent Oppedisano not

6   believing the defendant?

7   A.   Yes.

8   Q.   Okay.  What -- tell the Court how that conversation went

9   prior to the break.

00:-34 10   A.   He said, "The story doesn't make sense."  I mean, just

11   "That didn't happen."  And I'm the one that said to his

12   attorney [*sic*], "Listen, I think you need to talk to your

13   attorney.  We're going to take a break and step outside so we

14   could get back on track with the proffer."

15   Q.   Okay.  Now, when you mentioned one part of the story being

16   the Roberts' guns that the defendant provided, the Roberts'

17   guns in the bag being produced to someone who took the backpack

18   and never returned with it?

19   A.   Yes.

00:-33 20   Q.   Is that the gist of it?

21   A.   Yes.

22   Q.   How did he explain that in his own words during the course

23   of the proffer, meaning Mr. Daniells?

24   A.   That he had all the guns in a bag, he went into a

25   building, he went into a hallway.

```
 1    Q.   Was he supposed to meet with someone else?  In other
 2    words -- let me ask a better question.
 3         Isn't it true that Kenneth Brobby is not the only name
 4    that Mitchell Daniells provided during the course of the
 5    proffer?
 6    A.   Yes.
 7    Q.   What was the other name he provided?  If I suggested to
 8    you Will Robb -- excuse me -- Rob Rahd?
 9    A.   Rahd.
00:-3210    Q.   Rahd?
11    A.   Rahd.
12    Q.   So Kenneth Brobby wasn't the only name?
13    A.   Correct.  That's correct.
14    Q.   And what was Rahd's, according to the defendant who
15    proffered, role in this gun trafficking?
16    A.   To buy the guns.
17    Q.   He was going to buy the guns that Roberts had provided to
18    him and he had brought up, correct?
19    A.   Yes.  Yes.
00:-3220    Q.   Have you been able to identify Rahd as the purchaser of
21    the -- alleged purchaser -- or in this case the one that stole
22    his guns?
23    A.   Yes.
24    Q.   You participated in a proffer session relative to Timothy
25    Bailey.  Isn't that right?
```

1    A.    Yes.

2    Q.    Do you recall the date of that?

3    A.    I do not.

4    Q.    Looking at a proffer report prepared by a Daniel Campbell,

5    does this refresh your recollection concerning that particular

6    meeting?

7    A.    Yes.

8    Q.    And who is Daniel Campbell?

9    A.    He's another special agent in the ATF Boston office.

00:-31 10   Q.    And did he have a parallel investigation into essentially

11   the Columbia Point aspect of the case that eventually came

12   together with your investigation with Mr. Oppedisano?

13   A.    Yes, he did.

14         MR. MacKINLAY:  May I approach, please, your Honor?

15   Q.    I'm showing you a document, and I'd just ask you to take a

16   moment to read it to yourself and see if it refreshes your

17   recollection about the proffer conducted with Timothy Bailey.

18   A.    Yes, I remember that.

19   Q.    What date was that?

00:-30 20   A.    July 15th.

21   Q.    The same date as your meeting with Mr. Daniells?

22   A.    Yes.

23   Q.    Do you remember which one went first?

24   A.    I believe Timothy Bailey was first.

25   Q.    So the information identifying Mitchell Daniells by

1    Timothy Bailey you already had prior to the time of the proffer

2    at the time that you met Mr. Daniells, correct?

3    A.   Yes.

4    Q.   How were you notified about the passcodes?

5    A.   You sent me an email.

6    Q.   And do you know -- do you recall when that was?

7    A.   I believe it was in August -- early August.  August 4th

8    maybe.

9              MR. MacKINLAY:  One moment, please, your Honor.

00:-29 10          (Discussion off the record.)

11             MR. MacKINLAY:  May I approach, your Honor.

12   BY MR. MacKINLAY:

13   Q.   I'm showing you an email string, and I'd ask if you

14   recognize that, Mr. McPartlin.

15   A.   Yes, I do.  That was August 7th.

16   Q.   Are those emails between us regarding passcodes?

17   A.   Yes.

18   Q.   What was the date and time of me providing to you

19   passcodes?

00:-29 20  A.   August 7th, 5:02 p.m.

21   Q.   5:02 p.m.?

22   A.   Yes.

23             MR. MacKINLAY:  I would ask that this be marked as the

24   next exhibit, your Honor.

25             MR. SPENCER:  No objection.

1           THE CLERK:  Government's Exhibit 29 is received by the

2     Court.

3           (Government Exhibit No. 29 received into evidence.)

4           MR. MacKINLAY:  Can I have the document camera,

5     please.

6     BY MR. MacKINLAY:

7     Q.   You're referring to this exchange here.  Is that right,

8     sir?

9     A.   Correct.

00:-28 10   Q.   At that time with the email did I provide you with the

11    passcodes, on the date of August 7th around 5:02 p.m.?

12    A.   Yes.

13    Q.   There was discussion moments ago about what information

14    you had developed after the proffer session in particular from

15    the lead of Kenneth Brobby, correct?

16    A.   Yes.

17    Q.   Were there other investigative techniques that you were

18    utilizing at the time to continue the investigation aside from

19    relying on Kenneth Brobby?

00:-28 20   A.   Yes.

21    Q.   Tell the Court about some of the techniques and what you

22    were having to do.

23    A.   So we had the call data that we got from subpoena

24    information.  So we had all his, you know, top 100 callers, but

25    there's a program that sets it up by frequency.  So at least,

1    you know, we start with the top 10.  Like Ashley Faucher was 2,

2    I think, and I think Bagby was in -- Jessica Bagby was in the

3    top 10.

4         There was other guns -- you know, we knew other guns would

5    be recovered; that we eventually got information -- they gave

6    us some other leads.  We had social media to exploit.  There

7    were a lot of other avenues we were going to continue to work

8    on to further this case.

9    Q.   And have you continued to work and develop the case in an

00:-27 10   effort to locate additional firearms following the proffer and

11   continuing?

12   A.   Yes.

13            MR. MacKINLAY:  I have no further questions, your

14   Honor.

15            MR. SPENCER:  Just briefly on that.

16                      REDIRECT EXAMINATION

17   BY MR. SPENCER:

18   Q.   Was there an audio recording of the actual proffer?

19   A.   No.

00:-26 20   Q.   So would it be fair to say that an audio recording would

21   be the best evidence of when exactly a break took place?

22   A.   I've never seen a proffer be recorded.

23   Q.   That's not my question.  It would be the best evidence,

24   right?

25   A.   If it was possible.

1    Q.    And it's fair to say that nowhere in your notes or the

2    actual proffer report does it indicate a break even took place?

3    A.    That's correct.

4    Q.    All right.  Now, you said that Mr. Daniells did provide

5    another name in addition to Kenny Brobby, and that's a person

6    named Rob?

7    A.    Rahd.

8    Q.    R-O-D?

9    A.    I think we spelled it R-A-H-D in our report but I know --

00:-26  10   Q.    R-A-H-D?  Is that a first name or a last name?

11   A.    No idea.  A nickname.  I don't know.

12   Q.    Okay.  And so what do you know about this person Rahd?

13   A.    Well, I can just say that if you met somebody and he said

14   his name was Rahd and we already know the person he met, then

15   we know it's that person.

16   Q.    Which person was that?

17   A.    Timothy Bailey.

18   Q.    So you're saying that when he mentioned Rahd, he was

19   talking about Timothy Bailey?

00:-25  20   A.    That's what I thought it meant.

21   Q.    And that he dropped off eight guns to Rahd but never got

22   paid for them?

23   A.    That's his story.

24   Q.    And did you ever show him a picture of Timothy Bailey to

25   see if this person was the person named Rahd that you're

```
 1  talking about?

 2  A.    No.

 3  Q.    Did you ever get an address of where he specifically went

 4  to meet this person Rahd?

 5  A.    I think we asked.  I don't think we got specific

 6  information.

 7  Q.    Meaning he gave you specific information about Kenny

 8  Brobby, right?

 9  A.    He said he lived in Worcester.

10  Q.    He gave you a first name and a last name, right?

11  A.    Yes.

12  Q.    And he gave you a location?

13  A.    Yes.

14  Q.    And you were able to take that information and then

15  utilize that information to find Kenny Brobby, right?

16  A.    Yes.

17  Q.    So when Mr. MacKinlay asked did he identify anybody else,

18  all he told you about this other person was just Rahd?

19  A.    Yes.

20  Q.    And these other investigative techniques that you were

21  talking about, the cell data and the social media, did you

22  conduct any investigative techniques between the date of the

23  proffer, July 15th, and the date you received the passcode

24  August 7th?

25  A.    I don't believe so.
```

00:-25 (line 10)

00:-24 (line 20)

1    Q.   It's fair to say that your investigation really began

2    after that passcode was provided.  Fair to say?  As far as

3    speaking about all these witnesses we just went over.

4    A.   I would say we were waiting for the best evidence so we

5    were going to go that avenue.  If that didn't work out, then we

6    would go back to other investigative means.

7    Q.   Right.  But you only went down this investigative path

8    that we've just gone over after the proffer information was

9    provided and after you extracted the cell phone --

00:-24 10   A.   That's the path we took; yes.

11              MR. SPENCER:  Nothing further.

12              MR. MacKINLAY:  No further questions.

13              THE COURT:  All right, Agent.  You may step down.

14              THE WITNESS:  Thank you.

15              (The witness is excused.)

16              MR. SPENCER:  Agent Oppedisano.

17                       BRIAN OPPEDISANO, duly sworn

18              THE CLERK:  Please state your name and spell your last

19   name for the record.

00:-23 20              THE WITNESS:  Brian Oppedisano, B-R-I-A-N, Oppedisano,

21   O-P-P-E-D-I-S-A-N-O.

22              MR. SPENCER:  May I inquire?

23              THE COURT:  Yes.

24                       DIRECT EXAMINATION

25   BY MR. SPENCER:

```
 1   Q.   Are you employed?

 2   A.   I'm a special agent for the Bureau of Alcohol, Tobacco,

 3   Firearms and Explosives, otherwise known as the ATF.

 4   Q.   For how long?

 5   A.   I'm going on my 15th year.

 6   Q.   Are you aware of a gentleman named Mr. Mitchell Daniells?

 7   A.   Yes.

 8   Q.   Did you open up an investigation against Mr. Daniells

 9   about November of 2014?

10   A.   Yes.

11   Q.   And since that time are you aware that he filed a motion

12   to exclude evidence recovered from an iPhone after his former

13   lawyer provided a passcode to the government?

14   A.   Yes.

15   Q.   Did you ever hear Mr. Daniells give consent to that lawyer

16   to have that passcode provided to the government?

17   A.   No.

18   Q.   And are you also aware that Mr. Daniells filed a motion to

19   exclude statements that he made during a proffer session?

20   A.   Yes.

21   Q.   And were you present for any communications between

22   himself and his lawyer regarding any communications that he

23   gave during that day?

24   A.   Yes.

25   Q.   You actually heard him speaking with his lawyer during the
```

1  course of the proffer?

2  A.   I'm sorry, no.  Not between him and his attorney.

3  Q.   As of June 18, 2015, do you recall the arrest of

4  Mr. Daniells?

5  A.   Yes, sir.

6  Q.   Were you present for that arrest?

7  A.   I was present.

8  Q.   And you're aware it was recorded, at least in part?

9  A.   The interview?

00:-21 10  Q.   Yes, the interview.

11  A.   Yes, it was recorded.

12  Q.   And was there any objective that you had during that

13  actual post-arrest interview?

14  A.   I'm sorry, sir?

15  Q.   What was your objective for the post-arrest interview?

16  A.   To speak to Mr. Daniells to see if he would give us his

17  side of what was going on.

18  Q.   Did you want him to cooperate with you at that point in

19  time?

00:-21 20  A.   Yes.

21  Q.   Pretty much told him to help himself.  "You should help

22  yourself."  Do you recall language to that effect being told to

23  Mr. Daniells?

24  A.   I don't recall using those terms but, in essence, yes.

25  Q.   Do you recall at any point in time during that day that a

1   cell phone passcode was asked of him?

2   A.   Yes.

3   Q.   Who asked him for that cell phone passcode?

4   A.   I don't recall.

5   Q.   What was his response?

6   A.   "No."

7   Q.   And why did you want the passcode on the first day of his

8   arrest?

9   A.   Our intentions were to get a search warrant to search for

00:-20   10   evidence.

11   Q.   As opposed to getting a search warrant, why did you ask

12   him for the passcode?

13   A.   To get into the phone in a shorter period of time.

14   Q.   Shorter period of time.

15       So during that first interview he said no, right?

16   A.   Yes.

17   Q.   Were you left with the impression after he said no and

18   over the course of the interview that he didn't want to

19   cooperate with you?

00:-20   20   A.   I didn't get that impression that he did not want to

21   cooperate.

22   Q.   Did he ever explicitly state to you that "I am willing to

23   cooperate"?

24   A.   I think we left it open-ended.

25   Q.   Is it fair to say he didn't provide you with any intel on

```
 1   that day, though?  Any information of any importance to you?
 2   A.   I think he did provide some information that was of
 3   importance but...
 4   Q.   Like what?
 5   A.   Of the post-arrest interview?
 6   Q.   Correct.
 7   A.   I believe he gave us some information about an individual
 8   by the name of Rahd, I believe he gave us some information that
 9   he stored some of his firearms someplace -- I mean, he didn't
10   not speak to us.  He did give us some information that we could
11   have followed up on.
12   Q.   Did you follow up on any of it?
13   A.   Yes.
14   Q.   What information did he provide at the post-arrest
15   interview did you follow up on?
16   A.   Where he said that he stored the firearms, we followed up
17   on that.
18   Q.   When did you follow up on that?
19   A.   That was followed up on approximately two months ago, a
20   month and a half ago.
21   Q.   So about two years, almost, after the post-arrest
22   interview?
23   A.   Yes.
24   Q.   Do you recall telling Mr. Daniells that "We don't need for
25   you to help us prove your case.  We already have your case
```

1  proved"?

2  A.   I don't know if I said that.  I would say something to the

3  essence of that, yes.

4  Q.   Do you also remember statements being told to

5  Mr. Daniells, "As federal agents we can't lie to you"?

6  A.   Yes.

7  Q.   Who made that statement?

8  A.   I don't recall.  One of us did, though.

9  Q.   And is that a lie?

00:-18 10  A.   It could be.

11  Q.   And were you lying to him when he was told that "We don't

12  need any information from you to help us prove your case"?

13  A.   No.

14  Q.   That was true?

15  A.   I believe we had a lot of evidence at that time.

16  Q.   So you didn't need any information from him at that point

17  in time regarding his actions, the case against him?

18  A.   I believe the information that we were seeking of where

19  the firearms went, not so much the case on him.

00:-17 20  Q.   Right.  Meaning the charge against him had already been

21  completed, right?  There was a possession, a 922(n)?

22  A.   Yes.

23  Q.   So you specifically said, "We just want you to help us now

24  get other guns off the street"?

25  A.   That was part of it, yes.

1    Q.   Do you recall whose idea it was to actually have a proffer

2    on July 15th, 2015?

3    A.   I don't know specifically whose idea it was.

4    Q.   Do you recall any discussions that you had in preparation

5    for the proffer either with AUSA Glenn MacKinlay or other

6    agents?

7    A.   Nothing specific, no, sir.

8    Q.   Nor did you take any notes of any reports of any

9    pre-meetings, correct?

00:-17 10   A.   No, sir.

11   Q.   What was the objective of the proffer, as you recall it?

12   A.   The objective was to get, again, Mr. Daniells' side of the

13   story, maybe get some information of where his firearms ended

14   up.

15   Q.   And did you have any intention specifically, using any

16   information that you had -- you received from him, to further

17   investigate him?

18   A.   I believe we would use information that he provided to

19   investigate the offense, yes.

00:-16 20   Q.   And did you specifically tell him that during the proffer

21   session?

22   A.   Did I specifically tell him?

23   Q.   Yeah.

24   A.   I did not specifically tell him that.

25   Q.   Did you hear any other individuals present in the room

1    specifically tell him that "We intend to use this information

2    that you provide to us to further investigate you"?

3    A.    I believe my recollection is that Mr. MacKinlay explained

4    the proffer agreement and how it can be used.

5    Q.    Do you recall if any examples were provided to

6    Mr. Daniells as to, for example, "If you give us a name, we can

7    speak to that person, and if we get information, we can

8    actually introduce that information against you, call that

9    person before a grand jury?"  Was there any of that type of

00:-16  10   explanation provided?

11   A.    I understand your question.  I don't specifically remember

12   examples were given.

13   Q.    Okay.  And to your knowledge Mr. Daniells had never been

14   convicted of a felony before?

15   A.    To my knowledge, no, sir.

16   Q.    And clearly had never been charged by the federal

17   government?

18   A.    Yes, true.

19   Q.    Okay.  And to your understanding, did you know if he had

00:-15  20   any previous working knowledge with respect to a proffer

21   session, that he had done this at some previous point?

22   A.    I had no knowledge of that.

23   Q.    As of November 12, 2014, when you opened up your

24   investigation, were you aware that Mr. Daniells had picked up a

25   charge in Massachusetts for carrying a firearm?

1   A.   Yes, I was aware.

2   Q.   And were you aware just based on your working knowledge as

3   an ATF agent as to when Mr. Daniells would be going back and

4   forth to work?

5   A.   I was aware.

6   Q.   At any point in time between November when you first

7   opened up the investigation in 2014 until June of 2015, did you

8   ever make an attempt to try to go speak to Mr. Daniells about

9   the weapons that you found ending up in the hands of third

00:-1410   parties?

11   A.   I did not make an attempt.

12   Q.   Why is that?

13   A.   We were conducting an investigation.

14   Q.   Okay.  I mean, it's fair to say -- did you conduct an

15   investigation when you recovered the firearm from Mr. Timothy

16   Bailey on March 30, 2015?

17   A.   There was an investigation, yes.

18   Q.   And pursuant to that investigation, you went to speak to

19   the actual person who purchased the firearms?

00:-1420   A.   I did not but that person was spoken to, yes.

21   Q.   That's Will Roberts?

22   A.   Yes.

23   Q.   And so what would be the difference in speaking to

24   Mr. Will Roberts when you find out that he purchased a weapon

25   that ended up in the hand of a third party, Mr. Timothy Bailey,

1   but not approaching Mr. Mitchell Daniells when you find out

2   that fact?

3   A.   I think everybody conducts investigations differently.  On

4   this investigation, someone did attempt to locate Mr. Daniells

5   early on, not myself but someone from a different field

6   division, and they could not find him.

7   Q.   During your interviews with Mr. Will Roberts, did he

8   specifically identify a person that was allegedly present with

9   Mr. Daniells on the March 27th purchase of 2015?

00:-13 10   A.   I believe he did.

11   Q.   And who did he identify that person as?

12   A.   I believe he identified an individual by the name of

13   Gardner, Jermaine Gardner.

14   Q.   Were you present for that?

15   A.   I was not.

16   Q.   Was your partner present?

17   A.   I believe he was, yes.

18   Q.   And that would be Special Agent McPartlin?

19   A.   Yes.

00:-13 20   Q.   As of the date of the proffer, were you aware that this

21   person named Jermaine Gardner had been identified by Mr. Will

22   Roberts?

23   A.   I believe I was aware he was an individual that was

24   associated with Mr. Daniells that came up with Will Roberts,

25   yes.

1    Q.   And do you specifically recall testifying in front of a

2    United States Magistrate Judge Page Kelley?

3    A.   Yes.

4    Q.   And what was the date of that testimony, if you can

5    recall?

6    A.   June of 2015.

7    Q.   It was during a detention hearing?

8    A.   Yes.

9    Q.   Would it be fair to say that during that detention hearing

00:-12 10   you were specifically asked questions as to the identity of the

11   person that was allegedly with Mr. Daniells during that March

12   27th, 2015, purchase?

13   A.   I don't specifically recall if there was a date mentioned,

14   but if a person was with him, yes.

15   Q.   And did you -- were you under oath at the time?

16   A.   Yes.

17   Q.   And did you swear under oath that no person had been

18   identified as of the date that you testified?

19   A.   I believe that the person was not fully identified,

00:-12 20   correct, yes.

21   Q.   What do you mean by "not fully identified"?

22   A.   Well, the question was asked, but I don't believe we had

23   any type of independent corroboration, or 100 percent, that

24   that was Mr. Gardner that was with Mr. Daniells, my

25   recollection.

1   Q.   If I showed you a copy of the actual words you stated

2   under oath, would you recognize them?

3   A.   Sure.  Yes.

4   Q.   Showing you a document.  Take a look at that document and

5   tell me if you recognize what that document is.

6   A.   This looks like direct testimony from the detention

7   hearing.

8   Q.   Detention hearing?

9   A.   From the detention hearing.

00:-11 10   Q.   Meaning as you look at that document, does that refresh

11   your recollection as to the questions you were asked

12   specifically on this issue and the answers you gave?

13   A.   Yes, it does.

14   Q.   Do you see your name at the top where it says "Oppedisano

15   direct"?

16   A.   Yes, it does.

17   Q.   Just so we're clear, you were asked, "Was there a second

18   individual with Mr. Daniells at that point," and you said

19   "yes"?

00:-11 20   A.   Yes.

21   Q.   And then Mr. MacKinlay asked you, "And that person has not

22   yet been identified?"  Is that the question?

23   A.   It is the question, yes.

24   Q.   And your answer was "yes"?

25   A.   That's the answer, yes.

1          MR. SPENCER:  I would like to introduce this as the

2     next exhibit.

3          MR. MacKINLAY:  I believe the transcript's been marked

4     previously.

5          MR. SPENCER:  I think it's in the pleading, right?

6     I'll just enter it now.

7          MR. MacKINLAY:  I have no objection.  Can I see the

8     page, please?

9          THE COURT:  I think it's Exhibit 20.

00:-10 10         THE CLERK:  Defendant's Exhibit 30 is received by the

11    Court.

12         (Defendant's Exhibit No. 30 received into evidence.)

13    BY MR. SPENCER:

14    Q.   Now, it's fair to say that Mr. Will Roberts, to your

15    understanding, prior to your detention testimony identified a

16    person?

17    A.   Yes.

18    Q.   And actually, you tell me if I'm wrong, but didn't

19    Mr. Will Roberts say that he was confident that Jermaine

00:-10 20    Gardner was the person that went with Mr. Daniells or was with

21    Mr. Daniells at the March 27th purchase?

22    A.   I believe he said he was confident, yes.

23    Q.   And were you able to determine pursuant to your

24    investigation with your partner that there was law enforcement

25    that was contacted in Pennsylvania that confirmed that Jermaine

1  Gardner at the very least knew Mr. Daniells?

2  A.   Yes.

3  Q.   Because he was stopped in a vehicle on or about April 3rd,

4  2015?

5  A.   I don't recall the date but I'll take your word for it it

6  was on that date, yes.

7  Q.   And if he was stopped on April 3, 2015, that would have

8  been within a week of the March 27th purchase?

9  A.   Correct.

00:-09 10  Q.   All right.  It's fair to say that when Mr. MacKinlay asked

11  you questions at the detention hearing, you never told Judge

12  Kelley about Will Roberts identifying a person and being

13  confident about that identity, did you?

14  A.   I didn't have the opportunity to get asked that question,

15  but I guess I would have explained it that way, yes.

16  Q.   Well, he specifically asked you had that person been yet

17  identified, right?  That's your opportunity to answer him,

18  right?

19  A.   Correct.

00:-08 20  Q.   Did you provide any answer about Will Roberts being

21  confident in identifying Mr. Jermaine Gardner?  Yes or no?

22  A.   No.

23  Q.   Did you mention to Judge Kelley about the fact that

24  Jermaine Gardner was thereafter seen with Mr. Daniells a week

25  later after the alleged transaction?

1   A.   That did not come up in the hearing.

2   Q.   What you told the judge is that he hadn't been identified,

3   right?

4   A.   I believe I said that --

5   Q.   All right.  So my question is:  Was that true or was that

6   not true when you testified in front of Judge Kelley?

7   A.   Was what not true?

8   Q.   When you specifically said that that person had not yet

9   been identified.

00:-08 10   A.   It was -- I can't answer that question the way it was

11   asked.  I mean, we were doing an investigation where we didn't

12   have anything to corroborate what Roberts said about Jermaine

13   Gardner other than a picture.

14   Q.   Okay.  Did you ever receive a description of Mr. -- of the

15   person that was later identified as Kenny Brobby?  Let me

16   rephrase that.

17        Did Will Roberts ever give you a description of the person

18   who he believed accompanied Mr. Daniells?

19   A.   I believe a description was given.  It was not given to me

00:-07 20   but I believe a description was given.

21   Q.   As of the date of the proffer, how interested were you in

22   finding out the identity of this person?

23   A.   It didn't come into my mind at all.

24   Q.   So you weren't the one that asked the question at the

25   proffer?

| | |
|---|---|
| 1 | A.   I wasn't asking questions at the proffer, no. |
| 2 | Q.   Who asked the question about the identity of the person? |
| 3 | A.   I don't recall who asked the -- that specific question or |
| 4 | if it just came up.  I don't recall a question coming up of a |
| 5 | person being with Mr. Daniells. |
| 6 | Q.   At all? |
| 7 | A.   No. |
| 8 | Q.   Did you take notes in connection with this proffer? |
| 9 | A.   Yes. |
| 00:-06 10 | Q.   And were these contemporaneous notes? |
| 11 | A.   Yes. |
| 12 | Q.   Were you specifically assigned to take notes? |
| 13 | A.   Yes.  I volunteered to take notes. |
| 14 | Q.   And did you review those notes in preparation for your |
| 15 | testimony today? |
| 16 | A.   Yes. |
| 17 | Q.   Would you recognize a copy of those notes if I were to |
| 18 | show them to you? |
| 19 | A.   Yes. |
| 00:-06 20 | Q.   Take a look at that document and tell me if you recognize |
| 21 | what that document is. |
| 22 | A.   Yes; these are my notes from the -- of the proffer. |
| 23 | Q.   That's your handwriting? |
| 24 | A.   Yes. |
| 25 | Q.   And are there any other notes that exist with respect to |

```
 1  this proffer that you're not looking at?

 2  A.   No.

 3          MR. SPENCER:  Next exhibit.

 4          MR. MacKINLAY:  No objection, your Honor.

 5          THE CLERK:  Defense Exhibit 31 received by the Court.

 6          (Defendant's Exhibit No. 31 received into evidence.)

 7  BY MR. SPENCER:

 8  Q.   And would it be fair to say there's just one line on page

 9  3 --

10          MR. SPENCER:  If I can just use the screen.

11          Thank you.

12  Q.   Showing you Exhibit --

13          MR. SPENCER:  I'm sorry.  What exhibit number is it?

14          THE CLERK:  31.

15  BY MR. SPENCER:

16  Q.   -- 31, do you see on page 3 there's just a line on the

17  bottom that says "Kenny Brobby in car - Framingham"?

18  A.   Yes.

19  Q.   Okay.  And to your knowledge is there any other mention

20  inside the proffer, at least in your notes, that mention the

21  words -- the name "Kenny Brobby"?

22  A.   No.

23  Q.   Now, was there a break that took place during the proffer?

24  A.   Yes, there was.

25  Q.   Is there any mention in your notes about a break taking
```

00:-05 (line 10)
00:-04 (line 20)

| | |
|---|---|
| 1 | place? |
| 2 | A.   No, there isn't. |
| 3 | Q.   Did you generate a report some two years later regarding |
| 4 | this proffer? |
| 5 | A.   Yes, I did. |
| 6 | Q.   Showing you two pages, just take a look at that document |
| 7 | and tell me if you recognize what that document is. |
| 8 | A.   Yes, I do recognize this document. |
| 9 | Q.   And what is it? |
| 00:-03 10 | A.   It is a report of investigation of the proffer with |
| 11 | Mr. Daniells. |
| 12 | Q.   And the proffer is dated July 15, 2015? |
| 13 | A.   Yes; that's correct. |
| 14 | Q.   And the date that you actually authored that document? |
| 15 | A.   4/11/2017. |
| 16 | MR. SPENCER:  Next exhibit. |
| 17 | MR. MacKINLAY:  No objection. |
| 18 | THE CLERK:  Defendant's Exhibit 32 is received by the |
| 19 | Court. |
| 00:-03 20 | (Defendant's Exhibit No. 32 received into evidence.) |
| 21 | BY MR. SPENCER: |
| 22 | Q.   And have you had a chance to review that proffer report in |
| 23 | preparation for your testimony today? |
| 24 | A.   Yes. |
| 25 | Q.   Is there any mention in that proffer report about a break? |

1    A.    About?

2    Q.    A break.

3    A.    No.

4    Q.    And why did you take so long to draft up an actual written

5    report of the actual proffer that you conducted with

6    Mr. Daniells?

7    A.    I believe I took so long because when we ended this

8    proffer, we believed that a continuation of the proffer may

9    occur and I could do one complete report.

00:-02  10    Q.    And that never happened?

11    A.    No, it didn't.

12    Q.    And so when you drafted up the report, you were relying

13    pretty much exclusively on your notes that you took?

14    A.    My notes and my memory, yes.

15    Q.    And your memory.

16          Now, in your notes there's no mention of a passcode, is

17    there?

18    A.    I don't believe there is, sir.

19    Q.    Okay.  But then two years later when you draft up the

00:-02  20    actual proffer report, you include information about a

21    passcode?

22    A.    Correct.

23    Q.    And why did you do that?

24    A.    Because I remembered we asked him and Mr. Schneider about

25    the passcode.

1    Q.   And what did -- what was said in response to the request

2    for the passcode?

3    A.   In response to the request, my recollection is that

4    Mr. Schneider said if we applied for and received a search

5    warrant, that Mr. Daniells would provide the passcode.

6    Q.   Okay.  Now, that's a very important point, isn't it?

7    That's a very important point to your investigation, wouldn't

8    it be, what Mr. Schneider said?

9    A.   Yes.

00:-01 10    Q.   Is that statement ever listed at all inside of your notes?

11   A.   Mr. Daniells didn't say that to us; Mr. Schneider told us

12   that.

13   Q.   My question to you, sir, is:  Is that statement that you

14   just deemed to be very important to your investigation, is that

15   contained inside your notes?

16   A.   That is not in my notes of the proffer.

17   Q.   And it's also not mentioned at all in your report that you

18   drafted almost two years later?

19   A.   The report is of the proffer with Mr. Daniells; it's not

00:-01 20   my discussion with Mr. Schneider.

21   Q.   I understand.  But Mr. Schneider's name is mentioned in

22   that report, isn't it?

23   A.   Yes.  He's his attorney; yes.

24   Q.   All right.  And the passcode is specifically mentioned in

25   that report?

1    A.    Because we asked Mr. Daniells.

2    Q.    Fair enough.  But my question to you is:  In that same

3    report there's no mention that Mr. Schneider ever indicated

4    that he would provide it upon production of a search warrant or

5    that Mr. Daniells would provide it upon production of a search

6    warrant, does it?

7    A.    I typically wouldn't put what a defense attorney would

8    tell us in a proffer report.

9    Q.    But even though it's important, you would just leave it

00:00 10   out?

11   A.    We were all there to hear it.

12   Q.    Yeah, but the point is that you're drafting up a report to

13   memorialize the information that you deem to be important

14   pursuant to your investigation.  Yes or no?

15   A.    The report is of Mr. Daniells' statements in his proffer.

16   Q.    After Mr. Daniells provided the name of Kenny Brobby, what

17   was the -- what, if anything, did you do with that information?

18   A.    We located Mr. Brobby.

19   Q.    How did you locate him?

00:00 20   A.    Through -- I believe it was through a driver's license

21   search through the Massachusetts Registry of Motor Vehicles.

22   Q.    And then what address did you come up with?

23   A.    We came -- I don't recall a specific address but I do --

24   Q.    What location?  What location?

25   A.    It was in the city of Worcester.

1    Q.    And did you find him in Worcester?

2    A.    No, we did not.

3    Q.    How did you find him thereafter?

4    A.    We found Mr. Brobby -- we went to the address that we had

5    found.  It was a family member.  I believe it was his mom.  I'm

6    not sure.  There was a family member at the house who provided

7    a phone number, and we spoke to Mr. Brobby and set up a place

8    and time to meet.

9    Q.    Did you ever use information extracted from the cell phone

00:00 10   to locate witnesses?

11   A.    To locate this witness?

12   Q.    No; any witness pursuant to your investigation.

13   A.    I believe we -- in conjunction we did, yes.

14   Q.    Which witnesses?

15   A.    I believe we used it to locate or to corroborate some of

16   the information about Mr. Copithorne.  Possibly Jessica Bagby

17   too.

18   Q.    Do you know an Ashley Faucher?

19   A.    Faucher, yes.

00:01 20   Q.    And did you make contact with her?

21   A.    Yes.

22   Q.    How were you able to find her?

23   A.    I don't recall specifically how we found her but I do

24   remember she had numerous addresses and we found her at one of

25   those addresses.

```
 1   Q.   Do you recall how you even got her name?

 2   A.   I believe it was through a previous interview of another

 3   witness.

 4   Q.   Of another witness?

 5   A.   Yes.

 6   Q.   Would it be fair to say that once the name "Kenny Brobby"

 7   was provided to you, that provided a somewhat domino effect to

 8   lead you down a certain path of the investigation?

 9   A.   It helped.

10   Q.   Was there any other independent techniques that you used

11   to find these witnesses other than deriving from the

12   information you got from Kenny Brobby?

13   A.   Sure.  We used social media, was a big one, I'm sure we

14   got -- I recall getting on to --

15   Q.   I'm sorry.  I'll let you finish.  Go ahead.

16   A.   I recall a Facebook search -- I don't recall who did it --

17   to corroborate in conjunction with some of the information from

18   the cell phone.

19   Q.   Okay.  So once you got the information from the cell

20   phone, it was only then you started doing Facebook and social

21   media searches?

22   A.   It could have been either way, whether it be Facebook and

23   then on to Mr. Daniells' cell phone or vice versa.

24   Q.   Do you have any reports that outline or memorialize the

25   investigative techniques that you took in order to find and
```

1  locate these witnesses?

2  A.   No.

3  Q.   Do you have any reports that outline/memorialize any

4  investigative technique that you undertook between July 15,

5  2015, and August 7th of 2015?

6  A.   Other than speaking to witnesses, no.

7  Q.   Is there any witnesses that you spoke to between July

8  15th, 2015, and August 7, 2015, in relation to the

9  investigation of this case?

00:03 10  A.   I'm sorry.  Say that -- the question?

11  Q.   Did you speak to any witnesses between the date of the

12  proffer and the date the passcode was received about this case?

13  Any witness.

14  A.   I don't recall when we spoke with Kenny Brobby.

15  Q.   Okay.  Were you ever specifically told by AUSA MacKinlay

16  that Mr. Daniells specifically did not want to provide the

17  names of other individuals during the proffer?

18  A.   No.

19  Q.   Do you know why Officer Greg Brown was there?

00:04 20  A.   I believe he was there because where one of the firearms

21  was recovered, he was part of that investigation, and he was

22  familiar with some of the individuals surrounding that gun

23  recovery.

24  Q.   Which firearm?

25  A.   I don't recall specifically, sir.

1   Q.   All right.  Prior to this occasion, had you had any

2   previous experience with suspects providing you -- giving you

3   passcodes in order to allow them to search their phones?

4   A.   I don't recall a case where I had to get a passcode for an

5   iPhone.

6   Q.   Prior -- or prior to you receiving that passcode, do you

7   have any recollection of the iPhone being turned on to see if

8   it was passcode-protected?

9   A.   I don't recall.

00:05 10   Q.   Well, would it be fair to say that if a passcode was

11   protected -- I'm sorry -- if the iPhone was protected by a

12   passcode, it would have had to have been turned on to know

13   that, right?

14   A.   I believe so.

15   Q.   All right.  But you had no involvement with that, turning

16   on the phone?

17   A.   No.

18   Q.   Do you know if the phone had ever been in the possession

19   of AUSA Glenn MacKinlay prior to August 7th of 2015?

00:06 20   A.   No.

21   Q.   You said you had a recollection of asking Mr. Daniells for

22   the passcode on the way down to the federal courthouse?

23   A.   I don't think we spoke about that.

24   Q.   Okay.  So you have no recollection of the passcode being

25   asked for on the day of his arrest?

1    A.   I don't recall you asking me this question, but you're

2    asking me now?

3    Q.   Yeah.

4    A.   Would you restate the question?

5    Q.   Sure.  Was the passcode asked for on the day of his

6    arrest?

7    A.   So I don't recall specifically, but I'm sure we would

8    have -- I would ask for a passcode knowing that I was going to

9    obtain a search warrant to decrease the amount of time that it

00:06 10   would take to get into the phone.

11   Q.   In order to know that there was a passcode, you would have

12   had to at least had the phone in your hand and tried to

13   manipulate it, correct?

14   A.   We could have asked him if it was passcode-protected.  I

15   don't recall.

16   Q.   Well, he specifically told you "no" when you asked for the

17   passcode, right?

18   A.   Yes.

19   Q.   And you don't have any specific memory of asking him

00:07 20   first, "Does the phone have a passcode?"

21   A.   I guess it's safe to say that if he said no to the

22   passcode, then there is a passcode.

23   Q.   And you're saying you'd never handled that phone prior to

24   August 7, 2015?

25   A.   Did I ever handle the phone?

```
 1   Q.   Yeah.

 2   A.   I don't recall if I ever handled the phone.

 3   Q.   Was the name Jermaine Gardner brought up at all during the

 4   proffer?

 5   A.   During the proffer?

 6   Q.   Yeah.

 7   A.   No.

 8           MR. SPENCER:  One moment, please.

 9           (Counsel confers with the defendant off the record.)

10   BY MR. SPENCER:

11   Q.   On the ride down to the courthouse, do you ever recall

12   Mr. Daniells asking you to give his cell phone to his sister?

13   A.   I don't recall that he asked that.

14   Q.   How about being concerned that he had steel-toed boots on

15   and being brought down to the courthouse because he was coming

16   from work.  Do you recall that?

17   A.   No.

18           MR. SPENCER:  Anything else?

19           THE DEFENDANT:  The address.

20   BY MR. SPENCER:

21   Q.   Oh, do you recall Mr. Daniells giving you an address of

22   101 Canal Street as being where his sister was located?

23   A.   I believe Canal Street came up for his dad; I don't recall

24   about his sister.

25   Q.   Okay.  What did he specifically tell you about 101 Canal
```

1    Street?

2    A.   I think we were -- I don't recall specifically.  I

3    remember questions about where he lived and where his family

4    lived.

5    Q.   Okay.  And so you don't have any memory other than hearing

6    the term "Canal Street"?

7    A.   That's correct.

8            MR. SPENCER:  Anything else?

9            Thank you.  Nothing further.

00:09 10                        CROSS-EXAMINATION

11   BY MR. MacKINLAY:

12   Q.   You were asked a few minutes ago about the post-arrest

13   statement on or about June 18, 2015, that the defendant gave in

14   a recorded fashion.  Do you remember that?

15   A.   Yes.

16   Q.   Okay.  And during the course of that post-arrest

17   statement, did he provide an explanation of where his guns

18   might be?

19   A.   Yes.

00:10 20   Q.   What did he say?

21   A.   He said that the guns were in the safe at Ashley's house.

22   Q.   Ashley.  And did you follow up with a description of

23   asking about Ashley Turner in Grampian, Pennsylvania?

24   A.   Yes.

25   Q.   And that's the follow-up that you -- was there a follow-up

1   done in the short time after the arrest or did you attempt to

2   follow up with Ashley Turner following that statement?

3   A.   I don't recall -- we tried to locate Ashley Turner early

4   on.

5   Q.   And was it successful?

6   A.   No.

7   Q.   And subsequently, meaning a few months ago, there were

8   rekindled efforts to locate her and have her interviewed by

9   local ATF.  Is that correct?

00:11 10   A.   Yes.

11   Q.   And did you learn that -- from Ashley Turner that Mitchell

12   Daniells never left any guns in her safe?

13   A.   Correct.

14   Q.   So what he said to you in the statement post-arrest was

15   not true?

16   A.   It was contrary to what Ashley said, yes.

17   Q.   Now, let's talk about the proffer that occurred on July

18   15, 2015.  You took up the task of keeping notes that were

19   described and gone through earlier.  Is that correct?

00:11 20   A.   Yes.

21   Q.   And then there was some discussion that you developed a

22   final report more recently, almost two years later.  Is that

23   correct?

24   A.   Yes.

25   Q.   Again, why did you wait to prepare a final report of a

1    proffer?

2    A.   I believed that there was going to be a continuation of

3    that proffer, which never happened.

4    Q.   When you took the notes, you described them as being

5    contemporaneous.  Are they also chronological?

6    A.   Yes, they are.

7    Q.   And by that I mean you didn't go out of order, out of

8    sequence with the information being provided by Mitchell

9    Daniells?

00:12 10   A.   No, I didn't.

11   Q.   So if we -- referring to Exhibit No. 31 --

12        MR. MacKINLAY:  If we can have the document camera?

13   Q.   So referring to the notes of the proffer session that you

14   took, this indicates the starting time and the date and the

15   participants.  Isn't that correct?

16   A.   Yes, it is.

17   Q.   And this section says "MacKinlay went over the proffer

18   agreement."  What did you mean by that statement?

19   A.   That Mr. MacKinlay, you, went over the proffer agreement

00:12 20   with Mr. Daniells.

21   Q.   And do you recall his response to the review of the

22   proffer agreement in the presence of his counsel and the

23   agents?

24   A.   I do.

25   Q.   Describe for the Court what his response was, his

1    reaction.

2    A.    I believe you, Mr. MacKinlay, asked if he understood the

3    proffer agreement and if he had any questions.  And he said he

4    understood the proffer agreement and he did not have any

5    questions.

6    Q.    Did he execute it in your presence?

7    A.    I can't recall if he signed it in my presence.

8    Q.    There's a number of notes that purport to be background

9    information questions, would that be fair to say, on the first

00:13 10   page of your notes?

11   A.    Yes.

12   Q.    Who is providing that information?

13   A.    Mr. Daniells.

14   Q.    Referring to page 2 of the same exhibit, again, this is a

15   continuation.  Would that also be fairly described as

16   background information provided concerning places of employment

17   and places of residence?  Isn't that correct?

18   A.    About halfway through it changes, yes.

19   Q.    At some point in this location here in the middle of page

00:13 20   2, does he start talking about the incident in question?

21   A.    Yes.

22   Q.    And is there an individual named "Rob" mentioned?

23   A.    Yes.

24   Q.    Okay.  And was there a description provided in the time

25   that followed of what happened to the guns that Daniells had

1    from Will Roberts?

2    A.    Yes.

3    Q.    What did he say and how is it reflected in your notes?

4    A.    What he said and how it's reflected in my notes was that

5    he knew Rahd, where he was from, and that he brought seven to

6    eight guns -- I think it was a total of eight guns -- to sell

7    to Rahd.  When he arrived at the complex in the South End area

8    of Boston, two individuals who he didn't know were at the

9    complex.  He gave them the bag, he left, eventually called Rahd

00:14 10   to get his money, and Rahd didn't pay him.

11   Q.    He never got his money for the bag of guns?

12   A.    Correct.

13   Q.    Did he have a further explanation for the guns that he had

14   purchased himself in Pennsylvania?

15   A.    Yes, he did.

16   Q.    What did he say during the proffer and where is that

17   included in your notes as well?

18   A.    What he said was his guns were stolen and that they were

19   inside of his 1978 Monte Carlo, and that he parked the vehicle

00:15 20   with the guns stored inside in front of a housing project

21   called Academy Homes in the Roxbury area of Boston.

22   Q.    Did you have evidence at that particular time that

23   firearms were recovered already from the Will Roberts purchases

24   as well as the purchases made by Mr. Daniells?

25   A.    Yes.

1    Q.    So did you know that that statement that he was making

2    regarding that story was untrue?

3    A.    Yes.

4    Q.    Did you take steps afterwards with the assistance of

5    Detective Gregory Brown to investigate whether he did report,

6    in fact, a car stolen to back up his story of that's what

7    happened to the guns from Pennsylvania?

8    A.    We did.  Yes, I did.

9    Q.    What did you learn from Detective Brown regarding that

00:16 10   aspect of it?

11   A.    There was no report filed of a stolen car or guns by

12   Mr. Daniells.

13   Q.    Referring to page 3, is that the continuation of the story

14   regarding the bag of guns and also the story regarding the car

15   that was allegedly stolen?

16   A.    I believe the car is the next page, Mr. MacKinlay, but

17   here we're talking about --

18   Q.    The top of page 4, sir.

19   A.    Yes, this is the part about the stolen guns.

00:16 20   Q.    All right.  The name "Kenneth Brobby" appears for the

21   first and only time at the bottom of page 3.  Is that accurate?

22   A.    Yes; that is correct.

23   Q.    And again, is that sequential and chronological in terms

24   of when he provided that?

25   A.    Yes, it is.

1    Q.   And just to be clear, he provided it, not Attorney

2    Schneider?

3    A.   That's correct.

4    Q.   "He" meaning Mitchell Daniells?

5    A.   Yes, that's correct.

6    Q.   At some point the notes essentially just stop.  Is that

7    correct?

8    A.   Yes.

9    Q.   Was there a break?

00:17 10   A.   Yes.

11   Q.   When was the break?

12   A.   At the end of the proffer.

13   Q.   Was there only one break?

14   A.   There was only one break.

15   Q.   Is that reflected in your notes?

16   A.   The break?

17   Q.   Yes.

18   A.   I didn't note the break in my notes.

19   Q.   Does the fact that these are continuous notes lead you to

00:17 20   the belief that there was no break prior to the conclusion?

21   A.   That's correct.

22   Q.   Do you have an independent memory as to whether or not --

23   as to when the break occurred?

24   A.   I do.

25   Q.   Okay.  Tell the Court what you remember in terms of when

1  the break occurred in the proffer.

2  A.   The break occurred right after Mr. Daniells started

3  telling us about that his firearms were stolen in his

4  vehicle -- in his car parked in front of the housing project.

5  Q.   And would it be fair to characterize you and your belief

6  that that was a story that was incredible and so you decided at

7  that point to confront Attorney Schneider about it?

8  A.   Yes.

9  Q.   And request a break?

00:18 10  A.   Yes.

11  Q.   To be clear, Kenneth Brobby's name was provided by the

12  defendant long before that break, true?

13  A.   Yes.

14        MR. MacKINLAY:  One moment, please, your Honor.

15        (Pause.)

16        MR. MacKINLAY:  No further questions.

17        MR. SPENCER:  Nothing further.

18        THE COURT:  Nothing further?  All right, Agent.  Thank

19  you.  You may step down.

00:19 20        (The witness is excused.)

21        MR. SPENCER:  Can we take a morning break?

22        THE COURT:  Yes.  What else do you anticipate?

23        MR. SPENCER:  I could be calling Mr. Daniells.

24        MR. MacKINLAY:  I have one law enforcement witness who

25  will be about, in my view, 20 minutes.

1          THE COURT:  All right.  We'll take about a 15-minute

2     recess.

3          THE CLERK:  All rise.

4          (The Court exits the courtroom and there is a recess

5     in the proceedings at 11:34 a.m.)

6          THE CLERK:  All rise.

7          (The Court enters the courtroom at 11:53 a.m.)

8          THE CLERK:  You may be seated.

9          MR. SPENCER:  Judge, if I can go on record?

00:38 10          So I've had a chance to speak with Mr. Daniells about

11     testifying, and obviously -- and I just want to make sure so

12     there's no misunderstanding, he has grave concerns in light of

13     previous experiences about, for lack of a better way to

14     describe it, this issue Part II.  And so I've had a chance to

15     discuss this with Mr. MacKinlay.

16          Mr. Daniells is concerned that he will get up on the

17     stand and incriminate himself.  For the record, I provided

18     Mr. Daniells with some advice, saying that it's my

19     understanding, and I believe Mr. MacKinlay corroborates this,

00:39 20     that so long as he doesn't testify at trial, he cannot be

21     cross-examined as to any statements that he provides today.  As

22     far as his exposure, obviously, the same type of rules apply,

23     whereas if he were to lie under oath, he could be charged with

24     perjury.

25          And so he just wanted it to be on record before he

made any decision to testify that the statements that he

provides today won't, in fact, incriminate him.  I've tried my

best to give him the advice that I know based upon my years of

experience.  And I think he wants to address the Court too.

THE COURT:  I'm not exactly clear what you're saying.

MR. SPENCER:  Right.  And so he just wanted to be on

the record -- and I think perhaps if Mr. MacKinlay says it on

the record so it comes from the government.  It's not like I

want the Court to participate in putting statements on the

record but --

MR. MacKINLAY:  I just want be to be clear what I said

to counsel, and that is, it's my understanding of the law that

the government cannot introduce the transcript of this

proceeding at trial substantively but only could use it for

purposes of impeachment should he testify at trial.  That's my

understanding of the case law.  That's a simple statement that

I have provided to counsel.

MR. SPENCER:  I've explained that to him.  I'm not

necessarily looking for advice, I just want -- meaning that

down the road should Mr. Daniells go to trial, he just wants to

make sure that it's on record where the government has actually

made this representation that specifically they have no

intention of using his statements at trial so long as he

doesn't testify and can't be cross-examined about them, and so

long as he testifies truthfully, that he really doesn't have

```
 1    any exposure.
 2           However, and I think this deals with now the scope of
 3    Mr. Daniells' testimony, again, he does not want to be -- we
 4    don't believe this is going to be discovery or a fishing
 5    expedition where the government is going to be looking for
 6    intelligence regarding the merits of their case, so I don't
 7    think -- and Mr. MacKinlay said that that's not the specific
 8    case; however, the government has indicated its intention to
 9    cross-examine Mr. Daniells regarding inconsistent statements
10    that he's given regarding -- I guess perhaps statements at the
11    proffer and other statements that exist in the record.
12           I think, frankly, the case law supports that line of
13    cross-examination because it deals with credibility.  But that
14    being said, inconsistent statements given to a federal agent
15    could, in fact, expose the defendant to potential charges;
16    i.e., lying to a federal law enforcement officer and/or
17    obstruction of justice.
18           I told Mr. MacKinlay, Well, if the evidence in the
19    record has inconsistent statements, I think the case law
20    supports that he explores it, but then perhaps asking
21    Mr. Daniells to admit or deny that one was a lie or one was not
22    a lie, I would object.  I think perhaps we might have to just
23    take it as it comes, but I just want to make sure the record is
24    clear that although he's testifying, I still have a job to make
25    sure he's adequately protected.
```

1    He wanted all of those things indicated on the record,

2    and he hasn't, frankly, made the decision whether he wanted to

3    testify.  I'm not sure -- may I consult with him to see if he's

4    made a decision?

5         THE COURT:  Well, let me just say so far you have not

6    asked me to make any rulings about these matters.  I don't know

7    whether you're implicitly asking for that.

8         MR. SPENCER:  No, Judge.

9         THE COURT:  I'm not prepared to do it because I don't

00:42 10    know -- I think there is some ambiguity, frankly, in the

11    various propositions that you have outlined, and I'm not

12    prepared to make a ruling either about this case or perhaps

13    more generally about when and under what circumstances a

14    defendant's testimony under these circumstances might or might

15    not be used potentially contrary to his interests at some

16    future occasion.

17         I think that is -- at least as I sit here, that is not

18    a clear proposition, that there would be no effect or that he

19    could be protected from any effect.  I don't say that there

00:43 20    will be an effect that would be adverse; I am uncertain as to

21    whether there would be, and I just leave it at that at this

22    point.

23         MR. SPENCER:  Sure.  May I consult with him?

24         THE COURT:  Yes.

25         (Counsel confers with the defendant off the record.)

 1          MR. SPENCER:  There was one other thing that he did

 2     bring to my attention, and there was some advice that was

 3     given.  Again, I think there's perhaps issues of trust, but he

 4     did indicate that, well, if there's a question that he doesn't

 5     like, he would just plead the Fifth, and I said, "Well, you

 6     can't do that," meaning that my understanding of the case

 7     law -- and I've told him this many, many times -- is that if

 8     you plead the Fifth, the Court has the discretion, and I

 9     frankly think the Court would exercise this discretion, to

00:44 10     strike his whole testimony.

11          If I'm wrong on that, then I'm wrong, but that's the

12     advice that I've given him.  And I don't want to be put in a

13     position where I'm presenting a witness knowing that if there

14     are going to be issues where he's going to be pleading the

15     Fifth, that I'm just wasting the Court's resources and time.

16     So I wanted to put that issue on the record because that is the

17     intention that I've been told.

18          So with that -- I mean, I can call Mr. Daniells, but I

19     just don't want the Court to, frankly, think that I'm doing

00:45 20     something that I know I shouldn't perhaps be doing.

21          (Pause.)

22          MR. SPENCER:  What I can do I think in that respect, I

23     think if I hear a question that's objectionable, then I object

24     and the Court can rule at that point in time.  If the Court

25     feels that the area is too far afield from the issues at play,

1   then the government's cross would be limited.  But other than

2   that, I'm not sure what else I can do.

3          THE DEFENDANT:  If I could address the Court?

4          MR. SPENCER:  I don't advise it.

5          (Pause.)

6          THE DEFENDANT:  Yes?

7          MR. SPENCER:  I don't advise it.

8          (Counsel confers with the defendant off the record.)

9          MR. SPENCER:  He wants to know why he cannot exercise

00:46 10   his Fifth Amendment right not to testify on certain

11   questioning.

12          THE COURT:  Well, I'm not sure there's a simple answer

13   to that question.  In many cases it will depend on context.  So

14   it will depend on what questions have been asked, what

15   testimony has been given, and so on.

16          In general, selective testimony is problematic not

17   only as a -- a strict or formal sense; it can be problematic in

18   a less formal sense in terms of how the testimony is evaluated,

19   in general, even that that is given.  Its persuasive value can

00:47 20   be affected by selective answering of questions.  It's hardly a

21   sure way of navigating difficult questions.  It is not

22   necessarily --

23          MR. MacKINLAY:  I have one thought and I don't know

24   whether this assists the Court in its stance right now.  I do

25   have Special Agent Kelsch.  I can call him right now and that

 1   will take us to the lunch break, and then we can think about

 2   reconvening or whether or not -- and that will give him the

 3   opportunity to --

 4          THE COURT:  That's fine.  I'll accept that practical

 5   suggestion.

 6          MR. MacKINLAY:  Thank you.

 7          Mattheu Kelsch, please.

 8                    MATTHEU KELSCH, duly sworn

 9          THE CLERK:  Please have a seat.  State your name,

00:49 10   spell your last name for the record, and speak into the mic.

11          THE WITNESS:  Sure.  No problem.  I'll actually spell

12   both.  It's Mattheu Kelsch, but it's spelled a little

13   differently.  It's M-A-T-T-H-E-U, and Kelsch is K-E-L-S-C-H.

14                       DIRECT EXAMINATION

15   BY MR. MacKINLAY:

16   Q.   Good afternoon, sir.  Where do you work?

17   A.   Good afternoon.  I'm employed by the Bureau of Alcohol,

18   Tobacco, Firearms and Explosives.

19   Q.   How long have you worked for the ATF?

00:49 20   A.   I've worked with the ATF for approximately 15 years.

21   Q.   And what is your present assignment?

22   A.   Right now I'm assigned to our Crime Gun Intelligence Group

23   in Boston.

24   Q.   How long have you held that position in the Crime Gun

25   Intelligence Group?

1    A.    Just coming upon one year now.

2    Q.    What are your responsibilities in that group?

3    A.    Our unit focuses specifically on firearms trafficking in

4    the city of Boston and other local areas.  We also work on

5    something called NIBIN, which is a database that allows us to

6    match firearms and firearm shell casings to different crimes.

7    Aside from that, I hold a number of collateral duties with the

8    ATF as well.

9    Q.    I want to direct your attention to particular duties and

00:50 10   responsibilities regarding the examinations of, among other

11   things, cellular telephones.

12   A.    Yeah.

13   Q.    Is that one of your duties?

14   A.    Yes, it is.

15   Q.    And do you have particular training in that regard?

16   A.    Yes, I do.

17   Q.    Would you describe generally for the Court your training

18   regarding the examinations of mobile or cellular telephones?

19   A.    Okay.  In 2012 I attended an ATF course that we give to

00:50 20   all agents who are interested in performing the extraction of

21   cellular devices.  That was a week-long course which was held

22   down in Alabama.  I took that course and passed that course.

23        In the following years I took a number of added courses on

24   top of that.  One of the main companies that provides cellular

25   hardware for extracting cellular devices is called Cellebrite.

1    They have a four-tier system.  Basically they have a

2    fundamentals class that you take.  Once you've taken and passed

3    that course, you're given a certificate, having achieved that.

4    Then they have two tested tiers of extraction processes.  It's

5    called the "Logical Course" and the "Physical Course."  Each of

6    those courses are offered through Cellebrite.  Each of those

7    courses is tested by way of a written test and by practical

8    examination.

9        Upon completion of those three specific courses, you're

00:51 10   allowed to sit for what Cellebrite calls its Certified Cellular

11   Mobile Examiner Certificate.  That is a written, timed test,

12   and you have to complete a number of practical examinations

13   showing your knowledge in using their processes and the

14   analysis of cell phone data.  Once you've taken and passed

15   that, you've achieved what Cellebrite has as a high

16   certification.  So I hold all of those certifications.

17   Q.   And when did you receive the highest certification as a

18   Cellebrite certified -- Mobile Examiner Certification?

19   A.   I would like to say two years ago but I would have to

00:52 20   check the exact date on that.

21   Q.   If I were to suggest 2016?

22   A.   That could be correct, yes.

23   Q.   Do you have a current resumé describing your background

24   and certifications in professional affiliations?

25   A.   Yes, I do.

Q.   I'm showing you a document and ask you if you recognize

that, sir.

A.   Yes, that's a document that I submitted showing some

assignments.  There has been some additions to this as time has

passed, but this is what I had submitted to the Court at the

time.

         MR. MacKINLAY:  I would ask that it be marked as the

next exhibit, please.

         MR. SPENCER:  No objection.

00:53    THE DEFENDANT:  Government's Exhibit 33 is accepted by

the Court.

         (Government Exhibit No. 33 received into evidence.)

BY MR. MacKINLAY:

Q.   You have some -- in addition to this training and

affiliations that you've described and that are included on

your resumé, do you have some experience in conducting such

examinations of searching or exacting materials from cellular

telephones?

A.   Yes, I do.

00:53 Q.   Describe it to the Court.

A.   When it comes to the actual process of performing the

extractions and analysis, I've done extractions on, I'd

probably say, approximately 150 to 200 cellular devices.

Q.   And have you testified in courts concerning your

examinations of cellular devices?

1    A.    Yes, I have.

2    Q.    How many times and in which courts?

3    A.    I've testified twice here in the District of Massachusetts

4    and I've also testified once in Suffolk Superior Court.

5    Q.    I want to direct your attention to the execution of a

6    search warrant on a case involving Special Agent Daniel

7    McPartlin.  Were you assigned to assist in that?

8    A.    Yes, I was.

9    Q.    And did you search a phone that was reported to you

00:54 10    recovered from a Mitchell Daniells?

11    A.    Yes, I did.

12    Q.    What -- describe just generally the process that you

13    undergo in terms of conducting an extraction and the process.

14    A.    Okay.  Depending on the make of phone -- obviously, there

15    are two very popular companies out there right now:  There's

16    Android and there's Apple.  So depending on the company,

17    there's different processes.

18          In this case it was an Apple phone, so I'll kind of give

19    you the basics for Apple.  For Apple phones, we're more limited

00:54 20    in the information and the processes that we can conduct on a

21    phone.  Android phones allow for some other extractions to be

22    done.

23          So in this particular case, or in any case when I receive

24    this type of device, I'll document any information that I can

25    that's on the exterior of the device.  I will photograph that

1    device.  I will remove the SIM card, which is a small little

2    white chip that's usually in a tray on the side of the iPhone.

3    I will document any information that's on that SIM card.  I

4    will then process the SIM card to actually extract data that's

5    held on that card.

6         From there I will take the device.  It depends if the

7    device is locked or unlocked.  Depending on that, I'll take

8    steps to unlock the device.  If the device is unlocked or I've

9    been provided the user code, I'll use the Cellebrite software

00:55 10    that's provided to take what they call a logical extraction off

11    the phone, which is -- basically, the Cellebrite system is

12    asking the phone to deliver certain content to the system.

13    Q.   So the Cellebrite program essentially downloads or

14    extracts the information that's included in the iPhone?

15    A.   Yes, it does.

16    Q.   And is there a report generated following the extraction?

17    A.   Yes.  So once that data is extracted, you then have to

18    open up a separate software program within Cellebrite, which is

19    called "Physical Analyzer."  That Physical Analyzer software

00:56 20    parses out that data.  So it takes all that data that it's

21    received from the phone and it puts it into certain categories;

22    for example, text messages, contacts and call log, and it will

23    populate those fields in the software.

24         Once that's completed, I can take all that information and

25    output it in a report that someone can use.  It can be done in

a PDF format, it can be done in a number of different formats

for analysis after that.  So I did that in this case.

Q.   And are those reports searchable for information to assist

investigators and others in determining what is included in the

report that was on the phone?

A.   Oh, yes, they are.

Q.   Did you receive a search warrant and court order on this

case from the case agent?

A.   Yes, I did.

Q.   And did you at some point receive what I'm going to refer

to as "passcodes"?  I think you referred to them as "user

codes."

A.   Yes.  In this particular case the phone was locked by a

four-digit code.  And I received three possible passcodes for

that phone.

Q.   Now, describe for the Court how an iPhone requires a

passcode to access it.

A.   Okay.  So an iPhone, specifically an iPhone 5s in this

case, can be unlocked using a user's fingerprint, but there's

always some sort of secondary passcode that's needed with the

phone.  Apple has, let's say, three tiers of passcodes:  A

four-digit PIN, a passcode, which is the simplest for someone

to unlock; you can have a six-digit pin; or you can have a

password which would be alphanumeric.  You could have both

digits and numbers.  This particular phone used a four-digit

1  PIN.

2  Q.   So did you, using the passcode, conduct an extraction of

3  the phone that was provided by the case agent?

4  A.   Yes, I did.

5  Q.   And what is an extraction report face sheet?

6  A.   So when the report is created, it documents everything

7  that I've done, the time and date the extraction was done, the

8  particular software that was used at that particular time.  The

9  software updates itself, almost monthly now, to keep up with

00:58 10  technology.  So it documents all of that.  It has user

11  information, the specific serial number of the phone, the IMEI

12  of the phone, and a number of other information is placed on

13  that face sheet.

14       MR. MacKINLAY:  May I approach?

15       THE COURT:  Yes.

16  BY MR. MacKINLAY:

17  Q.   I'm handing you an item and ask you if you would take a

18  moment to look at it and tell me if you recognize it.

19  A.   Yes, I do.

00:59 20  Q.   What do you recognize that to be?

21  A.   So this would be the first two pages of the extraction

22  report that I created.

23  Q.   So the face sheet together with the first sheet of the

24  report?

25  A.   Correct, yes.

1    Q.   And is that of the report of the extraction of the

2    Daniells' phone?

3    A.   Yes.  The first sheet has information that I put into the

4    system, which is our unique ATF case number, the evidence

5    number that was assigned by ATF to this particular phone, and

6    then -- and whatnot.

7         MR. MacKINLAY:  I'd offer this as an exhibit, please,

8    your Honor.

9         MR. SPENCER:  No objection.

00:59 10         THE CLERK:  Government's Exhibit 34 is received by the

11    Court.

12         (Government Exhibit No. 34 received into evidence.)

13    BY MR. MacKINLAY:

14    Q.   Showing you what we just marked as Exhibit No. 34, is the

15    information on the front page, how is that entered?  Was that

16    information that you indicated you entered into the report?

17    A.   So the first two lines are not within my control.  The

18    software actually creates those entries.  The time zone setting

19    I had entered because we're here in Eastern Standard Time.  So

01:00 20    when I go into the software, I let them know we're in Eastern

21    Standard Time.  The next four entries I entered into the system

22    and it produces them on the report.

23    Q.   This particular report was generated 4/26/17 but there was

24    a prior report that was generated using a different format.

25    Would that be fair to say?

1  A.    Yes.

2  Q.    Referring to page 2, where does this source extraction

3  information come from?

4  A.    So everything on this page is populated by the Cellebrite

5  software.   I have no control over these entries.   These are

6  taken from the logs that Cellebrite creates as you're doing

7  these processes.

8  Q.    When it's populated by the Cellebrite program, does it

9  include, for example, the type of device that it was extracting

01:01 10  from?

11  A.    Yes, it does.

12  Q.    Where is that included?

13  A.    It's just on the bottom of the screen here.   It's kind of

14  cut off.   If you move it up a little bit.   So if we see

15  "detected phone vendor" it's telling us what model that is.

16  Where it says "A1433" or "A1453," one of those numbers would

17  actually physically be present on the back of the iPhone if you

18  wanted to check it, but it's telling you that this phone is

19  responding as one of those two models, which we would

01:01 20  categorize as an iPhone 5s.

21  Q.    Referring to this section?

22  A.    Yes, right where your pen is there.

23  Q.    What is the OS version representing in the left-hand

24  column as well above that?

25  A.    So Apple produces an operating system for their phone.

1    They call that particular operating system iOS, almost like

2    iPhone runs iOS.  And it's showing the particular version that

3    the user had installed on the phone at the time of extraction,

4    which would be Version 7.1.2.

5    Q.    Referring to this entry right here?

6    A.    Yes; that's correct.

7    Q.    Did that have some significance to you in your execution

8    of the search warrant?

9    A.    Yes, it did.

01:02 10   Q.    What's the significance of that particular operating

11   system on that iPhone 5s?

12   A.    Well, because I was provided the user PIN code, it didn't

13   have as much significance as it has in other extractions that

14   I've done.  But the -- kind of the turning point in Apple's

15   development was iOS A20, pushed out iOS 8 to their users.  They

16   notified law enforcement that they would no longer be assisting

17   law enforcement in unlocks or extractions of phones.  So

18   anything before iOS 8 would have still been supported by Apple

19   corporate itself, if need be.

01:03 20   Q.    When you say "Apple pushed out to law enforcement," how

21   did they notify law enforcement of the procedures that they

22   were now going to employ relative to searching iPhones?

23   A.    Apple would regularly publish a guide that was available

24   to everyone online, but this is a guide that went through all

25   sorts of data that could be requested by Apple and what they

1    could and could not support.

2    Q.   Did you have a copy of that available to you at that time

3    that you conducted the extraction back on August 11, 2015?

4    A.   Yes, I did.

5         MR. MacKINLAY:  May I approach, please, your Honor.

6    Q.   I'm showing you a group of documents and ask if you

7    recognize that.

8    A.   Yes, I do.

9    Q.   And what do you recognize it to be, sir?

01:04 10   A.   This is Apple's legal process guide that I just spoke of.

11   This one in particular that -- was actually released shortly

12   after this extraction was done.  This was released on September

13   29th of 2015.  But, once again, it explained the level of

14   cooperation that they could provide depending on what was

15   submitted to them.

16   Q.   And did this explain, to your understanding and your

17   training and experience, and alter the policy that Apple had

18   relative to searching iPhones submitted?

19   A.   It did, yes.

01:04 20   Q.   And how did it alter it?

21   A.   If we look in here -- and if you give me one second I'll

22   find it for you, unfortunately, the pages are not numbered,

23   but if we go to capital letter, it looks like I, it gives you

24   information on extracting data from passcode-locked iOS

25   devices.

1          MR. MacKINLAY:  One moment, please.

2          I would offer this procedures manual as the next

3     exhibit, please, your Honor.

4          MR. SPENCER:  So sorry.  No objection.

5          THE COURT:  Okay.

6          THE CLERK:  Government's Exhibit 35 is received by the

7     Court.

8          MR. MacKINLAY:  Thank you.

9          (Government Exhibit No. 35 received into evidence.)

01:05 10   BY MR. MacKINLAY:

11   Q.   I think you were referring to the paragraph about five or

12   six pages into the document that was titled I.  Is that

13   correct?

14   A.   Yes, that's correct.

15   Q.   And does that capture Apple's position as of the date of

16   September 29, 2015, of their change in policy regarding the

17   search of iPhones?

18   A.   Yes, it does.

19   Q.   Can you just point it out to the Court and describe your

01:06 20   understanding of the --

21   A.   So if we read the first paragraph there, it says, "For all

22   devices running iOS 8 and later, Apple will not the perform iOS

23   data extractions as data extraction tools are no longer

24   effective."  Then it goes on to say in the second paragraph,

25   "For iOS devices running iOS versions earlier than iOS 8, upon

1   receipt of a valid search warrant issued upon a showing of

2   probable cause, Apple can extract certain categories of active

3   data from passcode-locked iOS devices."  And it goes on in more

4   detail from there.

5   Q.   How is this policy applicable to the extraction you

6   conducted on Mitchell Daniells' phone?

7   A.   It is applicable because Mitchell Daniells' phone operated

8   on the iOS Version 7, so that would be an iOS version earlier

9   than 8.0.

01:07 10   Q.   And as such, would Apple continue to honor search warrants

11   in order to search a device?

12   A.   Yes, they would at that time.

13   Q.   And just to be clear, this was approximately a month and a

14   half after you conducted the search?

15   A.   It is, yes.

16   Q.   The face sheet that you described in the first page of the

17   device information sheet which is referred to earlier as

18   Exhibit 34 had more information than simply the operating

19   system.  Isn't that correct?

01:07 20   A.   Yes, it did.

21   Q.   Did it have a description generally of the amount of data

22   that was recovered on the phone?

23   A.   Yes, it does.

24   Q.   And do you know how much data was recovered during the

25   extraction report from the phone?

1   A.   I'd have to look at the report to tell you that.

2   Q.   Showing you again Exhibit 34, the second page.

3   A.   So to answer your question, it's saying that the actual

4   storage capacity that this phone has is 12 gigabytes and that

5   there was no available storage, so it's saying that it was a

6   full phone.  To tell you -- I can't tell you exactly from this

7   report how much data it took off because on Apple iPhones, it

8   only takes -- the system only takes certain information from

9   the phone.  It's not like an Android phone where if the Android

01:08 10   phone is 12 gigabytes, you end up with 12 gigabytes of data.

11   I'd have to go back to the actual file itself to tell you how

12   much in size, in gigabytes, the file was that was produced.

13   Q.   Now, you were able to access and extract the full contents

14   to the best of what the iPhone was producing at the time

15   through your extraction using the Cellebrite program?

16   A.   Yes, I was.

17   Q.   Now, in addition to the processes that you've described,

18   were there other means to obtain -- let me back up for a

19   minute.

01:09 20       What is the typical process that you would need to undergo

21   to obtain compliance or extraction from a cell phone, an iPhone

22   from Apple?

23   A.   Yes.  In this particular district at that time we were

24   regularly obtaining search warrants with court orders.  Those

25   would be sent to Apple along with the device.  Apple would

1   unlock that device and they would provide some sort of media

2   depending on how much data was extracted from the device.

3   Sometimes it would be a DVD, sometimes it you would be a USB

4   thumb drive.

5        That data would be sent back to us.  And that data wasn't

6   in a format that you could just open and look at.  You would

7   actually have to take a program such as the Cellebrite tool and

8   enter that data that they extracted into that tool.  That tool

9   would, once again, parse it into different categories, and we

01:10 10   would produce a report just like we have in this case.

11   Q.   And again, that would make it searchable and more

12   user-friendly and in the form that you then converted the

13   information provided by Apple?

14   A.   Yes, exactly.

15   Q.   What was the approximate turnaround time back in August of

16   2015 for devices sent to Apple with a court order that required

17   the passcode or access code to be opened or provided back to

18   them?

19   A.   Yes.  At that time we were regularly receiving turnaround

01:10 20   times of about two weeks.

21   Q.   Around that time were there other means to access or to

22   gain compliance with the search warrant for an iPhone other

23   than sending it out to Apple or having the passcode in hand?

24   A.   Not in -- well, I take that back.  In August of that time

25   there was something called IP-BOX which we used regularly, we

had in our lab.  That would require you actually manually

opening up the device and attaching certain wiring to the

device, and that would allow you to what they call brute force

the passcode.

So basically what it would do is it would start with 0001

as a PIN code and work its way all the way up to 9999 and reset

the device in between each attempt.  And depending on what the

particular passcode was, at some point it would unlock the

phone.

01:11  Q.   It was searching for the passcode?

A.   It wasn't searching for it; it was testing each passcode

until it found the correct one.  That was called IP-BOX.  That

was available in August at that time.  Later, in October of

2015, Cellebrite released its own unlocking tool.  That

unlocking tool worked on iPhone 5 and 5s, as long as it was

operating on iOS below 8.0.  So iOS 7 in any form would have

been supported.

That particular software tool used a different exploit

where you would not have to take apart the phone and use

01:12  the -- a function where you could plug in through the regular

port on the bottom of the phone, and that would, almost like

the other system, test passcodes until it found the correct

one, and it would unlock the phone and provide you with the

passcode it had used to unlock it.

Q.   Just to be clear, the vendor itself, Cellebrite, later in

 1   October provided another means to access the very same

 2   information on the -- for example, on an iOS 7.2.1 like

 3   Mr. Daniells' phone?

 4   A.   Yes, they provided it in October and they sent out the

 5   wiring and the software needed to do that, and we were

 6   regularly using that tool to unlock phones at that time.

 7   Q.   You were provided with certain -- or I would describe it

 8   as an article that was received during the course of this case

 9   that was purported to have been retrieved from the defense

01:13 10   counsel's file.  Do you recall that?

11   A.   Yes, I do.

12   Q.   Did you take a look at that article?

13   A.   Yes, I did.

14   Q.   Is that article titled "Apple versus FBI, Understanding

15   iPhone Encryption, The Risks for Apple and Encryption"?

16   A.   Yes.

17   Q.   Did you familiarize yourself with the article?

18   A.   Yes, I did.

19   Q.   Can you describe for the Court the applicability of the

01:14 20   article to the iPhone at issue and seized from Mr. Daniells?

21   A.   To me, in summary, the article is not applicable.  It's

22   talking about -- and it all spurned off the San Bernardino

23   shooting where Apple refused to cooperate with law enforcement

24   in decrypting a phone.

25        That particular phone was a different model and it was a

different iOS than the phone in question in this case.  Also, what Apple was being asked to perform in that was decrypting the phone, which is basically -- encryption takes whatever data is on that phone and it makes it into a form so that if you were to take data off that phone, you can't translate it into something that's understandable or readable without a certain key.

What we were looking to do in this phone was unlock the phone.  We weren't looking to decrypt the phone.  So the task at hand here was completely different than what was being asked to be done in this particular phone in San Bernardino.

Secondly, Apple had regularly performed the process on iOS 5 -- I'm sorry -- iOS 7 phones that were 5s at this time and before.  This article, once again, talks about a different phone with a different iOS, so to me it's not applicable to the case-in-chief here.

Q.   Just in terms of timing, San Bernardino was in 2015, approximately?

A.   Yes, it was.

Q.   And the article appears to be dated Wednesday, February 17, 2016?

A.   Yes.

MR. MacKINLAY:  I have no further questions, your Honor.

THE COURT:  Just for clarity of the record, I think

1    the -- I would like you to confirm -- my notes indicate that

2    that article is in evidence as Exhibit 5.

3                MR. SPENCER:  Yes.

4                THE COURT:  Just so the record is clear, that's the

5    article being discussed.

6                         CROSS-EXAMINATION

7    BY MR. SPENCER:

8    Q.   Good afternoon, sir.

9    A.   Good afternoon.

01:16 10    Q.   My name is Gordon Spencer.  I'm just going to ask you a

11   few questions.  I represent Mr. Daniells.

12   A.   Okay.

13   Q.   You indicated that the phone for the San Bernardino case

14   was a different type of phone and a different iOS?

15   A.   Yes.

16   Q.   What was the phone model?

17   A.   I mean, obviously, I didn't work on that case myself.  But

18   from general reading of articles and whatnot, it's been

19   reported it was an iPhone 5c.

01:16 20    Q.   Okay.  And what was the iOS level?

21   A.   I don't know the exact iOS level that was on that phone

22   because I never worked on that phone nor was I privy to know

23   the exact --

24   Q.   So then --

25   A.   -- version.

1  Q.  Did you not state on direct examination it was a different

2  iOS level than Mr. Daniells' phone?

3  A.  Yes.  From articles I've read, it's a higher iOS than

4  Mr. Daniells had, but I don't know the exact -- they break down

5  the iOS's.  So they could be Version 8.1, 8.2, 8.3.  I don't

6  know the exact iOS.

7  Q.  So based upon the articles that you read -- and just so

8  we're clear, you don't really have any firsthand knowledge of

9  the information inside those articles, right?

01:17 10  A.  Well, I've read some of those articles.

11  Q.  Yeah, but firsthand knowledge in the sense you weren't the

12  author of the article?

13  A.  Oh, no.  Of course not.

14  Q.  You didn't speak to any of the sources that provided

15  information for the article?

16  A.  No, of course not.

17  Q.  There's been no way to even be able to verify the

18  information inside the article?

19  A.  No, I could not.

01:17 20  Q.  Okay.  But so you have a distinct recollection -- and just

21  so we're clear, it's not listed in Exhibit 5 the level of the

22  iOS on the iPhone 5c from the San Bernardino case, right?

23  A.  I don't recall, but if you would like to show me the

24  article, I'm happy to look at it.

25  Q.  You mean the article?

```
 1  A.    Yes.

 2  Q.    Sure.

 3         MR. SPENCER:  Exhibit 5.  Do you have it?

 4  Q.    Showing you Exhibit 5, it looks like -- so we're here on

 5  page 3.  You see where it says "I've been careful"?

 6  A.    Yes.

 7  Q.    So "I've been careful" -- and that's obviously the author

 8  of the article.  Would that be fair to say?

 9  A.    Correct.  Yes.

10  Q.    "I've been careful here to note that the iPhone in

11  question is a 5c."  Is that right?

12  A.    Yes.

13  Q.    And it goes on to say that the 5s featured the A7 chip

14  which included a secure enclave?

15  A.    Yes.

16  Q.    What is a secure enclave?

17  A.    I mean, obviously I don't want to speak outside of my

18  area.  My area is in the knowledge of extractions.

19  Q.    Let me ask you this question:  Do you have any working

20  knowledge of what a secure enclave is?

21  A.    Yes, very basic knowledge.

22  Q.    What is your basic knowledge?

23  A.    So the big difference between the 5c and the 5s was that

24  the 5s, when you typed in your PIN code or you used your

25  fingerprint, it used that secure enclave to use that passcode
```

1    to encrypt the phone.  So without having either that user's

2    fingerprint or their particular code, you could not unencrypt

3    the phone, whereas in prior versions of the phone, you would be

4    able to do so without that PIN.  So you could break into the

5    phone and do that.

6    Q.    Using brute force?

7    A.    Yes.

8    Q.    So would it be fair to say the 5s actually has a security

9    upgrade over the 5c, the phone that was at issue in the

01:19 10    San Bernardino case?

11    A.    That would be a fair statement, yes.

12    Q.    Okay.  And do you see, at least on this language that's on

13    the screen -- do you see any language that makes reference to

14    what iOS level the 5c was running on?

15    A.    I don't.  And if it says it somewhere in that document, I

16    would be more than happy for you to show me.  But off the top

17    of my head -- I don't want to waste the Court's time, but if

18    you know an area where it shows it --

19    Q.    No, I just want to -- do you have any recollection of any

01:19 20    document on the iOS level of the 5c?

21    A.    No, I don't.

22    Q.    So then you're relying on other articles to demonstrate

23    your memory that the iOS -- I'm sorry -- that the 5c had a

24    different iOS?

25    A.    In that particular case, it's my memory from reading

1   articles, but like I said, I don't know the exact version.

2   Q.   Okay.  So you could be wrong about that?

3   A.   It is possible.

4   Q.   Okay.  And back to page 3 on Exhibit 5, do you see at the

5   bottom where it says, "In other words, had the terrorists had a

6   5 phone" -- "5s or later, the judge's order would be moot"?  Do

7   you see that?

8   A.   I do see that, yes.

9   Q.   And you're saying it's not applicable here because you're

01:20 10   asking for a different type of extraction from the phone?

11   A.   It's not applicable here because of two things:  This

12   particular phone had iOS 7, so it's a different operating

13   system.

14   Q.   Right.  But you just said you don't know what iOS the 5c

15   was operating on.

16   A.   Well, then let me correct myself.  This particular phone

17   was running iOS 7, which we just spoke about earlier, was

18   supported by Apple and was demonstrated in their September 2015

19   briefing packet.

01:21 20   Q.   Okay.  Now, were you aware at some point that Apple

21   decided not to order [sic] court orders anymore as it pertained

22   to iOS 7?

23   A.   Yes.

24   Q.   And when did that start to happen?

25   A.   I believe it was probably in the second week of December

1   of 2015.

2   Q.   And was there some type of specific written policy that

3   was given to law enforcement by Apple saying, "As of December

4   of 2015, we are no longer honoring court orders"?

5   A.   I don't remember any written policy coming out on that.

6   It was something that was more played out in the media at the

7   time.

8   Q.   Okay.  So you're just relying upon what you heard through

9   the media about this, about when Apple first changed their

01:21 10   position?

11   A.   Well, that's how it was first heard, and then later on as

12   we submitted phones to Apple, or as we called them to ask them

13   whether or not they would support that, we were told that they

14   were no longer supporting law enforcement in the unlocking of

15   any phone.

16   Q.   Did they say why?

17   A.   They said that there were ensuing legal issues going on

18   and they were not going to honor any requests at that time.

19   Q.   And --

01:22 20        MR. SPENCER:  One moment, your Honor.

21   Q.   And the device in question, the iPhone 5s that you

22   extracted, are you aware if that phone had an A7 chip which

23   included a secure enclave security feature?

24   A.   That phone would have, yes.

25   Q.   And can you affirm here as you sit here today whether data

1    on that device, the iPhone 5s, was encrypted with a unique key

2    generated by the secure enclave that is completely random and

3    unknown to Apple?

4    A.   I don't have the specific information on that because I'm

5    not sure if that was instituted between iOS's 7 and 8 or not.

6    Q.   Okay.  And you're saying that this document that was

7    admitted into evidence by Mr. MacKinlay was given to you as of

8    September of 2015?

9    A.   Which document?

01:23 10   Q.   I'm sorry.  It was the most recent document.  It was 35, I

11   believe, the --

12   A.   This is Apple --

13   Q.   The legal process?

14   A.   I provided that to the U.S. Attorney's Office.

15   Q.   When was this first provided to you by Apple?

16   A.   It was -- it was placed on their website as of that date.

17   They make it public to everyone.

18   Q.   As of September 2015?

19   A.   Yes, September 2015.  They would have placed that -- they

01:23 20   have a website where they would have placed that and anyone

21   would have been able to access that document.

22   Q.   And do you have any information to verify that this was

23   actually published by Apple as of September 2015?

24   A.   I mean, I have my own personal recollections of reading

25   the document in that time period but, no, I don't have anything

1   that specifically shows the data aside from what they've

2   provided in that document.

3   Q.   How can you remember to such a precise date today the date

4   that Apple actually began to publish this?

5   A.   Because at that particular time, with the release of iOS

6   8, we were having increasing troubles in getting into iPhones,

7   so it was very relevant at the time.  And most of the people in

8   my profession were staying up on top of what Apple could and

9   could not assist with at that time.

01:24 10   Q.   Why were you beginning to have trouble getting into

11   iPhones?

12   A.   Because the changeover from iOS 7 to iOS 8 made it

13   impossible for us to get into these phones at that particular

14   time.  That's changed since then.

15        MR. SPENCER:  One moment.

16        (Counsel confers with the defendant off the record.)

17   Q.   If you had tried to brute force this particular phone,

18   could there have been any complications that would have

19   resulted?

01:25 20   A.   Not with the Cellebrite tool that I spoke of before.  That

21   tool was a relatively safe tool.  So it would have -- it would

22   have processed the phone.  There are other processes, like the

23   IP-BOX that I mentioned before that at times does not work

24   properly, and it could have involuntarily erased the data on

25   the phone.

Q.   All right.  And so with the Cellebrite program that you

had, you've always been able to brute force into any iPhone

without erasing the data?

A.   Well, not any iPhones.  So it would have to be an iPhone 5

or below that used a four-digit PIN code.  Anything more than a

four-digit PIN code was not supported and it would have to be

before iOS 7.

Q.   Do you have any materials that reflect what you just

testified to regarding Cellebrite and its ability to do this?

01:26  A.   Yes, I do.

Q.   Okay.  And can you provide that to the government?

A.   Of course I can.

MR. SPENCER:  Nothing further.

THE COURT:  Before you do that, let me just be sure

I'm clear on something.  As of August/September 2015 --

THE WITNESS:  Yes, your Honor.

THE COURT:  -- if an iPhone 5s had an A7 chip, that

would or would not have interfered with Apple's ability to

respond to a search warrant by unlocking the phone?

01:26  THE WITNESS:  The chip had nothing to do with it; it

was the model of the phone.  So to make it very simple here, if

this phone was running iOS 8 instead of iOS 7, we would be

having a different discussion.  At that time we would not have

been able to get into it.

If this particular phone was an iPhone 6 instead of an

1    iPhone 5, we would not be able to get into it.  It's a

2    different discussion.  If this phone had more than a four-digit

3    PIN code, if it had a six-digit PIN code or an alpha numerical

4    PIN code, at that time we would not be able to get into it.

5         But this particular phone, a phone that's a 5s running

6    iOS 7 with a four-digit PIN code, at that time was supported by

7    Apple and just months later was supported by Cellebrite for

8    unlocking.  It just happens to be that this phone was not

9    updated.

01:27 10        THE COURT:  And the A7 chip just doesn't affect that

11   one way or the other?

12        THE WITNESS:  It does not.

13        THE COURT:  Is the article, Exhibit 5, inaccurate in

14   suggesting that it would?

15        THE WITNESS:  No, I don't think the article takes into

16   account the two different iOS versions.  IOS 8 had actually

17   been released a year before.  So most users had updated their

18   iPhone to that iOS 8.  In this particular case, for whatever

19   reason, the user had not updated the software.

01:28 20        MR. SPENCER:  May I ask a question?

21        THE COURT:  Yes.

22        And that would occur typically, for an ordinary user

23   like me, when you get a prompt to download the new update?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.  Thank you.  Go ahead.  No.

1    Mr. Spencer.

2              MR. SPENCER:  I just have a follow-up.

3              THE COURT:  He last had the floor.  We'll get back to

4    you.

5                    CONTINUED CROSS-EXAMINATION

6    BY MR. SPENCER:

7    Q.    Showing you the same exhibit, I believe Exhibit 5 on page

8    2, do you see down at the bottom where it says, "Starting with

9    the iOS 8, all the data on an iPhone is encrypted on disk with

01:28 10   extremely strong encryption"?

11   A.    I do.

12   Q.    And it says the FBI could extract the data directly from

13   the memory chips but it would take years to brute force the

14   key?

15   A.    Yes.

16   Q.    Okay.  And so you do see that the article does make some

17   distinction between iOS 8 and earlier versions, right?

18   A.    It does there, yes.

19   Q.    Right?  And it also talks about, in the case of the

01:28 20   terrorist's phone, the iPhone 5c, it talks about -- it actually

21   says, "Thus, while a passcode is massively easier to brute

22   force on the disk encryption, said brute-forcing can only be

23   done on the device itself"?

24   A.    Yes, meaning that if you were to clone that device or copy

25   the information from that device and put it on another one, it

1    wouldn't work.  If you were going to brute force it, you would

2    have to do it to the actual physical device in hand.

3    Q.    Right.  I guess the point is, we do see some distinction

4    between -- at least in the article, between iPhone -- a 5c and

5    a 5s, and the fact that it specifically states, "In other

6    words, had the terrorist had a 5s or later, the judge's order

7    would be moot"?

8    A.    I mean, I'm not going to argue with what the article

9    states.  That is what the article does state.

01:29 10            MR. MacKINLAY:  No further questions.

11            THE COURT:  All right, Agent.  Thank you.  You may

12    step down.

13            THE WITNESS:  Thank you, your Honor.

14            (The witness is excused.)

15            THE COURT:  We'll recess until two o'clock.

16            THE CLERK:  All rise.

17            (The Court exits the courtroom and there is a recess

18    in the proceedings at 12:45 p.m.)

19            THE CLERK:  All rise.

02:49 20            (The Court enters the courtroom at 2:04 p.m.)

21            THE CLERK:  You may be seated.

22            THE COURT:  Yeah, Mr. Spencer.

23            MR. SPENCER:  Thank you.  I call Mr. Mitchell

24    Daniells.

25            THE COURT:  Let me just to, I guess, complete the

 1  discussion, over the course of the recess I've had an

 2  opportunity to look at some cases.  It's rather clear that a

 3  defendant -- or a witness may not decline to answer

 4  cross-examination questions that are closely related to his

 5  direct testimony or otherwise affect his credibility by

 6  invoking the Fifth Amendment.  The offering of direct testimony

 7  waives the Fifth Amendment to reasonable cross-examination

 8  related to that testimony.

 9          MR. SPENCER:  Correct.

02:50 10          THE COURT:  So I just want to be sure that

11  that's -- that would be my ruling in the case.

12          MR. SPENCER:  Sure.  And I would assume that if the

13  defendant persisted in asserting his Fifth Amendment, the Court

14  would have the option of striking his entire testimony.

15          THE COURT:  That's a likely result.

16          MR. SPENCER:  I just wanted to make sure that was on

17  the record.  Thank you.

18          THE COURT:  Okay.

19          (Counsel confers with the defendant off the record.)

02:51 20          MR. SPENCER:  So over the break there were some

21  discussions by the Court -- before the break there were

22  discussions by the Court about how the Court said it could not

23  be certain one way or the other as to what specific

24  implications the defendant's testimony could have at some

25  future proceeding.  And so he just brought it to my attention

1    that even though the government just indicated that it had no

2    intention of using his testimony at trial should he not

3    testify, I don't know what, if any, additional information the

4    Court can provide on that issue, but that was his concern.

5              THE COURT:  Well, I haven't separately looked at that.

6    I would think that the rules about prior recorded testimony

7    would apply.  That's a rather limited opportunity to present --

8              MR. SPENCER:  Yes.

9              THE COURT:  -- the testimony, but it's not

02:52 10   nonexistent.

11             MR. SPENCER:  Right.

12             THE COURT:  I think that's all I would say about that.

13   It would be -- it's hard to -- one of the problems here is I

14   don't want to be making rulings on factual predicates that

15   don't exist yet --

16             MR. SPENCER:  Sure.

17             THE COURT:  -- that might.

18             It is not out of the question that there might be an

19   opportunity for prior cross-examined recorded testimony to be

02:52 20   used at a future proceeding, that's all I'm saying, both having

21   in mind that there would be proceedings -- having in mind that

22   there would be both proceedings to which the rules of evidence

23   might apply and proceedings to which the rules of evidence do

24   not apply, and in the latter case, the likelihood of the use

25   would increase, I would suppose.

1          MR. SPENCER:  Sure.

2          THE COURT:  Because in the former case, the likelihood

3     would be circumscribed by the rules of evidence.

4          MR. SPENCER:  Correct.  If there was a party

5     admission, I would think the rules of evidence, and I think

6     some precedent, would prohibit any prior recorded statement as

7     a party admission if he were not to testify at trial, meaning

8     that if the government had this prior recorded testimony -- I

9     could be wrong, but I think if the government had prior

02:53 10   recorded testimony, that they could not then offer that

11    testimony -- no, I think there are circumstances where he

12    could.

13         THE COURT:  I don't know.  That's exactly the problem.

14    What will the circumstances be --

15         MR. SPENCER:  Yup.  Yup.

16         THE COURT:  -- when such an attempt would be made.

17    And there might be some where the attempt might be unsuccessful

18    and there might be some -- but it's hard to be sure about that,

19    and I guess that's part of the --

02:54 20        MR. SPENCER:  Risk.

21         THE COURT:  -- assessment of risk, is that you don't

22    know what the occasion might be in which the offer might be

23    made and what the ruling would be.

24         MR. SPENCER:  The only thing I can say as a follow-up

25    is that I hear that Mr. MacKinlay on the record, as a

1     representative of the government and an officer of the court,

2     wouldn't do anything sua sponte on this issue, that they have

3     specifically indicated that any statements that he gives, short

4     of any perjurious testimony, would not be used against him at a

5     later proceeding.

6             MR. MacKINLAY:  I think that's an expansion of what I

7     said earlier.  I want to be very clear what I'm saying.  My

8     understanding of the case law would be that the government

9     cannot use any of his testimony substantively with the charges

02:54 10    before the Court at trial.  That's it.  That's as far as I'm

11    going with it.  Should there be additional proceedings -- I

12    can't predict what's going to come out of the testimony or

13    what's going to happen relative to that as well, your Honor.

14    That's all I'm stating.

15            THE COURT:  So I understand it, you are saying that

16    the government will not offer affirmatively in support of a

17    proposition the government would advance his testimony?

18            MR. MacKINLAY:  That's correct.  In the trial of the

19    charges presently before this Court.  I believe that's

02:55 20    consistent with First Circuit precedent.

21            THE COURT:  You know, Mr. Spencer, let me just offer

22    you the opportunity, since we've had a little more dialogue

23    here, if you want five minutes, we can do that.

24            MR. SPENCER:  Sure.  I think that's best.  Thank you.

25            THE COURT:  We'll take a short recess.

```
 1              THE CLERK:  All rise.

 2              (The Court exits the courtroom and there is a recess

 3    in the proceedings at 2:11 p.m.)

 4              THE CLERK:  All rise for the Court.

 5              (The Court enters the courtroom at 2:25 p.m.)

 6              THE CLERK:  You may be seated.

 7              MR. SPENCER:  I call Mr. Mitchell Daniells.

 8              THE COURT:  All right.

 9                   MITCHELL DANIELLS, duly sworn

03:11 10        THE CLERK:  State your name, spell your last name for

11    the record and speak into the microphone.

12              THE WITNESS:  Mitchell Daniells D-A-N-I-E-L-L-S.

13              MR. SPENCER:  May I inquire?

14              THE COURT:  Go ahead.

15                        DIRECT EXAMINATION

16    BY MR. SPENCER:

17    Q.   Good afternoon.

18    A.   Good afternoon.

19    Q.   Are you aware that you filed two motions in your case,

03:11 20    United States versus Daniells, 15-10150-GAO?

21    A.   Yes.

22    Q.   And is one of those motions asking to exclude evidence

23    gleaned from your cell phone?

24    A.   Correct.

25    Q.   And another is asking the Court to exclude evidence of a
```

```
 1   statement you made --

 2   A.   Correct.

 3   Q.   -- during a proffer?

 4   A.   That's right.

 5   Q.   Are you aware that two affidavits were submitted in

 6   support of these motions?

 7   A.   Correct.

 8   Q.   Now, do you have a recollection of -- at the time that

 9   these motions were filed and the affidavits were filed, that

03:11 10   there was some issue of time and deadlines, meaning you were

11   concerned about the motions being filed too soon?  Let me ask a

12   different question.

13       Do you have a recollection of me reading these affidavits

14   to you over the phone while you were at Wyatt?

15   A.   While I was in Plymouth?

16   Q.   I'm sorry.  Plymouth.

17   A.   No.  I got them when you gave it to me, though.

18   Q.   Do you have a recollection of you telling me to sign your

19   name to the affidavits?

03:12 20   A.   Yes.

21   Q.   Okay.  And since then have you had a chance to review

22   those affidavits?

23   A.   Yes.

24   Q.   And is there any changes you want to make in either

25   affidavit?
```

```
 1    A.   Well, for the iPhone, yeah, I just wanted the record to
 2    state that Michael Schneider withdrew himself; I didn't
 3    terminate him.
 4    Q.   Okay.  So do you have a recollection in one paragraph of
 5    your affidavit --
 6              MR. SPENCER:  And for the record, Paragraph 12 on
 7    Docket 141-4.
 8    Q.   -- where you indicated, "He also said to me," Michael
 9    Schneider, "if I was going to be filing any motion about this,"
 10   it would be better for you to terminate him, and you said you
 11   chose the latter and received Attorney Demissie as your
 12   counsel?
 13   A.   The Court appointed Demissie as my counsel.
 14   Q.   Right.  So did you fire Mr. Schneider or did Mr. Schneider
 15   withdraw?
 16   A.   He withdrew himself.
 17   Q.   So that's one correction?
 18   A.   That's correct.
 19   Q.   Any other corrections?
 20   A.   Can I take a look?
 21   Q.   Sure.
 22              MR. SPENCER:  May I approach?
 23              THE COURT:  Yes.
 24              (The witness reviews the document.)
 25   BY MR. SPENCER:
```

1    Q.    Any other corrections?

2    A.    No.

3    Q.    Do you recall being arrested on June 18, 2015?

4    A.    Yes.

5    Q.    Pursuant to that arrest, was there a cell phone that

6    belonged to you that was taken by the agents?

7    A.    Yes.

8    Q.    What type of phone was it?

9    A.    Apple iPhone 5s.

03:16 10   Q.    How long had you had that phone?

11    A.    About a year.

12    Q.    Did you have any other phones in addition to that phone?

13    A.    Yes.

14    Q.    What other phones did you have?

15    A.    I have an Apple model iPhone 6 Plus.

16    Q.    When did you get that iPhone 6 Plus?

17    A.    Early 2015.

18    Q.    So you had it for a few months?

19    A.    Yes.

03:16 20   Q.    Where was that phone at the time of your arrest?

21    A.    At my sister's residence.

22    Q.    What is your sister's name?

23    A.    Esther Daniells.

24    Q.    So why were you using the iPhone 5s instead of the iPhone

25    6 Plus?

```
 1    A.   I'm a commercial -- well, at the time I was a commercial

 2    truck driver for a building supply company in Framingham,

 3    Massachusetts, and the nature of the job requires me getting

 4    dirty or potentially dropping or ruining the phone.  Since the

 5    6 Plus was newer, I have AT&T where I could take out the SIM

 6    card and put it in the older phone to avoid ruining my new one.

 7    Q.   Did both phones have the same passcode?

 8    A.   Yes.

 9    Q.   And did they have the same contacts?

10    A.   Yes.

11    Q.   Do you have any recollection on the date of your arrest of

12    any of the agents asking you for the passcode to your iPhone?

13    A.   Yes.

14    Q.   Please tell the Court what your memory was about that.

15    A.   When I was being processed at Framingham, after my arrest

16    the ATF agent had asked me to provide my passcode.

17    Q.   Do you recall which agent it was?

18    A.   Yes.

19    Q.   Which one?

20    A.   I believe he identified himself as Oppedisano.

21    Q.   Was it the officer who testified today?

22    A.   Yes.

23    Q.   Oppedisano?

24    A.   I believe so.

25    Q.   And what did you say in response?  Well, first of all,
```

1    before we even get to that point, did you see which officer had

2    possession of the phone?

3    A.    No.

4    Q.    All right.  Did you ever see any of the officers going

5    through the phone?  Let me rephrase that.  Had you ever seen

6    any of the officers holding the phone and perhaps looking at it

7    while it was on?

8    A.    Yeah.

9    Q.    Who?

03:18 10   A.    Oppedisano.

11   Q.    And did that take place at booking?

12   A.    It took place on the ride to Boston to be arraigned.

13   Q.    Okay.  So at booking, Agent Oppedisano specifically asked

14   for the iPhone passcode?

15   A.    Correct.

16   Q.    And what did you say in response?

17   A.    No.

18   Q.    Did he say anything else to you in response to that "no,"

19   if you could recall?

03:19 20   A.    No.

21   Q.    And now you mentioned on the ride down to the

22   courthouse -- was there any further discussion about the

23   iPhone?

24   A.    Yes.

25   Q.    Please tell the Court what the discussion was about.

A.   The agent in the backseat, which was Oppedisano, had asked

me for the passcode again, and I told him to deliver it to my

sister.

Q.   Deliver what?

A.   The iPhone 5s to my sister, who was house-sitting in

Boston.

Q.   And did you give him an address?

A.   Yes.

Q.   What was the address?

A.   101 Canal Street.

Q.   And when you gave that address as 101 Canal Street to

Officer -- rather, Agent Oppedisano, what did he say?

A.   I observed him writing it down, and then he had asked me

if I wanted to pull over and cooperate or something like that.

Q.   During the ride?

A.   That's right.

Q.   Do you recall being interviewed at the Framingham Police

Station by the agents?

A.   Yup.

Q.   And at any point in time during that meeting did they

specifically tell you about -- asking or seeking your

cooperation?

A.   I mean, not directly in that sense but --

Q.   What did they ask you specifically?

A.   Various questions:  Where I worked in the past --

```
 1   Q.   Yeah, but did they ask you to help yourself?

 2   A.   In essence, yeah.

 3   Q.   Did you agree to help them at that point in time?

 4   A.   No.

 5   Q.   Did you ever try to give them the impression that you

 6   would help them that day?

 7   A.   Nope.

 8   Q.   Did they tell you anything about additional charges to be

 9   coming?

03:21 10   A.   No.

11   Q.   Now, once you got down to the federal courthouse, did you

12   have a chance to meet Mr. Michael Schneider?

13   A.   Yes.

14   Q.   And that was your former lawyer?

15   A.   Correct.

16   Q.   Do you recall having discussions with him only as it

17   pertains to the iPhone 5s on that day?

18   A.   I believe I did.

19   Q.   Okay.  Do you recall seeing in Exhibit 1 and admitted into

03:21 20   evidence with Mr. Schneider, showing those initial notes

21   between his conversations with you and him on 6/18?

22   A.   Can I take a look at that?

23   Q.   Sure.

24        (The witness reviews the document.)

25        MR. SPENCER:  Judge, may we --
```

1    Q.   Showing you what has already been admitted into evidence

2    as Exhibit 1, and you see on the left column, perhaps in the

3    tab section, the words "iPhone 5"?

4    A.   Yes.

5    Q.   And does that refresh your recollection as to whether or

6    not you spoke to Michael Schneider on June 18, 2015, about your

7    iPhone 5?

8    A.   Yes.

9    Q.   Okay.  Tell the Court what you remember about the

03:22 10   conversation, if anything.

11   A.   From what I recall, I told him that when I was arrested

12   they took my iPhone 5 and I wanted it to be brought to my

13   sister.

14   Q.   Why did you want the phone to go to your sister?

15   A.   So she could get ahold of contacts and for them not to get

16   into my phone.

17   Q.   You didn't want them in your phone?

18   A.   At all.

19   Q.   Do you recall what Mr. Schneider said about it?

03:23 20   A.   Can I look at that?

21   Q.   Yeah.

22        (The witness reviews the document.)

23   A.   No, I don't recall what he said.

24   Q.   Okay.  At any point in time thereafter do you have a

25   recollection of giving Michael an assignment regarding

1    contacts -- Michael Schneider an assignment regarding contacts

2    for your sister for people to call?

3    A.    Yes.

4    Q.    All right.  And did you handwrite those documents and then

5    give them to Michael Schneider?

6    A.    That's right.

7    Q.    In addition, was there a Facebook password that you

8    provided to Mr. Schneider?

9    A.    That's correct.

03:24 10    Q.    Okay.  And after you gave that document to Michael

11    Schneider, do you know what he did with it?

12    A.    I told him to give it to my sister, so...

13    Q.    Okay.  And do you know how he came in possession of this

14    document?

15    A.    I don't.

16    Q.    Okay.

17         MR. SPENCER:  May I approach?

18    BY MR. SPENCER:

19    Q.    I'm handing you a document.  Take a look at that document

03:24 20    and tell me if you recognize what that document is.

21    A.    I do.

22    Q.    What is it?

23    A.    It's a list of names and potential passcodes from my

24    Facebook.

25    Q.    Okay.  Do you have a recollection of writing -- is that

1    your handwriting?

2    A.    The majority of it, yes.

3    Q.    Okay.  And do you have a recollection of writing those

4    words and then providing them to Michael Schneider with the

5    instructions to provide them to your sister?

6    A.    Yes.

7    Q.    And to your understanding, did he do so?  Well, let me ask

8    this question:  Did you hear him testify under oath last week?

9    A.    Yes.

03:25 10   Q.    Do you have any recollection of him stating that he did

11   that?

12   A.    I believe so.

13          MR. MacKINLAY:  Objection, your Honor.  He can't

14   comment on what other witness testified to.

15          THE COURT:  Well, if he testified here about it, it's

16   in the record.  If he didn't, he didn't and it isn't in the

17   record, so we'll be able to determine that.

18   BY MR. SPENCER:

19   Q.    Yes, Mr. Daniells.

03:25 20   A.    I instructed him to give it to my sister, and she provided

21   me contact information.  So I believe that he did give it to my

22   sister.

23   Q.    Okay.  And how would she be able to get that information,

24   meaning your contacts?

25   A.    There would be no other way without getting access to my

1    phone or my Facebook.

2    Q.   Okay.

3         MR. SPENCER:   I'd like to admit this as the next

4    exhibit.

5         MR. MacKINLAY:   No objection.

6         THE CLERK:   Defendant's Exhibit 36 received by the

7    Court.

8         (Defendant's Exhibit No. 36 received into evidence.)

9    BY MR. SPENCER:

03:26 10   Q.   Okay.  Showing you Exhibit 36, is that your handwriting at

11   the top starting with "Rachel"?

12   A.   Yeah.

13   Q.   And does that handwriting continue all the way down to

14   "Jackie"?

15   A.   Yeah.

16   Q.   And you see the words "Jermaine Gardner"?

17   A.   I do.

18   Q.   Did you write that as well?

19   A.   No.

03:26 20   Q.   You don't know who wrote that?

21   A.   I'm assuming Michael.

22   Q.   Okay.  And there was a phone number that's scratched out?

23   A.   That's right.

24   Q.   That's because you didn't want Mr. Gardner's phone number

25   on record?

```
 1   A.   That's right.

 2   Q.   And then you also see some -- and what's these other items

 3   that are scratched out?

 4   A.   The top one that is scratched out is an email address,

 5   below that are passcodes.

 6   Q.   Passcodes to what?

 7   A.   To the email for the Facebook.

 8   Q.   All right.  And so -- and what is this information here?

 9   What are you saying there?  First of all, is that your

10   handwriting?

11   A.   That's right.

12   Q.   What are you saying there?

13   A.   Basically, how to get into the -- accurately type the

14   passcode, upper case, lower case, whatever.

15   Q.   Okay.  And you provided this to Michael Schneider at what

16   point in time?

17   A.   Very early.  I believe it was late June/early July.

18   Q.   All right.  And just for the record, these passcodes we

19   scratched out because you didn't want anyone to know what your

20   Facebook passcodes are?

21   A.   That's right.

22   Q.   Are those passcodes still accurate?

23   A.   Yes.

24   Q.   Now, in addition to these passcodes that you just -- you

25   described on Exhibit 36, do you ever have a recollection of
```

1    also giving Michael Schneider your cell phone passcodes?

2    A.    That's right.

3    Q.    And was that prior to August 7th of 2015?

4    A.    Absolutely.

5    Q.    And where was he located when you provided these cell

6    phone passcodes?

7    A.    I believe he was -- when he came down to visit me that I

8    provided the passcode.

9    Q.    At Wyatt?

03:28 10   A.    Yeah.

11   Q.    Had Mr. Schneider come to see you at Wyatt prior to

12   August 7, 2015?

13   A.    He did.

14   Q.    Do you recall how many times?

15   A.    I think one time.

16   Q.    All right.  Was that before or during or after the

17   detention hearing?  I'll withdraw that question as vague.

18        Do you recall if it was before or after the proffer

19   session?

03:28 20   A.    It was before.

21   Q.    Okay.  And what was the specific reason that you gave

22   Michael Schneider your passcodes at that time?

23   A.    To relay to my sister.

24   Q.    Do you know if he ever did that?

25   A.    I do, yes.

1    Q.    And did he?

2    A.    He did.

3    Q.    Okay.  Without the passcodes and your Facebook, would you

4    have any way to be able to contact anybody on the outside?

5    A.    No.

6    Q.    And other than your sister, had you ever given Michael

7    Schneider any permission to disclose your passcodes either to

8    your Facebook or to your iPhone to anybody else?

9    A.    No.

03:29 10    Q.    Do you have a memory of participating in a proffer session

11    with the government?

12    A.    I do.  And I'd just like to add to add too --

13    Q.    Yes?

14    A.    -- I can produce proof that I do have the iPhone 6 Plus,

15    if the Court needs to know that too.

16    Q.    Okay.  And is that because -- who is the cellular provider

17    for the iPhone 6?

18    A.    AT&T.

19    Q.    And is that phone still active?

03:29 20    A.    The service is not active but the phone functions.

21    Q.    Do you have a memory of participating in a proffer session

22    with the government on July 15, 2015?

23    A.    Yes.

24    Q.    Do you have an understanding today of what a proffer

25    session is?

1    A.    Yes.

2    Q.    What is your understanding today?

3    A.    To be blunt, it's snitching.

4    Q.    Where did you get that information from?

5    A.    *Busted by the Feds*.

6    Q.    Did you read *Busted By the Feds* as of July 15, 2015?

7    A.    No.

8    Q.    What was your understanding of what a proffer session was

9    as of July 15, 2015?

03:30 10    A.    I was agreeing to return my firearms because I'm a

11    licensed -- well, at the time I had a valid concealed carry

12    license in Pennsylvania, and I had purchased X-amount of

13    firearms.

14    Q.    Going back to the interview that you had with the agents

15    on June 18, 2015, do you recall any statements by them asking

16    you to help them get your guns off the street?

17    A.    Prior to July 15th?

18    Q.    Right.  On the day of your post-arrest interview on June

19    18th.

03:31 20    A.    No, I can't think of it.  No.

21    Q.    Were you of the impression as of July 15th that the agents

22    were interested in finding the location of the guns that you

23    purchased?

24    A.    Yup.

25    Q.    Where did you get that impression from?

1  A.   Michael Schneider.

2  Q.   And so he told you that the purpose of the proffer was

3  what, just to reiterate?

4  A.   To return my firearms so I don't get superseded to

5  trafficking guns and straw purchasing firearms.

6  Q.   Did you have any hopes back on July 15, 2015, that you

7  could be released from custody if you did that?

8  A.   To my understanding, he had told me prior to that that you

9  can only go for bail one time, and he omitted the appeal

03:32 10  process and change of circumstance.  So I believed that if I

11  did return my guns, or the opportunity to do that, then, yeah,

12  I would be out, at least for the purpose of doing that anyway.

13  Q.   Did you have any communications with Attorney Schneider

14  prior to the proffer about the providing of names of other

15  individuals or, in other words, you're not snitching?

16  A.   Yes and no.  Essentially, he knew from the first day I met

17  him, and agents can probably confirm, that I wanted nothing to

18  do with cooperation in terms of telling on nobody or nothing

19  like that.

03:32 20  Q.   Did you make it clear to Attorney Schneider at the

21  beginning you didn't want to tell on anybody?

22  A.   Very clear.  As a matter of fact, he told me that he read

23  a couple of books by Alexandra Natapoff entitled *Snitching*, as

24  well as Michelle Alexander, *The New Jim Crow*.  He said that

25  he's active in the black community, or something of that

1   nature, that it's not good, XYZ.  So he knew very well where I

2   stood with that.

3   Q.   What impression were you left with by him telling you

4   about these books that he read?

5   A.   I felt I could trust him.  I thought he understood where I

6   was coming from and he wouldn't sell me out.

7   Q.   When you --

8        MR. SPENCER:  One moment, your Honor.

9        (Pause.)

03:33 10   Q.   Prior to the proffer, did Mr. Schneider explain to you

11   what to expect during the proffer, any questions?  I'm sorry.

12   You have to answer the question.  Truthfully, please.

13   A.   Repeat that?

14   Q.   Prior to the proffer, were you explained by Attorney

15   Schneider of any expectations during the proffer?

16   A.   (No verbal response.)

17   Q.   What did he tell you was going to happen during the

18   proffer?

19   A.   At that day?

03:34 20   Q.   Yeah.  When was the first time that you and Mr. Schneider

21   had a discussion about doing a proffer session?

22   A.   He approached me I think at one of my bail hearings, the

23   second one, or one of the hearings.

24   Q.   What did he say?

25   A.   He said the prosecutor wanted me to come in and talk to

```
 1   the prosecutor or something like that, the ASU [sic] or
 2   whatever.
 3   Q.   Did he say about what?
 4   A.   No, he didn't specify.
 5   Q.   What did you say in response?
 6   A.   No.
 7   Q.   But you ended up talking with the prosecutor?
 8   A.   That's right.
 9   Q.   What changed between that day and the day of the proffer,
10   July 15th?
11   A.   He said I'm going to get superseded for firearm
12   trafficking and (a)(6), and I'd be getting like 20 years or
13   something on top of the five or ten I was facing already.
14   Q.   Were you scared at that point in time?
15   A.   I wouldn't say scared, but I didn't want to do 30-whatever
16   type of years for something I didn't do.
17   Q.   Did that influence your decision at all to go in to the
18   proffer?
19   A.   Absolutely.
20   Q.   Was there any other reason that you went in to the proffer
21   other than that statement that Michael Schneider told you?
22   A.   Not at all.  I believed I couldn't even get out of jail.
23   I didn't even know that the whole bail process or the Bail
24   Reform Act, how it works, or that he knew that I had no
25   detainer in the state.
```

1   Q.   On the day of the proffer -- when was the first time you

2   actually -- did you sign a proffer agreement?

3   A.   Yeah.

4   Q.   When was the first day you saw it?

5   A.   The day of the proffer.

6   Q.   Was that proffer agreement mailed down to you at Wyatt at

7   any point in time so you had a chance to review it before you

8   went in to the proffer?

9   A.   Not at all.

03:36 10   Q.   Do you have a recollection of Michael Schneider sitting

11   down with you and explaining the proffer?

12   A.   No.  He had only come to Wyatt one time, and the time he

13   did --

14   Q.   Actually, it would be better if you answer my question.

15   On the day of the proffer, do you have any recollection of --

16   you said the first day you saw the proffer agreement was on the

17   day of the proffer, right?

18   A.   Yes.

19   Q.   Do you have a recollection of Michael Schneider going over

03:36 20   that proffer agreement with you?

21   A.   No.

22   Q.   Do you have any recollection of AUSA Glenn MacKinlay going

23   over that proffer agreement with you during the proffer

24   session?

25   A.   I don't.

```
 1    Q.   Are you disputing that he did that, though?

 2    A.   I'm not.

 3    Q.   Why are you not disputing it?

 4    A.   Because it's possible that he could have mentioned it or

 5    spoke about it, but I just don't recall exactly what he

 6    discussed.  I was probably just kind of anxious.

 7    Q.   Did you sign that agreement?

 8    A.   I did.

 9    Q.   Did you have a chance to really review it and go over it

03:37 10    with your lawyer before you signed it?

11    A.   No.

12    Q.   Did you have any discussions with Attorney Schneider prior

13    to the proffer about the location of your weapons that the

14    government was looking to ascertain?

15    A.   Yup.

16    Q.   You did?

17    A.   Yeah.

18    Q.   Do you recall actually stating to the government where

19    these guns were located?

03:37 20    A.   What do you mean, when I spoke with Michael or --

21    Q.   What I'm trying to get at is that you gave a statement at

22    the proffer about -- to the government about where your guns

23    were located, right?

24    A.   Uh-huh.

25    Q.   Yes or no?
```

1       Did you give some information about a person named Rahd or

2   Rob?

3   A.    Yeah.

4   Q.    Okay.  Did you have that communication with Michael

5   Schneider prior to you walking in that day for the proffer?

6   A.    Yup.

7   Q.    So would it be fair to say that Michael Schneider told you

8   that the government wanted to know where those guns were

9   located?

03:38 10  A.    Yes.

11  Q.    And after you -- did you relay to Michael Schneider the

12  same information that you relayed to the government?

13  A.    I'm a little confused.  What's that?

14  Q.    Well, you had a discussion with Michael Schneider about

15  what the government wanted to know.

16  A.    Yeah.

17  Q.    Did you have a communication with Michael Schneider about

18  the information you provided to the government?

19  A.    I don't think do.  Not in-depth.

03:39 20  Q.    Well, did you speak about this Rahd person?

21  A.    To Schneider?

22  Q.    Yes.

23  A.    Honestly, I'm not 100 percent sure.

24  Q.    Okay.  I mean, would it be fair to say that the morning of

25  the proffer was the first day that you and him had a chance to

1    speak about what was going to take place at the proffer?

2    A.    That's correct.

3    Q.    All right.  What do you remember that happened during the

4    proffer?

5    A.    They asked me who went down to Pennsylvania with me in

6    January, February and March.

7    Q.    Okay.  And were you aware at the time that there was

8    allegations that you had purchased weapons from a gentleman

9    named Will Roberts?

03:40 10   A.    Yes.

11   Q.    That there was an allegation?

12   A.    Yup.

13   Q.    And that this allegation spanned over the course of

14   months, from January to March?

15   A.    Yup.

16   Q.    Okay.  And then when they asked you -- well, first of all,

17   when you first got in to the proffer, did you see anybody you

18   didn't recognize?

19   A.    I mean, I technically recognized all of them, but have I

03:40 20   not seen before?

21   Q.    Yes.

22   A.    Yes.

23   Q.    Who?

24   A.    I don't know who he is but --

25   Q.    Was it a black officer?

    1   A.   Yes.

    2   Q.   And if I told you his name was Officer Greg Brown, would

    3   that name sound right or you can't remember?

    4   A.   I believe that's true, yes.

    5   Q.   Did you know him?

    6   A.   No.

    7   Q.   Did he ask you any questions during the proffer?

    8   A.   He did.

    9   Q.   What did he ask you?

03:40 10  A.   He asked me if I sold or gave a firearm to an individual

   11   named Emanuel.

   12   Q.   Named who?

   13   A.   Emanuel.

   14   Q.   Emanuel?

   15   A.   Yeah.

   16   Q.   Were you expecting that question?

   17   A.   No.

   18   Q.   And why is that?

   19   A.   I don't know how he would know who that is or what the

03:41 20  purpose of that question was.

   21   Q.   Why -- I mean, based upon your understanding that you were

   22   just providing information about your guns, the location of

   23   your guns, did that question -- did you understand that

   24   question --

   25   A.   Yeah, that was a red flag.

```
 1    Q.   Did you respond to him?

 2    A.   Yes.

 3    Q.   What did you tell him?

 4    A.   I told him that I didn't give or sell a gun to Emanuel and

 5    I don't know how he ended up with a gun.

 6    Q.   Now, you stated that other agents were asking you

 7    questions about the identity of the person you went to

 8    Pennsylvania with?

 9    A.   That's right.

10    Q.   Do you remember which agent asked you that question?

11    A.   I don't know specifically which agent.

12    Q.   And when that question was asked of you, what was the next

13    thing -- what immediately went through your mind?

14    A.   Why am I being asked about people when I specifically

15    stated I don't want nothing to do with that?

16    Q.   And as a result of that question being asked of you, did

17    you -- what did you do?

18    A.   I turned to my attorney and I asked him, "What's going on?

19    What's all this about?"

20    Q.   And what did he say, if anything?

21    A.   I believe we had a break at that moment, and we discussed

22    the fact that the individual --

23    Q.   There was a break.  Did you remain in the room?

24    A.   Yes.

25    Q.   The agents left?
```

1    A.    I believe so, yes.

2    Q.    You were by yourself?

3    A.    Yes.

4    Q.    Tell the Court what you said and what Attorney Michael

5    Schneider said.

6    A.    Well, verbatim, long story short, there was a dispute

7    whether the individual who had went with me in March was a Sean

8    character, something like that.  And I told him that that

9    wasn't who they're claiming it was.

03:43 10   Q.    Okay.  Let's back up.

11   A.    Yeah.

12   Q.    Had you known information at that point in time that there

13   was a person that Will Roberts identified as Sean that was with

14   you?

15   A.    Yes, I believe so.

16   Q.    And was there any discussion between you and Michael

17   Schneider about whether or not that person Sean was properly

18   identified?

19   A.    No, I don't believe so.

03:43 20   Q.    Okay.  So I'm sorry to cut you off.  Please continue with

21   the discussion.

22   A.    Nonetheless, Schneider wanted to know who that individual

23   was, and I told him it was a friend of mine and that the

24   individual would more or less incriminate me.  I don't want him

25   approached, questioned or charged, anything of that nature.

```
 1   Q.   And what did Attorney Schneider say in response?

 2   A.   He assured me that if that individual -- in fact, I

 3   exonerated him, I stated he didn't have nothing to do with

 4   nothing, that he wouldn't be questioned or approached or

 5   charged.

 6   Q.   Did you rely upon that statement?

 7   A.   100 percent, yes.

 8   Q.   At any point in time during your discussions in this

 9   closed session, did Michael Schneider speak about the

10   derivative use doctrine?

11   A.   He did not.  But I had specifically told him that the

12   individual can and will incriminate me, that he was kind of,

13   you know --

14   Q.   Do you recall using the word "idiot"?

15   A.   Yes.

16   Q.   What did you specifically say about this person?

17   A.   I said he's, you know, a pothead and he's not hip and he's

18   an idiot and he's going to incriminate me if they approached

19   him.

20   Q.   Did you have any reason to believe that if this name was

21   given, that the government would thereafter reach out to him?

22   A.   Not after my attorney, who I trusted, assured me that he

23   wouldn't.

24   Q.   Was there any further discussions that you can remember

25   about this gentleman at the time during this meeting?
```

```
 1  A.   No, I don't recall.

 2  Q.   Okay.  Do you recall specifically that the passcode was

 3  asked for during the meeting, meaning the proffer session?

 4  A.   That's right.

 5  Q.   And who was asked for the passcode, you or your lawyer?

 6  A.   I was.

 7  Q.   And did you respond or did Attorney Schneider respond?

 8  A.   We both did, but I responded first.

 9  Q.   What did you say?

03:45 10  A.   I said "no."

11  Q.   And what did Attorney Schneider say?

12  A.   He felt that that was intrusive and he didn't think that I

13  should give up that passcode.

14  Q.   Did you ask to get his advice first before you said no?

15  A.   No.

16  Q.   After that proffer session, did you hear Michael Schneider

17  mention this passcode issue to you again?

18  A.   No.

19  Q.   In the year 2015, he never brought it up?

03:46 20  A.   No.

21  Q.   Did you hear him testify, stated that he went down to

22  Wyatt on August 7, 2015?

23  A.   Yes.

24  Q.   Did he actually go down to Wyatt?

25  A.   He did.
```

1    Q.   Do you recall the substance of that conversation?

2    A.   For the most part, I was upset why I was being questioned

3    about people, and he advised me he was going to give me

4    brotherly advice, like he claimed.  And that was kind of how it

5    ended.  There was no discussion about my cell phone.  He knew

6    where I stood with that.

7    Q.   At any point in time after that August 7, 2015, Wyatt

8    visit, did it come to your attention that your cell phone had

9    been searched?

03:47 10   A.   It came to my understanding individuals in my cell phone

11   that were not named in the indictment or they wouldn't have

12   been known to the government had been mentioned or -- yes.

13   Q.   I'm sorry.  Could you say that again?

14   A.   It came to my understanding that people that were in my

15   phone, like people that I knew that had nothing to do with the

16   situation, was mentioned, or photos of them were shown or

17   something of that nature.

18   Q.   How was that brought to your attention?

19   A.   I spoke to a friend of mine on the phone.

03:47 20   Q.   And as a result of hearing that information, what, if

21   anything, did you do?

22   A.   I instructed him to call my attorney, and I called my

23   attorney as well.

24   Q.   Would that be in 2015 or 2016?

25   A.   September 2015.

```
 1   Q.   Who was the person that called?

 2   A.   That called the attorney?

 3   Q.   Yes.

 4   A.   My friend Kenny.

 5   Q.   Kenny Brobby?

 6   A.   That's right.

 7   Q.   And then when you spoke to Michael Schneider about

 8   the -- and was this as a result of you learning that the agents

 9   had approached Kenny Brobby?

10   A.   That's right.

11   Q.   Did you talk to Michael Schneider about this?

12   A.   Absolutely.

13   Q.   And what did he say?

14   A.   Well, he said he wasn't concerned with one of the -- there

15   was a reference to human trafficking or something like that, so

16   he said he wasn't concerned with that charge.  And then he said

17   he didn't know why Kenny was approached, that the government

18   was just fishing, and he didn't know how or if they even got

19   into the phone.

20   Q.   Was there a concern at that point in time that they had

21   gotten into the phone?

22   A.   Yes.

23   Q.   Did Michael Schneider mention to you at that point in time

24   that there was a search warrant that the government had to go

25   into your phone?
```

1    A.    No.

2    Q.    At any point in time after that September 2015 phone call,

3    between the end of the -- then and the end of the year, was

4    there any further discussions about your iPhone?

5    A.    I believe so.

6    Q.    What's your memory of the discussions?

7    A.    Well, I believe San Bernardino had happened not too long

8    before that -- I mean, towards the end of that year, and I had

9    mentioned that I, too, had an iPhone and I don't know how they

03:49 10   got into my phone because Apple's not cooperating with the

11   government, so...

12   Q.    Did you believe that the government had actually entered

13   your phone as of that date when you learned about the

14   San Bernardino incident?

15   A.    Yes.

16   Q.    Did Michael Schneider confirm or deny that concern of

17   yours at that point in time?

18   A.    He didn't confirm or deny it, no.

19   Q.    I want to draw your attention to now around March of 2016.

03:50 20        MR. SPENCER:  May I have one moment, your Honor?

21        (Pause.)

22   BY MR. SPENCER:

23   Q.    I want to show you Exhibit 10.  Do you see that exhibit?

24   A.    Yes.

25   Q.    This was never mailed to you, was it?

1    A.    No.

2    Q.    All right.  And did you have a chance to review this after

3    Attorney Schneider produced this file?

4    A.    I have.

5    Q.    All right.  And directing your attention to page 2 -- but

6    first, you see it says, "Client interview, March 8, 2016"?

7    A.    Yes.

8    Q.    All right.  And do you dispute that Michael Schneider came

9    to see you that day?

03:50 10   A.    No.

11   Q.    Directing your attention to page 2, do you see the

12   comments, "M.D. had questions about how government obtained the

13   cell phone records and the GPS data"?

14   A.    I see it.

15   Q.    All right.  And do you have a memory now after reading

16   that of any concerns that you voiced to Michael Schneider about

17   how the government obtained any GPS data from your phone?

18   A.    Yes.

19   Q.    Tell the Court what you remember about it.

03:51 20   A.    I told Michael -- like I said, I refreshed -- I reiterated

21   the fact that the government couldn't have got into my phone

22   because Apple wasn't cooperating and I believed that we got a

23   good motion to suppress because I had an iPhone 6 Plus at the

24   time.  And when the government filed their -- tried to get into

25   my phone or whatever, a 2703(d) order or whatever he was

 1    referring to, they should have known that I had a 6 Plus

 2    upgrade, so that was the wrong phone that they went after.

 3    Q.    That's what you told Michael Schneider?

 4    A.    That's right.

 5    Q.    Did Michael Schneider respond to you at any point in time

 6    in March stating that he provided the passcode over to the

 7    government?

 8    A.    No.

 9    Q.    Showing you Exhibit 11, this is a letter that was sent to

03:52 10   you on March 10, 2016.  Can you confirm that?

11    A.    Yes.

12    Q.    And do you see a statement from Michael Schneider saying,

13    "As you know"?

14    A.    Yes.

15    Q.    Can you read that into the record?

16    A.    "As you know, the government also obtained a search

17    warrant without our consent to get phone information off your

18    cell phone that they seized when they arrested you."

19    Q.    Okay.  So you were aware at that point in time there was a

03:53 20   search warrant?

21    A.    Yes.

22    Q.    Do you know why he specifically stated to you "without our

23    consent"?

24    A.    Well, I'm assuming he knew I didn't consent, so...

25    Q.    And obviously, by reading that, he wasn't disclosing to

1    you that you consented at that point in time, right?

2    A.    Of course not, no.

3    Q.    Showing you Exhibit 7, is this a letter dated April 18,

4    2016, that was sent to you from Attorney Schneider?

5    A.    Yes.

6    Q.    And do you see language at the bottom of that letter,

7    "Items seized from your backpack at the time of your arrest and

8    materials related to the search of all cellular phones"?

9    A.    Yes.

03:54 10   Q.    And do you recall -- drawing you to Exhibit 8, did you

11   have any phone conversation with Michael Schneider?

12   A.    Yes.

13   Q.    And would that have been around April 20th of 2016?

14   A.    Yes.

15   Q.    And did you have any questions based upon the April 18th

16   letter that you got?

17   A.    Yes.

18   Q.    What were your questions?

19   A.    If they got that information from my cell phone as well as

03:54 20   the GPS records, so basically if they got into my phone.

21   Q.    At any point in time during that phone

22   conversation -- just for the record, was there another person

23   on the phone during the conference call?

24   A.    Yes.

25   Q.    Who was it?

```
 1   A.   His partner, Phil Cormier.

 2   Q.   Okay.  At any point in time during that conversation did

 3   Michael Schneider tell you that you had given consent for him

 4   to provide the passcode?

 5   A.   No.

 6   Q.   At any point in time during that conversation did he just

 7   admit that he provided the passcode?

 8   A.   No.

 9   Q.   Showing you Exhibit 13, is that your handwriting?

10   A.   Yes.

11   Q.   Do you recall sending this letter, at least a portion of

12   it, to Michael Schneider?

13   A.   Yes.

14   Q.   And was there a previous correspondence that he sent to

15   you referencing 922(n) cases that he sent you?

16   A.   There was.

17   Q.   All right.  And then did you also specifically ask him on

18   this date how your iPhone was accessed?

19   A.   Yes.  And that's his signature up there too.

20   Q.   Whose signature?

21   A.   Michael's.

22   Q.   Would that be just below his printed name?

23   A.   That's right.

24   Q.   And did you also talk to him about San Bernardino,

25   California?
```

```
 1    A.    Correct.

 2    Q.    What were you trying to convey to him in this

 3    correspondence?

 4    A.    That the government -- Apple wasn't cooperating with the

 5    government so there was pretty much no other way they could

 6    have got into my phone, or I don't know how they would have got

 7    into my phone.

 8    Q.    Is that why you were asking the questions?

 9    A.    Yes.

10    Q.    Was he able to answer you at this point?

11    A.    He didn't.

12    Q.    Showing you Exhibit 14, is that a letter dated May 4,

13    2016?

14    A.    Yes.

15    Q.    Was that sent to you?

16    A.    Yes.

17    Q.    Now, we've gone over previous questions that you had of

18    Mr. Schneider about trying to fill you in on how the government

19    got into the phone, correct?

20    A.    Yes.

21    Q.    And so this date of May 4th, did he tell you more

22    information about what was going on?

23    A.    It appears that he's trying to tell me -- or convey to me

24    that the government used an encryption company of some sort to

25    get into my phone.
```

1    Q.    Right.  But do you see the first statement about AUSA

2    MacKinlay?

3    A.    Yes.

4    Q.    And do you see the second statement about "the prosecutor

5    had asked for consent to search the iPhone"?

6    A.    Yes.

7    Q.    Okay.  And you -- and do you see him stating that

8    "Mr. MacKinlay told you that he got the warrant.  He did not

9    need our consent"?

03:58 10    A.    That's right.  And that we did not consent either.  We did

11    not do so.

12    Q.    I'm sorry?

13    A.    Yeah, I think it said when we did not do so, we didn't

14    consent, that he got a warrant, right?

15    Q.    Right.  Actually, is there a statement that says "when we

16    did not do so"?

17    A.    That's right.

18    Q.    So as of May 4, 2016, is Michael Schneider telling you

19    that there was no consent given for the search of your cell

03:58 20    phone?

21    A.    Correct.

22    Q.    Showing you Exhibit 2, prior to -- had this ever been

23    mailed to you by Michael Schneider?

24    A.    No.

25    Q.    Drawing your attention to -- just so we're clear, you see

1    how it mentions May 12, 2016, Wyatt interview to see you?

2    A.    Yes.

3    Q.    And do you see that second paragraph that's not redacted?

4    A.    Yes.

5    Q.    And could you read into the record, "I reminded Mitchell

6    Daniells"?

7    A.    "I reminded M.D. that he had given me several possible

8    passcodes for the phone after we had discussions about it and

9    that I was uncertain whether I had provided them or whether

03:59 10    Apple/Cellebrite decrypted the phone.  I told M.D. I thought it

11    was possible I had provided the passcodes but only after G.M.,"

12    Glenn MacKinlay, "had threatened to get Apple to open the phone

13    and provide the contents to them pursuant to the court order."

14    Q.    Was this May 12, 2016, the first time that you heard

15    Michael Schneider admit that he provided the passcodes?

16    A.    Yes.

17    Q.    And at any point in time during this discussion did he

18    convey to you that you provided the consent to do so?

19    A.    No.

03:59 20    Q.    And do you agree with the information that you just read,

21    that that's exactly what happened?

22    A.    Yeah, you see he did.  That's true.

23    Q.    Could you read also into the record starting with "G.M."

24    towards the top of the page?

25    A.    "G.M. sent me an email telling me that they had gotten the

1    search warrant without our consent and that if we did not give

2    them M.D.'s password, they would be serving the order on Apple

3    compelling them to provide the government with the contents of

4    the cell phone."

5    Q.   Did you know who "G.M." was?

6    A.   Glenn MacKinlay, I'd assume.

7    Q.   And did Michael Schneider reference any email that he

8    responded back to Glenn MacKinlay during this exchange he had

9    with you down at Wyatt?

04:00 10   A.   At that moment he did say -- he didn't tell me if he

11   responded or not, but I inquired that I wanted the text message

12   or the email or whatever he had done, so...

13   Q.   Were you upset at this point?

14   A.   Very upset.

15   Q.   At any point in time did Michael Schneider ever tell you

16   that you provided consent to give this passcode over to the

17   government?

18   A.   No.

19   Q.   When you participated in the proffer, did you realize by

04:01 20   not providing the passcode, would be considered as

21   non-cooperation.

22   A.   I mean, however they wanted to take it, I suppose, but...

23   Q.   The question I have is:  Did you not provide the passcode

24   understanding that the government wanted to have it?

25   A.   Yes.

1    Q.   And did you understand that if something was going to

2    happen as a consequence, you were willing to deal with that

3    consequence?

4    A.   That's right.

5    Q.   Were you aware of any consequences as it pertained to

6    the -- as it pertained to the strength of the case that the

7    government had against you -- I'll withdraw that.

8         When you provided the name of Kenny Brobby over to the

9    government, did you have an understanding of any potential

04:02 10   complications or implications that providing that name would

11   have?

12   A.   Potentially if what Schneider said was not true, that they

13   would approach him or question him or charge him, then, yes.

14   But I was under the impression that, no, since I exonerated him

15   of any wrongdoing, he wouldn't be charged, questioned,

16   approached because he would incriminate me.

17            MR. SPENCER:  May I have one moment?

18            (Pause.)

19   Q.   Showing you Exhibit 19, do you see towards the bottom of

04:03 20   this document a date of August 9, 2016?

21   A.   Yes.

22   Q.   Do you have a memory of pretty much around the month of

23   August the status of your relationship between you and Michael

24   Schneider?

25   A.   At that moment I didn't trust anything he said.

1    Q.    Okay.  Do you see a comment here that says "M.D., you told

2    me that prosecution was going to charge with trafficking.  I

3    feel that you coerced me"?

4    A.    Yeah.

5    Q.    Do you recall making that statement on or around August of

6    2016 to Michael Schneider?

7    A.    Yes.

8    Q.    Can you explain to the Court the circumstances behind that

9    statement?

04:04 10  A.    Well, he had come to visit me the day prior, I believe,

11   and we had discussions.  And I essentially caught him in a lie.

12   Q.    What lie is that?

13   A.    Well, I asked him outright if he represents cooperators,

14   and he said he doesn't and he never has and he never does.

15   Q.    When did he tell you that?

16   A.    That was the day he came to visit me August 8, 2016.

17   Q.    Okay.  But I want you to talk about why did you feel that

18   he coerced you?  And coerced you in respect to what?  What were

19   you making reference to?  Coerced you into doing what?

04:05 20  A.    To speak with the government.

21   Q.    During the proffer session?

22   A.    That's right.

23   Q.    Why did you feel he coerced you?

24   A.    Because he knew my stance about cooperation of any kind.

25   And had I known what a proffer was -- I'm a layman, you know.

1    So had I known what that was or I had read what the paperwork

2    said it was, I definitely would have had no parts with that,

3    and he knew it.

4    Q.   So what did he tell you in order to influence you to do

5    something that you normally wouldn't do?

6    A.   Well, he said I'm going to get superseded in trafficking

7    and straw purchasing, and anything that was stated can't be

8    used against me at trial.  And I think that kind of sums it up.

9    I'm sure there's probably a little more to that too but I don't

04:05 10    know.

11    Q.   Did he ever -- when he told you that you were going to be

12    superseded for trafficking, did he ever explain to you the

13    evidence that the government had against you at that point in

14    time?

15    A.   No.

16    Q.   And when I say "that point in time," meaning before you

17    went in to the proffer.

18    A.   No, he did not.  But based on our prior conversations, and

19    I had trusted him, I felt like he wouldn't be lying about that.

04:06 20    Q.   So when he told you that you were going to be superseded

21    for trafficking, you didn't question his comments?

22    A.   I assumed he was telling the truth.

23            MR. SPENCER:  Thank you, Judge.  I have nothing

24    further.

25            THE COURT:  Go ahead.

```
 1                          CROSS-EXAMINATION
 2   BY MR. MacKINLAY:
 3   Q.   During the proffer, you said that the bag of guns that you
 4   brought up to sell to Rob were essentially stolen from you.
 5   You didn't get paid for them, right?
 6   A.   I feel that's a trial issue and I'll be moving to suppress
 7   all statements of the proffer; therefore, I'd like to invoke
 8   the Fifth Amendment on that.
 9           MR. SPENCER:  I'd like to make an offer of proof.
10           I think that there's evidence in the record as to
11   specifically what Mr. Daniells, according to the agents,
12   stated.  I'm not sure why he needs to confirm whether or not he
13   actually stated -- made that statement.  So I would object on
14   that basis.
15           THE COURT:  The objection is sustained.
16           MR. MacKINLAY:  May I be heard briefly on the scope of
17   it, your Honor?
18           THE COURT:  Go ahead.
19           MR. MacKINLAY:  The argument goes like this:  If he's
20   lying about that aspect of the proffer, he can also be lying
21   about the aspects of the proffer in which he indicates he's
22   relying upon counsel's advice to give or not give the name
23   Kenny Brobby up.  I would suggest it's well within the scope of
24   it, your Honor.
25           THE COURT:  All right.  The objection is sustained.
```

1    BY MR. MacKINLAY:

2    Q.   Did you tell the truth in the proffer?

3         MR. SPENCER:  Objection.

4         THE COURT:  Sustained as formulated.

5    BY MR. MacKINLAY:

6    Q.   Did you provide statements to the ATF during the course of

7    the proffer?

8    A.   Yes.

9    Q.   Were those consistent with statements that you provided

04:09 10   before?

11        MR. SPENCER:  Objection to the form of that question.

12        THE COURT:  Sustained.

13   BY MR. MacKINLAY:

14   Q.   Had you provided different -- another -- different

15   accounts of what occurred in this proffer on prior occasions?

16   A.   Can you repeat that?

17   Q.   Sure.  Did you provide statements about what occurred in

18   the proffer on prior occasions?

19   A.   Can I look at the proffer statements real quick?

04:09 20   Q.   I'm sorry.  I didn't hear --

21   A.   Can I look at those statements real quick so I can jog my

22   memory?

23   Q.   Sir, your memory's exhausted as to whether or not you gave

24   other statements that were also involved at the proffer?

25   A.   That's a trial issue and I'm going to invoke --

1          MR. SPENCER:  Do you remember the questions?

2          THE WITNESS:  Do I remember the questions?

3          MR. SPENCER:  Ask him.

4    BY MR. MacKINLAY:

5    Q.   Did you give a statement after your arrest that you talked

6    about with counsel?

7          (Pause.)

8    A.   What's that got to do with Kenny Brobby and the passcode?

9    Q.   Unfortunately, I get to ask the questions and the Judge

04:10 10   decides what's appropriate, sir.  If you have an answer to the

11   question, sir --

12   A.   I plead the Fifth, sir.  I plead the Fifth.

13   Q.   Did you provide an account of topics in the proffer on a

14   prior recorded statement with Will Roberts?

15   A.   I'm going to be moving to suppress all statements from the

16   proffer, and I would like to invoke the Fifth Amendment on that

17   issue.

18         MR. SPENCER:  I would just submit that that's

19   definitely outside the scope of direct in the sense that I

04:11 20   never asked him about any recorded statements that he made to

21   Mr. Will Roberts outside the proffer.

22         THE COURT:  I'm not sure what the question is getting

23   at myself.

24         MR. MacKINLAY:  The question is --

25         THE COURT:  I thought the question originally was just

1   a setup to say, "Did you previously give a statement," like the

2   post-arrest statement.  I thought you were just laying that as

3   a predicate.

4        MR. MacKINLAY:  I am, but I didn't get a response to

5   that, your Honor.

6        THE COURT:  I don't think the witnesses understood the

7   question.

8   BY MR. MacKINLAY:

9   Q.   Did you give a post-arrest statement that was recorded for

04:11 10   the agents at Framingham P.D. the day you were arrested?

11   A.   Yes.

12   Q.   In that statement, did you give an account of what

13   occurred with the firearms that you had purchased in

14   Pennsylvania?

15   A.   My firearms that I purchased?

16   Q.   Your firearms.

17   A.   It's possible, yes.

18   Q.   Would listening to an excerpt of the statement help you

19   with that, remembering whether or not you gave that statement?

04:12 20   A.   If I gave that statement, I mean, I gave that statement.

21   Q.   How about if you listen to it?

22   A.   I mean, if it doesn't pertain to the passcode or Kenny

23   Brobby, I'm going to the plead the Fifth, so I don't know what

24   you want me to...

25   Q.   Did you get a *Miranda* waiver form that you signed before

     1   that statement?  Yes or no, sir?

     2   A.   (No verbal response.)

     3   Q.   You have to answer the question if you can, sir.

     4   A.   (No verbal response.)

     5   Q.   Did you sign a waiver form?

     6   A.   Yup.

     7   Q.   You gave a recorded statement.  Is that correct?

     8   A.   Yup.

     9   Q.   Would you recognize your voice on the recorded statement?

04:13 10  A.   I believe so.

    11   Q.   I'm going to play you --

    12   A.   I'm going to plead the Fifth if this doesn't pertain to

    13   Kenny Brobby.

    14              MR. SPENCER:  Just wait, sir.

    15              THE WITNESS:  Okay.  Sorry.

    16              (Audio recording played.)

    17   Q.   Did you hear the recording?

    18   A.   Yes.

    19   Q.   Do you recognize that as being an excerpt from the

04:14 20  recorded statement that you gave to the Framingham Police

    21   Department?

    22   A.   To the Alcohol -- Bureau of Tobacco, Firearms, yeah, not

    23   to the Framingham P.D.

    24              (Audio recording played.)

    25   Q.   Is that Agent Oppedisano questioning you at that

1   particular time?

2   A.   I don't know who that is.

3         MR. MacKINLAY:  May I approach the witness, your

4   Honor?

5   Q.   I'm handing you what purports to be a draft outline, a

6   transcript.  See if you can follow along and see if the words

7   are accurate with what you hear on the recording.

8         MR. SPENCER:  Can I have a copy?

9         (Pause.)

04:15 10        (Audio recording played.)

11   BY MR. MacKINLAY:

12   Q.   Do you recognize your voice in there as the line marked

13   "Daniells"?

14   A.   Do I recognize my voice?

15   Q.   Yes.

16   A.   Yeah.

17   Q.   Yes or no, sir?

18   A.   Yup.

19         (Audio recording played.)

04:16 20   Q.   Were you able to follow along on the transcript with the

21   words that you heard on the recording?

22   A.   Yes.

23   Q.   You gave an account of where your guns were to the agents

24   after your arrest, correct?

25   A.   Yes.

1    Q.   That account is different than the account you gave during

2    the proffer, is it not?

3    A.   I plead the Fifth.

4         MR. SPENCER:  I don't see why -- if it's in evidence,

5    it's in evidence.  Why does he need to confirm it was

6    different?  I mean, the point is made, I would submit, meaning

7    if there's evidence indicating -- he identified his voice here

8    and he gives a statement saying one thing and the agent

9    testified that something different was stated, then it's in

04:17 10   evidence.  The Court can --

11        THE COURT:  Well, I think I've already ruled this out;

12   in other words, general impeachment of inconsistencies between

13   statements is too broad.  We're going to focus on the

14   statements that are most at issue on these two motions which

15   relate to the identification of Brobby and to the delivery of

16   the passcodes.  Other inconsistencies are beyond the proffer

17   scope.

18        MR. SPENCER:  Thank you, your Honor.

19   BY MR. MacKINLAY:

04:18 20   Q.   You remember being at the proffer?

21   A.   Yes.

22   Q.   You're telling this judge that you didn't want to come to

23   the proffer?

24   A.   Under the circumstances that I had believed was the

25   proffer, those were my intentions.  But what it actually was, I

1   had no intention of.

2   Q.   Mr. Daniells, you wanted to come to the proffer in hopes

3   of getting out, correct?

4   A.   Nope.

5   Q.   Wasn't it your motivation to come to the proffer to get

6   out and help get guns back off the street that way?

7   A.   No; my intent was not to be superseded for firearm

8   trafficking and straw purchasing.

9   Q.   Sorry.  So you were looking to limit your exposure by

04:19 10  coming to the proffer, correct?

11   A.   Correct.

12   Q.   So at the time that you -- you talked a little bit about

13   the proffer letter.  This is a copy of it.  You did have a

14   chance at the proffer itself to read it, right?

15   A.   I don't recall.

16   Q.   Well, let me refresh your memory.  There was a meeting

17   beforehand, before anybody came in the room, between yourself

18   and Mr. Schneider.  Isn't that right?

19   A.   That's right.

04:20 20  Q.   Before anything started, correct?

21   A.   That's right.

22   Q.   And he had a piece of paper in his hand that looked a lot

23   like this one.  Isn't that right?

24   A.   Not true.

25   Q.   He never had the proffer letter in his hand at that time?

1    A.    Correct.  He did not.

2    Q.    So your testimony is that you didn't see the proffer

3    letter until I came into the room with the agents?

4    A.    That's right.

5    Q.    Did you have an opportunity at that time to go through it?

6    A.    I don't recall.

7    Q.    Well, I went through it with you.  Do you remember that?

8    A.    So you say, but I don't recall --

9    Q.    If you remember, sir.  Did I go through that during the

04:20 10    course of the proffer in the presence of your lawyer?

11    A.    It's possible but I don't recall.

12    Q.    Well, you had a chance to read it.  You certainly can read

13    and write.  We've seen that repeatedly throughout the course of

14    this hearing.  But the second paragraph -- do you have any

15    trouble understanding the second paragraph?  It starts with

16    "The government may make derivative use."

17           (Pause.)

18    A.    I can read that.

19    Q.    And how about -- it continues on to the second page.  The

04:21 20    top of the second page.  Any trouble understanding that?

21    A.    Yes, somewhat.

22    Q.    So it's clear to you that we intended on using information

23    we received in order to further our interests of getting guns

24    off the street.  That was made clear to you, correct?

25    A.    That was not made clear to me.

```
 1    Q.    Despite the language that's in Paragraph 2 you're saying
 2    that?
 3    A.    I'm not an attorney.  I don't understand that language.
 4    Q.    Again, what part of "may pursue any other investigative
 5    leads suggested by your statements" is unclear to you even
 6    today?
 7    A.    I don't know what the "derivative use" means.
 8    Q.    You're picking and choosing, sir.  I asked you a different
 9    section of the phrase.
10    A.    As I stated, I don't recall reading that at the proffer
11    and I didn't get an opportunity to read that prior.
12    Q.    And as you've described and has been described by your
13    lawyer, you're educated and obviously involved in your defense.
14    So you signed it without even reading it.  Is that what you're
15    telling the Court?
16    A.    That's very possible, yes.
17    Q.    Well, is it yes or is it possible?
18    A.    That's how I feel, yeah, I did not get a chance to read
19    that in its entirety and understand what was written on that,
20    so, yes.
21    Q.    Kenny Brobby.  You said it, right?  You brought up Kenny
22    Brobby's name.  Isn't that right?
23    A.    That's what the statements state.
24    Q.    No, what do you remember happened?  You remember during
25    the proffer?
```

1   A.   I recall, like I stated before, that my attorney had

2   advised me that the individual would not be questioned,

3   approached, accosted.

4   Q.   I don't mean to cut you off here.  That wasn't my

5   question.  My question was:  Did you provide the name "Kenny

6   Brobby" or did Schneider?

7   A.   It was elicited from me.

8   Q.   The agent asked you a question and you answered the

9   question, correct?

04:23 10   A.   That's correct.

11   Q.   Now, that name, Kenny Brobby, you described him as being

12   an idiot, right?

13   A.   Yes.

14   Q.   That was your words, right?

15   A.   (No verbal response.)

16   Q.   You have to answer verbally, sir.

17   A.   That's correct.

18   Q.   And the reason that you told -- and you told your lawyer

19   that he was an idiot -- and there was some exchange between the

04:23 20   two of you, according to your account, right?

21   A.   That's right.

22   Q.   Now, you're now saying that because he was an idiot you

23   were afraid he was going to incriminate you.  Is that correct?

24   A.   I'm now saying?

25   Q.   Well, that's what your version of this is, true?

```
 1   A.   That's correct.

 2   Q.   Attorney Schneider says it was because he was an idiot you

 3   weren't worried about him.  Do you dispute that?

 4   A.   Yes.

 5   Q.   So Schneider's wrong about that?

 6   A.   Yes.

 7   Q.   Your exposure -- or your concerns were exposure from

 8   providing a name that would lead to other investigative leads

 9   and other witnesses, right?  That's what we're here for.  You

04:24 10   provided Brobby's name that led to other witnesses, correct?

11   A.   We're here because my attorney gave out the passcode and

12   Brobby incriminated me.

13   Q.   We're talking about Brobby right now.  We're not talking

14   about the passcode.  We'll get to that, okay?

15        You're here with the Brobby motion because you believe

16   that that was disclosed and caused further investigative leads

17   against you, right?

18   A.   Correct.

19   Q.   How did the Rob/Rahd work for you?

04:24 20   A.   I don't know who Rahd is.

21   Q.   Okay.  So --

22   A.   That's not --

23   Q.   You didn't provide the name "Rob" or "Rahd" during the

24   course of the proffer session?

25   A.   That's not Timothy Bailey.
```

```
 1   Q.   Did you provide the name "Rob" or "Rahd" as the person you

 2   were to sell guns to during the proffer session?

 3   A.   I plead the Fifth.

 4        MR. SPENCER:  I object.

 5        THE COURT:  No, I think he can answer that.  You

 6   should answer that question.

 7        THE WITNESS:  But it doesn't pertain to Kenny Brobby

 8   or my passcode at all so...

 9   BY MR. MacKINLAY:

04:25 10   Q.   I'll ask it again.

11        MR. SPENCER:  You're instructed to answer,

12   Mr. Daniells.

13        MR. MacKINLAY:  I'm going to ask it again.

14   BY MR. MacKINLAY:

15   Q.   Did you provide the name "Rob" or "Rahd" during the course

16   of the proffer as the person you were selling the guns to?

17   A.   I plead the Fifth.

18        MR. SPENCER:  May I have one moment with him?

19        THE COURT:  You may.

04:25 20        (Counsel confers with the defendant off the record.)

21        THE WITNESS:  Your Honor, I believe that kind of

22   incriminates me if I state that answer to the question because

23   it contradicts what they're claiming I allegedly said when I

24   was arrested.

25        MR. SPENCER:  I understand that.  That's not in
```

```
 1   evidence.  The judge sustained that.

 2              THE WITNESS:  Okay.

 3              MR. SPENCER:  So just answer the question.

 4              THE WITNESS:  Did I mention the name "Rahd"?

 5              MR. SPENCER:  Yes, that's the question.

 6              THE WITNESS:  Yeah, I mentioned the name "Rahd" or

 7   "Rob."

 8   BY MR. MacKINLAY:

 9   Q.   And you provided it as the name of the person that you

10   were selling the guns to?

11              MR. SPENCER:  I object to that.

12              THE WITNESS:  I plead the Fifth.

13              THE COURT:  No, the objection is overruled.

14              THE WITNESS:  Well --

15              THE COURT:  You may answer the question.

16              THE WITNESS:  I'm not going to incriminate myself.  I

17   feel like I'd like to suppress all of those statements, and it

18   does not pertain to Kenny Brobby or the passcode, your Honor.

19              THE COURT:  The short answer is that this is within

20   the zone of inquiry to which the privilege against

21   self-incrimination does not apply.

22              THE WITNESS:  So?

23              THE COURT:  So there is no privilege to be invoked.

24   You have to answer the question.

25              THE WITNESS:  Can I speak to my attorney real quick?
```

```
  1    I'm not sure what that even means.
  2              THE COURT:  Yeah.
  3              (Counsel confers with the defendant off the record.)
  4              THE WITNESS:  Would you repeat that question?
  5    BY MR. MacKINLAY:
  6    Q.   You provided the name "Rahd" or "Rob," confirming that you
  7    gave that name in the proffer.  Is that the name of the person
  8    that you sold -- were to sell the guns to?
  9              MR. SPENCER:  No, that wasn't the question.
 10              THE COURT:  Sustained.  The objection is sustained.
 11    BY MR. MacKINLAY:
 12    Q.   What was the context of providing the "Rob/Rahd" name?
 13              (Pause.)
 14    A.   I don't recall.
 15    Q.   If I suggested to you that you provided the name to the
 16    agents in the context of describing what you were doing with
 17    the firearms, would that refresh your recollection?
 18    A.   No.
 19    Q.   Did you provide further discussion with the names of other
 20    witnesses besides Brobby and Rob or Rahd?
 21              MR. SPENCER:  Objection.
 22              THE COURT:  Well, the question isn't quite clear.
 23    Would you try it again?
 24              MR. MacKINLAY:  Sure.
 25    BY MR. MacKINLAY:
```

04:29 (line 10)
04:30 (line 20)

```
 1   Q.   Did you provide any other names to the agents besides

 2   Brobby and Rob/Rahd?

 3          MR. SPENCER:  Objection.

 4          THE COURT:  Overruled.

 5          You may answer that.  You are to answer that.

 6          THE WITNESS:  I don't recall that either, no.

 7   BY MR. MacKINLAY:

 8   Q.   Did your lawyer advise you not to provide any other names?

 9          (Pause.)

04:31 10   A.   I don't know if you could say he advised me opposed to --

11   I told him I don't want to provide any names, so I don't know

12   how to --

13   Q.   Correct me if I'm wrong, but didn't you testify on direct

14   examination that Schneider told you it was okay to give the

15   name of Brobby, right?

16   A.   Other than that one, yes.

17   Q.   So he gave you advice to give Brobby's name?

18   A.   He did, yes.

19   Q.   My follow-up question is:  Did he give advice to give any

04:32 20   other names, like Rob/Rahd?

21   A.   No.

22   Q.   You mentioned moments ago that you had a conversation with

23   Kenny Brobby when you were in Wyatt?

24   A.   Yes.

25   Q.   About when was that?
```

```
 1   A.    It was early September 2015.

 2   Q.    And who called who -- and you called him and spoke to him?

 3   A.    Yes.

 4   Q.    And that's a recorded call.  Is that correct?

 5   A.    I believe so.

 6   Q.    What was the conversation with Kenny Brobby about?

 7   A.    It initially started just checking up on him and to see if

 8   he was going to send me some money for the commissary and

 9   stuff.

10   Q.    The canteen account?

11   A.    Yes.

12   Q.    But did he confront you with asking you whether or not you

13   provided his name to the agents?

14   A.    No, he didn't ask me that that I could recall.

15   Q.    Did you volunteer that you provided his name to the

16   agents?

17   A.    No.

18   Q.    Did you lie to him that you provided his name to the

19   agents?

20   A.    How can I lie to him if he didn't ask me that question?

21   Q.    Counsel had you correct an affidavit with an explanation

22   that -- about how mechanically he signed it on your behalf,

23   correct?

24   A.    Yes.

25   Q.    Was that the only paragraph that you wanted to correct in
```

```
 1  that affidavit which is described as Document 141-4?
 2  A.   Is that for the passcode?
 3       MR. MacKINLAY:  May I approach, your Honor?
 4  Q.   You changed Paragraph 12, correct?
 5       (Pause.)
 6  A.   Yes, he revised 12.
 7  Q.   Is there anything about Paragraph 2 that you would like to
 8  change?
 9  A.   Can I look at Paragraph 2?
04:35 10       THE COURT:  It should be on the screen.
11       MR. MacKINLAY:  Thank you.
12  BY MR. MacKINLAY:
13  Q.   The location of the cell phone where it was seized, it
14  wasn't seized from your place of work; it was seized from your
15  person.  Isn't that correct?
16  A.   That is incorrect.
17  Q.   The statement I made is incorrect or the affidavit is
18  incorrect?
19  A.   The statement that you made is incorrect.
04:35 20  Q.   Your testimony is where was the cell phone seized -- the
21  cell phone that's the subject of the passcodes.
22  A.   It was in my bag.
23  Q.   And the bag was located where, sir, according to you?
24  A.   To my understanding, it was in the locker at work or
25  possibly the truck.
```

1    Q.   Well, not --

2    A.   It was not on my person.

3    Q.   Not your understanding.  Where did you believe the bag was

4    that you say was seized?

5    A.   In my locker.

6    Q.   So the bag wasn't taken out of the truck and brought in in

7    your presence when you were arrested and handcuffed?

8    A.   It was possible it was taken out of the truck too.  It was

9    either in the truck or in the locker, to be honest with you.

04:36 10   Q.   Mr. Daniells, the truck is right out the front door.  Is

11   that correct?  And the locker is way in the back building --

12   A.   That's not true.  The truck is right near the locker where

13   I parked it that day.

14   Q.   Now, you heard a lot about this meeting down at the Wyatt

15   facility, correct, between you and Attorney Schneider on August

16   7, 2015?

17   A.   Yes.

18   Q.   You remember that?

19   A.   Yes.

04:37 20   Q.   And that was a meeting in which, among other things, three

21   topics in particular, the passcodes were discussed, right?

22   A.   Not true.

23   Q.   The passcodes were not discussed at all at that meeting?

24   A.   Not discussed at all at that meeting.

25   Q.   I'm showing you a previous exhibit that reflects the

1    exhibit, I believe 2, which is -- we've heard testimony is the

2    notes of Michael Schneider relative to a meeting.  Did you see

3    him with a pad of paper?

4    A.    I recall he might have had a pad of paper.

5    Q.    Did he always have a pad of paper when he was talking to

6    you or just this one time?

7    A.    Typically he would come with his pad of paper or his

8    laptop or something.

9    Q.    And the meeting occurred on the date of August 7, 2015, at

04:38 10   Wyatt, correct?

11   A.    He came to visit me August 7, 2015, at Wyatt.

12   Q.    And at the meeting do you recall the other two topics,

13   that is, discussion regarding some new discovery?

14   A.    That did not occur.

15   Q.    As reflected in his notes?

16   A.    No.

17   Q.    You don't recall being provided video still photographs

18   from the Sportsman's store video which has you in the store in

19   Pennsylvania buying -- and someone assisting you buying guns?

04:38 20   A.    That didn't happen.

21   Q.    There was a discussion about your prior record.  That

22   didn't happen at that meeting either?

23   A.    That didn't occur.

24   Q.    The search warrant, topic two.  According to his notes,

25   "Obtain consent for password," it seems to be his notes,

1    correct?

2    A.    That seems to be his notes.

3    Q.    That's what it says in his notes, correct?

4    A.    That's what it says in his notes.

5    Q.    And just so we're clear, these passcodes on the right,

6    these are your passcodes, 4983, 1960 and 0313.  Is that

7    correct?

8    A.    That's right.

9    Q.    So those were your secret passcodes, correct?

04:39 10   A.    Yes.

11   Q.    You're not disputing that you gave them to Schneider;

12   you're just saying it never occurred then?

13   A.    That's correct.

14   Q.    So Schneider had them.  And then there's a third topic.

15   There appears to be much discussion about sentencing

16   guidelines.  Do you recall that as part of the discussion?

17   A.    Not on that date, no.

18   Q.    So your testimony is none of these topics were discussed

19   during that meeting regarding the -- which your records

04:39 20   indicate include the passcode?

21   A.    To my understanding.

22   Q.    How do you explain his notes?

23   A.    How do I explain his notes?

24   Q.    Yes.

25   A.    How would I explain his notes?  I don't know.

1    Q.    Well, he met with you that day?

2    A.    Yes.

3    Q.    He usually kept notes?

4    A.    That's right.

5    Q.    These purport to be notes.  How do you explain them?

6    A.    They could have been put together after the fact.

7    Q.    Oh, so Schneider lied and made them up and backdated them?

8    A.    It's possible.

9    Q.    Your account of it is, according to Exhibit 1, that you

04:40 10   gave the passcodes to him on an earlier date; for example, on

11   the date that you met him at the initial appearance, right?

12   A.    I believe that when he came to visit me, I think the

13   22nd --

14   Q.    Or the detention hearing, I think your testimony was?

15   A.    I believe when he came to visit me for the first time

16   was --

17   Q.    At the Wyatt facility?

18   A.    That's right.

19   Q.    Which would have been, according to the records, June 22nd

04:40 20   or before the proffer and before the time of the visit on

21   August 7th.  Is that correct?

22   A.    I believe so.

23   Q.    What leads you to believe that these notes reflect

24   the -- well, let me ask a better question than that one.  Did

25   you see him taking notes at that meeting?

1    A.    I believe so.  It was a while ago, so I believe so.  It's

2    possible.

3    Q.    Okay.  And it looks like 6/25 at 11 a.m., according to the

4    notes that are reflected here.  Is that correct?  Does that

5    refresh your memory as to the time of the meeting on the prior

6    occasion?

7    A.    It also says 6/18/15 on the left corner.

8    Q.    6/18 was the date you were arrested, correct?

9    A.    Okay.

04:41 10   Q.    So then this document appears to have actually two groups

11    of notes separated by about a week, correct?

12    A.    Uh-huh.

13    Q.    Show me on these notes where the conversation turns to you

14    providing the passcodes to Attorney Schneider as you described.

15    A.    I don't see it.  There's only reference to texts, phone,

16    Facebook and an iPhone.

17    Q.    But you would agree with me remembering three four-digit

18    passcodes wouldn't be that easy without any notes?

19    A.    Wouldn't be that easy?

04:42 20   Q.    Right.

21    A.    I don't know.

22    Q.    Well, it would be something you would write down.  You

23    yourself would write down.  Would that be fair to say?

24    A.    I don't know what you're referring to.

25    Q.    Okay.  Well, the iPhone was a topic of the conversation,

1    according to the notes.  Is that your memory as well?

2    A.    According to those notes?

3    Q.    Your sister, Esther, is also included here as well, Esther

4    Daniells?

5    A.    Yes.

6    Q.    Which is, according to your account of this, you directed

7    Schneider to provide the passcodes to Esther.  That's why

8    you're giving them to him, right?

9    A.    That's correct.

04:42 10   Q.    Okay.  But the passcodes aren't included in any of these

11   notes that you can see, correct?

12   A.    Not that I'm aware of.

13   Q.    Is it possible Mr. Schneider -- that you provided him the

14   passcode and at some point later changed your mind about giving

15   consent or giving them over to the government?

16   A.    Is that possible?

17   Q.    Yes.

18   A.    No.

19   Q.    It's not possible that you provided the passcode and

04:43 20   authority to turn it over to the government and then later

21   decided that that was a bad idea?

22   A.    No.

23   Q.    Because you had that information from your lawyer, that

24   the search hadn't been conducted until much later, correct?

25   A.    He didn't confirm that it occurred until much later.

1    Q.   You were informed there was a search warrant but you

2    weren't informed of the results.  Is that fair to say?

3    A.   The search warrant of the phone?

4    Q.   Correct.

5    A.   On what date?

6    Q.   At some point prior -- well, according to the notes of the

7    meeting on August 7th, during the course of that meeting.

8    A.   I never was informed of a search warrant on that date.

9    Q.   Which search warrant were you referring to -- was being

04:43 10   referenced by the notes in conversation with Attorney Schneider

11   here, for your mother's place on Interfaith?

12   A.   I'm testifying it didn't occur on that date.  We never

13   discussed a search warrant on that date.

14   Q.   To be clear, your mother's place was searched after August

15   7th.  Isn't that right?

16   A.   That's correct.

17   Q.   So it couldn't have been discussed during this meeting,

18   correct?

19   A.   I don't see how it would have been.

04:45 20        MR. MacKINLAY:  I have no further questions, your

21   Honor.

22        MR. SPENCER:  Nothing further.

23        THE COURT:  Mr. Daniells, thank you.  You may step

24   down.

25        (The witness is excused.)

1          THE COURT:  Does that complete the presentation of

2     evidence?

3          MR. SPENCER:  Not necessarily, Judge.  There was a

4     subpoena that I drafted, a Rule 17 subpoena, and I filed on

5     ECF.  I'm not sure what the government's position is.  But in

6     light of the fact that I think there's a question

7     regarding -- I think the only way to resolve the dispute about

8     whether or not there would have been inevitable discovery is to

9     hear some official word from the Apple company.

04:45 10          I don't know if the Court has seen the subpoena.

11          THE COURT:  I haven't seen a subpoena; I've seen a

12     motion for issuance of a subpoena.

13          MR. SPENCER:  I'm sorry, yes.

14          THE COURT:  Let me just say that it's not the proper

15     use of Rule 17 to issue -- to seek discovery by way of a Rule

16     17 subpoena.  That's for presentation of evidence at trial.  So

17     to the extent it requests discovery, that motion would be

18     denied.  It would seem to me that you could informally get the

19     information you're looking for by simply calling Apple.

04:46 20          MR. SPENCER:  I tried that and they just only sent me

21     to various links and then it --

22          THE COURT:  Well, I guess the other response I would

23     have is this is the time for it to be here, and if it isn't

24     here, we'll proceed without it.  We did have some evidence on

25     the subject.

1          So if that's the only other item, I would say the

2    evidence is closed.

3          MR. SPENCER:  And Mr. Daniells also wanted to have his

4    sister testify.  She was not available to appear today but he

5    did want to present her testimony.

6          THE COURT:  What would that be?

7          MR. SPENCER:  You mean a proffer?

8          THE COURT:  Yeah.

9          MR. SPENCER:  She would testify regarding the

04:47 10   last -- I don't know what exhibit number it is, Judge, but it

11   was the document that -- she would testify she received that

12   document that I admitted into evidence from Attorney Michael

13   Schneider that had the Facebook passcodes as well as contacts

14   along with passcodes from his cell phone with an instruction by

15   Mr. Daniells to contact these people.

16          So then it would verify that there would be a reason

17   for Mr. Schneider to have those passcodes notwithstanding the

18   fact that the government wanted to get them from Mr. Daniells.

19          THE COURT:  Does the government have a view?

04:47 20   MR. MacKINLAY:  I don't know the timing of what that

21   would be and whether it has any bearing upon the evidence in

22   the case, your Honor.  To be honest with you, I don't see that

23   it --

24          THE COURT:  Let me suggest that you confer about that.

25   It might be the subject of a stipulation.

 1              MR. MacKINLAY:  Exactly.

 2              MR. SPENCER:  True.

 3              Other than that, Judge, I know -- just one moment.

 4              (Counsel confers with the defendant off the record.)

 5              MR. SPENCER:  Other than that, Judge, if we can reach

 6      a stipulation, the evidence would be closed.

 7              THE COURT:  All right.  What's today?  Perhaps by

 8      Friday you'll know whether you can reach a stipulation over

 9      whether either the defense or the government has something

04:48 10     further to present?

11              MR. SPENCER:  Sure.

12              THE COURT:  We'll sort of leave the matter 10 percent

13      unresolved --

14              MR. SPENCER:  Sure.

15              THE COURT:  -- until Friday, all right?

16              I think it would be helpful in this case to have

17      post-hearing briefing.  Assuming that we have completed the

18      evidence, and we'll know that by Friday, I'm suggesting

19      maybe -- I don't know.  I know there's a holiday involved so I

04:49 20     don't want to make the time too compressed, but would two weeks

21      from Friday, which would be the 14th of July --

22              MR. SPENCER:  That's fine.

23              THE COURT:  -- be all right for briefing?

24              MR. MacKINLAY:  Yes, your Honor.

25              THE COURT:  Simultaneous briefing?

 1          MR. SPENCER:  Mr. Daniells also had a request if --

 2     and it's in light of a hardship on both parts.  Plymouth is

 3     about an hour and 20 minutes away from Framingham, and he

 4     wanted to know if there could be any way he could be

 5     transferred to Walpole.

 6          THE COURT:  That's not my department.

 7          MR. SPENCER:  I know.  I just wanted to raise it to

 8     the Court.

 9          THE COURT:  Okay.

04:49 10          MR. SPENCER:  I know it's with the marshals and it's

 11     up to them.

 12          THE COURT:  And there are multiple considerations that

 13     affect those judgments.

 14          MR. SPENCER:  Yes.

 15          THE COURT:  So I won't interfere, I guess is the

 16     answer.

 17          Did you have something?

 18          MR. MacKINLAY:  Nothing further.

 19          THE COURT:  Okay.  We will not set another date.

04:49 20     Well, I hate to do that in criminal cases.  I'm not sure after

 21     I see the briefing that I will want oral argument but I think

 22     maybe we ought to set a date that could be either argument or

 23     perhaps just status.

 24          Maybe the 24th, which is a Monday afternoon?

 25          MR. SPENCER:  One moment, your Honor.

```
 1              (Pause.)

 2              MR. SPENCER:  July?

 3              THE COURT:  Yes.

 4              MR. SPENCER:  Yes.  Yes.

 5              MR. MacKINLAY:  That's fine, your Honor.

 6              THE COURT:  2:30.

 7              What else have we got here?  Let me look.  I put the

 8    date out there without looking.

 9              Yeah, 2:30 on the 24th for a status conference, or

10    perhaps argument, if that seems to be advisable.

11              Okay.  We'll be in recess.  Thank you.

12              THE CLERK:  All rise.

13              (The Court exits the courtroom and the proceedings

14    adjourned at 4:06 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 15-10150-GAO,

8    *United States v. Mitchell Daniells*.

9

10   /s/ Marcia G. Patrisso.
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  7/11/17
13

14

15

16

17

18

19

20

21

22

23

24

25