```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


                                 )
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )   Criminal Action
v.                               )   No. 15-10150-GAO
                                 )
MITCHELL DANIELLS,               )
                                 )
          Defendant.             )
                                 )



         BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE




                          DAY THREE
                     EVIDENTIARY HEARING




          John J. Moakley United States Courthouse
                      Courtroom No. 22
                      One Courthouse Way
                 Boston, Massachusetts  02210
                    Monday, July 24, 2017
                          2:41 p.m.



               Marcia G. Patrisso, RMR, CRR
                   Official Court Reporter
             John J. Moakley U.S. Courthouse
              One Courthouse Way, Room 7209
               Boston, Massachusetts  02210
                     (617) 737-8728

          Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Glenn A. MacKinlay, Assistant U.S. Attorney
3         John Joseph Moakley Federal Courthouse
          Suite 9200
4         Boston, Massachusetts  02210
          On Behalf of the Government

5
          LAW OFFICE OF GORDON W. SPENCER
6         By: Gordon W. Spencer, Esq.
          945 Concord Street
7         Framingham, Massachusetts  01701
          On Behalf of the Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2                   Direct  Cross  Redirect  Recross

3    WITNESSES FOR THE
         DEFENSE:
4
     ESTHER DANIELLS
5
         By Mr. Spencer        5              32
6        By Mr. MacKinlay            14

7
                        E X H I B I T S
8

9    DEFENDANT'S
      EXHIBIT     DESCRIPTION              FOR ID    RECEIVED
10
     37   Forwarded email to Gordon Spencer from
11        Esther Daniells                              9

12   38   Attorney Schneider's billing records         13

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Court enters the courtroom at 2:41 p.m.)
 4              THE CLERK:  For a continuation of the evidentiary
 5      hearing in U.S. versus Mitchell Daniells, Docket 15-10150.
 6              Would counsel identify yourselves for the record.
 7              MR. MacKINLAY:  Good afternoon, your Honor.  Glenn
 8      MacKinlay on behalf of the government.
 9              MR. SPENCER:  Good afternoon, Judge.  Gordon Spencer
00:00 10     on behalf of the defendant, Mr. Mitchell Daniells, who is
11      present.
12              THE COURT:  Good afternoon.
13              All right.  We're here for a continuation of the
14      hearing because, as I understand it, the defense has an
15      additional witness to call.
16              MR. SPENCER:  Yes, thank you.
17              Mr. Daniells calls Ms. Esther Daniells.
18                   ESTHER DANIELLS, duly sworn
19              THE CLERK:  Have a seat.  State your name, spell your
00:01 20     last name for the record, keep your voice up and speak into the
21      mic so everyone can hear you.
22              THE WITNESS:  My name is Esther Daniells,
23      D-A-N-I-E-L-L-S.
24              MR. SPENCER:  May I inquire?
25              THE COURT:  Yes.
```

```
 1              MR. SPENCER:  Thank you.
 2                        DIRECT EXAMINATION
 3    BY MR. SPENCER:
 4    Q.   Good afternoon.
 5    A.   Good afternoon.
 6    Q.   In a nice clear voice, please state your date of birth.
 7    A.   June 14, 1988.
 8    Q.   And so that would make you how old today?
 9    A.   I'm 29 years old.
10    Q.   Where do you live, ma'am?
11    A.   I live in Framingham, Massachusetts.
12    Q.   Okay.  How long have you lived in Framingham,
13    Massachusetts?
14    A.   Probably 24, 25 years.  Most of my life.
15    Q.   Who do you live in Framingham, Massachusetts, with?
16    A.   My mother.
17    Q.   Can you just describe for the Court briefly your
18    educational background?
19    A.   I have a bachelor's degree in zoology.
20    Q.   In zoology?
21    A.   Yes.
22    Q.   And where did you get that bachelor's degree?
23    A.   Colorado State University.
24    Q.   Did you go on to get your master's or any continuing
25    education?
```

00:01 (line 10)
00:02 (line 20)

```
 1    A.    No.

 2    Q.    And do you work?

 3    A.    Yes.

 4    Q.    Where do you work?

 5    A.    I work at Endigo.

 6    Q.    Endigo?

 7    A.    Yes.

 8    Q.    What is Endigo?

 9    A.    It's an agriculture company.

10    Q.    And how long have you worked there?

11    A.    Seven months now.

12    Q.    Do you have a brother named Mitchell Daniells?

13    A.    Yes.

14    Q.    And do you see him in the courtroom?

15    A.    Yes.

16    Q.    Drawing your attention to June of 2015, do you remember

17    your brother getting arrested?

18    A.    Yes.

19    Q.    And as a result of that arrest, did you have an occasion

20    to meet his lawyer, Mr. Michael Schneider?

21    A.    Yes, I did.

22    Q.    And around that time, do you have any recollection of

23    speaking with your brother, that being June of 2015, while he

24    was at the Wyatt Detention Center in Rhode Island?

25    A.    Yes.
```

```
 1   Q.   And do you have any specific memory of him asking you to

 2   do various things for him back around June and early July of

 3   2015?

 4   A.   Yes.

 5   Q.   Tell the Court what you can recall.

 6   A.   He wanted me to contact some people via Facebook and on

 7   his phone and email.

 8   Q.   Facebook, on his phone and what?

 9   A.   Email.

10   Q.   Do you recall the names of the people that he wanted you

11   to contact?

12   A.   I don't remember.

13   Q.   And did he explain to you how you were to access his

14   Facebook, email and phone in order to find these people?

15   A.   Through passwords and passcodes.

16   Q.   And did he tell you these passwords and passcodes over the

17   phone?

18   A.   No.

19   Q.   Did he tell you where you could obtain these passcodes and

20   passwords?

21   A.   Through his lawyer.

22   Q.   And did you reach out and have any communication with

23   Attorney Michael Schneider about passcodes as it pertained to

24   Facebook and email?

25   A.   Yes.
```

1   Q.   Do you recall when you had that communication with Michael

2   Schneider?

3   A.   Not the specific date.

4   Q.   Okay.  Was there an email that was sent from Attorney

5   Schneider to yourself that you can recall?

6   A.   Yes.

7        MR. SPENCER:  May I approach?

8        THE COURT:  You may.

9   BY MR. SPENCER:

00:04 10   Q.   I'm showing you a document.  Take a look at the document

11   and tell me if you recognize what that document is.

12   A.   Yes, I recognize it.

13   Q.   What do you recognize it to be?

14   A.   This is a document where he attached Mitchell's email

15   passwords and Facebook passwords as well.

16        THE COURT:  I'm having trouble hearing you.

17        MR. MacKINLAY:  Likewise.

18        THE WITNESS:  Oh, this is a document where the email

19   and Facebook passwords were attached, along with people to

00:05 20   contact.

21   BY MR. SPENCER:

22   Q.   All right.  Do you remember the date of that email that

23   Michael Schneider sent to you?

24   A.   July 2, 2015.

25   Q.   All right.  And does that refresh your recollection as to

1  the date that Attorney Schneider first sent you the email and

2  Facebook passcodes?

3  A.   Yes.

4       MR. SPENCER:  I would like this as the next exhibit.

5       MR. MacKINLAY:  No objection.

6       THE CLERK:  This will be Defendant's Exhibit 37, is

7  received.

8       (Defendant's Exhibit No. 37 received into evidence.)

9  BY MR. SPENCER:

00:06 10  Q.   And would you recognize the actual attachment to the email

11  you got from Michael Schneider if I were to show it to you?

12  A.   Yes.

13  Q.   For the record, I'm showing you Defendant's Exhibit 36.

14  Take a look at that document.

15  A.   I recognize it.

16  Q.   And what do you recognize it to be?

17  A.   The document Michael Schneider sent to me July 2nd.

18  Q.   Okay.

19       MR. SPENCER:  Judge, may I just use the screen

00:06 20  briefly?

21       THE COURT:  All right.

22  BY MR. SPENCER:

23  Q.   Showing you Defendant's Exhibit 36, do you recognize your

24  brother's handwriting on that document?

25  A.   Yes.

1    Q.    In which portion of the document do you recognize your

2    brother's handwriting?

3    A.    The upper portion of it.

4    Q.    You mean starting from the name "Rachel Rizzuti" and

5    ending in "Jackie Monteiro"?

6    A.    Yes.

7    Q.    And do you see the passcodes at the bottom that have been

8    partly scratched out?

9    A.    Yes.

00:07 10    Q.    Would that also be your brother's handwriting?

11    A.    Yes.

12    Q.    And do you see this "Jermaine Gardener" signature?

13    A.    Yes, I do see that.

14    Q.    Whose handwriting is that?

15    A.    I don't know.

16    Q.    Okay.  You don't recognize it as being your brother's?

17    A.    No, that's not my brother's handwriting.

18    Q.    And do you see the words that say "phone," "email" and

19    some other word that I can't read?

00:07 20    A.    That is not my brother's handwriting.

21    Q.    All right.  That's not your brother's handwriting.

22        Now, as a result of seeing that document, did you attempt

23    to contact the names of those people listed on the document?

24    A.    Yes.

25    Q.    And were you able to do so?

1    A.    I was able to contact some of them but not all of them.

2    Q.    And why is that?

3    A.    Because they weren't all on Facebook or through email.  I

4    had to access his phone.

5    Q.    All right.  At that point in time, when you got the email

6    from Michael Schneider, did it contain his iPhone passcodes?

7    A.    In that email, no, it did not.

8    Q.    All right.  And did you know Mr. Daniells' iPhone passcode

9    at that point in time?

00:08 10    A.    I do not know his passcodes.

11    Q.    And just to back up for a second, were you in possession

12    of any iPhone that belonged to your brother?

13    A.    Yes, I was.

14    Q.    What kind of iPhone were you in possession of?

15    A.    IPhone 6s, I believe, or 6 Plus.

16    Q.    6 Plus or 6s?

17    A.    Yeah.  I don't know.  The iPhone 6s.

18    Q.    And where did you get that phone from?

19    A.    My mom's house.

00:08 20    Q.    He had it at his mom's house?

21    A.    Yes.

22    Q.    And did he give you any instructions or information as it

23    pertained to another phone that he had, meaning were you aware

24    that he had more than one iPhone?

25    A.    I believe so, yeah.  Yeah, I did know that he had more

1    than one iPhone.

2    Q.    Okay.  But the only iPhone you had in your possession

3    was --

4    A.    6s one.

5    Q.    The 6s or 6 Plus?

6    A.    Yeah.

7    Q.    Did you have the passcode for that phone?

8    A.    No.

9    Q.    All right.  And then so as a result of trying to reach the

00:09 10   people who were listed on Exhibit 36, what did Mr. Daniells

11   tell you to do?

12   A.    He said Mr. Schneider should be giving me passcodes, to

13   contact Mr. Schneider for the passcodes.

14   Q.    All right.  And do you have a memory of meeting with

15   Mr. Schneider to get those iPhone passcodes?

16   A.    It was sometime in July.  I don't remember when, but if I

17   look at the billing records, it will refresh my memory.

18   Q.    Have I had a chance to show you Attorney Schneider's

19   billing records?

00:09 20   A.    You have.

21   Q.    And after seeing those billing records, would it refresh

22   your recollection as to the exact date that you met with

23   Michael Schneider?

24   A.    Yes.

25   Q.    I'm showing you a document.  Take a look at that document

1    and tell me if you recognize what that document is.

2    A.    I recognize the document.

3    Q.    Is that the document I showed you regarding Michael

4    Schneider's billing records?

5    A.    Yes.

6    Q.    And after looking at those records, does that refresh your

7    recollection as to the date you met with Michael Schneider to

8    get the passcodes?

9    A.    Yes.

00:10 10    Q.    And what date was that?

11    A.    July 10, 2015.

12           MR. SPENCER:  I would like to introduce this as the

13    next exhibit.

14           THE COURT:  Any objection, Mr. MacKinlay?

15           MR. MacKINLAY:  No, your Honor.  I just needed a

16    minute.

17           THE CLERK:  Defendant's 38 is received.

18           (Defendant's Exhibit No. 38 received into evidence.)

19    BY MR. SPENCER:

00:10 20    Q.    And then after July 10th, after you got the passcodes from

21    Attorney Schneider, what, if anything, did you do with those

22    passcodes?

23    A.    I accessed the iPhone.

24    Q.    And were you able to find the contacts that Mr. Daniells

25    wanted you to find?

1    A.    Yes.

2    Q.    And were you able to contact those people?

3    A.    Yes.

4          MR. SPENCER:   Thank you.   I have nothing further.

5                         CROSS-EXAMINATION

6    BY MR. MacKINLAY:

7    Q.    We'll start where you left off, if that's all right, Ms.

8    Daniells?   Is it Ms. Daniells?

9    A.    Yes; that's fine.

00:11 10   Q.    Where did the meeting take place?

11   A.    At his office.

12   Q.    Okay.   Had you spoken to him, meaning the attorney, on the

13   phone before that?

14   A.    Yeah, I spoke to him a lot.

15   Q.    A lot of times?

16   A.    Yeah, a lot.   Yeah.

17   Q.    All right.   And at none of those prior occasions the issue

18   of the iPhone passcodes came up?

19   A.    No; we talked about passcodes and passwords.

00:12 20   Q.    Okay.   At none of those prior conversations did he provide

21   the passcodes to you?

22   A.    Over the phone?   No; he sent me an email.

23   Q.    Nothing -- I understand the email.   You showed an email

24   that clearly doesn't show the passcodes reflecting the iPhone,

25   right?   That would be Exhibit 36 that we showed you.

1           MR. MacKINLAY:  May I have the screen, please, your

2    Honor?

3    Q.   At no occasion did he -- you have a conversation in which

4    you discussed the passcodes and received the passcodes prior to

5    the time of the meeting in person.  Is that what you're saying?

6    A.   No, I don't believe so.

7    Q.   Well, let's see.  Why wouldn't you discuss the passcodes

8    on the phone through the numerous conversations that you had

9    before July 10th?

00:13 10   A.   That's a question you should ask him.  I don't know why he

11   wouldn't --

12   Q.   No, I'm asking you.  You were speaking to him --

13   A.   Yeah.

14   Q.   -- right?

15        I'm asking you what was your reason for not discussing it.

16   A.   I did talk to him about the passcodes.  I don't --

17   Q.   The question is:  Why didn't you ask him for the passcodes

18   on the phone in the numerous discussions before July 10th?

19   A.   Because I was going to meet with him in person.

00:13 20   Q.   What prevented you from getting them earlier and starting

21   to help your brother earlier?

22   A.   I don't know.

23   Q.   Nothing.  Is the answer "nothing"?

24   A.   No, I didn't ask for them over the phone.  There were some

25   things that...

1   Q.   But you were in a rush to get assistance by contacting

2   people, correct?

3   A.   I wasn't in a rush, but...

4   Q.   Were you eager to help him?

5   A.   Yeah, I did help him when I can.  I also work full time.

6   Q.   But you were eager to help him because he's your brother?

7   A.   Sure, yeah.

8   Q.   And you wanted to make sure that he got in contact with

9   people that were in his contacts, correct?

00:14 10   A.   Yes.

11   Q.   And yet you had numerous conversations with his counsel

12   and didn't request the passcodes?

13   A.   (Nonverbal response.)

14   Q.   You have to answer yes or no or something.

15   A.   I assume not.

16   Q.   Is the reason that you didn't talk to him or receive it in

17   writing because you didn't want to get the passcodes in writing

18   so as to protect the integrity of it?

19   A.   I don't even think I was thinking like that.

00:14 20   Q.   Let me ask a better question, Ms. Daniells.

21   A.   Okay.

22   Q.   You got this attached to an email, correct?

23   A.   Yes.

24   Q.   The passcodes for the iPhone are not included, are they?

25   A.   No.

1    Q.    When you got this, did that spur you to say to Attorney

2    Daniells, hey, where's the iPhone passcodes?  I've got to get

3    into his contacts?

4    A.    To my brother?

5    Q.    No, to Attorney Schneider.

6    A.    Oh.  Yeah, I did talk to him about it and I told my

7    brother what I received.

8    Q.    I mean, he had them right from the start, right?

9    A.    Had what?

00:15 10    Q.    The passcodes.

11    A.    No.  What?  What?

12    Q.    When did -- do you know when Attorney Schneider got the

13    passcodes?

14    A.    I don't know when he received them.

15    Q.    Did he tell you when he got the passcodes?

16    A.    No, he didn't tell me what date he received them.

17    Q.    Did Mitchell tell you when he gave them to Attorney

18    Schneider?

19    A.    Mitchell told me that he gave Attorney Schneider

00:15 20    information to access his email, his Facebook and his iPhone 6.

21    Q.    Okay.  And on this document is the Facebook, right?  We

22    can agree on that, here?

23    A.    I don't know which one is which, but, between those.

24    Q.    Is one of them an email and one of them a Facebook?

25    A.    I don't remember how it worked out, but, between those

options.  I was able to access the Facebook and the email.

Q.   But nevertheless, the iPhone passcodes were not provided
to you in this document early on in the case, correct?  What
was the date you got this again?

A.   July 2nd, 2015.

Q.   And yet your testimony is you waited until you met with
him in person on July 10th to get the passcodes?

A.   That's when he gave it to me.

Q.   Why did you need the passcodes anyway?

A.   Why did I?

Q.   Yeah, why did you need it?

A.   Because he wanted me to go in his phone.  That's what he
asked me to do.

Q.   Okay.  And what was the reason that you were going to use
the contacts and the passcodes -- by accessing through the
passcodes?

A.   To contact them to let them -- his friends know the
situation, some of them it was to actually give to Michael
Schneider so he could talk to some of those people as well.

Q.   So they were potential witnesses?

A.   I don't know.  I didn't ask that question.

Q.   I mean, was it explained to you what was included in the
contacts?

A.   No; he just told me he wanted to contact these people and
to give the information to Michael Schneider.

1    Q.    Did you assume it was about the case, though?

2    A.    Well, yeah, that's a good assumption.

3    Q.    And you were looking to assist him in that regard, right?

4    A.    Yeah.

5    Q.    Again, because he's your brother and you didn't want to

6    see anything bad happen to him?

7    A.    He's my brother, yeah.

8    Q.    You would want to see something bad happen to him?

9    A.    No, I wouldn't want to see anything bad happen to him.

00:17 10    Q.    Well, you provided, as you've described it, pretty

11    significant amount of assistance to your brother.  Isn't that

12    right?

13    A.    I didn't say that.

14    Q.    Well, you characterized it by saying you had a lot of

15    conversations with his lawyer?

16    A.    Yeah.

17    Q.    His prior lawyer, mind you.

18    A.    Yeah.

19    Q.    And you've also taken some steps to connect with potential

00:17 20    witnesses?

21    A.    I contacted the people that were on the list.  Whether

22    they're a witness or not, I don't know.  I didn't ask that

23    question.

24    Q.    And how many people did you contact?

25    A.    In what sense?  In, like, the time frame of July 2015 or

1    in --

2    Q.   No, let's look at the time frame of June 18, 2015, to the

3    present.

4              MR. SPENCER:  Objection.  Relevance.

5              THE COURT:  Sustained.

6              MR. MacKINLAY:  Your Honor, it just goes to the bias,

7    your Honor.  She's done a significant amount of --

8              THE COURT:  The objection is sustained.

9              MR. MacKINLAY:  Okay.

00:18 10   BY MR. MacKINLAY:

11   Q.   Between the time of his arrest on June 18th and the time

12   of, let's say, July 10th when you met with his lawyer, how many

13   people had you contacted on behalf of your brother?

14   A.   A few.  I don't know the number offhand.

15   Q.   Can you estimate for us?

16   A.   Estimate?  Five?  I don't know.

17   Q.   Were they all in this area, in the Boston area?

18   A.   Yeah, I believe so.  I don't know them.  I don't know all

19   of them so I can't even answer that question for you.

00:19 20   Q.   Okay.  You also went to the Wyatt Detention Facility to

21   visit your brother?

22   A.   No, I did not.

23   Q.   Maybe I'm mistaken.  I thought you indicated on direct

24   examination you went to Wyatt.

25   A.   No.  I never seen my brother in jail, actually.

1   Q.   You've never been to one of the facilities he's been

2   detained at?

3   A.   Nope.

4   Q.   All right.  I misspoke, then.  Did you speak to him while

5   he was at Wyatt?

6   A.   Yes, I did.

7   Q.   Okay.  That's maybe where I misunderstood.

8        So in your speaking to him, it was by a phone call that he

9   placed from the facility to you?

00:19 10   A.   Yes, from --

11   Q.   That would be the times that he asked you for some

12   assistance in contacting these individuals.  Would that be

13   correct?

14   A.   Or he just talked to me about life in general, yeah.

15   Q.   And during those conversations, would it be fair to say

16   there was an opportunity for him to provide you with the

17   passcodes directly?

18   A.   He didn't want to.

19   Q.   No, no.  But there was an opportunity?  Yes or no?

00:20 20   A.   Yeah, I talked to him.

21   Q.   All right.  And during that time he could have provided

22   the passcodes to you, correct?

23   A.   Okay.  Yes.

24   Q.   Ma'am, you're speaking about his case and trying to help

25   him --

1    A.    Yes, he could have gave me the passcodes but he did not.

2    Q.    Okay.  Did he tell you why he did not?

3    A.    He didn't want to give it over the phone.

4    Q.    Okay.  And why was that?

5    A.    I didn't ask in detail.  I'm assuming it's because it

6    could be recorded, I'm assuming.

7    Q.    Are you familiar with -- have you assisted in three-way

8    calls from the facility?

9    A.    From Wyatt?  No, I did not.

00:20 10   Q.    How about from Plymouth?

11   A.    Have I?  Yes.

12   Q.    Okay.  So you're familiar with the process of three-way

13   calls; in other words, someone would call you and then you

14   would call someone else or someone would call someone else and

15   then call you, correct?

16   A.    No.  I would call someone else?

17   Q.    Please describe a three-way call, then.

18   A.    I added someone to the phone call.

19   Q.    And you had to stay on the line in order for it to be

00:20 20   effective, right?

21   A.    Yeah.

22   Q.    Had you done those calls with your brother?

23   A.    When, in Wyatt Detention?

24   Q.    At any time had you done three-way calls on behalf of your

25   brother?

```
 1   A.   I had.

 2   Q.   In any of those three-ways calls, yet, you did not request

 3   the passcode?

 4   A.   No.  No.

 5   Q.   Now, this iPhone -- what did you call it, a 6s, a 6 Plus?

 6   A.   I don't believe -- I don't remember what it is but it's an

 7   iPhone 6.  I don't remember if it's the Plus or 's or whatever

 8   the case may be.

 9   Q.   Now, is that your phone?

10   A.   No, it's not my phone.

11   Q.   Well, your brother was arrested with a phone.  Are you

12   aware of that?

13   A.   Okay.  Yes.

14   Q.   And do you know why he had two phones?

15   A.   No.

16   Q.   Never explained that to you?

17   A.   No.

18   Q.   The phone that you had, did it have service?

19   A.   The phone I had?  My phone or his phone?

20   Q.   The phone that you possessed, you described as a 6s or 6

21   Plus or something along those terms, was it working?  Did it

22   have service?

23   A.   I believe it did have -- I never tried to make a call out

24   of it so I honestly cannot answer that question.

25   Q.   Okay.  How did you come to be in possession of it?
```

00:21 (line 10)
00:22 (line 20)

1   A.   It was at my mom's house.

2   Q.   Okay.  Did you see him leave it there?  Did he routinely

3   leave it there?  What's the circumstances of the phone being at

4   your mother's house?

5   A.   He regularly used the phone, from my understanding, but I

6   honestly wasn't keeping notes of what he did with his phones so

7   I can't answer.

8   Q.   Just to be clear, this was his phone, you're saying, not

9   your phone?

00:22 10   A.   It's his phone, yes.

11   Q.   And your testimony is that you did not know the passcode

12   of his phone before being provided to you by Attorney

13   Schneider?

14   A.   That is correct.

15   Q.   Have you reviewed documents before you came in here to

16   testify?

17   A.   Did I review -- yes.

18   Q.   I mean, have you reviewed materials --

19   A.   Have I seen documents?  Yes.

00:23 20   Q.   Okay.  What have you reviewed before coming in to testify?

21   A.   Is this a general question or is it like -- I looked at

22   this email, I seen the billing records.

23   Q.   What else?

24   A.   That's all I can really recall.

25   Q.   Have you looked at any of the materials that were filed in

1    the case?

2    A.    No, I don't think so.

3    Q.    Have you looked at any of the affidavits that were filed

4    in the case by your brother?

5    A.    No.

6    Q.    Have you looked at any of the motions or efforts filed by

7    counsel on behalf of your brother?

8    A.    No, I actually don't think I looked at them.  No.

9    Q.    The only thing you looked at, then, is the email and the

00:24 10   document that I had up on the screen?

11   A.    I actually did sign an affidavit, so...

12   Q.    What was the affidavit that you signed?

13   A.    I think it was about Mitchell coming to live at my mom's

14   house to be released, with Michael Schneider.  He presented it

15   to me.

16   Q.    And what did that entail, the search at the house?

17   A.    I don't know what you're asking.  I'm confused.

18   Q.    Well, I'm not trying to confuse you.

19   A.    Okay.

00:24 20   Q.    So you signed an affidavit in the past.  The affidavit, do

21   you remember what it said?

22   A.    It said that I'm Mitchell's sister, I live in Framingham,

23   and I would help him or be, like, aware of him if he was

24   released.

25   Q.    Oh, this is early on in the case when he was looking to

1    get out on release on conditions?

2    A.   Yeah.  Yeah.

3    Q.   Okay.  And is that around the time -- just so we're clear,

4    that's when you contacted his employer and tried to make sure

5    he was going to be rehired, right?

6    A.   No.  Actually, that was not, no.

7    Q.   It was where, then?

8    A.   This is crazy.  I don't know what's going on so I don't --

9    I signed an affidavit to Mitchell to be released to the house.

00:25 10   I don't know what you're talking about.

11   Q.   Did you review a proposed agreement or stipulation

12   about -- to avoid your having to come in here today?  A

13   stipulation?

14   A.   Yes.  Yes.

15   Q.   Okay.  So that's something that -- did you assist in

16   drafting that and preparing that as well?

17   A.   Not -- no.

18   Q.   Okay.  But you did have a chance to look at it?

19   A.   Yeah, I looked at that.

00:26 20   Q.   And during the course of preparing that, you made sure it

21   was accurate?

22        MR. SPENCER:  Objection.  It assumes facts in

23   evidence.  She never testified that she prepared that document.

24        THE COURT:  You may have the question.

25   BY MR. MacKINLAY:

1    Q.    Did you look at the document to make sure it was accurate?

2    A.    Yeah, I read the document.  Yeah.

3    Q.    And was it accurate?

4    A.    Yeah.  I don't have it in front of me but, yeah, I believe

5    so.

6    Q.    Well, I mean, it was going to be a summary of your

7    testimony.  Would you make sure that it was accurate before

8    this Court?

9    A.    Yes.

00:26 10   Q.    Nowhere in this stipulation did you indicate the date that

11   you met with Mr. Schneider at his office, did you?

12   A.    No.

13   Q.    Nowhere --

14   A.    I didn't make the stipulation, though.

15   Q.    Sorry?

16   A.    I didn't make the stipulation; I just read it.

17   Q.    But you did read it and you did agree that it was

18   accurate?

19   A.    Yes.

00:27 20   Q.    Now, did you -- when was your first conversation with

21   Attorney Schneider following this June 18th arrest?

22   A.    I do not remember my first conversation with Attorney

23   Schneider.

24   Q.    Well, do you remember if it was the first day, June 18th?

25   A.    I don't remember that.

1          MR. MacKINLAY:  May I have Exhibits 1 and 2, please?

2     Q.    Showing you what we previously marked as Exhibit 1, is

3     this your name, Esther A. Daniells, here?

4     A.    That's my name, yes.

5     Q.    Is this your phone number?

6     A.    No.

7     Q.    Is that your mother's number at the place you're staying?

8     A.    Yes; that's my mom's number.

9     Q.    Okay.  It references an iPhone 5 here?

00:29 10   A.    Okay.

11    Q.    Do you see that?

12    A.    Yes, I do see "iPhone 5."

13    Q.    Do you recall having a conversation in the days that

14    followed June 18th with Attorney Schneider?

15    A.    Yeah, I talked to Attorney Schneider after June 18th.

16    Q.    Okay.  And were any of those conversations -- were they by

17    phone?

18    A.    They were by phone -- excuse me.  Yes, they were by phone.

19    I think we sent some emails.

00:29 20   Q.    Let me just ask it a different way.  Was July 10th your

21    only in-person meeting with him at the office?

22    A.    I want to say yes but, honestly, I could have met him

23    beforehand.

24    Q.    At the office?

25    A.    At the office?  I don't -- I think I've only been to his

1    office, maybe, once.

2    Q.   Where did you meet him beforehand, before July 10th?

3    A.   I don't remember.  I honestly don't remember.  But I may

4    have met him beforehand at a case -- a court case or something.

5    But that was not my first time meeting him, was July 10th.  I

6    just don't remember where I met him before.

7    Q.   Fair enough.  So you met him previously and you spoke to

8    him previously, but the time that you're telling the Court that

9    the iPhone passcodes came up was at the July 10th meeting?

00:30 10          MR. SPENCER:  Judge, this has been asked and answered.

11          THE COURT:  Overruled.

12          THE WITNESS:  So I can repeat?

13   BY MR. MacKINLAY:

14   Q.   You met with him previously in person on several occasions

15   and you spoke to him on numerous occasions, but the time that

16   you say that you got the passcodes was at the July 10th

17   meeting, correct?

18   A.   Yeah.

19   Q.   I'm showing you what we marked as Exhibit 6.  Did you have

00:30 20   any conversation with him, meaning Attorney Schneider,

21   following an August 7th meeting?

22   A.   I do not remember.  Maybe.  I talked to him a lot.

23   Q.   Okay.  Would you have met with him in his office following

24   the August 7th meeting?

25   A.   No; I've only been to his office once.

| | | |
|---|---|---|
| | 1 | Q.   Would you have met with him in person after August 7th? |
| | 2 | A.   Yeah, I saw him at other court cases in the future. |
| | 3 | Q.   At this courthouse? |
| | 4 | A.   Yes; this is the only one I've been to. |
| | 5 | Q.   And did you discuss passcodes on those occasions? |
| | 6 | A.   Most likely not because once I got the information -- |
| | 7 | Q.   Well, what's your specific memory? |
| | 8 | A.   No, I don't think so. |
| | 9 | Q.   Just to be clear, you eventually did get the passcodes. |
| 00:31 | 10 | Is that correct? |
| | 11 | A.   I did get the passcode, yes. |
| | 12 | Q.   And these are the passcodes right here, right? |
| | 13 | A.   I don't know. |
| | 14 | Q.   Well, did you record them? |
| | 15 | A.   Yeah, I believe so. |
| | 16 | Q.   Well -- |
| | 17 | A.   It was two years ago.  I honestly don't remember every |
| | 18 | detail that happened, so, and I don't want to say yes to |
| | 19 | something I'm not sure of. |
| 00:32 | 20 | Q.   And no one is asking you to do anything differently.  But |
| | 21 | the fact of the matter is it's a four-digit passcode, correct? |
| | 22 | A.   Yes, it was four digits. |
| | 23 | Q.   And you see there that there's at least three of them that |
| | 24 | are listed here, one, two and three, that were possible options |
| | 25 | that were recorded in Attorney Schneider's notes.  My question |

1    to you is:  Do you recall the passcode that was provided to

2    you, you say, on July 10th?

3    A.   No, I do not recall that.

4    Q.   Was it one?

5    A.   Was it one passcode?

6    Q.   One four-digit passcode.

7    A.   No, it was multiple ones.

8    Q.   How many?

9    A.   I honestly don't remember.

00:32 10   Q.   Well, you say you recorded it.  How did you record it?

11   A.   I'm assuming a paper, pen.

12   Q.   With a pen and paper?

13   A.   Yeah, that's what I'd assume, so...

14   Q.   I mean, you left the meeting at his office with the

15   passcode, you say?

16   A.   Yeah, and took -- I got his possessions and -- yeah.

17   Q.   Okay.  Now, a lot of people record it, like, in their own

18   phone.  Maybe they'll log it into the notes or some section.

19   Did you do that?

00:33 20   A.   No.

21   Q.   You wrote it on a piece of paper.  Where did you keep the

22   paper?

23   A.   I'm assuming in the bag.  I don't remember.

24   Q.   Were you asked to search for the paper before coming here

25   to court?

```
 1   A.   I don't have it.

 2   Q.   That wasn't really my question, though.  Were you asked to

 3   search for it?

 4   A.   No, I wasn't asked to search for it.  No.

 5   Q.   Did you preserve it at all?

 6   A.   No.

 7   Q.   So there's no actual corroboration or documentation of the

 8   fact that you received the passcodes at that meeting?

 9   A.   Currently?

10   Q.   Sorry?

11   A.   Are you asking do I have a paper with the passcodes?

12   Q.   Is there -- no documentation of your receipt of the

13   passcodes at that meeting on July 10th?

14   A.   No.

15            MR. MacKINLAY:  Nothing else.

16            MR. SPENCER:  Just briefly.

17                         REDIRECT EXAMINATION

18   BY MR. SPENCER:

19   Q.   Ms. Daniells, why didn't you preserve the passcodes?

20   A.   Because I shredded it.  I got rid of it.

21   Q.   And when did you do that, if you could recall?

22   A.   Once I accessed the phone.

23   Q.   And why did you feel a need to shred the passcodes?

24   A.   Just in case -- our house was eventually raided so I guess

25   it was a good idea.  In case someone came and got it.
```

00:33 10
00:34 20

| | |
|---|---|
| 1 | Q.   Were those your personal passcodes? |
| 2 | A.   Those -- the ones that -- |
| 3 | Q.   Yeah. |
| 4 | A.   No, they were not. |
| 5 | Q.   Did you want to leave them laying around the house? |
| 6 | A.   No. |
| 7 | Q.   And did you have them already accessed into the phone? |
| 8 | A.   Yes. |
| 9 | Q.   And two years ago did you think you would be testifying |
| 00:35 10 | today about this case? |
| 11 | A.   No. |
| 12 | Q.   Did anyone say to preserve the passcodes back then? |
| 13 | A.   No.  No. |
| 14 | Q.   And if you never received the July 2nd email, would you |
| 15 | have specific memory of the date that you received the email? |
| 16 | A.   No. |
| 17 | Q.   Would you have a specific memory of the information that |
| 18 | was on that document given to you by Michael Schneider if you |
| 19 | haven't seen it today? |
| 00:35 20 | A.   No. |
| 21 | Q.   And why is that? |
| 22 | A.   Because I never thought of taking notes when I was talking |
| 23 | with Mitchell's lawyers. |
| 24 | MR. SPENCER:  Okay.  Nothing further. |
| 25 | THE COURT:  All right, Ms. Daniells.  Thank you.  You |

 1   may step down.

 2              (The witness is excused.)

 3              MR. SPENCER:  That will conclude the evidence.

 4              THE COURT:  Well, I think as we had previously

 5   discussed, proposed findings?

 6              MR. SPENCER:  Yes.

 7              THE COURT:  I think within seven days?  So that would

 8   be a week from today.

 9              MR. SPENCER:  And, Judge, if I just need to file a

00:35 10   motion then so be it, but I don't, as of present, have any

11   transcripts of the testimony of the -- I'm not CJA, and so I

12   just wanted to inform the Court of that fact, but at the same

13   time, I don't believe Mr. Daniells has the funds to be able to

14   pay for the transcripts.  So I can file a motion, that's fine,

15   I just wanted to bring it to the Court's attention because I

16   know --

17              THE COURT:  I'm not sure what kind of motion you mean.

18   I can't authorize funds for someone who isn't CJA.

19              MR. SPENCER:  Right.  Then that answers the question.

00:36 20              THE COURT:  Unless you can find a way.  I don't think

21   of one off the top of my head.

22              MR. SPENCER:  All right.  Fair enough.  Thank you.

23              THE COURT:  All right.  We'll set a date for hearing

24   on the submissions, if appropriate, after we've seen them.

25              All right.  We'll be in recess.

1           THE CLERK:  All rise for the Court.

2           (The Court exits the courtroom at 3:18 p.m.)

3           THE CLERK:  Court will be in recess.

4           (The proceedings concluded at 3:18 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 15-10150-GAO,

 8     United States v. Mitchell Daniells.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date:  7/31/17
13

14

15

16

17

18

19

20

21

22

23

24

25
```