**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

**File Number 1: 15-cr-10150-GAO-1**

_____ )
**UNITED STATES OF AMERICA**    )
                                )
**v.**                          )
                                )
                                )
**MITCHELL DANIELLS**           )
_____ )

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HIS
MOTIONS TO EXCLUDE  (Dkt Nos. 140  & 141)**

**Introduction**

The Defendant submits this Memorandum in support of his previously filed Motions to

Exclude (Dkt. Nos. 140 & 141).  In essence, the Defendant believes that there are three factual

questions for the Court to answer, along with various corresponding and intertwining legal

questions which must necessarily follow.  The Defendant's believed and proposed questions can

be outlined as follows:

**Factual Question #1:**

    1) Did Mitchell Daniells ("Daniells") give consent to his former lawyer, Michael
       Schneider, ("Schneider") for him to give Daniells' iphone 5 passcode to the
       Government?

**Legal Question #1a:**

    1a) If Daniells did give consent, was the consent knowing, intelligent, and
        therefore voluntary?

**Legal Question #1b:**

    1b) If Daniells did not give consent, did Michael Schneider's actions, in providing
        the Government with his passcode, render him as ineffective to his former
        client?

**Legal Question #1c:**

> 1c) If the answer to 1b is "yes", would the Government have gotten access to Mr. Daniells' iphone anyway, making the answer in 1b moot?

**Factual Question #2:**

> 2) Did Daniells specifically seek advice from Schneider on whether to give the Government the name of Kenny Brooby – a potential witness to his alleged crimes, and if so, did Schneider in fact advise Daniells to provide the Government with the name?

**Legal Question #2a:**

> 3) If Schneider did in fact provide the advice outlined in Factual Question #2, was the advice "deficient performance" – meaning below the standard of what a reasonable lawyer would advise, understanding the derivative use doctrine and how it would apply in this situation?

**Legal Question #2b:**

> 3a) If the answer to #2a is "yes" that Schneider's advice was "deficient performance", was Daniells prejudiced by that outcome and therefore making Schneider once again ineffective?

Before getting into the proposed findings upon which the Defendant seeks the Court to make, in answering the aforementioned questions, it is noteworthy to mention that all of the information the Court needs to answer them, and most particularly the factual questions, come from only two sources of evidence – ***The Defendant and Michael Schneider***.  The Government was not present for either attorney/client communication (regarding passcodes consent and proffer advice) and cannot offer anything of value other than pure speculation about what happened between the two.  As a result, and when the Court reviews the Government's submission, unless they have an argument as to why Mr. Schneider's version is more credible than Daniells' version, nothing else really matters.  As far as the Court's function, the Defendant believes it is necessary for the Court to take both testimonial accounts from the client and his attorney, and decide which is the

more credible of the both.  With that premise, the Defendant submits proposed findings on the aforementioned questions.

**On August 7th, 2015, Did Mitchell Daniells _really_ tell his lawyer, "give them the passcode"?**
**Introduction – a question for the ages.**

This question before the Court is really one for the ages.   This is because this issue may just very well be the first time in existence (meaning in American Legal Jurisprudence), past, present, or future, where an allegation like this has been made.   To be sure, a client has made an allegation that his attorney, knowingly and intentionally, provided a law enforcement officer with a confidential communication which came from his client.  Looking at this via the lens of a criminal practitioner (defense, prosecution, or even judicial), an allegation like this is unheard of, perhaps even inconceivable – and thus making the Court's quest for the truth in this regard one for the ages.

To be sure, what has happened is one of two scenarios -- Daniells gave his consent, or he didn't.  However, and considering the possibility that Daniells did not give his consent, it would necessarily mean that his former lawyer had knowingly breached the most sacred of core ethical principles.  It should also mean that if Schneider breached his duty of loyalty to his client, such conduct is **_per se prejudicial_** to his client**,** and as a consequence, Schneider has effectively tainted the entire Daniells/Schneider relationship at its core, and from a credibility standpoint Schneider must stand without it, and including when the Court must assess his credibility on other matters, like whether or not he was providing this same client with effective advice (i.e., at the proffer session).

What Daniells is trying to say here as an introduction, is that if the bottom line presents that Michael Schneider knowingly gave this confidential piece of information to the

Government, and without his client's consent, the Court, in abundance of caution, should necessarily strike any evidence obtained by the Government via this septic attorney-client relationship, due to the egregious and unprecedented breach by his counsel.  So, the main and perhaps case altering question comes next.  Who is telling the truth?  Mr. Mitchell Daniells, or Attorney Michael Schneider?   As monumental as the answer may be, it is surprising that from a very simple analysis, the Court can only come to one conclusion about who is telling the truth, and that it must be Mr. Daniells.   This is because out of the two witnesses who can answer this question, one can remember what happened and the other one inexplicably cannot.

### a.  Mr. Daniells' memory is crystal on his issue, with said memory also being corroborated with other facts in the record.

To be sure, and before August 7th 2015, there were approximately two separate occasions where Mr. Daniells was asked for his passcode by the Government, and Mr. Daniells refused.  On the day of his arrest – **June 18, 2015;** *See testimony of Mitchell Daniells at 2-133-135;* and during the proffer on **July 15, 2015.** *Id. at 2-144; 157.*  Although it is Daniells who has made these claims, his claims are actually not in dispute, as they have been corroborated by the Government's witnesses. *See testimony of Agent Brian Oppedisano at 2-56-57; see also Oppedisano at 2-72-73 (stating that Mr. Schneider claimed Daniells would provide it upon production of a search warrant, although that claim is not memorialized anywhere in any report drafted by Oppedisano, Id. at 2-74; see also Exhibit 31 and 32).*  Furthermore, and in addition to Daniells' recollection of his own refusals to provide the passcode over to the Government, Attorney Schneider also himself has a recollection of conveying his client's refusal to AUSA Glenn MacKinlay, on or about **July 21, 2015,** and thereby bolstering Mr. Daniells' two previous

objections regarding the Government's request for him to cooperate in this regard. *See testimony of Schneider at 1-25-27.*[1]

For all intents and purposes the record is clear -- when third parties are around, Mr. Daniells' objections to providing assistance to the government to get into his phone are unwavering, persistent, and repetitive. Additionally, and when third parties are around, Michael Schneider's memory is on the ball, regarding this public and recurring theme of Daniells' lack of interest in giving consent to his adversary. However, but yet in a private setting, where it's only Schneider and Daniells, the Attorney is now off his game, as he can no longer remember his client's position anymore. This lack of memory by Schneider on this issue is just as troubling as it is incredible.

**b. Schneider's lack of memory on this issue is just as troubling as it is incredible.**

To be sure, Schneider has been practicing law for almost 35 years. *Schneider at 1-7.* During that time, Schneider has had only one case in his career where a prosecutor has asked a client to provide consent to search a cell phone. This one. *Scheider at 1-19-20.* Even Schneider had to concede the irregularity of such a request.[2] However, and although in almost 35 years of

---

[1]    Seeing now three repeated and unwavering objections lodged by Mr. Daniells and/or Schneider, when requested to produce this passcode, it is absolutely perplexing as to what could have triggered Daniells' stark change of heart so soon thereafter these refusals. Was it the search warrant? It's not a compelling theory. Government agents get search warrants all of the time. Mr. Daniells wasn't willing to cooperate with the Government about this passcode issue at the proffer session on July 15, 2015, and he must have realized that the Government had the power of the search warrant at their disposal to get into his phone. It's a reach to suggest that a search warrant (that the Defendant had no control over) would cause Daniells to abandon the hard stance he took regarding his lack of cooperation on this issue. Mr. Daniells appeared for a proffer session, where cooperation was the name of the game, and yet Mr. Daniells chose rather to sit on the bench than participate in this particular match. What is even more perplexing about all of this, however, is that Attorney Schneider can remember each and every instance where his client says "NO" to providing the passcode to the Government, but cannot remember the one time when his client finally says "YES"? It's absolutely unbelievable.

[2]    *Id. at 1-34.* Schneider specifically testified that he has never experienced a situation where an AUSA or federal agent asked for his client's consent before executing a search warrant at a residence. This is a circumstance, which the Defendant believes, should have raised all sorts of red flags in his mind about the Government's request for the passcode here once they already had their warrant in hand. But it didn't. *Id at 1-34; line 11-14.* Does it make sense that the Government really just wanted to save a week or two (in August of 2015 – less than two months after an indictment) in getting the information? Maybe, but then why the full court press by AUSA MacKinlay to Schneider,

practice, this being his only case ever where something like this has come up, he can remember all of the times when Daniells said "NO", but he can't remember the one time when Daniells said "YES".  This is just as troubling as it is incredible.

For example, Schneider can remember that Daniells told him at some point during the representation that federal agents asked him for the passcode, and can also remember Daniells' response, which was "NO".  *Schneider at 1-24.*   Schneider can remember the proffer of July 15, 2015th whereupon the Government asked again, with a following refusal for the second time. *Id. at 1-24.*  Also, on or about July 21, 2015, Schneider can also remember a conversation he has with the prosecuting attorney about the Government's same tired request for the passcode, and can also remember telling the prosecutor himself, and on his former client's behalf, an unequivocal "I did not believe that Mr. Daniells would or should consent to a search of his cell phone". *Id. at 1-26.*  But then on August 7th, 2015, Schneider can't remember the conversation where his client said "YES" for the first time to something so significant?  *Id. at pages 14; 18; 21; 22; 23; 24; 111; 113; 138-139* And where this "YES" was the first and only time in Schneider's 35 year career, where something like this has come up?  And now the Court has been involved in days and days of litigation to answer a question upon which Schneider has no memory of the answer?  To be moderate in this assessment, this claim by Schneider is quite suspicious.  Daniells submits that if the Court finds it suspicious, then there really isn't any need to go any further.  This is because where Mr. Daniells is claiming on two separate occasions that he did not want to cooperate with the Government, it is certainly credible to believe that he also

---

calling it his "last chance"? *See Exhibit 4.*  It all seems very dramatic.  There can be no dispute that AUSA MacKinlay was trying to get something from Schneider (via Daniells) that he really didn't need.  Or did he?  Did the magistrate's issuance of the search warrant dispense with the need for the passcode, or did AUSA MacKinlay still need it, in light of the A7 chip Mr. Daniells' iphone contained?  This is a question which the record (meaning Agent Kelsch, as discussed *supra*) cannot answer.  Perhaps this should be a teaching moment for all concerned – when all the energy and resources are expended to get a warrant to search a Defendant's smart phone, leave the Defendant alone and just execute the warrant – *if you really can.*

did not want to cooperate just weeks later on August 7th , 2015.  However, and for Schneider to claim lack of memory on an issue of fact which is just so critical in the representation of a client, is not only troubling but it is incredible.  The Defendant submits the answer to factual question #1 is "NO".

Additionally, and just so the Court sees it as clearly as Daniells, the Defendant asks the Court to review Daniells testimony in its entirety, and alongside the testimony of his lawyer. Upon review, it is apparent that Daniells, on May 12, 2016, accused Schneider of giving the prosecutor his passcode without his consent, along with other complaints, but Schneider's notes of May 12, 2016, nor his memory confirm any actual denial conveyed to Mr. Daniells of doing this, or presenting him with his notes of August 7th, to show him what he thinks really happened. *See Schneider at 1-75-76; (see also Exhibit 2, where Daniells blames Schneider for the Government's cell phone entry).*   Why has Schneider never told Daniells what he thinks actually happened?  Who knows.  Schneider's testimony, after he was specifically confronted with such an unprecedented allegation by his client, merely responds that it is merely "highly unlikely" that he would have done that".  *See Exhibit 3 – August 5th memo to file, from four people, including Partner and Attorney Phil Cormier.*  This response is actually one for the ages.

First of all, *Exhibit 3* is not a communication to Daniells, but a Memorandum to the file". Again, a review of all communications between Daniells and Schneider in the record show no evidence that Schneider ever told Daniells that he believed Daniells "actually" gave him consent; that it was "likely" that Daniells gave consent; or that it was "possible" that Daniells gave consent.  Not one conversation informing the client that it was even remotely possible took place between lawyer and client after months of communication between the two.  Not one conversation.  Then, and upon review of the ECF, Schnieder withdrew his appearance on August

9th, 2016.  Just four days before this withdrawal, however, we see for the first time in *Exhibit 3,*

when speaking on the probabilities that Schneider could have breached the attorney client

privilege, and he says to the file – "highly unlikely". This is response is for the ages because

imagine if any other criminal defense practitioner were asked the same question – would you

ever breach a duty of loyalty to a client by knowingly and intentionally provide their confidential

communications to the Government without their consent?  How reasonable would a response be

that it is "highly unlikely"?  Any reasonable response would be "NO" – primarily because a

lawyer could face disbarment to commit such an ethical violation. *See Massachusetts Rules of*

*Professional Conduct, 1.6 (a) – A lawyer may not reveal confidential relating to the*

*representation of a client.*  Schneider's response that it was "highly unlikely" suggests that in his

mind, there is possible room to provide classified information to a governmental agent which has

nothing to do with a future crime. *See Massachusetts Rules of Professional Conduct 1.6 (b) –*

*allowing disclosure to prevent fraud or a future crime.*  This "highly unlikely" response by

Schneider is as troubling as it is incredible, when appreciating the privilege.

> **c.  The Government wants to rely upon Schneider's notes of August 7th, 2015 as the proof that Daniells gave consent. If that evidence was so telling, how does the Government respond to the blatant charade Schneider played with Daniells for the months to follow, and until Schneider had to finally come clean and admit to Daniells that he "possibly" provided his passcode to the Government.**

To cut to the chase, Daniells anticipates (and in fact it's a certainty) that the Government

will ask the Court to rely upon Schneider's August 7th notes to conclude that because the

passcode was discussed, meant that Daniells' consent was given. *See Exhibit 6.*  First of all, and

assuming that the August 7th notes were written contemporaneous with Schneider's visit to

Wyatt, nowhere does it state on these notes that Daniells actually gave consent.  Upon review of

*Exhibit 3* – Schneider's memo to the file, Schneider concedes that his notes of August 7th make

no mention that Daniells actually gave consent. Second of all, the notes of August 7th were contained within Schneider's file, written in his own handwriting, and upon Schneider's review of them, still never refreshed his failing memory on whether Daniells gave him consent, because as of the date of his testimony, he still has no independent recollection of the consent being given, and even after review of the notes. So, and if these notes cannot establish in Schneider's own mind that Daniells gave consent, how can some outsider like the Government rely upon them to confirm what its author cannot? It would seem as if the Government is really trying to rely upon *Exhibit 6* to try and put words in Schneider's mouth which Schneider has refused to independently remember.

In fact, if all Schneider did was follow his ethical responsibilities and followed rule 1.6, which the Court has taken judicial notice of, he would have necessarily obtained "informed consent" from Daniells – which would have required that he had gotten "written consent" – a requirement which Schneider admitted he never obtained in violation of his own rules of professional conduct. *Schneider at 1-80-81.* Why should Schneider's notes save the day for this issue, and thereby penalizing the Defendant, where the ethical rules require that he obtained written consent from Daniells? Adding further gasoline to the fire is Schneider's excuse that he "forgot about that provision". *Id. at 81.* This ethical provision obviously is for the protection of Mr. Daniells -- so that Daniells cannot say later that he did not give informed consent. To prevent the issue that is happening "now". Therefore, who is the only person to blame for this litigation? Daniells? Or the person who did not follow the rules – his former counsel. Let's see if the Government even comments on this non-feasance by Schneider when trying to persuade this Court in crediting his notes.

The Government will merely put *Exhibit 6* front and center in their memorandum, suggesting that this is all the proof the Court needs to fill in the blanks of Schneider's inexplicable memory lapse.  However, and the Defendant would bet there will be no mention of Rule 1.6, and there will not be one word by the Government devoted towards explaining away the charade that Schneider played with Daniells, when addressing Daniells' concerns on how the Government got into his phone. *See Exhibit 10 – March 9, 2015 note to file, detailing March 8th meeting; Exhibit 11 – March 10th letter to Daniells from Schneider; Exhibit 8 – notes of telephone conference dated April 20, 2016.*

Upon review of the aforementioned exhibits, there can be no dispute that Daniells wanted to know how the government got into his phone.  These inquires obviously belie the notion that Daniells gave consent – for if he did, Schneider's response should have been dispositive and even curt.  The response of any criminal defense practitioner would and should have been: " the Government got into your phone because you gave me your permission to give them your passcode".  In fact, and if this was the truth, any other response by the Attorney would have been inappropriate.  Schneider (and to this day) never gave such a response to Daniells.  The record fleshes out that Schneider's response to Daniells was the following:

> 3/10/2016, – "The Government obtained a search warrant ***without our consent***.[3] *Exhibit 11.*

> 5/4/2016   -- " Last summer the prosecutor had asked that consent to the search of your iphone.  When we did not do so, he informed me that he had gotten a warrant and that he ***did not need our consent***. Attached is that warrant." *Exhibit 14.*

> 5/12/2016 –   "GM sent me an email telling me that they had gotten the search ***warrant without our consent***[4] and that if we did not give them

---

[3]   Every lawyer knows that the Government does not need a defendants consent to get a search warrant, meaning, that Schneider had to have been telling Daniels that neither he or Schneider gave consent to get into the phone.

[4]   The recurring language by Schneider has to raise some suspicion with the Court.

MD's password, they would be serving the order on Apple compelling them to provide the government with the contents of the cell phone.  I reminded MD that he had given me several possible passcodes for the phone after we had discussions about "it"[5] and that he ***was uncertain whether [he] provided them or whether Apple/Cellbrite decrypted the phone.***  He then admitted it was possible he did it.  But never not once said he did so with his client's consent. *Exhibit 2.*

Schneider's responses to his client is clear evidence of a sham.   The reason why this is such a

sham is because first Schneider tries to pacify Daniells (in March of 2016) by telling him that

consent had nothing to do with the Government getting into his phone – it was all about the

search warrant.  Then Schneider claims after further research (and in his face to face meeting

with Daniells on May 12, 2016 – 9 months after) that he can finally remember that there was an

email form the Government asking for the client's passcodes, and maybe he might have had

something to do with providing it, when it is undisputed that Schneider had an email in his file

agreeing to provide it. *Exhibit 25.*  The point is that if Schneider can tell Daniells he remembers

receiving the emails that AUSA MacKinlay sent to him requesting the passcode, why is it that

Schneider forgets to tell Daniells in his face to face meeting with him about the most important

email of them all – his response to MacKinlay which agrees to provide the passcode?  He gives

just as much information to Daniells which makes things look unclear, but then omits the one

email which would have removed the clouds, and an email demonstrating a breach of the

---

[5] He never identifies what is "it".  Was "it" discussed during the August 7th meeting?  It is unclear.  However, Schneider's statement does reveal that he has a memory of Daniells giving him several possible passcodes.   But when?  According to the Government's theory, it would have to have been during the August 7th visit at Wyatt.   But let's assume that is true.  Can the Government explain why Schneider can now remember on May 12, 2016 that Daniells provided him with several passcodes, but still has no memory of getting his client's consent to pass them along?  In fact, as of May 12, 2016, Schneider states that although he got passcodes from his client, he was still uncertain if he passed them along, or whether the Government relied upon other means to get into his phone.  The Defendant is curious as to what the Government has to say about all of this.

attorney/client privilege. On May 12, 2016, that omission is substituted for an attempt by Schneider to tell his client he was still "uncertain" as to what had happened.[6]

The Defendant beseeches this Court to dismiss the Government's "theory" that Schneider's notes are conclusive on the issue of consent.  Rather, Daniells asks the Court not to consider the notes of Schneider as conclusive proof, as notes cannot testify, but rather just consider Schneider's incredibly suspicious behavior after August 7th, 2015.  If the Government believes that Schneider's notes are dispositive, have them first provide a persuasive argument as to why Schneider could never acknowledge (and even after seeing those notes) that Daniells gave him permission to provide the passcode. He could never make such a claim because Schneider knows that it never happened.

### d. The Elephant in the room -- why on earth would Michael Schneider breach this attorney-client privilege?  What would be the upside or his motivation for such behavior?

This is a question which any attorney (prosecutorial, defense or even Judicial) would most certainly ask.  The undersigned did.   At first blush, the prospect of it all seems a bit inconceivable. But however, and after review of the entire record, and particularly from a defense perspective, the answer becomes somewhat obvious.   The answer actually reveals a noble goal, but with an unfortunately unethical execution.

It is clear that Attorney Schneider wanted to have Daniells cooperate with the government to lessen his exposure. *Schneider at 1-109.*  The proffer session obviously did not go well (*Exhibit 10*) but Schneider was still hopeful he could resolve the case favorably for his client. When AUSA MacKinlay began demanding the passcode, and told Schneider he got the

---

[6]   If one can say antying about this, is that Scheider is not the type of lawyer who appears uncertain about anything. Schneider actually appears to be a highly intelligent, and thorough attorney, who was quite active with his client on keeping him abreast of his case.  Schneider kept a very well documented file – which doesn't help his plight when considering his lack of memory about such an important issue.

warrant, Schneider probably thought he could give it to the Government without his client finding out, as he thought the Feds were going to get into the phone anyway. *Id. at 1-20.*  By making it just a little easier on the Government to get into the phone, this was a check that Schneider deposited that he thought he could maybe cash in on later down the road. *Id. at 1-28.*

In essence, the Defendant believes that Schneider thought he could use the falsified cooperation as leverage with the Government for a future plea deal.   Of course, Schneider never admitted this, and as such the Defendant concedes that this is a purely theoretical proposition, but it does have a ring of common sense, doesn't it?  After all, and although the Defendant may want to believe, it, the undersigned will never suggest to this Court that Attorney Michael Schneider was working as a double agent in the case of <u>United States v. Mitchell Daniells</u>, where it appeared on paper that he was working for Mr. Mitchell Daniells, but behind the scenes he was actually working for the United States Government.  Truth be told, even the suggestion of such claim is absurd.  First of all there is no evidence of this, and second of all, there would be no upside to Schneider in doing this.  However, and when one sees that Schneider only provided the passcode once the Government got the warrant, and with the lack of experience Schneider had in dealing with smart phone litigation (*Id. at 1-32)* a reasonable inference can be drawn that Schneider really didn't see the harm.

Not seeing the harm in August of 2015, only meant however, that Schneider did not have the foresight to know what was to come.  Schneider did not anticipate all of the litigation which came into the public domain with respect to iphones and passcodes, including APPLE's public stance on refusing to help the Government extract data. *See Exhibit 5 – Internet article "Apple v. FBI" – printed in May of 2016, and located in Schneider's file.* Schneider also did not anticipate in August of 2015 (just two months into his representation of Daniells) that Daniells was highly

intelligent *(Id. at 114)* and would subsequently begin to challenge his lawyer on how the Government got into his iphone 5s, *(Exhibits 8, 10, 11, and 13)* since APPLE has now gone on record saying they can't and won't help them. *(Exhibit 5).* The record establishes above that once Daniells began to back Schneider into a corner with his questions about the Governmental breech into his smartphone, Schneider had no choice but to claim ignorance, and even up until the day he testified.   Actually, and to Daniells' credit, it was really all of the communication between himself and his lawyer after August 7th, which exposed the charade played by Schneider.   And what is the Government's anticipated response about the charade?   Daniells gave consent for the passcode to Schneider on August 7th, and then must have created a subsequent scheme, via the creation of a paper trail, to lure Schneider into claiming lack of memory, so that he could file the instant motion.   Daniells would need to be a soothsayer of the highest order to be able to conjure up this plot.   It couldn't even be a conspiracy, because Daniells would need Attorney Schneider to promise beforehand that he would forget whether or not consent was actually given.   Sometimes the parties to litigation should just concede about the obvious, instead of fighting merely because this is an adversarial process.   If the Government, in any forthcoming pleading, suggests that Daniells gave the passcode, and then subsequently changed his mind, but then had the intuition to know that his lawyer would forget he changed his mind, so he could then be in the best position to advance this present motion, would show that they are willing to argue anything just to remain in the fight.[7]

---

[7]   Furthermore, the claim that the Defendant also tried to recruit his sister into the conspiracy is as speculative as it is unfounded.  If the Court will note, on *Exhibit 3 at page 4*, Daniells has claimed as soon as his lawyer decided to clue him in as to what was going on, that "he has given the passcodes to Schneider in June of 2015 to be shared only with his sister Esther".  The fact that Esther Daniells came in to corroborate what Mr. Daniells had been saying all along does make her a liar.  Why is it according to the Government that everybody must be lying?  Why can't it just be that Schneider just gave them the passcode without Mr. Daniells' consent?

There really shouldn't be anymore to say on this.  Based upon the aforementioned, Daniells respectfully asks the Court to come down on answering question #1 with a "NO." – Daniells did not give consent to his former lawyer to give his Iphone 5 passcode to the government.

**Legal Question #1a:** If Daniells did give consent, was the consent knowing, intelligent, and therefore voluntary?

Daniells responds that if this Court finds that Daniells did not give consent, then this question need not be answered.


**Legal Question #1b**

 If Daniells did not give consent to Schneider, was Schneider therefore ineffective when he did provided the passcode to the Government anyway?

Notwithstanding the fact that Attorney Schneider believes that he would have been ineffective by breaching a client's confidence (*Schneider at 1-14)* the Court has to make that decision on its own.   The standard regarding ineffective assistance of counsel is well-established.  To put it plainly, the Defendant must show "deficient performance" on the part of Schneider and "prejudice".  Strickland v. Washington, 466 U.S. 668, 687 (1984).

As far as deficient performance, the Defendant asks that the Court find that, and as a matter of law, any breach by Schneider of the attorney-client privilege would be deficient performance on his part.  And for obvious reasons. The privilege is intended to encourage "full and frank communication between attorneys and their clients" and promotes trust in the representational relationship. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).   The privilege is also required to be preserved and as dictated under Massachusetts Rules of professional responsibility 1.6, upon which the Court took judicial notice.  A violation of this

provision if the Court so finds, must be "[un]reasonable under prevailing professional norms".

See Strickland at 688.

The Government surely cannot state otherwise.  The Government is arguing there was no breach of this relationship, but if the Court does not agree with the Government, they have no counter-alternative argument to suggest that a breach of the privilege is not the equivalent of deficient performance.   The Defendant asks that should the court find a breach of the attorney-client privilege, that prong 1 (or deficient performance) of Strickland has been satisfied.

Regarding the second prong of prejudice, the Defendant states a breach of the attorney/client privilege is a breach of the duty of loyalty one has to his client.  In re Agent Orange Prod.Liab.Litig., 800 F.2d. 14, 17 (2nd Cir. 1986) ("As a matter of professional responsibility, an attorney owes a duty of loyalty to his client . . . not to divulge confidential communications).  Furthermore, a breach of a duty of loyalty has been found under Strickland to be *per se prejudicial.* Strickland at 692. (finding that when counsel breaches the duty of loyalty, the most basis of counsel's duties, that prejudice is presumed) citing Culyer v. Sullivan, 446 U.S. 335, 345-350 (1980) (presuming prejudice in the context of a breach of a duty of loyalty in the context of a conflict of interest).  The Defendant submits that if the court makes such a finding, that Attorney Schneider breached his duty of loyalty to Mr. Daniells when he provided the passcode to the Government, that prejudice can be presumed under those circumstances, and therefore he has shown a Sixth Amendment violation in that regard.

**Legal Question #1c. – Would the Government have gotten the information from the phone anyway?**

The Government is most certainly aware that it is their burden to show by a preponderance of the evidence that it was more likely than not that they would have inevitably obtained the data inside the Defendant's cell phone via constitutional means.  Nix. v. Williams,

16

467 U.S. 431, 444-445 n.4-5 (1984).  In satisfying this burden, they provided the testimony of one person, Special Agent Matthew Kelsch.

From the government's perspective, what was significant about Agent Kelsch's testimony was that he testified that the Defendant's smartphone had an operating system (or "IOS") of version 7.1.2, and that according to the Apple legal process guide *(Exhibit 35)*, Apple would provide cooperation to the Government in assisting them with data extractions on phones not running IOS 8 and later, as their data extraction tools are no longer effective.  *See testimony of Agent Kelsch, at 2-107.*  This testimony obviously supports the Government's claim that Apple would have helped the Government get into the phone, so long as the Defendant's phone had an IOS under a level 8.  Defendant Daniells does not dispute that his phone had an operating system level of 7.1.2, and that *Exhibit 35* purports to be Apple policy agreeing to assist the Government with data extractions on iphones with operating systems levels identical to his. What the Defendant does dispute however, is: a) when exactly Apple changed that policy, and furthermore, and even if APPLE still agreed to help: b) whether they actually could?  This is because, and since the Defendant's iphone 5s had an A7 chip with a secure enclave feature – there is a claim in the record which purports that Apple had no ability to help the Government get into the Defendant's phone, even if it wanted to.  *See Exhibit 5.*

With respect to dispute "a", it is true that Agent Kelsch claimed that Apple had a policy that explained the level of cooperation they would provide on phones running IOS versions earlier than IOS 8.  *Kelsch at* 2-106-107.  In specific, the policy claims that "For IOS devices running IOS versions earlier than IOS 8, upon receipt of a valid search warrant issued upon a showing of probable cause, Apple can extract certain categories of active data from passcode-locked IOS devices."  *Id. at* 2-107-108.  However, there is question mark as to when this policy

was in effect, and when it was abandoned.   Agent Kelsch's testimony was that this document was placed on Apple's website in September of 2015. *Id. at 2-120.* What is interesting to note is that *Exhibit 3*5 is not dated, nor is there any evidence presented on the document as when it was printed out from the world wide web by Agent Kelsch.  What is also interesting is that, and according to Kelsch's memory, he first became aware that Apple decided not to honor court orders on all Apple phones around "probably in the second week of December", but yet there was no written policy promulgated by Apple articulating that". *Id. at 2-118-119.*  The point is that this is the Government's burden to establish that Apple would have assisted them in getting into the Defendant's iphone, in August of 2015, and all they produced was an undated document stating that they would, along with a claim that at some point thereafter, Apple changed their mind, but never put that in writing.  It's all very flimsy.

If, for example, Kelsch was able to testify that he himself in September of 2015, sent an iphone 5s to Apple, along with a search warrant, for their assistance in getting into the phone, and thereafter Apple complied (successfully the Defendant would add) then such evidence would make it more likely than not that that Apple would have cooperated with the Defendant's iphone 5s (and successfully he would add) in August of 2015.  Again it's the Government's burden, and they weren't interested in presenting any persuasive evidence of that kind.

With respect to dispute "b", has the Government even proved that (and even if Apple wanted to help these federal agents, would) Apple have been successful in getting into the Defendant's iphone 5s?  There is evidence in the record, which claims the following information about the Defendant's iphone 5s:

"The 5s featured the A7 chip which included a secure enclave". This is basically an independent computer with its own operating system that offer two important security upgrades over the 5C,"

"Data on disk was now encrypted with a key that has three ingredients: the device specific key and passcode plus a unique key generated by the secure enclave that is ***completely random and unknown to Apple.*** In other words, simply guessing the passcode doesn't get you anywhere unless the secure enclave is cooperating

"To that end, the secure enclave has its own timer that increases how long you have to wait between incorrect guesses:  you get the first four for free, then you have to wait a minute, then five, then 15; once you've guess wrong 9 or more times you have to wait an hour every time, which means even a 4 digit passcode would take over a year to brute force."

"In other words, had the terrorists' had an iphone 5s or later, the judge's order would be moot.  Apple could correctly counter that fulfilling the order was impossible because there is no software solution to the secure enclave's enforcement of an entry delay".

*Exhibit 5 at page 3.*

The Defendant reads all of this is to say that if his iphone 5s had a secure enclave feature, which it does, (*Kelsch at 2-119)* therefore, Apple would be of no assistance to the Government in unlocking his phone, because the unique key generated by the secure enclave is ***completely random and unknown to Apple.***  Now, and knowing that this is the Government's Burden, they provided an expert – Agent Kelsch, to give an opinion about this obviously problematic claim. His opinion about the language in Exhibit 5 is the following:

"The article is not applicable.  Its's talking about where Apple refused to cooperate with law enforcement decrypting a phone.  That particular phone was a different model and it was a different IOS than the phone in question in this case.  Also, what Apple was being asked to perform in that was decrypting the phone . . . What we were looking to do here is unlock the phone".

*Id. at 112-113.*

Agent Kelsch's response is not helpful.  First of all, it is clear from the plain reading of Exhibit 5 that the article was speaking in terms of entry into a locked phone via a passcode – just like

here.[8]   The Court can take judicial notice of the fact that decryption is the process of converting

encrypted data back into its original form, so it can be understood.   There is no mention in

*Exhibit 5*, that decryption of data was what was sought by the FBI in the San Bernadino phone.

Furthermore, Agent Kelsch's attempt to distinguish the model of the phones was not persuasive.

This is because and according to Kelsch, it's the level of the operating system on the phone, and

not the model which determines whether Apple can assist the Government. *Id. at 2-105.* Why

Kelsch attempts to address the disparity in model numbers between the Defendant's phone and

the San Bernadino phone appears as if he is trying to plant a diversion, by merely seeing how

many differences between the two fact patterns he can come up with.   But to re-focus Agent

Kelsch, the important issue deals with the IOS level, and we see that Kelsch was ill-equipped to

address it.

Again, Kelsch first tried to dismiss the article by stating that the smartphone in the article

was a model "5c".   *Id. at 2-114.*   However, when Kelsch was asked what was the IOS level of

the "5c" he said he "didn't know". *Id.*   After further cross-examination, he did try to say that he

knows from other articles he has read that the IOS version of the model 5c could be "8.1, 8.2,

8.3" but he doesn't know.   *Id. at 2-115.*   Then Agent Kelsch goes on to say, after further cross-

examination, that he could be wrong about the model 5c having a different IOS level than Mr.

Daniells iphone altogether. *Id. at 2-118.*   As such, there is no way for the Court to put any stock

into Kelsch's testimony, where he has waffled on this point.   Additionally, Kelsch never

identified the source of his knowledge for the claim that Daniells smartphone and the smartphone

described in Exhibit 5 had different IOS levels other than to say it was based upon the

unidentified articles he read.   *Id. at 2-115.*   This lack of supporting evidence for Kelsch's bare

---

[8]  *See page 1 of Exhibit 5 – " A federal judge ordered Apple, Inc., to help the U.S. Justice Department unlock an iphone used by one of the shooters in December's terrorist attack in San Bernadino, California.  Federal investigators haven't been able to unlock the iPhone . . ."*

naked assertions cannot bode well for the Government with their ensuing burden.  This first claim by Kelsch has done nothing to discrediting the language in Exhibit 5 that Apple could not help the Government get into the Defendant's iphone.

The second argument made by Kelsch does even less. Again, the issue is whether the secure enclave feature would prevent apple from unlocking the Defendant's iphone.  Kelsch's testimony acknowledges that the Defendant's iphone (a "5s") had a secure enclave feature, but then subsequently had to concede that he had no specialized knowledge regarding how the secure enclave works, claiming only "basic knowledge". *Id. at* 2-116; 2-119, the Government has come short on its burden.   This is because agent Kelsch's lack of knowledge renders him ill-equipped to reconcile the following dispute made by the Exhibit 5 article:

> "Had the terrorists had a 5s or later the judge's order would be moot"

*Exhibit 5 at page 3.*

The evidence of Kelsch's inability to reconcile the dispute?

> "I  mean I am not going to argue with what the article states. That is what the articles states".

*Id. at* 2-125.

Needless to say, Agent Kelsch had nothing of value to offer by way of testimony to resolve the dispute posed by Daniells and articulated in *Exhibit 5.* The Government has not sustained their burden on Legal Question #1c.

**Factual Question #2:** Did Daniells specifically seek advice from Schneider on whether to give the Government the name of Kenny Brooby – a potential witness to his alleged crimes, and if so, did Schneider in fact advise Daniells to provide the Government with the name?

To find the answer to whether Daniells sought advice from Schneider on whether to give the name of Kenny Brooby to the Government is a question which does not require too much investigation or testimony balancing.  This is because both Daniells, and Schneider admit to this.

*Schneider at 1-92; Daniells at 2-154.*  The Government cannot prove otherwise.  The Government agents do try to claim that there was no break about Kenny Brooby during the proffer session, and so therefore this communication between attorney and client did not happen. *See testimony of Special Agent Daniel McPartlin, at 2-36; 45; See also testimony of Special Agent Brian Oppedisano at 2-87-88.*  However, both attorney and his client, have a specific and almost identical memory about this communication.[9]  Unless the Government is claiming that the communication didn't happen, which they can never prove, the issue before this Court is whether Daniells did specifically seek advice from Schneider on whether to give the name of Kenny Brooby to the Government – an issue which both Attorney and Client have sworn under oath in the affirmative.  The answer to the first part of **Question #2 is "YES".**   Regarding whether Kenny Brooby was a potential witness to his alleged crimes, the record also reflects that he was, or at the very least, the Government wanted to get any live witnesses to corroborate their theory of their case against Daniells, because their testimony against Daniells was limited, supporting their reason to ask about the identity of all live witnesses who accompanied him to an alleged gun purchase.  *See testimony of McPartlin at 2-21; 27; and 34.*

The final part of **Factual Question #2** dealt with whether Schneider advised Daniells to give the name of Kenny Brooby to the Government, and which must necessarily require a review and consideration of the testimony of both attorney and client[10].  Daniells claims yes, after he told Schneider, "I don't want this witness approached, questioned or charged, anything of that nature".  *Testimony of Daniells at 2-155.*   According to Daniells, Schneider said, "If I told them

---

[9]    See testimony of both Daniells and Schneider about this.  See also their affidavits, attached to Dkt Nos 140 and 141.  Upon review, the only significant difference to the communication between one another is that Daniells claims his lawyer told him to provide the name and Michael Schneider states "maybe" you should provide the name.

[10]   Again, the Government has no business weighing in on this discussion, other than to state which version is more believable.

he had nothing to with nothing, then he wouldn't be questioned, or approached, or charged.  *Id. at 2-156.*  Daniells stated he relied upon that advice and assurance from Schneider that if he gave the name, this person would not be approached by the Government, and thereafter admitted to giving the Government the name. *Daniels at 2-156; 181-182.*  Michael Schneider says he asked Daniells "Was this guy along for the ride? Does he know anything about anything? And hearing that he didn't I told him **"maybe"** you could give the name. *Testimony of Schneider at 1-94.* It seems as if the same problem has reared its ugly head that Schneider and Daniells experienced with the passcode.   Meaning, once again this is a problem where once again Daniells expresses certainty on the issue but his lawyer expresses uncertainty.

***If the Court finds that Schneider feigned memory to his own client, when he stated to him, "its possible I may have given Glenn MacKinlay the passcodes", when the evidence suggests he knew he did, then he has no credibility regarding any other communications concerning his client.***

The Defendant will not belabor it, but if Schneider cannot be believed when he tells the Court he can't remember if Daniells gave him consent (regarding the passcode) or not, even perhaps feigning memory, then anything else Schneider has to say should carry little if not any credibility. Meaning, if the Court actually finds that Schneider not only feigned memory to his client about it, but actually breached the attorney client privilege, it shouldn't be a stretch to question the language Schneider used in giving advice to his client regarding whether he should provide the name of Kenny Brooby.   Without even analyzing the specifics of what each person said, to determine which one makes more sense, or is more credible, the Defendant submits that he should automatically should be given the benefit of any credibility call between him and

Schneider, and therefore asks this Court to credit his claim that Schneider advised him to give

the name of Brooby.[11]

**Legal Question #2a:**

If Schneider did in fact provide the advice outlined in Factual Question #2, was the advice below
the standard of what a reasonable lawyer should know, concerning the derivative use doctrine
and how it would apply in this situation?

It is without contest that "bad advice" is the equivalent to deficient performance. See

Padilla v. Kentucky, 130 S.Ct. 1473 (2010) (bad advice, and even bad advice regarding collateral

consequences within the scope of the Sixth Amendment).  See also Strickland at 686; (Counsel

can also a Defendant of the right of effective assistance, by simply failing to render adequate

legal assistance") citing Cuyler v. Sullivan, 446 U.S. at 344.  See also United States v. Cuoto,

311 F.3d 179, 187 (2002) (We have implied that an attorney's affirmative misrepresentations

might constitute ineffective assistance). Further, Padilla has abandoned the rule that the bad

advice needs to be the equivalent of "affirmative mis-advice"[12] – rather holding that ineffective

assistance of counsel can amount to affirmative mis-advice as well as no advice at all on issues

of collateral matters.  Id. at 1484-85.

So it is clear, and to be sure, Mitchell Daniells is entitled to "reasonably competent

assistance" from counsel at each stage of the proceedings, including pretrial preparation and

investigation. United States v. Garcia, 698 F.2d 31, 35 (1st Cir. 1983).  Additionally, the Sixth

Amendment guarantees the accused a lawyer "for his defense" against a "criminal prosecutio[n]"

Padilla, at 1494 (Scalia, J., in his dissent, holding that the Sixth Amendment should only be

---

[11]   This advice actually goes into the same theory of before, as to Schneider's motivations when representing
Daniells.  It appears that Schneider wants to help Daniells so bad, that he would breach the privilege to provide the
Government with information, to give the appearance of cooperation, as well as advise to give the Government
names of witnesses who was with him at the time of this alleged crimes, to achieve the same effect.

[12]   Although its clear that Schneider telling Daniells to give the Government the name of Kenny Brobby because
they won't approach him if you exonerate him (knowing that the derivative use doctrine says otherwise) is
affirmative misadvice indeed.

limited guaranteed competent advice for defending against a criminal prosecution, and not for collateral consequences of a conviction). The point is that the ruling in <u>Padilla</u>, would thus dispense with any governmental argument that giving bad advice in a proffer session would not amount to deficient performance.  The only thought induced question which may be asked is whether the Defendant has proved prejudice.

Under <u>Strickland</u>, the question is simple.  To give Daniells the advice to provide Kenny Brooby's name to the Government reasonable? Or did it fall below what a reasonable lawyer would do.  The answer is determinative on the communications between attorney and client.   If Daniells told Schneider that he did not want Brooby approached – fact which is not in dispute by either party, and if Schneider knew of the machinations regarding the derivative use doctrine, which he did (*Testimony of Schneider at 1-96)*, then Schneider had to know that there was nothing to stop the government from approaching Kenny Brooby.  As a consequence of Schneider's familiarity with the derivative use doctrine, there is no conclusion that the Court can draw, other than the fact, and particularly because that Brooby went with Daniells to Pennsylvania, that the derivative use doctrine would necessarily cause the Government to investigate this lead.  Failure of Schneider to give this advice amounted to deficient performance, when Schneider was specifically asked for it.  Or in other words, it was objectively unreasonable for him not to mention it.  <u>See</u> <u>Strickland</u> at 688 (Defendant must show counsel's representation fell below an objective standard of reasonableness).

As far as this standard goes, more specific guidelines are not appropriate. <u>Id</u>. The Sixth Amendment refers simply to "counsel", not specifying particular requirements of effective assistance.  At the very least, Schneider testified that he cannot say that Mitchell Daniells understood the proffer agreement he signed, let alone the derivative use doctrine. *Testimony of*

*Schneider at 1-124*.[13] Defendant Daniells also stated that the first time he saw the proffer

agreement was when AUSA MacKinlay entered the room and can't remember if the document

was gone over with him, and did not know what "derivative use" meant, and did not understand

the doctrine. *Testimony of Daniells at 2-150; 181*.  Daniells lack of understanding is actually

obvious, and supported by the record, or he would not have asked his counsel for assistance on

the government's approach of a third-party witness. *Id. at 2-154*.  There can be no finding other

than it is objectively unreasonable to fail to advise a client about the doctrine when asked

specifically about a scenario which implicates the doctrine.

By all accounts, Schneider is a very experienced federal lawyer.  Regarding Schneider's

experience with proffer sessions, Schneider attests that he has participated in many proffers

before this.  *Testimony of Schneider at 1-96.*  As of result of his experience, Schneider is well

aware of the derivative use doctrine. *Id.*  Mr. Daniells, not so much. *Daniells at 2-147; 150; 181.*

In addition to a duty of loyalty to his client, Schneider also has a duty to bring to bear such ***skill***

***and knowledge*** s well render the trial an adversarial testing process. See Powell v. Alabama, 287

U.S. 45 at 68-69 (1932).  Schneider did not bring to bear his skill and experience with proffer

agreements, and was deficient in the advice he gave to Daniells.  The only question which

remains is did the outcome prejudice the Defendant?

***The standard of prejudice espoused in Strickland***

Quite simply, the standard espoused in Strickland is the following:

> "[T]here is a reasonable probability that but for counsel's
> professional errors, the result of the proceeding would
> have been different".

Strickland, at 694.

---

[13]  The Government can waive Mr. Daniells signed proffer agreement all around the courtroom if they like and refer
to it all they want in their upcoming Memorandum of Law, citing to the plain language in the document.  Daniells
signature is only proof that he signed the document.  It's not proof that he understood any of its provisions.

This is where the Government will try and gain the most traction.  They will argue, as they have had in the past, that because there has been no trial, the Defendant has not as of yet proved prejudice, making the issue unripe.  The argument by the Government has one flaw in its premise – why does there have to be a trial to prove prejudice?  In adjudicating claims of ineffective assistance of counsel, a court should keep in mind that the principles do not establish "mechanical rules".  Id. at 698.  "The ultimate focus of inquiry must be on the fundamental fairness of the ***proceeding*** whose result is being challenged." Id. (emphasis added).  The Defendant submits that the proceeding at issue where the Defendant was denied effective assistance of counsel is not the trial, but the proffer session.  The result of that proceeding is the deficient performance resulted in incriminating information extracted against the Defendant that the Government would not have had without it. *See testimony of Daniel McPartlin, at 2-38-42, ending with his testimony that:*

> Q.    Is it fair to say that before the proffer and before the extraction of the cell phone, the evidence that you had about Mr. Mitchell Daniells allegedly selling guns was limited but then came supplemented upon speaking with all of these witnesses?
>
> A.    The proffer helped, yes.
>
> Q.    And the cell phone?
>
> A.    That helped too, yes.

 That is the outcome which has caused the Defendant prejudice.   The Defendant seeks relief from that outcome.

Respectfully submitted,

MITCHELL DANIELLS
By his Attorney,

/s/Gordon W. Spencer
Gordon W. Spencer, Esq.
BBO#630488
945 Concord Street
Framingham, MA 01701
(508) 231-4822

Dated: August 3, 2017

## CERTIFICATE OF SERVICE

I, Gordon W. Spencer, hereby certify that I have served a copy of the enclosed motion on all parties by causing it to be filed electronically via ECF.

August 3, 2017                                    /s/ Gordon W. Spencer
Date                                             Gordon W. Spencer, Esq.