UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 15-10150-GAO

UNITED STATES OF AMERICA,

v.

MITCHELL DANIELLS,
Defendant.

MEMORANDUM OF DECISION
April 5, 2018

O'TOOLE, D.J.

The defendant, Mitchell Daniells, is charged with felony firearms offenses under 18 U.S.C. §§ 922(a)(1)(A) and 922(n). He has moved to exclude evidence the government derived from information he provided at a proffer session, as well as evidence obtained from a search of his cellular phone. His argument as to the proffer session is that he agreed voluntarily to provide certain information on his previous lawyer's advice, which advice he now contends amounted to ineffective assistance of counsel in violation of his Sixth Amendment right. As to the cell phone, his claim is that his former lawyer provided the passcode to unlock the phone to the government over his objection, and that also constituted constitutionally ineffective assistance of counsel. The government has opposed the motions. For purposes of the motions, Daniells waived his attorney-client privilege with respect to pertinent communications with his prior counsel. The Court held a three-day evidentiary hearing on the motions, and the parties subsequently submitted supplemental memoranda in support of their respective positions. On March 12, 2018, I denied the motions from the bench, indicating that written findings and rulings of law would follow. This Memorandum sets forth those findings and rulings.

**I.     Factual Findings**

Based on the credible testimony and evidence offered at the hearing and in the record, I make the following findings of fact:

A.     Proffer Session

On June 16, 2015, a grand jury indicted Daniells for possession of a firearm by a person under indictment for a felony offense. 18 U.S.C. § 922(n). When he was arrested two days later, agents seized an Apple iPhone 5S from him in a search incident to the arrest. The phone was passcode-protected with a four-digit numeric code. The phone's mobile operating system was Apple's iOS version 7.1.2. Agents asked the defendant for the passcode, but he declined to provide it.

A detention hearing was held before a magistrate judge on June 25 and July 1, 2015. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Brian Oppedisano testified generally about the investigation into Daniells' activities, telling the court that investigators believed Daniells had, personally or through straw buyers, purchased approximately fourteen handguns in Pennsylvania. Two of those firearms had been recovered in other States (Massachusetts and New York) with their serial numbers obliterated. Special Agent Oppedisano testified that a cooperating witness had told investigators that he had purchased eight firearms in Pennsylvania for Daniells, and the statement was apparently corroborated to some degree by firearms transaction records. Additionally, prior to Daniells' indictment, investigators had obtained cell site location data for Daniells' cell phone pursuant to an order issued under 18 U.S.C. § 2703(d), which appeared to corroborate that Daniells had been in Pennsylvania on at least one date when the cooperating witness said that he had acted as a straw buyer there for Daniells. The cooperating witness also told agents that another person had accompanied Daniells to

Pennsylvania on at least one occasion, but agents thought the witness had identified the wrong person. They were still unsure who that person had been.

Accompanied by his lawyer, Michael Schneider, and acting consistently with Schneider's advice, Daniells participated in a proffer session with prosecutors and agents on July 15, 2015. At the time, he was charged only with a violation of 18 U.S.C. § 922(n). Although the case was still at an early stage, counsel was aware both from the detention hearing, see supra, and from discovery that the government had information that might warrant additional charges.

Before the proffer session, Schneider had several meetings with the defendant. He discussed with Daniells various strategies, including both pleading guilty to minimize sentencing damage and proceeding to a jury trial. He explained that it was his opinion that the case against Daniells was strong and that the prosecutor was considering obtaining a superseding indictment against him for violating either § 922(a)(1)(A) or § 922(a)(6), or both. Schneider advised Daniells that if he made a satisfactory proffer to the government, he might avoid exposure to additional charges. The government expressed its interest in getting illegal guns "off the street," and Schneider had the impression that if the defendant provided information helpful to that goal, the prosecutor might not only decline to supersede, but also might be more lenient in his sentencing calculations and recommendation. The defendant agreed to proffer, but told Schneider that he was not willing to provide any names of persons to the government.

Schneider also explained the proffer process. He told the defendant that during the proffer session, Daniells would be "queen for a day," which meant that he would decide what to say or

not say and that his statements during the proffer could not be introduced against him at trial other than to rebut contrary testimony.[1]

Prior to the session, the government provided a standard proffer letter agreement. It was dated July 6, 2015, and was signed by both Schneider and Daniells the day of the proffer session, July 15, 2015. The agreement included standard language regarding derivative use:

> The government may make derivative use of, or may pursue any investigative leads suggested by, any statements made or other information provided by Mitchell Daniells in the course of the proffer. Any evidence directly or indirectly derived from the proffer may be used against him and others in any criminal case or other proceeding. This provision is necessary in order to eliminate the possibility of a hearing at which the government would have to prove that the evidence it would introduce is not tainted by any statements made or other information provided during the proffer. See Kastigar v. United States, 406 U.S. 441 (1972).

(Evidentiary Hr'g Ex. 23 ¶ 2.) Consistent with his usual practice, Schneider explained the agreement to Daniells, including the derivative use paragraph, before Daniells signed the letter. The prosecutor also explained the agreement to Daniells at the proffer session.

During the proffer, agents asked Daniells the identity of the person who, according to the cooperating witness, had driven with him to Pennsylvania. The defendant requested a break to consult with Schneider. During the break, the defendant expressed concern about providing the person's name. When Schneider asked whether the person had any involvement in or knowledge of potentially criminal gun purchases, Daniells responded that the person had just been along for the ride and did not do or know anything. It is not clear from the evidence exactly what Schneider's advice was, but from the fact that when the session resumed Daniells provided the name, it is a fair inference that he advised the defendant essentially that it would be okay to provide the name if the person was not a likely source of evidence for the government. Schneider understood that

---

[1] The term "queen for a day" did not originate with Schneider; it is a term commonly used in legal circles when discussing proffer sessions and agreements.

the more helpful the defendant could be, the better result the defense might be able to achieve with respect to avoiding a superseding indictment and sentencing enhancement. He did not view providing the name of an uninvolved and uniformed person as particularly significant or likely to be adverse to Daniells based on what Daniells had told him, namely, that the individual was "an idiot, he was a pothead, and he was just along for the ride." (Tr. Evidentiary Hr'g 95, June 22, 2017; see also id. at 90, 129.) When the session resumed, Daniells, not Schneider, disclosed the person's name. The government ultimately contacted the person and purportedly learned from him information potentially adverse to Daniells. One of his motions seeks to prevent the government from using that information at trial.

  B.  The Cell Phone Passcode

At the proffer session, the government asked Daniells to provide that passcode to the iPhone that had been seized during his arrest. He again refused to provide the passcode. After the proffer session, the government continued to press Schneider to persuade Daniells to agree to provide the passcode, but Schneider believed at the time that Daniells would not and should not agree to provide the passcode. He also testified that he was sympathetic to Daniells' refusal because cell phones may contain a good deal of personal and private information having nothing to do with the criminal investigation.

On Friday, July 31, the prosecutor, Glenn MacKinlay, emailed Schneider to ask whether Daniells "is going to provide us with the password to his iPhone." (Evidentiary Hr'g Ex. 4.) Schneider responded the same day, stating that he "hadn't had a chance to go down to [the detention facility] to speak with [the defendant]" but that he would "try to go down next week to talk with him." (Id.)

Apparently deciding not to wait for the voluntary disclosure of the passcode, on Tuesday, August 4, the government applied for and obtained a warrant to search the iPhone for call logs, contacts, text messages, emails and pictures. The government also obtained an order directing Apple to provide reasonable technical assistance to extract the data for the government.

The same day the search warrant issued, MacKinlay emailed Schneider stating, "We have obtained a search warrant for his cell phone. This is his last chance to provide the password on the phone or we will go forward with providing the court order to Apple next week." (Id.)

Schneider responded soon thereafter that he had been on vacation but would "try to see [the defendant] by Thursday or Friday of this week." He added that he "anticipate[d] he will provide what you're looking for." (Id.) I infer from that statement that he intended to advise Daniells to provide the passcode voluntarily. It was Schneider's assessment that it was in Daniells' best interest to be helpful to the government in light of the existence and imminent execution of the search warrant. He was concerned that if Daniells did not comply, the risk would increase that the government would supersede the existing indictment to add charges based upon the alleged straw purchases and sales.

That Friday, August 7, Schneider visited the defendant at the detention facility. Although he testified that he did not have an independent present recollection of the meeting, the totality of the record gives rise to a fair inference that during that visit, Daniells gave Schneider his passcode for the purpose of providing the information to the government. This finding is supported by counsel's contemporaneous notes of the meeting as well as the timing of events that day.

First, Schneider's contemporaneous notes of his August 7 meeting with Daniells strongly support a conclusion that they discussed providing the passcodes to the government. (See Evidentiary Hr'g Ex. 6.) The notes on one line say "SW," undoubtedly referring to the search

warrant, thus indicating that Schneider and Daniells discussed that a search warrant had issued to search his phone. On the next line is the word "obtained," indicating either that counsel told the defendant that the government had "obtained" the "SW" or that counsel "obtained" consent from the defendant. (See Tr. Evidentiary Hr'g 135, June 22, 2017.) Just below that the words "CONSENT re PASSWORD" are circled. A dash follows the word "PASSWORD" and three separate four-digit numbers are listed in a column with a box around all three numbers and an asterisk next to the first.

Further, the email correspondence between Schneider and MacKinlay confirm that after discussion with Schneider on August 7, Daniells disclosed the passcodes to Schneider for disclosure to the government. On Tuesday, August 4, Schneider had told MacKinlay that he would try to see Daniells on the following Thursday or Friday to discuss the passcodes. The detention facility's visiting records and counsel's billing records indicate he did visit the defendant in the late morning on Friday, August 7. That same afternoon at 4:09 p.m., Schneider emailed MacKinlay, stating "Give me a call and I'll give you the passcode(s)." (Evidentiary Hr'g Ex. 25.)

To be sure, Daniells previously had declined to provide his passcode to the government. But by August 7, when Schneider met with him, there had been a significant change in circumstances regarding access to the cell phone: the government had obtained a search warrant that it intended to serve on Apple to search the phone. When faced with the prospect of looking obstructive when the government was about to access the phone regardless of his assistance, it is not unreasonable to conclude the defendant had a change of heart consistent with advice from Schneider in light of the risk of a superseding indictment and consequent exposure to a higher sentence.

7

Having received from the defendant the passcodes and consent to share them with the government, Schneider provided the three possible passcodes to the prosecutor by phone shortly after his 4:09 p.m. email on August 7. At 5:02 p.m., MacKinlay emailed ATF Special Agent Daniel McPartlin, stating that the "[i]Phone password is one of the following three #s," followed by three four-digit numbers. (Id. Ex. 29.) The numbers matched the three numbers on counsel's notes from the meeting that day.

On August 11, ATF Special Agent Mattheu Kelsch, a digital media collection specialist and digital investigator, tried the passcodes and was able to successfully unlock the phone and extract data using a commercially available forensic program known as Cellebrite.

Although unutilized, there were other methods available at the time to the government to unlock and access a phone like Daniells' without his cooperation or consent. For instance, the government at the time frequently obtained search warrants for cell phones, as it did here. Additionally, the government was also able to use technology known as IP-BOX, which would unlock a phone utilizing "brute force," that is, by trying every possible four-digit permutation from 0000 through 9999, one of which would inevitably unlock the phone. Moreover, in October 2015, two months after what transpired in August, Cellebrite released its own unlocking tool that worked on the iPhone 5s as long as it was, like Daniells' phone, operating on an iOS below 8.0.

Daniells testified to a different version of events regarding the passcodes. He claimed that he had furnished them to Schneider not in August but in early July. His version is improbable and unconvincing. First, it is inconsistent with the notes Schneider took at his August 7 meeting with Daniells. There would have been no need for Schneider to record the passcodes in his notes if he already had them. Second, there would have been no reason for Daniells to share the passcodes with Schneider if both he and Schneider agreed that the passcodes should not be given to the

8

government. Schneider himself had no need for them. It should be recalled that at the July 15 proffer session, Daniells refused the government's request for the passcode to the seized phone, apparently with Schneider's support.

I do not find credible or reliable Daniells' sister's testimony that in July Daniells gave the passcodes for the seized iPhone to Schneider to give to her so that she could access a different Daniells phone in her possession for the purpose of contacting certain friends of Daniells. The evidence indicated that on July 2, Schneider provided an email address and two passwords for Daniells' Facebook account. (Id. Exs. 36, 37.) Exhibit 36 is a handwritten note that contains a list of persons in Daniells' handwriting that he wanted his sister to contact about his (relatively) recent arrest. The note also contains some blacked-out markings which the testimony indicated were Daniells' email address and passwords for Facebook. They were being provided to his sister so that she could communicate with the listed persons on Daniells' behalf. Esther Daniells testified that the note did not contain the passcode to the iPhone itself, but that she separately was given that by Schneider on July 10 when she met with him at his office. There is no doubt there was such a meeting, because Schneider's time records confirm that fact. However, no notes from that conference were offered.

I do not credit the testimony that the iPhone passcode was given to Esther Daniells on July 10. Daniells' email and Facebook passwords could be used by his sister to access the account from her own general access to the internet. It was not necessary for her to also have the passcode for his iPhone for her to access his Facebook account, so there is no anomaly in the fact that the note Schneider sent her did not include the iPhone passcode. Moreover, it would also be unusual for the provision of codes to be bifurcated. If Daniells intended to give his sister the iPhone passcode in addition to the email and Facebook passwords, he would more likely have given all such

9

information to Schneider at the same time, and Schneider would have done the same in conveying it to Esther. Additionally, the oral delivery of the passcodes on July 10 is inconsistent with Schneider's notes of his August 7 meeting with Daniells.

### C. Breakdown of Attorney-Client Relationship

Between March and May 2016, there were numerous communications between Schneider and Daniells related to the iPhone. On May 12, 2016, Schneider met with Daniels and discussed with him the iPhone records. Daniells accused Schneider of having provided the passcodes to the government without his permission. Daniells' dissatisfaction led to a breakdown of the attorney-client relationship. Consequently, Schneider filed a motion to withdraw as counsel on August 9, 2016, which this Court allowed after hearing on August 11, 2016.

On March 22, 2017, a grand jury returned a superseding indictment, adding a charge of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A).

## II. Conclusions

"In all criminal prosecutions, the accused shall enjoy the right to . . . the assistance of counsel for his defense." U.S. Const. art. VI. The right to counsel is the "right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (citation omitted). A defendant claiming ineffective assistance must show (1) counsel's performance was deficient, meaning it "fell below an objective standard of reasonableness . . . under prevailing professional norms," and (2) prejudice resulted from counsel's deficient performance. Id. at 687–89. Because of the need for a defendant to show actual prejudice, the Strickland test is essentially backward-looking and thus commonly raised post-conviction. There are reasons why a pretrial assertion should not be entertained, but that question need not be addressed in the present circumstances. Because Daniells' claims of ineffective assistance of counsel are meritless, it is appropriate to say

why and thus to eliminate any potential post-trial issues regarding the factual matters raised by the two present motions.

The defendant's claim regarding his iPhone fails in light of the factual findings. Because I have found as a matter of fact that the defendant gave counsel his passcodes for the express purpose of providing that information to the government, it follows that counsel's performance did not fall below an objective standard of reasonableness when he turned over the passcodes. Nor did Schneider give constitutionally deficient advice in recommending that Daniells voluntarily turn over the passcode to try to curry a little favor with the government that might be useful in subsequent discussions. Far from being deficient, that was solidly mainstream advice.

But even if Schneider had given ill advice or provided the passcodes to the government without the defendant's authorization, Daniells has not shown how he could have been prejudiced by the disclosure. The credible evidence offered at the hearing shows that the government was going to be able to unlock and access the iPhone data without the defendant's cooperation, either by serving on Apple the search warrant and order it had already obtained from the magistrate judge or by utilizing an IP-BOX to unlock the phone by brute force or using Cellebrite's unlocking tool released two months later. The extraction of data from the defendant's iPhone—with or without the defendant's consent—was inevitable.

The defendant's argument that counsel was ineffective when he advised the defendant about disclosing his traveling companion's name at his proffer fares no better. The record makes clear the strategic justification for counsel's advice, advice which I have found the defendant accepted after adequate explanation of the benefits and risks. See id. at 690 (explaining that adequately informed strategic decisions are "virtually unchallengeable"). To begin with, Schneider understood and explained to Daniells that the case against him was strong and that he stood to

benefit from satisfying the government, thereby potentially avoiding a superseding indictment and mitigating his sentencing exposure. At the same time, the risk of providing the name in question seemed low given Daniells' own description of the companion as someone with no inculpatory knowledge (i.e., an "idiot" and "pothead" who "was just along for the ride").

Prior to Daniells' disclosure of the name, Schneider had explained the proffer process to Daniells, and Daniells had read and signed the proffer letter agreement after it was explained both by his own counsel and by the prosecutor. That proffer agreement included an explicit term on derivative use, putting Daniells on notice that the government "may pursue any investigative leads suggested by" the information provided by Daniells at the proffer. (Evidentiary Hr'g Ex. 23.) Based on this record, the defendant has failed to overcome the "strong presumption" that counsel's tactical advice regarding the proffer falls within the range of objectively reasonable professional assistance and represents sound trial strategy. See Strickland, 466 U.S. at 689; see also Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011).

Accordingly, the defendant's claims of ineffective assistance of counsel are rejected. For the foregoing reasons, the defendant's Motion to Exclude and Preclude the Government from Using Evidence Obtained at Proffer Session (dkt. no. 140) and Motion to Exclude and Preclude the Government from Using Evidence Obtained from His Cell Phone (dkt. no. 141) are DENIED.

It is SO ORDERED.

                                                  /s/ George A. O'Toole, Jr.
                                                  United States District Judge